# EXHIBIT "N"

|  |  |
|---|---|
| STATEMENT OF: | Lt. Evelyn Cintron #168, PR #213638 H/F<br>Appointment Date: 07-20-92<br>Assignment Date: 06-20-16<br>Assignment: PAL |
| DATE AND TIME: | 01-25-18   11:31 AM |
| PLACE: | Philadelphia Police Department<br>Internal Affairs Division<br>7790 Dungan Rd. |
| IN THE PRESENCE OF: | Danielle Nitti Esq. |
| CONCERNING: | EEO #17-0039 |
| INTERVIEWED BY: | Sergeant Brent Conway #8892 |
| RECORDED BY: | Sergeant Brent Conway #8892 |

Lieutenant Cintron, I am Sergeant Brent Conway #8892, Internal Affairs Division, and I will be taking your statement, directly on this computer. You are being interviewed regarding a possible EEO/IAD complaint.

Q. Are you represented by counsel?
A. Yes.

**Lieutenant Cintron, you are reminded that failure to cooperate in a Departmental Administrative Investigation is punishable by ten (10) days suspension to dismissal under Article 1- §008-10 of the Disciplinary Code.**

**Lieutenant Cintron, you are reminded that lying or attempting to deceive regarding a material fact during the course of any Departmental investigation is punishable by dismissal under Article 1-§009-10 of the Disciplinary Code.**

Q. Do you understand this?
A. Yes.

Q. Are you willing to cooperate?
A. Yes.

Q. Are you recording this interview?
A. No.

Q. Please state your rank, full name, badge number, payroll number, and district or unit of assignment.
A. Lieutenant Evelyn Cintron #168, Payroll #213638, PAL.

1

_____
Lieutenant Evelyn Cintron            01-25-18

CITY137

Q. Do you know Police Officer David Klayman #9321?
A. Yes.

Q. How would you describe your relationship with Officer Klayman?
A. Officer Klayman was my aide and I consider him a friend

Q. How would you describe Officer Klayman as an employee?
A. He was efficient and I can count on him to get the work done.

Q. During the summer (2017), did you observed an argument involving Officer Kareem Johnson and Officer Klayman while at a PAL baseball game?
A. Yes.

Q. Can you describe, in your own words, what occurred during the argument you observed involving Officer Kareem Johnson and Officer Klayman while at a PAL baseball game?
A. I was in the field talking to a reporter. We were about done doing the interview; I hear behind me one of the parents say, let's do it while she is doing the interview. While I was doing the interview, I heard "one, two, three cheaters." The reporter said don't worry about it I will edit it.

By the time I got done my interview and I was walking to the other side to give out trophies I observed Sgt. Pascussi walking toward Officer Johnson and Officer Klayman because they were involved in a verbal altercation. I walked over, when I walked over Sgt. Pascussi was pulling Officer Johnson away. So I told the sergeant to tell him to calm down because he was cursing. I walked over to Klayman to find out what was going on and I heard Johnson, something along the lines of who the fuck was he. Officer Klayman responded "don't say fuck you to me." I told Klayman to calm down and wait for me in the car because at that time Chase Trimmer came and got me and told me they were ready to do the trophies and I needed to do another interview. Sgt. Pascussi said I got this and Lieutenant, go take care of whatever you need to take care of.

By the time I got done with the trophies and the interviews, I spoke to Sgt. Pascussi and asked him if we needed to address this formally. He said no, that he addressed Officer Johnson and I told him that I would talk to Officer Klayman.

When I got into the car I back I reamed out Officer Klayman and told him that as my aide he is an extension of me and he should know not to get into an argument.

Since Sgt. Pascussi handled the situation I took his recommendation that it was done and over with and no further action was necessary.

Q. Where did the argument Officer Klayman and Officer Johnson had take place?
A. It took place at the light house field on Erie Avenue.

2

_____
Lieutenant Evelyn Cintron          01-25-18

CITY138

Q. When did the argument Officer Klayman and Officer Johnson had take place?
A. I don't remember the date.

Q. Did you hear Officer Klayman state Officer Johnson, "The next time the lieutenant is talking you shut up?"
A. I don't remember hearing that.

Q. Did you instruct Officer Klayman to address Officer Johnson about Officer Johnson interrupting you while you were talking?
A. Absolutely not.

Q. Did you state to Officer Klayman, "Not here David; do it for me please?"
A. No.

Q. Did either Officer Johnson or Officer Klayman receive any form of disciplinary action as a result of the argument?
A. They were both verbally counseled.

Q. During you tour of duty on 10-12-17, did you observe an incident involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters?
A. I saw part of it.

Q. Can you describe, in your own words, what occurred during the part of the incident you observed involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters on 10-12-17?
A. I was in my office having a meeting with Sgt. Faust and Cassandra Harris when we heard people arguing and loud voice. We came outside of my office to see what was going on. When I came outside I observed Officer Klayman and Chase where involved in a verbal argument, at which time I told them to knock it off which they did.

I said what is going on out here. Klayman said I am tired of people undermining and being disrespectful and they forget I sit at this computer. They always try to undermine the command and the sergeants. Chase also started talking and they were talking over each other. I said this wasn't the place, I said to go into the kitchen, come into my office or go outside to finish the conversation calmly. Chase replied we can either go into the kitchen or go outside. Officer Klayman responded we can do either; go in the kitchen or outside to speak about the use his space. I said something along the lines of let it go and then I asked Klayman and Sgt. Faust to come into my office.

While in my office, Officer Klayman said he approached Chased about the use of his cubicle that led into, something along the lines that either Officer Klayman or Chase questioning a commanding officer's decision.

At that point we got into a conversation about the culture at PAL. Sgt. Faust made a comment, something along the lines, that is just the way it is around here. Officer Klayman stated that if you think that is the way it is, then maybe you are part of the

3

_____
Lieutenant Evelyn Cintron          01-25-18

CITY139

problem. I told Office Klayman I was going to reach out to Ted Qualli and we would talk about how we would handle the satiation between Chase and Klayman being that Chase reports to Ted Qualli.

They left my office, I called Ted several times but he didn't respond. I called his office several times, he didn't respond. I called Pat Winter to see if he was up there and she said he was at a meeting. In the mean time I told everyone who was there on the police side to give me memos. While I was waiting for Ted to return my calls, everyone was talking about how Ted was telling the staff that if they were afraid of Officer Klayman because he is a cop and he carries a gun, to go home.

Ted Qualli eventually came to my office, it was almost four o'clock. But when he walked into my office it wasn't to discuss the matter. He basically walked in my office, shut the door behind him. I said I guess you heard about the incident. He said that is why I am here, what are you going to do about Officer Klayman, he needs to go. I said what are you talking about, that is why I am calling you, we need to do something about both of them because they were both involved in an argument. He said we can't have officer here who is inviting Chase to go outside and fight. I said that wasn't what happened.

Later that day, Laura Kelly told Sgt. Faust that when Ted came back from the meeting he was surprised that none of his staff left as he instructed them to do so earlier in the day and he was telling them not to come into work the next day. I confirmed this because when I was heading the bathroom I heard him having a conversation with McCauley about staying home and she said she wasn't even here. Ted told her to stay home anyway. Ted walked over to Taron Franklin and it appeared they were having a similar conversation.

By the time I went into my office Ted was gone so I called him on his cell phone. I asked him why he felt it was necessary to put the seed in people's minds that they needed to be in fear Klayman and he said that was his staff and he could tell them to stay home if he wanted to.

When I realized that he was not going not work with to address the disciplinary at hand I notified D/C Sullivan who instructed me to send him all the memos I had and that he would take it from there.

The next day when I left my house I went straight to Strawberry Mansion to meet with DHS. While in route there I called our grant writer Diana Harris about a grant I needed for the meeting. She informed that Ted told her that she did not need to be at the meeting and she would not be in attendance but that Ted and Chase would be there.

While we spoke on the phone she mentioned it was a shame what Ted is trying to do, nobody is afraid of Dave but if he wants to give me day off I will take. She stated Lieutenant I wanted to give you a timeline about what was going on. She said that after the incident Ted had an emergency meeting with all of his staff encouraging them to go home and was saying that because Officer Klayman is an office and carries a gun there is

4

Lieutenant Evelyn Cintron    01-25-18

CITY140

a reason they should be afraid of him. She said that everyone at meeting said that they were not afraid of Klayman. She said it was all about me, he was trying to get at me.

During the meeting, a person we were speaking to said they would call him later and Chase said he was not returning to the office. When I returned to the office, none of the civilian staff was there except for Laura Kelly who stated to me, nobody is here, except for me and EVA, this is bull sit, nobody is afraid of Dave.

Q. What was Officer Klayman's tone and demeanor during the incident he had with Chase Trimmer on 10-12-17?
A. They were both yelling at each other.

Q. Did you hear Officer Klayman use profanity during the incident he had with Chase Trimmer on 10-12-17?
A. Not that I heard.

Q. Did you hear Officer Klayman make any inappropriate comments or statements during the incident he had with Chase Trimmer on 10-12-17?
A. No.

Q. Did you hear Officer Klayman state to Sergeant Faust, "you're the reason all of this bullshit that is going on?"
A. No.

Q. Did you hear Chase Trimmer use profanity during the incident he had with Officer Klayman on 10-12-17?
A. No.

Q. Did you tell Officer Klayman to "calm down" during the incident he had with Chase Trimmer on 10-12-17?
A. I told both of them to calm down.

Q. Did you tell Officer Klayman and Chase Trimmer that they should take the matter into the kitchen or outside?
A. Yes.

Q. Why did you tell Officer Klayman and Chase Trimmer that they should take the matter into the kitchen or outside?
A. Because initially they were arguing but then they calmed down. I told them if they wanted to finish the conversation to do it elsewhere in a calm matter.

Q. Did you believe it was appropriate for two employees who were overheard arguing, to take that same argument to another area to continue it?
A. I told them to finish the conversation somewhere else. If they wanted to work through an issue they should do it privately, without arguing, as adults.

5

_Lt. Evelyn Cintron_ _01-25-18_
Lieutenant Evelyn Cintron

CITY141

Q. Did Sergeant Faust also tell Officer Klayman to "calm down" during the incident he had with Chase Trimmer on 10-12-17?
A. No.

Q. Did you stand between Officer Klayman and Chase Trimmer in an event to separate the two of them?
A. No.

Q. In your opinion, was Officer Klayman's conduct during the incident he had with Chase Trimmer on 10-12-17 inappropriate for the work place?
A. Yes; definitely, they were both arguing in the workplace.

Q. Did you request disciplinary action for Officer Klayman in reference to his conduct during the incident he had with Chase Trimmer on 10-12-17?
A. No, because once I spoke to D/C Sullivan he told me to give him the memos and he would take it from there. I was waiting to seek his guidance but he never got back to me with how to proceed.

Q. On 10-13-17, did you order Sergeant Pascucci to tell Officer Janice Little to, "Stay out of things that don't concern her?"
A. Not in those words but yes I told him to talk to Officer Little.

Q. What words did you use?
A. Officer Ricardo Hanton called Officer Klayman to give me a heads up that one of the civilian employees told Officer Little to start a rumor that me and Officer Klayman were in relationship to get rid of Klayman. Officer Hanton told Klayman that when Officer Little was saying this to the officers, the officers were telling her that problem was that in order to hurt Klayman they would have to hurt me. Officer Hanton also said the Officer Little was talking about the incident Klayman and Chase had.

I told Sgt. Pascussi to tell Officer Little that this was an ongoing investigation and that she needed to focus on her PAL center instead of focusing on the rumors.

Q. Did Sergeant Pascucci inform you that the message you ordered him to deliver to Officer Little was inappropriate and out of line?
A. No.

Q. Did you inform Sergeant Pascucci that you would have him and Officer Little removed from the Police Athletic League?
A. No.

6

Lieutenant Evelyn Cintron    01-25-18

Q. Did you inform Sergeant Pascucci that you were good friends with the Police Commissioner?
A. No.

Q. Did you inform Sergeant Pascucci that you would ruin both Sergeant Pascucci's and Officer Little's careers?
A. No, absolutely not.

Q. Did you take any formal action against Officer Little based on what Officer Hanton informed Officer Klayman?
A. No.

Q. Has Officer Little ever expressed to any concerns that memorandums she was submitting to you were not being approved?
A. I never disapproved any of her memorandums. I adjust memorandums depending on what is budgeted and do that for all the PAL Centers. I don't specifically recall doing that for one of hers.

Lieutenant Cintron, I am showing a copy of an e-mail you sent to Nadirah McCauley on 11-01-17, with the subject, "Office Gossip."

Q. Did you send Nadirah McCauley the e-mail I am showing you today with the subject, "Office Gossip?"
A. Yes.

Q. Can you describe, in your own words, what the content of the e-mail you sent Nadirah McCauley on 11-01-17 were?
A. When her named came up as being the person who started the rumor with Officer Little, I went and talked to Chase Trimmer so that we could talk to Nadirah together because she reports to Chase. Chase and I agreed that it was appropriate to bring Ted into the conversation. Ted comes down to join us; I explained to Ted that her name came up in the starting of the rumor about me and Klayman.

I tried to explain that this behavior undermined my command and created a hostile work environment for me. I asked to have a conversation with Nadirah, not to accuse her but to talk her about if she was involved to refrain from participating in this type of stuff because it could be damaging to anyone's reputation that was the subject of this type of rumor.

When I told him what was being said, Ted said he didn't see any problem with it, people can say whatever they want to say. He said if anyone was going to talk to her it would be him. I reminded him that in the past when rumors surfaced about him and misappropriation of funds we brought in the entire staff and told everyone that rumors could be damaging to a career and I was asking for the same courtesy.

7

_____
Lieutenant Evelyn Cintron    01-25-18

CITY143

We left the meeting, after Ted he didn't find anything wrong with what she saying if she was saying anything at all and gave me the impression that he wasn't going to do anything at all and forbid me from talking to Nadirah.

Since Ted was dismissive and implied that this behavior was okay, I felt it was necessary to address the matter and that is why I sent the email.

Q. Does Nadirah McCauley work for the Philadelphia Police Department?
A. No she works for PAL, the non-profit.

Q. Who is Nadirah McCauley's immediate supervisor?
A. Chase Trimmer.

Q. In the e-mail you sent Nadirah McCauley on 11-01-17, you stated, "It was also brought to my attention that there was a plot to spread a malicious rumor that Officer Klayman and I were in a relationship as a way to get him kicked out of the unit." Is that correct?
A. Yes.

Q. Was Officer Klayman detailed out of PAL because of the rumors you referred in this statement?
A. I was called to D/C Sullivan's office and he said we know you are in a relationship with Officer Klayman and then I was told he needed pick three districts to go to. I told D/C Sullivan we were not in a relationship. The Deputy told me to write a memo with the three districts Klayman wanted to go to. However, when I told that to Klayman he got upset and called the FOP who filed a grievance.

I then sent D/C Sullivan the memo he requested saying that Klayman said he was not going to pick three districts.

Sgt. Shevlin then began contacting Officer Klayman and offered him to go to neighborhood services.

Q. Did you conduct a formal investigation into your concerns that rumors were being spread that you and Officer Klayman were involved in a personal relationship?
A. No, because I receive an email from D/C Sullivan that I should not approach anyone else about the subject.

Q. Do you still have the emails you received from D/C Sullivan regarding not approaching anyone else and Officer Klayman being reassigned?
A. Yes.

Q. Can you provide copies of those emails to the assigned (Sergeant Conway)?
A. Yes.

8

_____
Lieutenant Evelyn Cintron        01-25-18

CITY144

Q. Do you believe it was appropriate to send an e-mail regarding rumors that may have been discussed referencing personal matters without first conducting an investigation or taking formal action?
A. I felt that opportunity was taking away from me by D/C Sullivan to address the problem affected me. He sent me an email that stated not address anyone about it. After I sent the email to Nadirah, I received another email stating not to approach anyone else about the rumors.

Q. Does Nadirah McCauley fail under your command?
A. No she is a civilian and she reports to Chase Trimmer.

Q. Have you ever disapproved a memorandum submitted by Officer Little because you believed she was responsible for rumors that you and Officer Klayman were involved in a personal relationship?
A. No.

Q. Have you ever failed to approve a memorandum submitted by Officer Little because you believed she was responsible for rumors that you and Officer Klayman were involved in a personal relationship?
A. No.

Q. What was your tour of duty on 01-11-18?
A. I was working the 9 AM to 5 PM tour of duty.

Q. Toward the end of your tour of duty on 01-11-18, did you have a conversation with Taaj Andrews?
A. I spoke to him that day but it was not toward the end of the day.

Q. What was your conversation on 01-11-18 with Taaj Andrews about?
A. I walked over to Taaj because he sent me an email and wanted to know if I was going to approve a proposal for a program he submitted. Since I had a few questions I walked over to his cubicle to talk about it and Nadirah's cubicle is next to his; I was standing between both of their cubicles.

Q. Prior to talking to Taaj Andrews on 01-11-18, were you standing by his and Nadirah McCauley's cubicles?
A. I walked toward their cubicles to talk to him.

Q. Were you taking pictures of Nadirah McCauley's cubicle?
A. I was taking pictures but it was not of Nadirah McCauley's cubicle. I was taking pictures of the area for this investigation because I wanted to show you where everyone was standing during the argument between Officer Klayman and Chase as instructed by my private attorney.

9

_____
Lieutenant Evelyn Cintron     01-25-18

CITY145

Q. Did Taaj Andrews ask you why you were at Nadirah McCauley's cubicle?
A. No.

Q. Did Taaj Andrews ask you if you were taking pictures of Nadirah McCauley's cubicle?
A. No.

Q. Is Sergeant Eric Ervin currently detailed to the Civil Affairs Unit?
A. Yes.

Q. Why is Sergeant Ervin detailed to the Civil Affairs Unit?
A. Because there was an incident involving Sgt. Ervin not properly handling city wide basketball, he disregarded an order while handled city wide basketball, I received a detailed email from coaches and a memo from Officer Hanton detailing cheating and violations of PAL rules at the city wide basketball games.

Once I got the information, I contacted D/C Sullivan and he ordered me to conduct an investigation which I did. Sgt. Ervin called the FOP complaining I conducting was the investigation because he believed I was doing it on my own. I got called into the Commissioner's office and the Commissioner, D/C Patterson and D/C Sullivan asked me to detail my findings. I told them ether were multiple violations and showed them my documentation. At that point they said to stop the investigation and they were going to detail him out.

The Commission instructed D/C Patterson and D/C Sullivan to speak to him. I wasn't in the meeting. They spoke to him and then I was notified he was detailed out.

Q. Do you know Police Officer Ricardo Hanton #5448?
A. Yes he works for me.

Q. When was Officer Hanton assigned to PAL?
A. He was one of my selections when he came to work for PAL based on his reputation to do great community outreach.

Q. Do you consider Officer Hanton to be your friend?
A. I never met Hanton before he came to PAL and he is just my subordinate.

Q. Prior to Sergeant Ervin being detailed to the Civil Affairs Unit, did he request to take disciplinary action against Officer Hanton because Officer Hanton failed to show up for a PAL event Sergeant Ervin scheduled?
A. He never asked me to take disciplinary action against Officer Hanton.

10

_____
Lieutenant Evelyn Cintrón        01-25-18

CITY146

Q. Did you have Sergeant Ervin detailed to the Civil Affairs Unit because he attempted to request disciplinary action against Officer Hanton?
A. No.

Q. On 11-06-17, did you inform Sergeant Faust that as of 01-01-18 his tour of duty would be changing to 1 PM to 9PM?
A. Yes.

Q. Why did you inform Sergeant Faust that as of 01-01-18 his tour of duty would be changing to 1 PM to 9PM?
A. When first I arrived to PAL I was short a sergeant so I submitted a memo to D/C Patterson and they gave me Sgt. Pascussi. Then when Sgt. Ervin left I found myself short a sergeant again. When Sgt. Ervin left I had several meetings with Sgt. Faust and Sgt. Pascussi that there was chance I would have to move Sgt. Faust to supervisor the PAL officers. In addition to that, he is not an efficient administrative sergeant which I have documented in his performance evaluation, emails and memos.

Q. Prior to your meeting with Sergeant Faust on 11-06-17, did Sergeant Faust meet with Deputy Commissioner Sullivan to discuss the incident Officer Klayman had with Chase Trimmer on 10-12-17?
A. Yes, D/C Sullivan called him up to his office.

Q. Did Sergeant Faust's meeting with Deputy Commissioner Sullivan to discuss the incident Officer Klayman had with Chase Trimmer on 10-12-17 have anything to do with you changing Sergeant Faust's tour of duty?
A. No.

Q. When was Sergeant Ervin detailed to the Civil Affairs Unit?
A. I don't remember the date.

Q. Between the times Sergeant Ervin was detailed to the Civil Affairs Unit and the time you met with Sergeant Faust on 11-06-17, how many supervisors did you have assigned to your unit?
A. Just the two sergeants.

Q. Between the times Sergeant Ervin was detailed to the Civil Affairs Unit and the time you met with Sergeant Faust on 11-06-17, did something occur that led you to believe you needed more supervisory coverage?
A. I have been requesting it since I got there and I fell back into the same situation when Sgt. Ervin left. I have memos to D/C Patterson showing that I requested additional sergeants and my need to have two sergeants to supervise the officers.

11

_____
Lieutenant Evelyn Cintrón      01-25-18

CITY147

Q. Did something about Sergeant Faust's performance change between the times Sergeant Ervin was detailed to the Civil Affairs Unit and the time you met with Sergeant Faust on 11-06-17?
A. Sgt. Faust's performance had been inefficient since I got there.

Q. Was Officer Klayman detailed to the Neighborhood Services Unit?
A. Yes.

Q. Why was Officer Klayman detailed to the Neighborhood Services Unit?
A. I don't know that decision was made above my level.

Q. Did you change Sergeant Faust's tour of duty in retaliation for Officer Klayman being detailed out of PAL?
A. No; absolutely not.

Q. Did you change Sergeant Faust's tour of duty because of something he stated to Deputy Commissioner Sullivan when he met with him to discuss the incident Officer Klayman had with Chase Trimmer on 10-12-17?
A. No.

Q. Is it your statement that the only reason you were changing Sergeant Faust's tour of duty was for supervisory coverage?
A. Yes.

Q. When was Officer Klayman assigned to PAL?
A. He came several months after I was assigned to PAL.

Q. Why was Officer Klayman assigned to PAL?
A. Because I spoke to D/C Patterson and explain my need for an aide and he I could find someone. My first choice was Jimmy Mulholland from the 25th but he couldn't work PAL hours. After that Officer Klayman approached me and asked me if I would consider him. Since he was admin staff at the 25th and always did good work, I chose to give him a chance.

Q. Did you submit your request for an aide in a memorandum?
A. I had a meeting with D/C Patterson about it. I may have given him a memo.

Q. Did the previous Commanding Officers of PAL have aides assigned to them?
A. Yes; Lt. Eddis aide was Officer Andre Epps.

Q. How long had you known Officer Klayman prior to you choosing him to be your aide?
A. Not long. I met him at the 25th.

12

Lieutenant Evelyn Cintron    01-25-18

CITY148

Q. Did you have personal relationship with Officer Klayman prior to you choosing him to be your aide?
A. No.

Q. What were Officer Klayman's responsibilities as you aide?
A. He did administrative work as far as doing reports, he did the crime stats that were for funders, he attended meetings on my behalf if I was unavailable and he did overtime management for me making; sure we kept everyone on the wheel.

Q. Did you allow Officer Klayman to utilize the PAL owned vehicle you were assigned when you were assigned to PAL?
A. He would use it sometimes.

Q. What would Officer Klayman be doing when he utilized the PAL owned vehicle you were assigned when you were assigned to PAL?
A. He would use it for police related function related to PAL.

Q. Has Officer Klayman ever given rides to members of your family using the PAL owned vehicle you were assigned when you were assigned to PAL?
A. No.

Q. Has Officer Klayman ever given rides to your daughter using the PAL owned vehicle you were assigned when you were assigned to PAL?
A. No.

Q. Have you ever given rides to your daughter using the PAL owned vehicle you were assigned when you were assigned to PAL?
A. Yes; my daughter as a PAL employee sometimes had to go to the same place I had to go so just like the other PAL employees I would give rides to, I gave her a ride as well.

Q. Did you have permission from PAL to use the vehicle you were assigned to give you daughter rides to the PAL center she was assigned?
A. I had permission to give PAL employees rides to PAL related events and she was a PAL employee. That may have happened once or twice.

Q. During Officer Klayman's time as your aide, did you give him preferential treatment as it compare to the other officers assigned to PAL?
A. I didn't do anything for Klayman that I didn't do for anyone else. There was no preferential treatment.

Q. Did you allow Officer Klayman to adjust his work schedule in order to accommodate his school schedule?
A. Yes.

13

_____
Lieutenant Evelyn Cintron    01-25-18

CITY149

Q. How did you allow Officer Klayman to adjust his work schedule in order to accommodate his school schedule?
A. Most of his classes were a night after work hours. During the fall semester he had a class from 2:30 to 3:30 for which I would let him come in early so that he could leave early or I would adjust his scheduled where he would come back after class. He always worked forty hours a week.

Q. Did you require Officer Klayman to use vacation time to accommodate him going to school during work hours?
A. It was more adjusted then taking time.

Lieutenant Cintron, I am showing you a copy of the DAR entries that were made for Officer Klayman from 01-01-17 through 11-02-17.

Q. Can you review the DAR entries you have been shown and direct the assigned investigator (Sergeant Conway) to the dates Officer Klayman was shown as working a different tour of duty to attend college classes?
A. We did not have the capability of entering the DAR so Community Relations did our DAR up until a few months ago and they showed everyone 9 to 5. They would only make adjustment if Sgt. Faust told them to make them prior to the DAR closing out. Because this was problem I requested for a computer so that we could enter our own DAR.

Q. When did you receive the computer that gave the capably to enter you unit's DAR?
A. It has been three or four months now.

Q. Do you know why there are no DAR entries from 01-01-17 through 11-02-17 that reflect Officer Klayman working a different tour of duty with the exception of two dates (10-05-17 and 10-06-17) that he attended MPO training?
A. Everyone was usually carried 9 to 5 because of the erratic schedules at PAL.

Q. Who was responsible for DAR entries during the time you were assigned to PAL?
A. Sgt. Faust was responsible for communicating with Community Relations when they entered them. Now Sgt. Faust usually does it.

Q. Did you ever inform Sergeant Faust that Officer Klayman was leaving early to attend college classed so that the DAR entry made for him could be adjusted to reflect him leaving early?
A. After we got the computer, I told Sgt. Faust to start adjusting the DAR to reflect the hours people actually worked, but in retrospect I should have checked behind him to see it was being done.

Q. To your knowledge, did Officer Klayman ever inform Sergeant Faust that he was leaving early to attend college classed so that the DAR entry made for him could be adjusted to reflect him leaving early?
A. I don't know.

14

_Lt Evelyn Cintron_ 01-25-18
Lieutenant Evelyn Cintron

CITY150

Q. Who is responsible for reviewing the DAR entries made each day for accuracy?
A. Sgt. Faust checks it and he had been certifying it.

Q. Are you aware that Directive #11.1, Daily Attendance Report (DAR), states that, "The platoon/unit Lieutenant will personally check all entries on the D.A.R. for Accuracy?"
A. Yes.

Q. Are you aware that Directive #11.1, Daily Attendance Report (DAR), states that, "If the platoon/unit Lieutenant is unavailable or if one is not assigned, another supervisor will certify the D.A.R?"
A. Yes.

Q. Are you aware that Directive #11.1, Daily Attendance Report (DAR), states that, "District/unit Commanding Officers will periodically review and sign the certified copy of the D.A.R?"
A. I do review them but I haven't been certifying them daily, but we just continued the practice of the sergeant certifying them.

Q. Did you allow any of the other PAL officers to adjust their schedules or utilize vacation time to attend college classes?
A. No; but I have adjusted schedules for other officers and sergeant for personal reasons.

Q. Did you make the other PAL officers aware that they could adjust their schedules or utilize vacation time to attend college classes?
A. No; but when they come to me I adjust their schedules if needed.

Q. Do you have a specific uniform policy for the personnel assigned to PAL?
A. Yes.

Q. Do you require all of your personnel to adhere to the same uniform policy?
A. Yes.

Q. Was Officer Klayman required to adhere to the same uniform policy as the other officers assigned to PAL?
A. Yes.

Q. Where was Officer Klayman's desk located when he was assigned to PAL?
A. He a cubicle right outside my office.

Q. Was Officer Klayman's desk located in an area that is designated for police personnel?
A. Yes.

15

_____
Lieutenant Evelyn Cintrón      01-25-18

CITY151

Q. Was Office Klayman also given permission to utilize the office that was previously assigned to Sergeant Ervin?
A. Yes; he would use that office to work on confidential memos he was writing for me, crime stats memos or any other confidential matter he was working on for me at the time.

Q. After Officer Klayman was detailed to the Neighborhood Service Unit, did you assign another officer to be your aide?
A. No; I brought in Officer Younger to oversee his responsibilities but he is not my aide.

Q. Are you involved in a personal relationship with Officer Klayman?
A. No.

Q. Have you ever been involved in a personal relationship with Officer Klayman?
A. No.

Q. Do you attempt to use your position to threaten the personnel assigned to PAL?
A. No.

Q. Do you attempt to threaten the personnel assigned to PAL by referencing people you know?
A. No.

Q. Have any of the employees assigned to PAL expressed to you that they feel threatened by the relationship you have with Officer Klayman?
A. No, because there is no relationship.

Q. Is there anything else you would like to add that had not been addressed in this interview?
A. I would like to document that Ted Qualli has continued to attempt to create situations for which he wants to argue with me and intimidate me. He is subjecting me along with a few members of this staff to a hostile work environment. Friday he came to my office to yell at me and berate me about PAL related matters in his attempt to have me removed from the Unit. I feel that the incident involving Chase Trimmier and Officer Klayman is been used as a platform to drive personal agendas. Evelyn Cintron

_____
Lt. Evelyn Cintron        01-25-18

16

CITY152

This is an on-going investigation being conducted by Internal Affairs. By orders of the Commanding Officer of Internal Affairs you are instructed not to disclose any information discussed here to anyone other than your attorney and FOP representative.

Q. Do you understand this?
A. Yes.

Please read your interview to be certain that it is accurate. If there are any errors, correct and initial them. After you reviewed your interview, please sign each page in the lower right hand corner.

_____ I would like a copy of this interview sent to me through police mail to my district/unit of assignment.

\_\_\_\_X_____ I would like a copy of this interview sent to my home address.

_____ I do not wish to receive a copy of this interview.

STATEMENT CONCLUDED: 3:12 PM

I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **SEVENTEEN (17)** PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE: *Evelyn Cintron*

DATE: 1/25/18   TIME: 3:18 PM

WITNESSES: _____

_____

17

*Lt. Evelyn Cintron*
Lieutenant Evelyn Cintron   01-25-18

CITY153