IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EVELYN CINTRON, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO. 19-4078 |
| CITY OF PHILADELPHIA, et al., | : | |
| Defendants. | : | |

**DEFENDANTS, CITY OF PHILADELPHIA AND JOSEPH SULLIVAN'S STATEMENT OF UNDISPUTED MATERIAL FACTS**[1]

Defendants, City of Philadelphia and Joseph Sullivan, submit the following statement of Undisputed Facts in support of their motion for summary judgment.

**A. Plaintiff, Evelyn Cintron, Worked for the City of Philadelphia for Over Twenty-Five Years**

1. Plaintiff, Evelyn Cintron, was employed by the City of Philadelphia from July 20, 1992, until she retired on January 31, 2019. Plaintiff's Employment History is attached hereto as Exhibit 1.

2. On July 20, 1992, Plaintiff began her service with the City of Philadelphia as a correctional officer assigned to the Philadelphia Department of Prisons. *See* Ex. 1.

3. On June 28, 1999, Plaintiff joined the Philadelphia Police Department ("PPD") as a police officer recruit and was promoted to police officer in December of 1999. *See* Ex. 1.

---

[1] Defendants do not dispute the evidence described in its Statement of Undisputed Material Facts for the purposes of this summary judgment only. This evidence may be disputed by Defendants at trial.

1

4. After moving up the ranks for over fifteen years, on February 6, 2015, Plaintiff was promoted to lieutenant. *See* Ex. 1.

5. On June 20, 2016, Plaintiff was appointed Commanding Officer of the Police Athletic League ("PAL"). *See* Internal Affairs Investigation at City5, attached hereto as Exhibit 2.

6. Plaintiff retired from City employment on January 31, 2019. *See* Ex. 1.

7. Plaintiff identifies as a Hispanic woman. *See* Ex. 1.

**B. Philadelphia Police Department and Police Athletic League are Two Distinct Entities**

8. The Police Athletic League ("PAL") is a nonprofit, 501(c)(3) organization that works in collaboration with the PPD PAL Unit. *See* Cintron Dep. 1, 10/28/2022, at 42:21-25, 43:2 (attached hereto as Exhibit 13); Castellano Dep., 11/15/2024, at 12:2 (attached hereto as Exhibit 17).

9. The PAL nonprofit and the PPD PAL Unit are two distinct entities that work together to provide free services to children of Philadelphia. Cintron Dep. 1, 10/28/2022, at 45:15-25, 46:2-8, 46:18-25; Rush Dep., 11/3/2023, at 15:13-19 (attached hereto as Exhibit 16).

10. The PPD PAL Unit is a unit within the Department that is comprised of officers who report to the Unit's Commanding Officer. *See* Ex. 13, Cintron Dep. 1, 10/28/2022, at 46:9-17, 47:2-20.

11. The PAL Commanding Officer reports to the PPD Commissioner and corresponding Deputy Commissioner. *See* Ex. 13, Cintron Dep. 1, 10/28/2022, at 42:18-21.

12. The PAL Commanding Officer is responsible for overseeing the officers assigned to the PAL Unit while collaborating with the PAL board and civilian employees. Ex. 16, Rush Dep, 11/3/2023, at 16:12-19.

13. As the Commanding Officer of PPD PAL unit, Plaintiff supervised approximately two sergeants and twenty-seven police officers. Ex. 13, Cintron Dep. 1, 10/28/2022, at 47:5-12).

14. PAL civilian employees report to the PAL Executive Director. *See* Ex. 17, Castellano Dep., 11/15/2024, at 34:13-16; Ex. 13, Cintron Dep. 1, 10/28/2022, at 49:9-20.

15. The PAL Executive Director reports to the PAL Board. Ex. 17, Castellano Dep., 11/15/2024, at 12:16-18.

16. PAL operates eighteen different sites throughout the City of Philadelphia. *See PAL Center Locations*, PHILLYPAL.ORG, phillypal.org (last visited Jan. 22, 2025).

17. The PAL Board determines the utilization and allocation of funds, including money spent on programming, which centers receive programming, and money spent on facility improvements or repairs. Ex. 16, Rush Dep., 11/3/2023, at 68:22-24, 69:1-24, and 70:1-11.

18. The City of Philadelphia does not provide funding to PAL. City of Philadelphia Responses to Discovery, Interrogatory # 10, attached hereto as Exhibit 19.

19. The City of Philadelphia does not disburse charitable gifts or donations made to PAL, approve how PAL disburses donations or gifts, and does not otherwise control donations made to PAL. PAL Responses to Discovery, Interrogatory # 13, 16, 17, attached hereto as Exhibit 18.

20. While the City of Philadelphia pays the salaries for PAL police officers, all operations at PAL sites and all other programmingare funded by the PAL 501(c)(3). Ex. 17, Castellano Dep., 11/15/2024, at 42:12-22.

21. At all times material, Ted Qualli, the PAL Executive Director, was a PAL employee who reported to the PAL Board of Directors. *See* Ex. 17, Castellano Dep., 11/15/2024, 12:16-18.

22. At all times material, Bernie Prazenica, Rob Rabena, and Maureen Rush were members of the PAL Board and were not City of Philadelphia employees.

23. At all times material, Chase Trimmer, Nadirah McCauley, Cassandra Harris, Nija Burton, and Taaj Andrews were PAL employees and were not employed by the City of Philadelphia. *See* Ex. 2, at City2.

24. Police Commissioner Richard Ross, Deputy Commissioner ("D/C") Joseph Sullivan, D/C Myron Patterson, Sergeant ("Sgt.") Brent Conway, Sgt. Michael Faust, Sgt. Michael Pascucci, Police Officer David Klayman, and Police Officer Janice Little were all employed by the City of Philadelphia. *See id.*

25. D/C Patterson, as Deputy Commissioner for Patrol Operations and Community Operations, supervised PAL from Plaintiff's arrival at PAL in June 2016 to March of 2017. *See* Ex. 13 Cintron Dep. 1, 10/28/2022, 40:19-25, 41:1-6; Sullivan Dep., 11/15/2023, at 8:3-5, 10:9-18, attached hereto as Exhibit 15.

26. In March 2017 D/C Sullivan was promoted to the rank of Deputy Commissioner of Operations and supervised PAL from March of 2017 to March of 2020. Ex. 15, Sullivan Dep., 11/15/2023, at 8:3-5, 9:1-6.

**C. Plaintiff's Tenure with PAL**

1. **Plaintiff Expresses Concerns About Conditions at Wissinoming PAL June 2017**

27. Plaintiff claims that during her first week as Commander of PAL in 2016, she toured the Wissinoming PAL Center and attempted to close the center because she was concerned that the center contained mold. *See* Ex. 13, Cintron Dep. 1, 10/28/2022, at 80:2-25, 81:2-7.

28. Plaintiff alleges that she expressed her concerns to D/C Patterson, who agreed that the center should be closed until it was "properly fixed" for the safety of the children and staff. Ex. 13, Cintron Dep. 1, 10/28/2022, at 87:12-17, 95:20-25, 96:2-15.

29. Plaintiff alleges she reported concerns to D/C Patterson by phone and in person. Ex. 13, Cintron Dep. 1, 10/28/2022, at 95:20-25, 96:2-3.

30. The Wissinoming PAL Center did, in fact, close, and remained closed through at least February 2017. *See* Ex. 13, Cintron Dep. 1, 10/28/2022, at 87:10-12; Minutes of the PAL Board of Directors Meeting, 2/22/2017 at Cintron/PAL58, attached hereto as Exhibit 21.

31. Plaintiff believes that every police officer has a duty to ensure the safety of officers and community and that this duty applied to her as PAL Commanding Officer. *See* Ex. 13, Cintron Dep. 1, 10/28/2022, at 96:20-23.

2. **Plaintiff Expresses Concerns About Disparate Treatment Between White and Minority Children at PAL Centers**

32. Plaintiff claims that PAL centers that provided programming to white children received preferential treatment while black and under privileged kids received less programming, less funding, and endured poorer quality facilities. *See* Ex. 13, Cintron Dep. 1, 10/28/2022, at 112:18-25, 113:2-5.

33. Plaintiff specifically alleges the following instances of inequitable treatment:

    a. Some programs, such as the wrestling program at the predominantly white Rizzo PAL, were run by an outside organization that was allowed to send the kids to Disney World, however, the African-American basketball team was not allowed to leave the Delaware Valley area for games per an unwritten PAL policy. *See* Ex. 13, Cintron Dep. 1, 10/28/2022, at 113:24-25, 114:2-22.

    b. The PAL Board would not allow kids to take a boxing class out of concern it was too dangerous but allowed children to participate in other potentially injurious sports, such as gymnastics and wrestling, which predominantly involved white children. *See* Ex. 13, Cintron Dep. 1, 10/28/2022, at 115:23-25, 116:2-25.

34. Plaintiff alleges that when she expressed concerns of inequality to Ted Qualli and Bernie Prazenica, no action was taken to address her concerns. *See* Ex. 13, Cintron Dep. 1, 10/28/2022, at 113:6-23.

35. Plaintiff admits that no one from PAL disciplined her due to voicing her concerns about inequality between the centers. *See* Ex. 13 Cintron Dep. 1, 10/28/2022, at 77:17-25, 78:2-23; Cintron Dep. 2, 2/14/2023, at 29:5-7, 42:11-13, 83:9-11, 117:5-7; 147:14-20, attached hereto as Exhibit 14.

**3. Plaintiff Is Cited for Multiple Traffic Violations in PAL-Owned Vehicles**

36. During Plaintiff's tenure as Commanding Officer over PAL, she received two toll violations and one red light violation in PAL vehicles. *See* Correspondence Regarding Tickets on PAL Vehicles, attached hereto as Exhibit 4 at Sullivan397-98 and 411-12.

37. Plaintiff's PAL vehicle and a PAL van received EZ Pass toll violations that occurred on September 4, 2016 , and November 6, 2016, respectively. *See* Ex. 4 at Sullivan397-398 and 411.

38. PAL vehicles do not have EZ Pass transponders, so, when PAL vehicles need to be used toll roads, officers are expected to submit a memo requesting to use the vehicles for a specific activity. Plaintiff did not submit this memo. *See* Ex. 4 at Sullivan398.

39. Furthermore, PAL did not have scheduled events on the days that the vehicles received toll violations. *Id.*

40. Plaintiff never advised PAL of the EZ-Pass violations, so PAL did not become aware of the violations until it received notice from a collections agency in late 2017. *See* Ex. 4 at Sullivan397-98.

41. Although PAL paid the toll violations to avoid further expense, its expectation was that officers pay any fines for violations incurred while operating a PAL vehicle. *See* Ex. 4 at Sullivan398)

42. Additionally, Plaintiff's vehicle received a red-light camera violation on October 1, 2016, and PAL had "no knowledge of this violation until January 8, 2018" when PAL received a letter from a debt collector attempting to collect on the outstanding debt. *See* Ex. 4 at Sullivan398 and 412.

4. **Plaintiff's Aide Engages in a Verbal Altercation with a Civilian PAL Employee**

43. On October 12, 2017, Plaintiff's aide, Officer David Klayman, approached Chase Trimmer, a civilian PAL employee, about PAL employees using Officer Klayman's workspace while he was absent. *See* Ex. 2 at City58.

44. Multiple employees witnessed this altercation and characterized it as Officer Klayman getting into Trimmer's personal space, become loud, and inviting Trimmer to go outside and engage in a physical fight. *See id.* at City38, 43, 52, 58, and 117.

45. Nija Burton, a civilian PAL employee, characterized the incident as "pretty frightening" and noted that Officer Klayman "carries a weapon and you never know what he might do when they are getting aggressive. *Id.* at City38.

46. Trimmer reported that Officer Klayman asked him to "step outside." *Id.* at City58-59.

47. Plaintiff, Sgt. Faust, and PAL civilian employee Cassandra Harris were meeting inside Plaintiff's office when they heard loud voices coming from outside of the office. *Id.* at City43, 116, and 139.

48. Sgt. Faust told Klayman that this was not the place for the conversation and for Klayman to calm down. *Id.* at City 116.

49. Sgt. Faust heard Officer Klayman tell Trimmer that they could "go in the kitchen" or "go outside." *Id.* at 117.

50. After this, Plaintiff physically extended her arm toward Officer Klayman and positioned herself between Officer Klayman and Trimmer. *Id.* at 58.

51. The argument ended after Plaintiff asked Officer Klayman to go into her office so she could speak with him. *Id.* at City139.

52. Klayman admitted that he raised his voice but denied using profanity during the incident. *Id.* at City132.

53. After the incident, Qualli advised his employees that they could work from home the following day if they felt unsafe following the incident. *See* Ex. 2 atCity65.

54. Qualli noted that when he met with the civilian employees who had witnessed this incident they appeared visibly shaken and that every staff member expressed concerns following the incident. *Id.*

55. Plaintiff, who personally witnessed the argument, believed that Klayman's conduct was inappropriate but did not request that disciplinary action be taken because she believed that D/C Sullivan would impose discipline if necessary. *See* Ex. 2 at City142.

56. On October 27, 2017, Plaintiff had a conversation with D/C Sullivan in which he told her that due to his belief that Officer Klayman and Plaintiff were in a personal relationship, Officer Klayman was to pick one of three districts to which he would be reassigned. *See* Klayman Transfer Memo, attached hereto as Exhibit 5.

57. Instead of requiring Officer Klayman to select a new district, on October 30, 2017, Plaintiff submitted a memo to D/C Sullivan conveying Klayman's refusal to select a new district because the direction was based on an invalid and "malicious rumor." *Id.*

58. D/C Sullivan detailed Officer Klayman to the Neighborhood Services Unit ("NSU") effective November 1, 2017. *See* Klayman Transfer Email, dated October 31, 2017, attached hereto as Exhibit 6.

**5. Plaintiff Tells a PAL Civilian Employee to Stop Spreading Rumors About Her**

59. Following Officer Klayman's reassignment, Plaintiff emailed Nadirah McCauley, a civilian PAL employee, complaining that there "was a plot to spread a malicious rumor that Officer Klayman and [Plaintiff] were in a relationship as a way to get him kicked out of the unit" and requested that she stop participating in rumors. *See* "Office Gossip" Email, dated November 1, 2017, attached hereto as Exhibit 7.

9

60. In the email, Plaintiff told Ms. McCauley, "[i]f this continues, I have no other recourse but to defend my integrity through official means." *Id.*

61. Plaintiff advised Ms. McCauley that rumors could be the subject of an EEOC complaint by those who felt harmed by the gossip. *Id.*

62. As a civilian employed by PAL, Ms. McCauley was not under Plaintiff's command. *See* Ex. 2, at City35.

63. Plaintiff's email to Ms. McCauley was shared with PAL's HR Staff who considered the email to be threatening. *Id.* at City68.

6. **Plaintiff Reassigns a PAL Sergeant to Night Duty**

64. On November 6, 2017, Plaintiff informed Sgt. Faust that effective January 1, 2018, his tour of duty would be changed from 1pm to 9pm. *See* Ex. 2 at City147.

65. Prior to changing Sgt. Faust's assignment, Plaintiff was aware that Sgt. Faust had met with D/C Sullivan to discuss the incident between Officer Klayman and Chase Trimmer. *See id.*

66. Plaintiff denied that this reassignment was due to Sgt. Faust's discussions with D/C Sullivan about the incident between Officer Klayman and Chase Trimmer and instead attributed it to the need for supervisory coverage and Sgt. Faust's "unsatisfactory performance." *Id.* at 147-48.

67. However, this shift change meant that both PAL supervisors were working the same shift, which left PAL headquarters was without supervisory coverage during the other shift. *See* Sgt. Faust Schedule Change, attached hereto as Exhibit 9.

68. Due to the gap in supervisory coverage, D/C Sullivan moved Sgt. Faust's shift back to the daytime shift. *Id.*

10

**D. PPD Receives an Anonymous Complaint about Plaintiff**

69. On October 27, 2017, the Office of the Police Commissioner received an anonymous letter complaining about Plaintiff, written by a "concerned PAL." Ex. 2 at City036.

70. The anonymous letter detailed an incident in which Plaintiff ordered one of her subordinates, Sgt. Pascucci, to deliver a message to another PAL officer, Janice Little, advising her to "[s]tay out of things that don't concern her." *Id.*

71. The author of the letter also alleged that Sgt. Pascucci felt the message was inappropriate but did so because he was concerned that he would be removed from PAL if he did not deliver it. *Id.*

72. This section of the letter referred to rumors that Plaintiff was in a romantic relationship with Officer Klayman. *Id.*

73. The anonymous complaint also alleged that civilian employees from PAL were working from home because they felt threatened by an "ongoing situation involving [Plaintiff] and Officer Klayman." *Id.*

74. Plaintiff does not know who wrote this letter. *See* Ex. 14, Cintron Dep. 2, 2/14/2023, at 91:6-15.

75. The author of this letter asserted that Plaintiff's actions created a hostile work environment for Officer Little and all civilian PAL employees. *Id.*

**E. PPD Investigates the Allegations in the Anonymous Complaint Against Plaintiff**

76. In response to receiving the letter, the PPD Internal Affairs Division ("IAD") assigned Sgt. Brent Conway to investigate the complaint. *See* Ex. 2 at City5.

77. Sgt. Conway interviewed six civilian PAL employees and ten uniform PPD employees, including Plaintiff, all of whom were assigned to PAL. *See id.* at City2.

78. D/C Sullivan was not interviewed as part of this investigation. *Id.*

79. Sgt. Conway interviewed Officer Little who confirmed that on October 13, 2017, Sgt. Michael Pascucci informed her that Plaintiff ordered him to tell Little to stay out of things that did not concern her. *Id.* at City73-74.

80. Sgt. Conway also interviewed Sgt. Pascucci as part of this investigation. *Id.* at City105-13.

81. Sgt. Pascucci confirmed that Plaintiff ordered him to tell Officer Little to "[s]tay out of things that don't concern her." *Id.* at City106.

82. Sgt. Pascucci stated that this request made him "a little uneasy" because it was a personal matter and not something she was typically ordered to do. *Id.* at City107.

83. Sgt. Conway interviewed Ted Qualli on February 16, 2018. *See id.* at City63-71.

84. Qualli reported that civilian PAL employees, as well as Sgt. Faust, expressed concern with "the ongoing situation" between Officer Klayman and Plaintiff. *Id.* at City69.

85. During the investigation, Sgt. Faust expressed that Officer Klayman appeared to receive preferential treatment from Plaintiff. *Id.* at City115.

86. Sgt. Faust observed that Officer Klayman did not seem to work an eight-hour day despite being scheduled to do so. *Id.*

87. Sgt. Faust also advised that he had seen Officer Klayman giving Plaintiff's daughter rides in a PAL-owned vehicle. *Id.* at City116.

88. Plaintiff gave Officer Klayman permission to adjust his own hours by allowing him to come to work early, leave work early, or allow him to return to work after class. These tour adjustments were made so that Officer Klayman could attend law school

classes on Tuesdays and Thursdays from 2:30pm to 3:45pm during the Fall 2017 semester. *Id.* at City128.

89. Despite this arrangement, the DAR entries for Officer Klayman from January 1, 2017, through November 2, 2017, reflected that each time Klayman worked, he did so from 9am-5pm except for when he took Municipal Police Officer training on October 5, 2017, and October 6, 2017, when his DAR entries reflected that he worked 8am-4pm. *Id.* at City150.

90. For that same time period, there were no DAR entries for Officer Klayman's use of vacation, sick or holiday time, or days when Officer Klayman left work early. *Id.* at City35.

91. PPD policy set forth in Directive 11.1, Daily Attendance Report, section K, provides that Plaintiff was responsible for her officer's timekeeping. *See* Daily Attendance Report Directive 11.1, attached hereto as Exhibit 23.

92. Plaintiff was aware that Directive #11.1 provides that "[t]he platoon/unit Lieutenant will personally check all entries on the DAR for Accuracy." Ex. 2 at City150.

**F. Plaintiff's Interviews**

93. On January 25, 2018, Sgt. Conway interviewed Plaintiff in the presence of an attorney. *Id.* at City137-53.

94. At this interview, Plaintiff handwrote a complaint about Ted Qualli. She did not raise a single complaint of discrimination or retaliation by D/C Sullivan or any other City employees. *Id.* at City152.

95. On February 9, 2018, Sgt. Conway interviewed Plaintiff again. She declined representation for this interview. *Id.* at City154-56.

96. In response to her statements that PAL employees were creating a hostile work environment for Plaintiff, Sgt. Conway provided her with an EEO complaint form and Directive 8.7 "EEO Complaint Procedures." *Id.* at City155.

97. Plaintiff did not raise any complaints about D/C Sullivan or other City employees during this interview. *Id.*

98. The investigation concluded on June 8, 2018. *Id.* at City1.

99. As of June 8, 2018, Plaintiff had not submitted the EEO complaint form she was issued during her interview with Sgt. Conway on February 9, 2018. *Id.* at City31.

### G. IAD Sustains Violations Against Plaintiff and PPD Prepares Disciplinary Action Against Plaintiff

100. At the conclusion of Sgt. Conway's investigation, IAD concluded that Plaintiff abused her authority as a supervisor "on multiple occasions." Ex. 2 at City34-35.

    a. IAD determined that Plaintiff's ordering Sgt. Pascucci, her subordinate, to tell Officer Little to stay out of things that don't concern was an abuse of authority because she did not independently verify whether Officer Little was in fact spreading rumors about her and the message was personal in nature. *Id.* at City34.

    b. IAD also concluded that Plaintiff's "Office Gossip" email to Nadirah McCauley was an abuse of authority because Ms. McCauley was not her subordinate employee and concerns about Ms. McCauley should have been discussed with Ted Qualli. *Id.* at City34-35.

101. IAD also concluded that Plaintiff violated Directive #11.1, "Daily Attendance Report (DAR)," Section K, because she failed to ensure that Officer Klayman's DAR'S were accurate. *Id.* at City35.

102. As a result of IAD's sustained findings against Plaintiff, the Police Board of Inquiry ("PBI") charged Plaintiff with Conduct Unbecoming (1-§011-10) and Failure to Supervise (8-§03-10). *See* Cintron Disciplinary Records, attached hereto as Exhibit 8; *see also* Philadelphia Police Department Disciplinary Code, attached hereto as Exhibit 22.

103. Plaintiff retired from the City on January 31, 2019, before receiving discipline for the pending charges.. *See* Ex. 8.

**H. Plaintiff Makes Complaints Making Complaints About Hostile Treatment From Civilian PAL Employees After the IAD Investigation Begins**

   **1. Memorandum Concerning an "Incident with Ted Qualli"**

104. On January 19, 2018, while the IAD investigation into Plaintiff remained open, Plaintiff sent D/C Sullivan a memorandum with the subject, "Incident with Ted Qualli *See* Ted Qualli Incident Memo, dated 1/19/2018, attached hereto as Exhibit 3.

105. In the memorandum, Plaintiff identified tension among PAL employees and wrote that PAL Board was aware of concerns with Qualli but had not done anything to address them. *Id.*

106. Plaintiff alleged that "[s]ince Ted began his employment with PAL he had the same problems with the last two Commanders with me being the third, this speaks for itself." *Id.* at City252.

107. Plaintiff did not make complaints about D/C Sullivan or other City employees in this memorandum. *Id.*

   **2. Plaintiff Makes a Complaint Against Ted Qualli During her IAD Interview**

108. During Plaintiff's IAD interview on January 25, 2018, she handwrote a complaint about Ted Qualli while in the presence of an attorney. *See* Ex. 2 at City152.

109. In this complaint, Plaintiff asserted that Qualli was subjecting her to a hostile work environment. *Id.*

110. Plaintiff further asserted that she felt that the incident between Chase Trimmer and Officer Klayman was being used to drive "personal agendas." *Id.*

111. Plaintiff did not raise a single complaint of discrimination or retaliation by and City employee or D/C Sullivan.

### I. PPD Directive 97 Prohibits Discriminatory or Retaliatory Conduct and Sets Forth Instructions for Reporting Such Conduct

112. PPD Directive 97 concerns Equal Employment Opportunity Procedures and became effective on October 21, 2011. A true and correct copy of Police EEO Directive 97 is attached hereto as Exhibit 11.

113. PPD Directive 97 prohibits PPD personnel from engaging in discrimination or retaliation on the basis of a protected class or activity. *See* Ex. 11 at City693.

114. PPD Directive 97 defines discriminatory action or conduct for purposes of the directive is any "act, action or course of conduct which interferes with another employee's terms and conditions of employment." *Id.*

115. Retaliation is defined as "any act, action, or course of conduct taken against an employee which interferes with an employee's terms, conditions, rights, entitlements, or responsibilities of employment because the individual has opposed any unlawful employment practice, made a charge, testified, or assisted in any manner, in any investigation, proceeding, or hearing under local, state, or federal discrimination laws." *Id.*

116. When there are instances "where a supervisor other than the commanding officer is the alleged discriminating party, the complainant will contact the commanding officer directly or the Office of Professional Responsibility." *Id.* at City696.

117. "In instances when the commanding officer is the alleged discriminating party, the complainant will contact the next level of command directly, or the Office of Professional Responsibility." *Id.*

118. "Supervisors are not only accountable for themselves, but also for the conduct and/or actions of their subordinates and non-employees present in the workplace about which they know or should have known. Supervisors will be held to a higher standard for violation of this directive and/or failure to take necessary appropriate action." *Id.* at City 697.

119. "Supervisors/commanders are responsible for implementing and monitoring compliance with this policy." *Id.*

120. "Supervisors who become aware of an EEO complaint from any source must report this to the Office of Professional Responsibility regardless of whether the complainant desires to pursue the complaint." *Id.*

**J. Plaintiff's Separation from the Police Department**

121. On January 31, 2018, Plaintiff started a leave of absence. *See* Ex. 2 at City30.

122. Plaintiff never returned to work from her leave of absence. *Id.*

123. Plaintiff voluntarily retired effective January 31, 2019. *See* Ex. 1 at City333.

124. Plaintiff has never been disciplined for any policy violations. *See* Ex. 8.

125. Plaintiff did not raise any formal complaints with Defendant City concerning D/C Sullivan or against the City of Philadelphia. Ex. 14, Cintron Dep. 2, 2/14/2023, at 135:9-11; 137:10-18.

126. The only complaints Plaintiff submitted to the City involved concerns with Ted Qualli and other PAL employees. *See* Ex. 2 at City152; Ex. 3.

127. Plaintiff admits that she was not disciplined for making complaints to D/C Sullivan. *See* Ex. 14, Cintron Dep. 2, 2/14/2023, at 42:11-13.

**K. Plaintiff Files a Charge of Discrimination against the City**

128. On May 22, 2019, Plaintiff filed a joint complaint with the Pennsylvania Human Relations Commission and the Equal Employment Opportunity Commission, which the EEOC docketed as 530-2019-2982. *See* EEOC Complaint #530-2019-2982, attached hereto as Exhibit 12.

129. In the complaint, Plaintiff alleges discrimination based on sex, national origin and retaliation. *Id.*

130. The EEOC issued Plaintiff a right to sue letter on June 10, 2019. *See* Exhibit 20.

131. On September 6, 2019, Plaintiff filed this Civil Action Complaint. *See* Doc. 1.

132. Plaintiff's First Amended Complaint was filed on September 13, 2021. Doc. 40.

133. In that Complaint, she alleges that the City of Philadelphia, D/C Sullivan, and PAL, engaged in a pattern of discrimination and retaliation against her. *See* Doc. 40.

134. Plaintiff also alleges that the City of Philadelphia failed to train, supervise, and discipline D/C Sullivan, which allowed him to engage in alleged acts of discrimination and retaliation against Plaintiff. *See* Doc. 40.