# ANONYMOUS COMPLAINT

## <u>EEO #17-0039</u>

Sgt. Brent Conway #8892
Internal Affairs Division
05-29-18

REVIEWED AND APPROVED BY:

C.O., I.A.D:    _Insp. L. Hall_

DATE:          _5/29/18_

C/I O.P.R.:    _____

DATE:          _9 JUNE 18_

CITY001

# INDEX

**A. Section:**
Memorandum to Police Commissioner

**B. Section:**
EEO White Paper
Anonymous Letter Sent to the Office of Professional Responsibility on 12-07-17

**C. Section-Interviews**
Nija Burton, IT Manager, PAL, B/F
Cassandra Harris, Auction Manager and Senior Development Coordinator, PAL, B/F
Nadirah McCauley, Program Coordinator, PAL, B/F
Taaj Andrews, Program Coordinator, PAL, B/M
Chase Trimmer, Director of Programs and Education, PAL, W/M
Theodore Qualli, Executive Director, PAL, W/M
Police Officer Janice Little #9812, Payroll ███████ B/F, PAL
Police Officer Rasheed McDaniels #6362, Payroll ███████ B/M, PAL
Police Officer Michael Ragucci #1857, Payroll # ███████, W/M, PAL
Police Officer Keith Balco #6726, Payroll # ███████ W/M, PAL
Police Officer Kareem Johnson #5317, Payroll # ███████ B/M, PAL
Sergeant Eric Ervin #8643, Payroll # ███████ B/M, PAL
Sergeant Michael Pascucci #562, Payroll # ███████, W/M, PAL
Sergeant Michael Faust #369, Payroll # ███████ W/M, PAL
Police Officer David Klayman #9321, Payroll # ███████, W/M, PAL
Lieutenant Evelyn Cintron #168, Payroll # ███████ H/F, PAL

**D. Section-Documents**
Memorandum Submitted by Lieutenant Evelyn Cintron #168, Subject: "PAL Unit Incident" (10-13-17; pgs. 1-4)
Memorandum Submitted by Lieutenant Evelyn Cintron #168, Subject: "PAL Unit Civilian Staff" (10-13-17; pgs. 1-2)
Memorandum Submitted by Police Officer David Klayman #9321, Subject: "Incident with Chase Trimmer" (10-13-17)
Memorandum submitted by Sergeant Michael Pascucci #562, Subject: "Civilian Staff issues" (09-28-17)
Memorandum Submitted by Sergeant Michael Faust #369, Subject: "Incident on Thursday, October 12, 2017" (10-17-17)
E-mail sent by Lieutenant Evelyn Cintron #168, Subject: "Dave Klayman" (10-30-17)
Memorandum Submitted by Lieutenant Evelyn Cintron #168, Subject: "P/O David Klayman PR # ███████ " (10-30-17)
E-mail sent by Sergeant Christopher Shevlin #356, Subject: "P/O Klayman" (10-31-17)

**D. Section-Documents (Cont.)**

E-mail sent by Lieutenant Evelyn Cintron #168, Subject: "RE: P/O Klayman" (10-31-17)

E-mail Correspondence between Deputy Commissioner Sullivan and Lieutenant Evelyn Cintron #168 on 10-30-17

E-mail sent by Lieutenant Evelyn Cintron #168, Subject: "Office Gossip" (11-01-17; pgs. 1-2)

E-mail sent by Sergeant Christopher Shevlin #356, Subject: "Message from Deputy Sullivan" (11-10-17)

Memorandum Submitted by Lieutenant Evelyn Cintron #168, Subject: "Police Athletic League Personnel" (06-24-16)

Memorandum Submitted by Lieutenant Evelyn Cintron #168, Subject: "Request an Additional Sergeant be Assigned to PAL" (12-20-16)

Counseling Memorandum Issued to Sergeant Michael Faust #369, Subject: "Failure to Follow Order" (08-04-17)

Performance Evaluation (2016) for Sergeant Michael Faust #369

Memorandum Produced by Lieutenant Evelyn Cintron #168, Subject: "Police Athletic League Personnel" (10-31-17)

Memorandum Submitted by Lieutenant Evelyn Cintron #168, Subject: "Shift Re-Assignment" (11-06-17)

E-mail sent by Sergeant Christopher Shevlin #356, Subject: "PAL Performance Reports" (10-31-17)

Memorandum Submitted by Lieutenant Evelyn Cintron #168, Subject: "Documented Verbal Warning" (11-06-17)

Investigation Conducted by Lieutenant Evelyn Cintron #168 in Reference to Sergeant Ervin (pgs. 1-58)

E-mail Correspondence between Chase Trimmer and Lieutenant Evelyn Cintron #168, Subject: "Program/Event Approval and Chain of Command" (12-27-17; pgs. 1-2)

Memorandum Submitted by Officer Ricardo Hanton #5448, Subject: "Verbal Altercation between Chase Trimmer and Taaj Andrews" (01-19-17)

Memorandum Submitted by Officer Ricardo Hanton #5448, Subject: "01-24-18 Phone Conversation with Chase Trimmer" (01-24-18)

Memorandum Submitted by Lieutenant Evelyn Cintron #168, Subject: "Incident with Ted Qualli" (01-19-18; pgs. 1-2)

Memorandum Submitted by Officer Brian Younger #5465, Subject: "Incident at PAL Headquarters" (01-19-18)

Memorandum Submitted by Lieutenant Evelyn Cintron #168, Subject: "Incident between Sergeant Pascucci and Chase Trimmer 01-17-18" (01-19-18; pgs. 1-2)

Memorandum Submitted by Officer Angel Gonzalez #3233, Subject: "Concerns at Harrowgate" (01-23-18)

Letter Submitted by Mr. Ed Rentezela Regarding Officer Klayman's Class Schedule

DAR Printout of Officer Klayman's Timecard Balances

DAR Entries made for Officer Klayman (01-01-17 through 11-02-17; pgs. 1-16)

**D. Section-Documents (Cont.)**

Memorandum Submitted by Lieutenant Evelyn Cintron #168, Subject: "DAR Entries-PPD Directive 32" (01-30-18)

E-mail sent by Lieutenant Evelyn Cintron #168, Subject: "DAR" (11-22-17)

Certified Letter (7016-1370-0001-6227-9095) sent to Mr. Qualli (02-05-17)

E-mail Correspondence between the Assigned Investigator and Mr. Qualli Regarding Mr. Qualli's Interview

Memorandum Submitted by Police Officer Janice Little #9812, Subject: "Requesting Petty Cash" (10-10-17)

Memorandum Submitted by Police Officer Janice Little #9812, Subject: "Requesting Petty Cash" (10-10-17)

Memorandum Submitted by Police Officer Janice Little #9812, Subject: "Requesting Movie Theater Tickets" (10-20-17)

Memorandum Submitted by Police Officer Janice Little #9812, Subject: "Requesting Funds" (10-20-17)

Memorandum Submitted by Police Officer Janice Little #9812, Subject: "Requesting Permission" (10-25-17)

Photographs taken by Lieutenant Evelyn Cintron #168 on 01-11-18

CITY004

# MEMORANDUM

POLICE
CITY OF PHILADELPHIA
DATE: 05-29-18

TO    :    Police Commissioner

FROM  :    Commanding Officer, Internal Affairs Division

SUBJECT: **ANONYMOUS COMPLAINT, EEO #17-0039**

## ALLEGATION:

On 10-27-17, Sergeant Brent Conway #8892, Internal Affairs Division, was notified of an Equal Employment Opportunity complaint, received via Office of the Police Commissioner. EEO control #17-0039 was issued.

On 10-27-17, an anonymous letter was received by the Office of the Police Commissioner. The writer(s) of the anonymous letter alleged that Lieutenant Evelyn Cintron #168, Payroll # ███ Police Athletic League, created a hostile work environment for the personnel assigned to the Police Athletic League. The writer(s) of the anonymous letter alleged that Lieutenant Cintron created a hostile work environment by threatening a female officer. The writer(s) of the anonymous letter alleged that Lieutenant Cintron had a supervisor deliver a message to the female officer that stated, "Stay out of things that don't concern you." The writer(s) of the anonymous letter stated that they believed Lieutenant Cintron was referencing her (Lieutenant Cintron's) boyfriend, Police Officer David Klayman #9321, Payroll # ███, Police Athletic League.

**A check of the computerized personnel database revealed the following:**

**Lieutenant Evelyn Cintron #168, Payroll # ███ H/F, was appointed to the Philadelphia Police Department on 07-20-92, and assigned to the Police Athletic League on 06-20-16.**

On 10-30-17, Sergeant Brent Conway #8892 of the Internal Affairs Division was assigned the investigation.

## INVESTIGATIVE ANALYSIS:

A review of the anonymous letter received by the Office of Professional Responsibility regarding the allegation that Lieutenant Cintron created a hostile work environment for the personnel assigned to the Police Athletic League (PAL) revealed the following:

The writer(s) of the anonymous letter stated that on 10-13-17, Lieutenant Cintron ordered Sergeant Michael Pascucci #562 to tell Officer Janice Little #9812 to, "Stay out of things that don't concern you." The writer(s) of the anonymous letter believed that this was a reference to Lieutenant Cintron's boyfriend, Officer David Klayman #9321. The writer(s) of the anonymous letter stated that Sergeant Pascucci was reluctant to deliver the message to Officer Little and that he expressed to Lieutenant Cintron that he believed the message was inappropriate. The writer(s) of the anonymous

1

letter alleged that Lieutenant Cintron stated that she would have Police Commissioner Richard Ross remove both Sergeant Pascucci and Officer Little from PAL and that she would ruin both of their careers.

The writer(s) of the anonymous letter stated that the civilian employees at PAL were working from home because of the hostile work environment that was created by Lieutenant Cintron. The writer(s) of the anonymous letter stated that the civilian employees at PAL felt "threatened" by an ongoing situation involving Lieutenant Cintron and Officer Klayman.

In addition to the anonymous letter that was received by the Office of Professional Responsibility, several memorandums were forwarded which detailed a verbal argument between Officer Klayman and Chase Trimmer, Director of Programs and Education, PAL. In the memorandum that was produced by Lieutenant Cintron, she stated that she overheard Officer Klayman and Mr. Trimmer arguing outside of her office. Lieutenant Cintron stated in the memorandum that she instructed both Officer Klayman and Mr. Trimmer to stop arguing which they did.

*Note: PAL consists of employees of both the Philadelphia Police Department and PAL. The employees who are employed by PAL do not report to or work directly for the Philadelphia Police Department.*

On 10-31-17, the assigned investigator contacted Theodore Qualli, Executive Director, PAL, and inquired if there were any of his employees who would be willing to provide a statement regarding any concerns they might have with the work environment at PAL. Mr. Qualli provided the assigned investigator with the names of employees who either had concerns or who witnessed the incident involving Officer Klayman and Chase Trimmer. Those PAL employees were all contacted via e-mail and asked if they would be willing to provide a statement. The summary of the statements provided by the PAL employees are listed below.

**Nija Burton, IT Manager, PAL, B/F, Phone #**███████, was interviewed on 12-13-17, by the assigned at the Police Athletic League Headquarters, 2524 Clearfield Street, Philadelphia Pa. 19134, and relayed the following in summary:

Ms. Burton states that on 10-12-17, she observed an incident involving Officer Klayman and Chase Trimmer during which Officer Klayman and Mr. Trimmer had a verbal altercation in reference to Mr. Trimmer sitting at Officer Klayman's desk. Ms. Burton states that during the argument, Officer Klayman became aggressive and that she believed the argument Officer Klayman and Mr. Trimmer were having was going to become physical. Ms. Burton describes Mr. Trimmer's tone during the argument as "mild" as she believed he was trying to deescalate the situation. Ms. Burton states that Officer Klayman got loud during the argument and that he was inside of Mr. Trimmer's "personal space."

Ms. Burton states that Officer Klayman used profanity during the argument and that at one point during the argument, he asked Mr. Trimmer to "step outside." Ms. Burton states that as the argument got louder, Lieutenant Cintron, Sergeant Michael Faust #369 and Cassandra Harris (PAL employee) came out. Lieutenant Cintron and Sergeant Faust separated Officer Klayman and Mr. Trimmer and then they took Officer Klayman into Lieutenant Cintron's office.

CITY006

Ms. Burton states that she worked from home the day following the argument involving Officer Klayman and Mr. Trimmer. Ms. Burton states that she stayed home to clear her head after witnessing Officer Klayman and Mr. Trimmer arguing.

Ms. Burton states that she does not believe there is a hostile work environment at PAL.

Ms. Burton states that she does not know if Lieutenant Cintron gave Officer Klayman preferential treatment because she does not know what an aide does.

**Cassandra Harris, Auction Manager and Senior Development Coordinator, PAL, B/F, Phone #**████████, was interviewed on 12-13-17, by the assigned at the Police Athletic League Headquarters, 2524 Clearfield Street, Philadelphia Pa. 19134, and relayed the following in summary:

Ms. Harris states that while inside of Lieutenant Cintron's office on 10-12-17, with Lieutenant Cintron and Sergeant Faust, she overheard loud voices coming from outside the office. Lieutenant Cintron and Sergeant Faust got up and opened the door to see what was going on. As Lieutenant Cintron and Sergeant Faust were attempting to find out what was going on, Ms. Harris states that she heard Officer Klayman's voice. Ms. Harris stood in the doorway to Lieutenant Cintron's office and observed that it was Officer Klayman and Mr. Trimmer who were having a loud conversation.

Ms. Harris states that she did not work from home on the day following the argument involving Officer Klayman and Mr. Trimmer.

Ms. Harris states that she does not believe there is a hostile work environment at PAL.

Ms. Harris states that she was not aware of Lieutenant Cintron giving Officer Klayman preferential treatment.

**Nadirah McCauley, Program Coordinator, PAL, B/F, Phone #**████████, was interviewed on 01-18-18, by the assigned at the Police Athletic League Headquarters, 2524 Clearfield Street, Philadelphia Pa. 19134, and relayed the following in summary:

Ms. McCauley states that she did not witness an incident involving Officer Klayman and Mr. Trimmer on 10-12-17.

Ms. McCauley states that she does believe Lieutenant Cintron uses her position and rank against her (Ms. McCauley). Ms. McCauley states that she believed Lieutenant Cintron was "out to get her."

Ms. McCauley states that on 11-01-17, she received an e-mail from Lieutenant Cintron with the subject, "Office gossip." Ms. McCauley states that Lieutenant Cintron stated in the e-mail, her (Ms. McCauley) name came up in a conversation about gossiping and that she (Ms. McCauley) should stop discussing her (Lieutenant Cintron) and Officer Klayman. Lieutenant Cintron also stated in the e-mail that she was not accusing Ms. McCauley of anything; however, she asked her (Ms. McCauley) to stop gossiping.

CITY007

Ms. McCauley states that she believes Lieutenant Cintron felt that she needed to address the rumors she (Lieutenant Cintron) believed were being spread about her (Lieutenant Cintron) and Officer Klayman. Ms. McCauley believes Lieutenant Cintron sent her the e-mail because her (Ms. McCauley's) supervisors were against Lieutenant Cintron having a face-to-face meeting with her. Ms. McCauley believes that Lieutenant Cintron felt that sending the e-mail was the best option she had in lieu of a face-to face meeting.

Ms. McCauley states that on 01-11-18, her co-worker, Taaj Andrews, informed her that Lieutenant Cintron came into their workspace and began taking pictures of her (Ms. McCauley's) desk and nameplate. Mr. Andrews informed Ms. McCauley that Lieutenant Cintron did not see him and that he just watched her take the pictures and walk away. Mr. Andrews stated to Ms. McCauley that he called Lieutenant Cintron back over after she walked away and discussed a work-related matter with her. Lieutenant Cintron informed Mr. Andrews that she did not see him there when she was over there previously. Ms. McCauley states that she informed her supervisor (Mr. Qualli) what Mr. Andrews told her he observed and she also reported what occurred to the PAL Human Resources personnel.

Ms. McCauley states that she believed Lieutenant Cintron gave Officer Klayman preferential treatment. Ms. McCauley states that she estimates that Officer Klayman was in the office no more the eight hours during the course of a forty-hour work week.

**Taaj Andrews, Program Coordinator, PAL, B/M, Phone #** ▇▇▇▇▇▇▇ was interviewed on 01-18-18, by the assigned at the Police Athletic League Headquarters, 2524 Clearfield Street, Philadelphia Pa. 19134, and relayed the following in summary:

Mr. Andrews states that on 10-12-17, he observed Officer Klayman approach Mr. Trimmer and ask him if he (Officer Klayman) could talk to him (Mr. Trimmer). Officer Klayman stated to Mr. Trimmer that he understood that "AmeriCorps Coaches" were sitting at his desk the day prior. Mr. Trimmer informed Officer Klayman that he allowed the "AmeriCorps Coaches" to sit at Officer Klayman's desk to finish an assignment because he did not have anywhere else for them to sit. Mr. Trimmer stated to Officer Klayman that he did not believe it would be a problem because the desk was clear and the "AmeriCorps Coaches" were not going to be at the computer for a long period of time. Mr. Andrews states that Officer Klayman began getting louder and stated that it was a problem. Officer Klayman stated to Mr. Trimmer that he did things for Lieutenant Cintron that involved sensitive information that no civilian should have access to.

Mr. Andrews states that Officer Klayman and Mr. Trimmer went back and forth for a while and that Officer Klayman began making personal attacks toward Mr. Trimmer stating to Mr. Trimmer, "You're passive aggressive; you don't respect Lieutenant Cintron and her authority; I am tired of hearing about this." Mr. Andrews states that Mr. Trimmer did not say much to Officer Klayman; however, Mr. Trimmer did state that he did not know Officer Klayman was still sitting at that desk. Mr. Trimmer stated that he thought Officer Klayman had moved into Sergeant Eric Ervin's #8643 old office. Mr. Andrews states that Officer Klayman asked Mr. Trimmer if he wanted to the take the conversation outside. Mr. Andrews states that the conversation became loud enough for Lieutenant Cintron and Sergeant Faust to hear through the closed door of her office.

CITY008

Mr. Andrews states that at his supervisor's suggestion, he worked from home the day following the argument Officer Klayman and Mr. Trimmer had on 10-12-17. Mr. Andrews worked from home because he believed that there was an uncomfortable work environment after the argument.

Mr. Andrews states he has learned more about the process and the culture at PAL and learned that it was not necessarily PAL's culture; the argument had by Officer Klayman and Mr. Trimmer was an isolated incident.

Mr. Andrews does believe there is a hostile work environment at PAL. Mr. Andrews states that he believes the personnel at PAL allow personal disagreements and agendas to get in the way of their purpose for being at PAL. Mr. Andrews believes that some of the personnel do not feel comfortable voicing their opinions for fear of their job security.

Mr. Andrews states that he believed Lieutenant Cintron gave Officer Klayman preferential treatment. Mr. Andrews states that Lieutenant Cintron's current aide is at work more than Officer Klayman ever was. Mr. Andrews believes that Lieutenant Cintron's current aide is in the office eighty percent of the time, whereas when Officer Klayman was her aid, he was only in the office twenty percent of the time.

Mr. Andrews states that he was sitting at his desk approximately a week prior to his Internal Affairs interview, when he heard what sounded like a camera flash. Mr. Andrews looked up and saw Lieutenant Cintron taking a photo of Ms. McCauley's cubicle. Mr. Andrews believes Lieutenant Cintron also took a picture of Ms. McCauley's nametag. Mr. Andrews states that Lieutenant Cintron stepped closer to Ms. McCauley's cubicle and took a picture of her desk, looked at her phone and then walked away. Mr. Andrews does not believe Lieutenant Cintron saw him sitting there while she was taking the pictures. Mr. Andrews called Lieutenant Cintron back after she walked away to ask her questions about a reading program. Mr. Andrews states that Lieutenant Cintron seemed shocked that he was standing there and kept saying to him that she did not know he was there. Mr. Andrews and Lieutenant Cintron discussed the reading program and she left.

**Chase Trimmer, Director of Programs and Education, PAL, W/M, Phone #**              , was interviewed on 12-13-17, by the assigned at the Police Athletic League Headquarters, 2524 Clearfield Street, Philadelphia Pa. 19134, and relayed the following in summary:

Mr. Trimmer states that on 10-12-17, he was approached by Officer Klayman in the open office area where Officer Klayman asked him if he had a minute to talk. Officer Klayman then asked Mr. Trimmer, "What happened yesterday?" Mr. Trimmer was not sure what Officer Klayman was referring to because he did not have any interactions with Officer Klayman on 10-11-17. Mr. Trimmer believed Officer Klayman was referring to the use of his (Officer Klayman's) workspace outside of Lieutenant Cintron's office. Mr. Trimmer states that Officer Klayman informed him that he wanted to discuss the use of his (Officer Klayman's) workspace and a claim that he (Mr. Trimmer) did not know Officer Klayman's work hours or what Officer Klayman did at PAL. Mr. Trimmer states that he informed Officer Klayman that he was not aware of Officer Klayman's schedule and that he did not make any comments about his (Officer Klayman's) schedule or role at PAL. Mr. Trimmer states that Officer Klayman began to raise his voice and starting yelling at him

CITY009

in an aggressive manner, stating that he (Mr. Trimmer) had been, "Disrespectful toward the Commanding Officer for the past year." Officer Klayman also stated that Mr. Trimmer was "passive aggressive" and that he questioned Lieutenant Cintron. Mr. Trimmer asked Officer Klayman for examples of his disrespectful behavior and Officer Klayman responded by cursing at Mr. Trimmer and stating that he did not have the authority to use the workspace near Lieutenant Cintron's office. Officer Klayman stated that there needed to be separation between police space and PAL space and informed Mr. Trimmer that he needed to understand and respect police protocol and the chain of command.

Mr. Trimmer states that Officer Klayman continued to yell at him at which time Lieutenant Cintron and Sergeant Faust came out of Lieutenant Cintron's office. Mr. Trimmer states that Officer Klayman continued his aggressive behavior and cursing, stating that he (Mr. Trimmer) was, "back talking" and "talking behind the lieutenant's back." Officer Klayman added that "everyone should hear this" while referencing the other PAL members who were in the area. Mr. Trimmer states that Lieutenant Cintron and Sergeant Faust asked Officer Klayman to calm down, after which Lieutenant Cintron stated, "David, this cannot happen here." Officer Klayman responded, "We can go in the kitchen or we can go outside." Mr. Trimmer states that Lieutenant Cintron extended her arm and positioned herself between him and Officer Klayman. Mr. Trimmer states that after Lieutenant Cintron positioned herself between him and Officer Klayman, Officer Klayman stated to Sergeant Faust, "You are the reason all of this bullshit is going on." Following this statement, Officer Klayman walked away after which he and Lieutenant Cintron left the building.

Mr. Trimmer states that Officer Klayman did not make any verbal threats to him; however, Mr. Trimmer did feel threatened by Officer Klayman stepping closer to him while yelling.

Mr. Trimmer states that on 10-13-17, he worked from home because he felt concerned with the work environment after Officer Klayman's supervisors did not address or acknowledge the incident that occurred on 10-12-17.

Mr. Trimmer states that he believes there was a hostile work environment at PAL. Mr. Trimmer believes that the hostile work environment at PAL was a direct result of Lieutenant Cintron's distrust, failure to communicate and a lack of respect for PAL non-profit staff members.

Mr. Trimmer states that he did feel threatened by what he described as the "personal nature" of the relationship between Lieutenant Cintron and Officer Klayman.

Mr. Trimmer states that Ms. McCauley informed him that she felt threatened by Lieutenant Cintron. Mr. Trimmer states that Ms. McCauley that she felt threatened by Lieutenant Cintron after Lieutenant Cintron sent her an e-mail that included Lieutenant Cintron threatening to file a harassment complaint against Ms. McCauley.

Mr. Trimmer believes that Lieutenant Cintron gave Officer Klayman preferential treatment. Mr. Trimmer states that Officer Klayman was given flexible hours to accommodate his school schedule and that Officer Klayman had different "uniform standards" compared to the other PAL officers. Mr. Trimmer has also observed Officer Klayman providing transportation to Lieutenant Cintron's

CITY010



daughter and family members while using the PAL owned vehicle that was assigned to Lieutenant Cintron.

**Theodore Qualli, Executive Director, PAL, W/M, Phone #** ▮▮▮▮▮▮▮ was interviewed on 02-16-18, by the assigned at the Police Athletic League Headquarters, 2524 Clearfield Street, Philadelphia Pa. 19134, and relayed the following in summary:

Mr. Qualli states that his responsibilities at PAL include the supervision of the civilian personnel employed by PAL. Mr. Qualli states that Lieutenant Cintron is the Commanding Officer of the PAL unit and her responsibilities are to ensure the PAL unit is providing services to the children at the PAL centers in a manner consistent with PAL's strategic plan. Mr. Qualli states that he does not report to Lieutenant Cintron and that she does not report to him. Mr. Qualli added that the civilian personnel employed by PAL report directly to him and not to Lieutenant Cintron.

Mr. Qualli states that on 10-12-17, Mr. Trimmer reported to him that Officer Klayman asked to speak to him regarding the use of a cubicle that Officer Klayman used. Mr. Trimmer informed Mr. Qualli that Officer Klayman began yelling and cursing at him while the two of them discussed the cubicle being used. Mr. Qualli states that he instructed Mr. Trimmer to document what occurred. Mr. Qualli also asked PAL's Director of Finance and Administration (HR), Sunny Li, to speak to Mr. Trimmer about what occurred between him and Officer Klayman. Mr. Qualli states that a memorandum was produced and forwarded to the PAL Board Treasurers requesting counsel with how he should proceed due to the incident involving a police officer.

Mr. Qualli states that he then met with his staff to discuss what occurred during the incident involving Mr. Trimmer and Officer Klayman. Several of Mr. Qualli's staff members relayed that they were concerned for Mr. Trimmer's safety and their safety in general. Mr. Qualli informed his staff that he and Lieutenant Cintron would discuss the matter. Mr. Qualli states that he also informed his staff that if they felt unsafe, they could work from home.

Mr. Qualli states that he met with Lieutenant Cintron to discuss what occurred during the incident involving Mr. Trimmer and Officer Klayman. During the meeting, Lieutenant Cintron informed Mr. Qualli that the incident was, "A disagreement between two men." Lieutenant Cintron also informed Mr. Qualli that Officer Klayman was, "Sick of the sarcasm at PAL and people talking behind her (Lieutenant Cintron) back."

Mr. Qualli states that to his knowledge, Lieutenant Cintron did not take any actions as it related to the incident Mr. Trimmer had with Officer Klayman.

Mr. Qualli states that the days following the incident involving Mr. Trimmer and Officer Klayman, he (Mr. Qualli) did not feel comfortable at PAL. Mr. Qualli states that several of his employees and Sergeant Faust have expressed to him concerns with the incident.

Mr. Qualli states that on 11-01-17, Lieutenant Cintron informed him that Ms. McCauley was spreading rumors. Mr. Qualli asked Lieutenant Cintron how she knew Ms. McCauley was spreading rumors and Lieutenant Cintron responded, "She (Ms. McCauley) was at the party." Mr. Qualli asked Lieutenant Cintron what party she was referring to and Lieutenant Cintron responded that she

7

was referring to her (Lieutenant Cintron's) birthday party that took place during the summer (2017). Lieutenant Cintron informed Mr. Qualli that the rumor she was referring to emanated from that party.

Mr. Qualli states that he told Lieutenant Cintron he did not believe it was a good idea for her to talk to Ms. McCauley at that time because he believed Lieutenant Cintron was emotional. Mr. Qualli informed Lieutenant Cintron he would speak to Ms. McCauley about the alleged rumor and that he would get back to Lieutenant Cintron as soon as possible. Mr. Qualli states that he did meet with Ms. McCauley to discuss Lieutenant Cintron's concerns. During that meeting, Ms. McCauley stated that she heard rumors about Lieutenant Cintron and Officer Klayman from PAL police personnel; however, she did not engage in spreading rumors that she heard.

Mr. Qualli states that he documented the meeting he had with Ms. McCauley in an e-mail and informed Lieutenant Cintron that she could speak to Ms. McCauley directly. Mr. Qualli states that Lieutenant Cintron was subsequently informed that another PAL employee, Diana Harris, was engaged in spreading the rumors she referred to previously. Mr. Qualli informed Lieutenant Cintron that he would speak to Ms. Harris. Mr. Qualli met with Ms. Harris at which time; Ms. Harris denied spreading rumors about Lieutenant Cintron. Mr. Qualli states that he documented his meeting with Ms. Harris in an e-mail to Lieutenant Cintron.

Mr. Qualli states that Lieutenant Cintron did not request to meet with the PAL staff in order discuss the rumors she alleged were being spread.

Mr. Qualli states that on 11-01-17, Lieutenant Cintron sent an e-mail to Ms. McCauley with the subject, "Office Gossip." Mr. Qualli states that Ms. McCauley shared the e-mail with PAL's Human Resources staff. The e-mail was then forwarded to the PAL Board Treasurers and the Chair of PAL due to Ms. McCauley and PAL's Human Resources staff believing that the e-mail was threatening in nature.

Mr. Qualli states that Lieutenant Cintron did not explain to him why she sent Ms. McCauley the e-mail.

Mr. Qualli states that he does not know if Lieutenant Cintron gave Officer Klayman preferential treatment.

Mr. Qualli states that he does not believe there was a hostile work environment at PAL. Mr. Qualli states that he and Lieutenant Cintron have taken actions together to address communication challenges at PAL, including a retreat for both the police and civilian staff at PAL, as well as a retreat for the PAL leadership staff.

CITY012



**Police Officer Janice Little #9812, Payroll** ▆▆▆▆ **B/F, PAL,** was interviewed on 11-29-17, by the assigned at Internal Affairs Headquarters and relayed the following in summary:

*Note: Officer Little is assigned to the Winnfield PAL Center located at 2251 North 54th Street.*

Officer Little states that she did not witness the incident involving Mr. Trimmer and Officer Klayman that occurred on 10-12-17.

Officer Little states that on 10-13-17, Sergeant Michael Pascucci #562, informed her that Lieutenant Cintron ordered him to tell her (Officer Little) to stay out of things that don't concern her. Sergeant Pascucci informed Officer Little that Lieutenant Cintron stated that she (Officer Little) had a picture of her (Lieutenant Cintron) and Officer Klayman. Sergeant Pascucci also informed Officer Little that Lieutenant Cintron wanted to know who was talking about her. Officer Little informed Sergeant Pascucci that she did not know what picture he was referring to and that he needed to talk to the civilian employees in reference to who was talking about Lieutenant Cintron.

Officer Little states that she felt threatened by the order Lieutenant Cintron told Sergeant Pascucci to give her (Officer Little). Officer Little felt threatened by Lieutenant Cintron's order because Lieutenant Cintron is the Commanding Officer of PAL and Officer Little having to go through her in order to get approval for programs at her PAL center. Officer Little states that after she received Lieutenant Cintron's order from Sergeant Pascucci, she submitted a memorandum to Lieutenant Cintron requesting to take her PAL children to the movies and she did not receive a response. Officer Little asked Sergeant Pascucci about the memorandum and he informed her that the memorandum was on Lieutenant Cintron's desk. Officer Little states that she also submitted memorandums to Lieutenant Cintron prior to receiving her order on 10-13-17, that were not approved and she did not know why.

Officer Little states that Officer Klayman was Lieutenant Cintron's aide and that she believes Lieutenant Cintron gave Officer Klayman preferential treatment because there were times when Officer Klayman would not have on a uniform; however, the other PAL officers did.

Officer Little states that it was known within the unit that Officer Klayman had what she describes as, "Words" with Officer Keith Balco #6726, Officer Michael Ragucci #1857 and Officer Kareem Johnson #5317.

**Police Officer Rasheed McDaniels #6362, Payroll** ▆▆▆▆ **, B/M, PAL,** was interviewed on 12-21-17, by the assigned at Internal Affairs Headquarters and relayed the following in summary:

*Note: Officer McDaniels is assigned to PAL Headquarters at 3068 Belgrade Street.*

Officer McDaniels states that he did not witness the incident involving Mr. Trimmer and Officer Klayman that occurred on 10-12-17.

Officer McDaniels states that he believes Lieutenant Cintron gave Officer Klayman preferential treatment. Officer McDaniels states that, to his understanding, Officer Klayman did not have to report to either sergeant assigned to PAL. Officer McDaniels also states that he could not think of

CITY013

one week since Lieutenant Cintron was assigned to PAL that Officer Klayman came into work on time or left on time. Officer McDaniels does not know if Officer Klayman was allowed to adjust his work schedule to accommodate his school schedule; however, Officer McDaniels is aware that Officer Klayman was going to school and he (Officer McDaniels) believes Officer Klayman left work whenever he felt like it.

Officer McDaniels states that Officer Klayman was also given Sergeant Ervin's old office after Sergeant Ervin was detailed to another unit.

Officer McDaniels states that Officer Klayman was required to wear the same uniform as the other police personnel assigned to PAL.

Officer McDaniels states that he has observed Officer Klayman providing transportation to Lieutenant Cintron's daughter using a PAL owned vehicle; however, Officer McDaniels does not know why.

**Police Officer Michael Ragucci #1857, Payroll ███████, W/M, PAL,** was interviewed on 12-21-17, by the assigned at Internal Affairs Headquarters and relayed the following in summary:

*Note: Officer Ragucci is assigned to PAL Headquarters at 3068 Belgrade Street.*

Officer Ragucci states that he spoke to civilian personnel employed by PAL who informed him about an incident involving Mr. Trimmer and Officer Klayman on 10-12-17; however, he did not witness the incident himself. Officer Ragucci states that civilian personnel employed by PAL appeared to be "shaken-up" after the incident involving Mr. Trimmer and Officer Klayman.

Officer Ragucci states that he believes Lieutenant Cintron gave Officer Klayman preferential treatment. Officer Ragucci states that Officer Klayman did not have to work on holidays despite the other PAL police personnel being required to work.

Officer Ragucci states that he does not know if Officer Klayman was allowed to adjust his work schedule to accommodate his school schedule.

Officer Ragucci states that he assumes Officer Klayman was required to wear the same uniform as the other PAL police personnel; however, he (Officer Ragucci) did not see Officer Klayman enough or deal with him often enough to know what he was wearing while on-duty.

Officer Ragucci states that he does not know if Officer Klayman provided transportation to members of Lieutenant Cintron's family while using a PAL owned vehicle.

Officer Ragucci states that he has never been involved in an incident with Officer Klayman during which Officer Klayman yelled or cursed at him. Officer Ragucci also states that he has never been involved in an incident with Officer Klayman during which other officers or supervisors had to separate him and Officer Klayman.

CITY014



**Police Officer Keith Balco #6726, Payroll #** ▮▮▮▮ **W/M, PAL,** was interviewed on 12-21-17, by the assigned at Internal Affairs Headquarters and relayed the following in summary:

*Note: Officer Balco is assigned to PAL Headquarters at 3068 Belgrade Street.*

Officer Balco states that he did not witness the incident involving Mr. Trimmer and Officer Klayman that occurred on 10-12-17.

Officer Balco states that in his opinion, Lieutenant Cintron did not give Officer Klayman preferential treatment.

Officer Balco states that he believes Officer Klayman was allowed to adjust his work schedule to accommodate his school schedule; however, he did not know how Officer Klayman adjusted his schedule because Officer Klayman was quiet with where he was going. Officer Balco is not sure if Officer Klayman was doing something for Lieutenant Cintron or if he was going to school when he left work.

Officer Balco states that as far as he knows, Officer Klayman was required to wear the same uniform as the other PAL police personnel.

Officer Balco states that he has observed Officer Klayman providing transportation to Lieutenant Cintron's daughter using a PAL owned vehicle. Officer Balco believes some of the rides Officer Klayman provided Lieutenant Cintron's daughter were to PAL events.

Officer Balco states that both Mr. Trimmer and Ms. McCauley have informed him they felt uncomfortable with Officer Klayman. Officer Balco states that Officer Klayman can talk down to people and that Mr. Trimmer and Ms. McCauley felt uncomfortable with Officer Klayman's tone.

**Police Officer Kareem Johnson #5317, Payroll #** ▮▮▮▮ **, B/M, PAL,** was interviewed on 12-21-17, by the assigned at Internal Affairs Headquarters and relayed the following in summary:

*Note: Officer Johnson is assigned to the Cozen PAL Center located at 732 North 17th Street.*

Officer Johnson states that he did not witness the incident involving Mr. Trimmer and Officer Klayman that occurred on 10-12-17.

Officer Johnson states that he cannot specifically say that Lieutenant Cintron gave Officer Klayman preferential treatment. Officer Johnson believes that some things did not apply to Officer Klayman such as coming and going from work. Officer Johnson states that he does not see Officer Klayman often. Officer Johnson does not know if Officer Klayman was allowed to adjust his work schedule to accommodate his school schedule; however, Officer Johnson has heard that Officer Klayman was allowed to adjust his schedule.

Officer Johnson states that Officer Klayman was required to wear the same uniform as the other police personnel assigned to PAL.

11



Officer Johnson states that he does not know if Officer Klayman provided transportation to members of Lieutenant Cintron while using a PAL owned vehicle.

Officer Johnson states that none of the civilian personnel employed by PAL informed him that they felt threatened by an ongoing situation involving Lieutenant Cintron and Officer Klayman.

Officer Johnson states that during the summer of 2017, he had an incident with Officer Klayman while at a PAL baseball game. Officer Johnson states that he had an issue with his team displaying poor sportsmanship after the game. Officer Johnson talked to his team and rectified the situation by having his team shake hands with the players from the other team. Officer Johnson states that Lieutenant Cintron and Officer Klayman came over to address his team's poor sportsmanship and he informed Lieutenant Cintron that he already addressed the situation.

Officer Johnson states that Officer Klayman asked to have a word with him, during which Officer Klayman stated to Officer Johnson, "The next time the lieutenant is talking, you shut up." Officer Johnson asked Officer Klayman if he was giving him an order, to which Officer Klayman responded that he (Officer Johnson) could take it anyway that he wants. Officer Johnson states that he began to walk away from Officer Klayman because he knew that was not the place for that discussion. Officer Johnson states that he walked away from Officer Klayman; however, Officer Klayman followed him, yelling obscenities toward him. Officer Johnson states that he told Officer Klayman that if Lieutenant Cintron had any issues with him that she could address him, not him (Officer Klayman). Officer Johnson states that Officer Klayman continued to follow him, at which time Officer Johnson stopped and stood face to face with him. Officer Johnson stated to Officer Klayman that he did not have authority over him and to stop talking to him like he was one of the kids. Officer Johnson states that Lieutenant Cintron and Sergeant Pascucci approached him and Officer Klayman. Officer Johnson states that Lieutenant Cintron stated to Officer Klayman, "Not here David, do it for me please" and Sergeant Pascucci told him (Officer Johnson) to walk away.

Officer Johnson states that he does not know if Lieutenant Cintron took any actions in relation to the incident he had with Officer Klayman.

**Sergeant Eric Ervin #8643, Payroll ███████ B/M, PAL,** was interviewed on 12-28-17, by the assigned at Internal Affairs Headquarters and relayed the following in summary:

*Note: Sergeant Ervin was detailed to the Civil Affairs Unit on 07-10-17.*

Sergeant Ervin states that he believes Lieutenant Cintron gave Officer Klayman preferential treatment. Sergeant Ervin states that during the summer vacation period, he was short-handed and requested to use Officer Klayman to provide transportation for children to a PAL event; however, Lieutenant Cintron informed him to find another way. Sergeant Ervin states that he was ordered by Lieutenant Cintron not ask Officer Klayman anything or to ask Officer Klayman to do anything.

Sergeant Ervin states that he does not know if Officer Klayman was allowed to adjust his work schedule to accommodate his school schedule.

CITY016



Sergeant Ervin states that he observed Officer Klayman not wearing the same uniform as the other police personnel assigned to PAL; however, Sergeant Ervin did not know if Officer Klayman was working or not at the time.

Sergeant Ervin states that he has observed Officer Klayman providing transportation to Lieutenant Cintron's daughter using a PAL owned vehicle on multiple occasions; however, he does not know why.

Sergeant Ervin states that he was detailed to the Civil Affairs unit on 07-10-17. Sergeant Ervin was not told why he was detailed to the Civil Affairs unit; however, he believes it was due to a PAL basketball game. Sergeant Ervin states that he attempted to talk to Lieutenant Cintron about a basketball game he scheduled and an officer (Officer Ricardo Hanton #5448) not showing up to that basketball game. Sergeant Ervin attempted to request disciplinary action against Officer Hanton for not showing; however, after submitting his request, he did not hear anything else from Lieutenant Cintron. Sergeant Ervin states that Lieutenant Cintron refused to talk to him about it, as he describes her as just shutting down.

*Note: The assigned contacted Sergeant Ervin via phone and asked him if he still had possession of the memorandum he produced in relation to his concerns with Officer Hanton. Sergeant Ervin informed the assigned that he did not have a copy of the memorandum; however, he believed a copy would have been submitted to Lieutenant Cintron. The assigned conducted a review of Officer Hanton's personnel file at PAL headquarters and was unable to locate the memorandum referred to by Sergeant Ervin during his interview.*

**Sergeant Michael Pascucci #562, Payroll █████████, W/M, PAL,** was interviewed on 12-29-17, by the assigned at Internal Affairs Headquarters and relayed the following in summary:

*Note: Sergeant Pascucci is not assigned to a specific PAL Center as he is responsible for the conducting checks of the PAL Centers located throughout the city.*

Sergeant Pascucci states that he not aware of Lieutenant Cintron giving Officer Klayman preferential treatment.

Sergeant Pascucci states that he did not witness the incident involving Mr. Trimmer and Officer Klayman that occurred on 10-12-17.

Sergeant Pascucci states that on 10-13-17, Lieutenant Cintron stated to him (Sergeant Pascucci) that she received information that Officer Little and a civilian employee were trying to get her aide (Officer Klayman) kicked out of PAL. Lieutenant Cintron stated to Sergeant Pascucci that the civilian employee had a picture of Officer Klayman kissing her (Lieutenant Cintron) at her fiftieth birthday party. Sergeant Pascucci states that Lieutenant Cintron ordered him to tell Officer Little to stay out of things that do not concern her. Sergeant Pascucci contacted Officer Little over the phone and relayed Lieutenant Cintron's order to her.

Sergeant Pascucci states that he felt uneasy delivering Lieutenant Cintron's message to Officer Little because he believed it to be more of a personal topic; not the type of thing he is usually

13

ordered to do. Sergeant Pascucci did not inform Lieutenant Cintron that he believed that the message she ordered him to deliver was inappropriate.

Sergeant Pascucci states that Lieutenant Cintron did not tell him that she was good friends with the Police Commissioner or that she would ruin his and Officer Little's careers.

Sergeant Pascucci states that Officer Little has expressed to him that memorandums she submitted to Lieutenant Cintron were not being approved. Sergeant Pascucci told Officer Little that he did not know what memorandums needed the approval of the non-profit personnel at PAL or which memorandums could be approved by Lieutenant Cintron. However, Sergeant Pascucci states that some memorandums, that included requests for money for a program or event, required the approval of the non-profit personal at PAL. Sergeant Pascucci did not know what happened to the memorandums after they were submitted to Lieutenant Cintron.

*Note: Sergeant Pascucci was re-interviewed on 01-11-18, in reference to the incident Officer Johnson had with Officer Klayman at a PAL baseball game during the summer of 2017.*

Sergeant Pascucci states that he observed an argument involving Officer Johnson and Officer Klayman while at a PAL baseball game during the summer of 2017. Sergeant Pascucci states that he heard screaming coming from the baseball field while Lieutenant Cintron was handing out trophies to the winners of the baseball game. Sergeant Pascucci investigated the screaming he heard and found that Officer Johnson and Officer Klayman were involved in a verbal argument. Sergeant Pascucci heard both Officer Johnson and Officer Klayman yelling; however, he could not hear what they were yelling about. Sergeant Pascucci took Officer Johnson to the side behind the batting cages to cool off and Lieutenant Cintron took Officer Klayman to the other side of the field.

Sergeant Pascucci states that he was not aware of Lieutenant Cintron stating to Officer Klayman, "Not here David; do it for me please."

Sergeant Pascucci states the he did not believe Officer Johnson or Officer Klayman should have received disciplinary action as a result of the argument they had.

**Sergeant Michael Faust #369, Payroll ███████, W/M, PAL,** was interviewed on 12-19-17, by the assigned at Internal Affairs Headquarters and relayed the following in summary:

*Note: Sergeant Faust is assigned to PAL Headquarters at 3068 Belgrade Street.*

Sergeant Faust states that he believes Lieutenant Cintron gave Officer Klayman preferential treatment. Sergeant Faust states that there were many times that he did not see Officer Klayman working an eight-hour day and it appeared as though Officer Klayman was allowed adjust his work schedule to accommodate his school schedule.

Sergeant Faust states that he has observed Officer Klayman providing transportation to Lieutenant Cintron's daughter using a PAL owned vehicle. Sergeant Faust does not know where Officer Klayman and Lieutenant Cintron's daughter went during the times he would provide her

CITY018

transportation; however, he was aware that Lieutenant Cintron's daughter worked at the 25th PAL center (3150 North Mascher Street).

Sergeant Faust states that Officer Klayman was required to wear the same uniform as the other police personnel assigned to PAL.

Sergeant Faust states that on 10-12-17, he was in a meeting with Lieutenant Cintron and Ms. Harris inside of Lieutenant Cintron's office when they heard a disturbance coming from outside of the office. Sergeant Faust and Lieutenant Cintron went out of Lieutenant Cintron's office to see what was happening and found Officer Klayman and Mr. Trimmer involved in an argument. Sergeant Faust states the argument stemmed from Mr. Trimmer allowing people to use Officer Klayman's computer the day before. Sergeant Faust and Lieutenant Cintron explained to Officer Klayman and Mr. Trimmer that this was not the place for the conversation. Sergeant Faust states that after he told Officer Klayman that was not the place for the conversation, Officer Klayman looked at him (Sergeant Faust) and stated to Sergeant Faust, do not tell him what to do. Officer Klayman then stated that he (Sergeant Faust) was part of the problem and he (Officer Klayman) would deal with him later. Sergeant Faust states that it was suggested by Lieutenant Cintron that if they wanted to continue the conversation, they should do so in the kitchen. Sergeant Faust states that Lieutenant Cintron then told Officer Klayman to go into her office so she could speak to him.

Sergeant Faust states that he heard Officer Klayman yelling and using profanity during the incident he had with Mr. Trimmer on 10-12-17. Sergeant Faust described Officer Klayman as extremely upset while the whole incident took place.

Sergeant Faust states that he did not hear Mr. Trimmer raise his voice or use profanity during the incident. Sergeant Faust described Mr. Trimmer as calm during the incident, as he listened to Officer Klayman and came back with some responses.

Sergeant Faust states that he did hear Officer Klayman state to Mr. Trimmer, "We can go into the kitchen or we can go outside."

Sergeant Faust states that in his opinion, Officer Klayman's conduct during the incident he had with Mr. Trimmer on 10-12-17 was inappropriate for the work place. Sergeant Faust did not believe Mr. Trimmer's conduct during the incident was inappropriate.

Sergeant Faust states that he is not aware of Lieutenant Cintron taking any action against Officer Klayman in reference to the incident he had with Mr. Trimmer or in reference to the comment Officer Klayman made toward him (Sergeant Faust).

Sergeant Faust states that none of the civilian personnel employed by PAL informed him directly that they felt threatened by an ongoing situation involving Lieutenant Cintron and Officer Klayman; however, he has heard rumors to the effect. Those employees informed Sergeant Faust that they felt uncomfortable with Officer Klayman being assigned to PAL because of his attitude and him having a gun.

CITY019



*Note: Sergeant Faust was re-interviewed on 12-27-17, in reference to concerns he relayed to the assigned investigator after his interview on 12-19-17, regarding him being re-assigned.*

Sergeant Faust states that following his Internal Affairs interview on 12-19-17, he informed the assigned investigator that Lieutenant Cintron told him that as of 01-01-18, his tour of duty would be changed to 1 PM to 9 PM. Sergeant Faust states that he had been the Administrative Sergeant at PAL for approximately eight years; however, on 11-06-17, he received a memorandum from Lieutenant Cintron changing his tour of duty. The memorandum Sergeant Faust received from Lieutenant Cintron stated that the reason for the shift change was to provide coverage for the PAL centers. The memorandum also stated that when a new sergeant was assigned to PAL, a sergeant would be assigned to the administrative position. Sergeant Faust believed this to mean that another sergeant would be assigned to the administrative position.

Sergeant Faust believes that he has become a target now that Officer Klayman was detailed out. Sergeant Faust states that he believes that somehow Lieutenant Cintron believes that he (Sergeant Faust) spoke to Deputy Commissioner Sullivan about the incident Officer Klayman had with Mr. Trimmer. Sergeant Faust states that following the incident he was called into Deputy Commissioner Sullivan's office and asked about the incident. Following Sergeant Faust's meeting with Deputy Commissioner Sullivan, Officer Klayman was detailed to the Neighborhood Services Unit.

Sergeant Faust believes that Lieutenant Cintron is now retaliating against him; however, he does not know why.

*Note: During his Internal Affairs interview on 12-27-17, Sergeant Faust alleged that Lieutenant Cintron used her take home vehicle for personal use. The information provided by Sergeant Faust has been referred to ISS for investigation.*

**Police Officer David Klayman #9321, Payroll** ▮▮▮▮▮▮▮**, W/M, PAL,** was interviewed on 12-28-17, by the assigned at Internal Affairs Headquarters and relayed the following in summary:

*Note: Officer Klayman was detailed to the Neighborhood Services Unit on 11-03-17.*

Officer Klayman states that he and Lieutenant Cintron are friends. Officer Klayman states that he met Lieutenant Cintron while there were both working the 25th District.

Officer Klayman states that Lieutenant Cintron did not give him preferential treatment during the time he was assigned to PAL.

Officer Klayman states that Lieutenant Cintron would allow him to adjust his schedule or use his time (vacation/holiday) to accommodate his school schedule. Officer Klayman states that during his last semester of college classes, he attended class on Tuesdays and Thursdays from 2:30 PM to 3:45 PM. With the exception of this one class, Officer Klayman states all of his other classes were held at night.

CITY020




*Note: On 01-17-18, Officer Klayman provided a letter from a Mr. Ed Rentezela at Rutgers Law School, which states that Officer Klayman attended a class (Critical legal analysis) during the fall semester (2017) that met on Tuesdays and Thursdays from 2:30 PM to 3:45 PM.*

Officer Klayman states that he was required to wear the same uniform as the other police personnel assigned to PAL.

Officer Klayman states that he does not recall specifically providing transportation to Lieutenant Cintron's daughter; however, Officer Klayman states it was possible he did. Officer Klayman states that he does recall driving Lieutenant Cintron's PAL owned vehicle with Lieutenant Cintron and her daughter being in the car and possibly going to a Phillies event.

Officer Klayman states that he does not recall the date it occurred; however, he recalled being involved in an argument with Officer Johnson at a PAL baseball game. Officer Klayman states that one of the coaches for a team involved in the baseball game made an accusation that Officer Johnson's team cheated during the baseball game. While Officer Johnson and the coach were talking, the coach's team stood at home plate waiting to shake hands. Officer Klayman states that Officer Johnson's team did not line up to shake hands prompting Lieutenant Cintron to approach Officer Johnson at which time she told Officer Johnson to have his team line up and shake hands. Officer Johnson responded, "Chill, chill, chill; I got it" to Lieutenant Cintron. Lieutenant Cintron told Officer Johnson to step aside and then instructed his team to shake hands.

Officer Klayman states that after the teams shook hands, he stated to Officer Johnson, "When you get a second, I want to talk to you" to which Officer Johnson responded he had time right then. Officer Klayman informed Officer Johnson that it was disrespectful for him to "flag" Lieutenant Cintron with his hand and state to her, "Chill, chill, chill." Officer Johnson responded by stating that if Lieutenant Cintron found it disrespectful, she can tell him about it; however, Officer Klayman could not. Officer Klayman states that he told Officer Johnson that he was not sure what anyone was going to tell him, but he was disrespectful toward the commanding officer. Officer Johnson stated to Officer Klayman, "Are you telling me or are you asking me" to which Officer Klayman responded, I am telling you. Officer Johnson stated to Officer Klayman, "You are not a supervisor; you can't tell me anything." Officer Klayman states that Lieutenant Cintron and Sergeant Pascucci came over and told both him and Officer Johnson to stop; however, Officer Johnson starting yelling at Sergeant Pascucci stating that he (Officer Klayman) was not a supervisor.

Officer Klayman states that Lieutenant Cintron asked what was going on and Officer Johnson responded that he (Officer Klayman) was trying to talk to him as a supervisor; however, Officer Klayman believed he and Officer Johnson were just having a conversation. Sergeant Pascucci stated he would take care of the matter and Lieutenant Cintron went back to finish her interviews.

Officer Klayman states that after Sergeant Pascucci took Officer Johnson away to talk to him, he (Officer Klayman) could hear Officer Johnson state, "Fuck him, he can't tell me shit." Officer Klayman states responded by yelling, "Don't say fuck me." Officer Klayman states that was the only time he raised his voice or curse during the argument he had with Officer Johnson.

CITY021



Officer Klayman states that Lieutenant Cintron yelled at him about the argument and reminded him that he worked for her and represented her. Lieutenant Cintron also informed Officer Klayman not to address other officers.

Officer Klayman states the on 10-12-17, he asked Mr. Trimmer if he could talk to him after he (Officer Klayman) was made aware that Mr. Trimmer allowed other people to use his (Officer Klayman's) desk the day before. Officer Klayman states that the gist of the conversation was concerning there being other desks that could be used and that they (civilian employees) have to respect the police area because he may have sensitive information in his work area. Officer Klayman informed Mr. Trimmer that he needed to get permission from Lieutenant Cintron prior to using his (Officer Klayman's) work space. Mr. Trimmer responded, "That could have been communicated to me" to which Officer Klayman responded that everything does not have to be communicated to him (Mr. Trimmer), he should just know or ask.

Officer Klayman states that he said to Mr. Trimmer that he needed to have respect for Lieutenant Cintron and her twenty-five years of service. Officer Klayman stated to Mr. Trimmer that he had kept his mouth shut since he had been there (PAL); however, there was a lot of passive aggression from some of the civilians toward the police.

Officer Klayman states that Lieutenant Cintron and Sergeant Faust came out and Sergeant Faust stated, "Dave, not here; you can't do this here." Lieutenant Cintron and Sergeant Faust stated to take the conversation into the kitchen or go outside. Officer Klayman states that he said, "Okay, we can go into the kitchen or go outside." Officer Klayman recall Mr. Trimmer stating, "I thought we were having a conversation" because he (Officer Klayman) did get loud during the conversation. Officer Klayman states the he told Mr. Trimmer to forget it and that he was done. Officer Klayman informed Mr. Trimmer that he said what he had to say and then left the area.

Officer Klayman states that he did raise he voice during the conversation he was having with Mr. Trimmer on 10-12-17; however, he did not use profanity during the conversation.

Officer Klayman states that he did state to Mr. Trimmer something to the effect that he was "being disrespectful toward the commanding officer for the past year." Officer Klayman states that Mr. Trimmer constantly questioned Lieutenant Cintron's authority, makes "snarky" comments and does not follow through on things she asks of him.

Officer Klayman states that he did not tell Sergeant Faust not to tell him what to do. Officer Klayman states that he met with Lieutenant Cintron and Sergeant Faust to discuss what occurred with Mr. Trimmer. During the meeting, Officer Klayman informed Lieutenant Cintron that there were a lot of issues related to how the civilian staff treated the police personnel. Officer Klayman expressed that the civilian staff needed to respect the chain of command, to which Sergeant Faust stated, "Dave, you are a hundred percent right." Officer Klayman states that he said to Sergeant Faust, you are part of this; this existed way before I (Officer Klayman) got here.

Officer Klayman states that Lieutenant Cintron also met with Mr. Qualli to discuss what occurred between him and Mr. Trimmer on 10-12-17.

CITY022

Officer Klayman states that he was transferred as a result of what occurred between him and Mr. Trimmer on 10-12-17.

**Lieutenant Evelyn Cintron #168, Payroll ████ H/F, PAL,** was interviewed on 01-25-18, by the assigned at Internal Affairs Headquarters and relayed the following in summary:

Lieutenant Cintron states that she does not recall the date; however, she recalls Officer Klayman and Officer Johnson having an argument while at a PAL baseball game that was held at Lighthouse Field. Lieutenant Cintron was completing an interview in reference to the baseball game when she observed Sergeant Pascucci walking toward Officer Klayman and Officer Johnson because they were involved in a verbal altercation. Lieutenant Cintron walked over while Sergeant Pascucci was pulling Officer Johnson away. Lieutenant Cintron told Sergeant Pascucci to tell Officer Johnson to calm down because he was cursing. Lieutenant Cintron states that when she walked over to Officer Klayman to find out what was going on, she heard Officer Johnson state something along the lines of "Who the fuck was he" to which Officer Klayman responded, "Don't say fuck you to me." Lieutenant Cintron instructed Officer Klayman to wait for her in the car while she finished handing out trophies and conducting interviews.

Lieutenant Cintron states that when she got back to her car, she "reamed" Officer Klayman out and let him know that as her aide, he was an extension of her and should know not to get into an argument.

Lieutenant Cintron states that since Sergeant Pascucci handled the situation, she took his recommendation that it was over and no further action was necessary.

Lieutenant Cintron states that on 10-12-17, she was having a meeting with Sergeant Faust and Ms. Harris when they heard people arguing. Lieutenant Cintron and Sergeant Faust went outside of her office and observed Officer Klayman and Mr. Trimmer involved in verbal argument. Lieutenant Cintron instructed Officer Klayman and Mr. Trimmer to "knock it off" and asked them what was going on. Officer Klayman responded that he was, "Tired of people being undermining and disrespectful; and they forget I sit at this computer." Mr. Trimmer began talking after which, he and Officer Klayman began talking over each other. Lieutenant Cintron stated that she said "this was not the place." Lieutenant Cintron stated they (Officer Klayman and Mr. Trimmer) could go into the kitchen, come into her office or go outside to finish the conversation calmly. Officer Klayman responded that they could do either, go outside or go into the kitchen to talk about the use of his (Officer Klayman's) space. Lieutenant Cintron states that she said something along the lines of let it go and then asked Officer Klayman and Sergeant Faust to go into her office.

Lieutenant Cintron states that while in her office, Officer Klayman stated that he approached Mr. Trimmer about using his cubicle and that led into either Officer Klayman or Mr. Trimmer questioning a commander's decision. Lieutenant Cintron states that the conversation continued with Officer Klayman and Sergeant Faust and that they began discussing the culture at PAL. Sergeant Faust stated something to the effect of, "That is just the way it is around here" to which Officer Klayman responded, "If you think that it the way it is, then maybe you are part of the problem." Lieutenant Cintron states that she informed Officer Klayman that she was going to reach out to Mr.

CITY023

Qualli to discuss what occurred between him and Mr. Trimmer because Mr. Trimmer reports to Mr. Qualli.

Lieutenant Cintron states that she attempted to contact Mr. Qualli several times; however, he did not respond. Lieutenant Cintron instructed her personnel to produce memorandums in reference to what they observed during the incident Officer Klayman had with Mr. Trimmer. Lieutenant Cintron states that while she was waiting for Mr. Qualli to respond, she heard everyone talking about Mr. Qualli telling his staff that if they were afraid because Officer Klayman is a police officer and carries a gun, they could go home.

Lieutenant Cintron states that at approximately four o'clock, Mr. Qualli came into her office to discuss another matter. Lieutenant Cintron stated to Mr. Qualli, "I guess you heard about the incident" to which Mr. Qualli responded, "That is why I am here; what are you going to do with Officer Klayman, he needs to go." Lieutenant Cintron informed Mr. Qualli that they needed to do something about both Officer Klayman and Mr. Trimmer because they were both involved in the argument. Mr. Qualli responded, "We can't have officers here who are inviting Chase to go outside and fight." Lieutenant Cintron informed Mr. Trimmer that was not what happened.

Lieutenant Cintron states that later the same day, a PAL employee (Laura Kelly) informed her that Mr. Qualli was surprised that none of his staff left as he instructed them to do earlier in the day. Lieutenant Cintron contacted Mr. Qualli and asked him why he felt it was necessary to put the seed in the mind of his staff that they should fear Officer Klayman. Mr. Qualli responded that it was his staff and he could send them home if he wanted to.

Lieutenant Cintron states that it was at that point she realized Mr. Qualli was not going to address the issue. Lieutenant Cintron notified Deputy Commissioner Sullivan about the incident after which he instructed her to forward all the memorandums she had regarding the incident to him and that he would take care of it from there.

Lieutenant Cintron states that the following day she spoke to another PAL employee via phone (Dianna Harris) who stated that it was, "A shame what Ted is trying to do; nobody is afraid of Officer Klayman, but if he wants to give me the day off, I will take it." Lieutenant Cintron states that when she when she arrived at PAL Headquarters, she noticed that with the exception of two PAL employees, none of the PAL employees were at work.

Lieutenant Cintron states that during the argument Officer Klayman and Mr. Trimmer had on 10-12-17, she heard both of them yelling at each other. Lieutenant Cintron did not hear Officer Klayman or Mr. Trimmer use profanity during the argument.

Lieutenant Cintron states that the conduct of both Officer Klayman and Mr. Trimmer was inappropriate for the workplace. Lieutenant Cintron states that she did not request disciplinary action for Officer Klayman because she spoke to Deputy Commissioner Sullivan who instructed her to forward all the memorandums she had regarding the incident to him and informed her that he would take it from there. Lieutenant Cintron states she was waiting for guidance from Deputy Commissioner Sullivan; however, he never got back to her with how to proceed.

CITY024



Lieutenant Cintron states that on 10-13-17, she asked Sergeant Pascucci to talk to Officer Little; however, Lieutenant Cintron states that she did not tell Sergeant Pascucci to tell Officer Little to, "Stay out of things that don't concern her." Lieutenant Cintron told Sergeant Pascucci to tell Officer Little there was an ongoing investigation and that she (Officer Little) needed to focus on her PAL Center, instead of focusing on rumors. Lieutenant Cintron states that she had Sergeant Pascucci talk to Officer Little after Officer Ricardo Hanton #5448 informed her (Lieutenant Cintron) that a civilian employee told Officer Little to start a rumor that Lieutenant Cintron and Officer Klayman were in relationship in an effort to get rid of Officer Klayman.

Lieutenant Cintron states that Sergeant Pascucci did not tell her that he believed the message she asked him to deliver to Officer Little was inappropriate.

Lieutenant Cintron denies informing Sergeant Pascucci that she would have him and Officer Little removed from PAL. Lieutenant Cintron also denies telling Sergeant Pascucci that she was good friends with the Police Commissioner and that she (Lieutenant Cintron) would ruin both his and Officer Little's careers.

Lieutenant Cintron states that she never disapproved any of Officer Little's memorandums.

Lieutenant Cintron states that she has adjusted memorandums submitted by officers assigned to PAL based on the budget for the PAL Center; however, she does not recall adjusting one of Officer Little's memorandums.

Lieutenant Cintron states that on 11-01-17, she sent Ms. McCauley an e-mail with the subject, "Office Gossip." Lieutenant Cintron sent the e-mail to Ms. McCauley after her (Ms. McCauley's) name came up as being the person who, along with Officer Little, started the rumor about her (Lieutenant Cintron) and Officer Klayman. Lieutenant Cintron states that she spoke to Mr. Trimmer prior to sending the e-mail to Ms. McCauley because she reported directly to Mr. Trimmer. Lieutenant Cintron and Mr. Trimmer agreed that it would be more appropriate to bring Mr. Qualli into the conversation prior to talking to Ms. McCauley. Lieutenant Cintron explained to Mr. Qualli that Ms. McCauley's name came up in reference to starting the rumor about her (Lieutenant Cintron) and Officer Klayman. Lieutenant Cintron explained to Mr. Qualli how such behavior could undermine her command and create a hostile work environment for her (Lieutenant Cintron).

Lieutenant Cintron states that Mr. Qualli informed her that he did not see a problem and informed Lieutenant Cintron if anyone was going to talk to Ms. McCauley, it would be him. Lieutenant Cintron asked Mr. Qualli for the same courtesy that was previously afforded to him, to address rumors that were being spread. Lieutenant Cintron states that she did not get the impression Mr. Qualli was going to do anything about Ms. McCauley possibly spreading rumors. Lieutenant Cintron believed Mr. Qualli was dismissive and implied that Ms. McCauley's behavior was okay. Lieutenant Cintron states that she still felt it was necessary to address the matter with Ms. McCauley, which was why she sent her the e-mail.

Lieutenant Cintron states that she was called into Deputy Commissioner Sullivan's office, at which time Deputy Commissioner Sullivan stated to her, "We know you are in a relationship with Officer Klayman." Deputy Commissioner Sullivan informed Lieutenant Cintron that Officer Klayman

CITY025

needed to pick three districts to go to. Lieutenant Cintron states that she informed Deputy Commissioner Sullivan that she and Officer Klayman were not in a relationship.

Lieutenant Cintron states that Officer Klayman refused to pick three districts that he would want to go to and contacted the FOP who filed a grievance on his behalf. Lieutenant Cintron states that Sergeant Christopher Shevlin #356, who was assigned to Deputy Commissioner Sullivan's office, contacted Officer Klayman and asked him if wanted to go to the Neighborhood Services Unit. Lieutenant Cintron states that Officer Klayman has since been detailed to the Neighborhood Services Unit.

Lieutenant Cintron states that she did not conduct a formal investigation in reference to her concerns that rumors were being spread because she received an e-mail from Deputy Commissioner Sullivan stating that she should not approach anyone else about the subject.

Lieutenant Cintron states that on 01-11-18, she took pictures of the area where everyone was standing during the argument Officer Klayman had with Mr. Trimmer. Lieutenant Cintron took the pictures of the area after she was instructed to do so by her attorney. Lieutenant Cintron states that she took the pictures so that she could show the assigned investigator (Sergeant Conway) where everyone was standing during the argument Officer Klayman had with Mr. Trimmer.

Lieutenant Cintron states the Mr. Andrews did not ask her why she was at Ms. McCauley's desk or if she was taking pictures of Ms. McCauley's cubicle.

Lieutenant Cintron states that Sergeant Ervin was detailed to the Civil Affairs unit after an incident involving Sergeant Ervin improperly handling a PAL basketball game. Lieutenant Cintron received an e-mail from the coaches for the teams involved in the game which alleged cheating and violations of PAL rules for city-wide basketball games. Lieutenant Cintron states that Officer Hanton also submitted a memorandum documenting his concerns with Sergeant Ervin's handling of the basketball game. They allegations made by Officer Hanton and the coaches for the team involved in the basketball game include Sergeant Ervin changing the start time without notifying both team and Sergeant Ervin changing rules of the game that was being played. Lieutenant Cintron states that Sergeant Ervin also disregarded her orders related to how she wanted him to handle the basketball game.

Lieutenant Cintron conducted an investigation into Sergeant Ervin improper handling of a PAL basketball game after being ordered by Deputy Commissioner Sullivan. Lieutenant Cintron states that during the course of her investigation, she was called in to the Police Commissioner's office where Police Commissioner Ross, Deputy Commissioner Sullivan and Deputy Commissioner Myron Patterson asked her to detail her findings. Lieutenant Cintron detailed that she found multiple violations that were made by Sergeant Ervin. Lieutenant Cintron states that she was told to stop her investigation and Police Commissioner Ross instructed Deputy Commissioner Sullivan and Deputy Commissioner Patterson to speak to Sergeant Ervin. Lieutenant Cintron states that Deputy Commissioner Sullivan and Deputy Commissioner Patterson spoke to Sergeant Ervin, after which he was detailed to the Civil Affairs unit.

CITY026

*Note: The investigation conducted by Lieutenant Cintron was not completed. Lieutenant Cintron conducted multiple interviews during her investigation which included interviews of police personnel and civilian witnesses. However, Sergeant Ervin was not interviewed during the investigation, nor was a memorandum produced summarizing the findings of Lieutenant Cintron's investigation.*

Lieutenant Cintron states that Sergeant Ervin never asked to take disciplinary action against Officer Hanton for not showing up to a PAL event Sergeant Ervin scheduled.

Lieutenant Cintron states that on 11-06-17, she informed Sergeant Faust that his tour of duty would be changing from 9 AM to 5 PM to 1 PM to 9 PM. Lieutenant Cintron states that when she arrived at PAL she was short a sergeant. Lieutenant Cintron submitted a memorandum requesting another sergeant be assigned to PAL and she received Sergeant Pascucci. Lieutenant Cintron states that she was once again short a sergeant after Sergeant Ervin was detailed to the Civil Affairs unit. Lieutenant Cintron met with Sergeant Faust and Sergeant Pascucci several times after Sergeant Ervin was detailed to the Civilian Affairs unit. Lieutenant Cintron states that during those meetings, she stated there was a chance that she would need to move Sergeant Faust from the administrative position, to supervise the PAL offices. In addition to being short-handed, Lieutenant Cintron states that Sergeant Faust was not an efficient administrative supervisor which she documented on his performance evaluation and in e-mails and memorandums she produced.

Lieutenant Cintron states that Sergeant Faust met with Deputy Commissioner Sullivan on 10-27-17, to discuss what occurred during the argument Officer Klayman had with Mr. Trimmer. Lieutenant Cintron denies that meeting having anything to do with her changing Sergeant Faust's tour of duty. Lieutenant Cintron also denied changing Sergeant Faust's tour of duty in retaliation for Officer Klayman being detailed to the Neighborhood Services unit.

Lieutenant Cintron states that she is not in a personal relationship with Officer Klayman. Lieutenant Cintron met Officer Klayman while working in the 25th District. Lieutenant Cintron states that Officer Klayman was assigned to PAL to be her aide after she spoke to Deputy Commissioner Patterson and explained to him her need for an aide.

Lieutenant Cintron denied giving Officer Klayman preferential treatment during the time he was assigned to PAL as her aide. Lieutenant Cintron states that she did not do anything for Officer Klayman that she would not have done for anyone else.

Lieutenant Cintron states that Officer Klayman has never given her daughter or any other member of her family transportation while using the vehicle that was assigned to her as the Commanding Officer of PAL. Lieutenant Cintron has given her daughter transportation in the vehicle that was assigned to her as the Commanding Officer of PAL. Lieutenant Cintron states that her daughter was a PAL employee and she would give her daughter rides if she had to go to the same place as she did. Lieutenant Cintron states that she has also given rides to other PAL employees.

Lieutenant Cintron states that she would allow Officer Klayman to adjust his work schedule in order to accommodate his school schedule. Lieutenant Cintron states that most of Officer Klayman's classes were at night; however, during the fall semester (2017) he had a class that started at 2:30 PM

CITY027



and ended at 3:30 PM. Lieutenant Cintron would allow Officer Klayman to adjust his schedule to accommodate attending that class.

*Note: A review of the DAR entries made for Officer Klayman from 01-01-17 through 11-02-17, revealed that Officer Klayman was entered into the DAR as working 9 AM to 5 PM each day he worked during that time period with two exceptions. On 10-05-17 and 10-06-17, Officer Klayman was entered in the DAR as working 8 AM to 4 PM while attending MPO training. There were no DAR entries made for Officer Klayman during which vacation, holiday or sick time was used to reflect Officer Klayman leaving work early*

Lieutenant Cintron states that the police personnel assigned to PAL were entered in the DAR by Sergeant Faust as working 9 AM to 5 PM due the erratic schedules at PAL. However, Lieutenant Cintron noted that her unit did not have the capability of making DAR entries until her unit received a computer three or four months ago, which then allowed her unit to make their own DAR entries. After receiving the computer, Lieutenant Cintron instructed Sergeant Faust to adjust the DAR entries to reflect the hours that each person actually worked.

Lieutenant Cintron states that Sergeant Faust was responsible for checking and certifying the DAR entries that were made at PAL. Lieutenant Cintron did review the DAR entries; however, she did not certify them. Lieutenant Cintron states that in retrospect, she should have checked behind Sergeant Faust to ensure the entries he was making into the DAR were correct.

Lieutenant Cintron states that she did not make the other PAL officers aware that they could adjust their schedules or utilize vacation time to attend college classes. Lieutenant Cintron states that she has adjusted the schedules for both officers and supervisors in the past for personal reasons.

Lieutenant Cintron states that Officer Klayman was required to conform to the same uniform policy as the other police personnel assigned to PAL.

Lieutenant Cintron denied using her position to threaten the personnel assigned to PAL. Lieutenant Cintron also denied attempting to threaten the personnel assigned to PAL by referencing people she knows.

Lieutenant Cintron states that she believes Mr. Qualli continued to create situations that afforded him the opportunity to argue with her in an attempt to intimidate her. Lieutenant Cintron believes that Mr. Qualli created a hostile work environment for her and that Mr. Qualli used the incident involving Officer Klayman and Mr. Trimmer as a platform to drive his personal agenda.

*Note: During her Internal Affairs interview, Lieutenant Cintron informed the assigned investigator that she would provide the documentation she referred to throughout her interview. Lieutenant Cintron was re-interviewed on 02-09-18, due to her failing to provide the documentation she stated she would provide.*

Lieutenant Cintron states that she had the documentation with her that she stated she would provide the assigned investigator. Lieutenant Cintron also states that she had with her the pictures she took on 01-11-18, inside of PAL Headquarter.

CITY028



*Note: Lieutenant Cintron provided the assigned investigator with all of the documentation she referred to during Internal Affairs interview on 01-25-18. During her Internal Affairs interview on 02-09-18, Lieutenant Cintron was issued a copy of Directive #8.7, EEO Complaint Procedures and a copy of an EEO complaint form in reference to the allegation she previously made that Mr. Qualli created a hostile work environment.*

A review of the documentation provided by Lieutenant Cintron revealed the following:

Lieutenant Cintron conducted an investigation into allegations that were made by Officer Ricardo Hanton and the coaches involved in the PAL basketball game, concerning an incident involving Sergeant Ervin at a PAL basketball game. Lieutenant Cintron included with her investigation, an e-mail she received from Sergeant Shevlin. In the e-mail sent by Sergeant Shevlin, he (Sergeant Shevlin) relayed instructions that were made by Deputy Commissioner Sullivan to conducted interviews related to the allegations that were made by Officer Hanton and the coaches involved in the PAL basketball game. Lieutenant Cintron conducted seven interviews, three of which were of police personnel and four of which were of civilian witnesses. Copies of the e-mail correspondence between Lieutenant Cintron and Sergeant Shevlin and copies of the interviews conducted by Lieutenant Cintron during her investigation have been included with this package.

The following information was provided by Lieutenant Cintron in reference to her changing Sergeant Faust's tour of duty:

On 06-24-16, Lieutenant Cintron submitted a memorandum to Deputy Commissioner Patterson requesting additional officers and an additional sergeant be assigned to PAL.

On 12-20-16, Lieutenant Cintron submitted a memorandum to Deputy Commissioner Patterson requesting an additional sergeant be assigned to PAL.

On 10-31-17, Lieutenant Cintron prepared a memorandum requesting additional officers and an additional sergeant be assigned to PAL.

On 11-06-17, Lieutenant Cintron issued Sergeant Faust a memorandum with the Subject, "Shift re-assignment." In the memorandum, Lieutenant Cintron stated that Sergeant Faust's tour of duty would be changing to 1 PM to 9 PM effective 12-06-17 and that he would be designated the sergeant for the "South region."

The following information was provided by Lieutenant Cintron in reference to her concerns with Sergeant Faust's performance:

On 08-04-17, Lieutenant Cintron issued Sergeant Faust a Counseling Memorandum in reference to his failure to follow orders.

On 10-31-17, Lieutenant Cintron received an e-mail from Sergeant Shevlin which stated that Police Personnel had not received performance evaluations for the personnel assigned to PAL.

25

CITY029



On 10-31-17, Lieutenant Cintron issued Sergeant Faust his annual performance evaluation. On the performance evaluation, Lieutenant Cintron noted in the comments section that she would like to see Sergeant Faust show improvement in the areas of meeting deadlines and keeping her informed on all matters that require her attention.

On 11-06-17, Lieutenant Cintron issued Sergeant Faust a memorandum with the subject, "Documented verbal warning." In the memorandum, Lieutenant Cintron stated that she previously discussed with Sergeant Faust his failure to adhere to a deadline during the month of May (2017). Lieutenant Cintron stated during the month of September (2017), she instructed Sergeant Faust to "take the lead" on ensuring that all of the unit's performance evaluations were completed and submitted to her office prior to the deadline given by Deputy Commissioner Sullivan. Lieutenant Cintron stated the Sergeant Faust failed to submit the performance evaluations by the prescribed deadline and was therefore being issued a "final verbal warning."

Lieutenant Cintron also provided memorandums that were produced by her, Sergeant Pascucci and Officer Hanton regarding incidents they had with Mr. Qualli or Mr. Trimmer or that they witnessed involving Mr. Qualli or Mr. Trimmer with other employees.

The following information is relevant to the final deposition of this investigation:

On 05-04-18, Officer Little provided copies of five memorandums she submitted to Lieutenant Cintron that she (Officer Little) stated were not approved.

On 10-10-17, Officer Little submitted two memorandums, requesting to be reimbursed for money of her own that she spent on decorations for a Father-Daughter dance.

On 10-20-17, Officer Little submitted a memorandum requesting to purchased fifteen movie tickets.

On 10-20-17, Officer Little submitted a memorandum requesting funds to purchase pizza for a PAL event.

On 10-25-17, Officer Little submitted a memorandum requesting to take thirteen PAL members to an even at the Free Library of Philadelphia.

*Note: The assigned attempted to contact Lieutenant Cintron on 05-07-18, in reference to the memorandums provided by Officer Little with negative results. The assigned went to PAL headquarters on 05-07-18, in attempt to review the personnel files located in Lieutenant Cintron's office in an effort to locate the memorandums Officer Little stated she submitted to Lieutenant Cintron. Upon entering Lieutenant Cintron's office, the assigned found that the office had been cleared out, with only the personnel files being left behind; however, those files did not contain any memorandums from PAL officers who were requesting funds related to their PAL centers.*

*While on location at PAL headquarters, the assigned spoke to Sargent Faust who informed the assigned that Lieutenant Cintron cleared out her office the day (01-31-18) before starting a Family Medical Leave of Absence (FMLA). While on location at PAL headquarters, the assigned also spoke to Sunny Li, Director of Finance and Administration for PAL, and requested that she check her*

CITY030

*records for any memorandums that would have been submitted by Officer Little for funds related to her (Officer Little's) PAL center during the months of October and November, as she (Sunny Li) is responsible for dispersing funds after a request was approved. Sunny Li informed that assigned that she did not have any approved memorandums for Officer Little*

The Police Athletic League (PAL) consists of two separate entities, police personnel and civilian personnel. As noted during this investigation, the police personnel report to Lieutenant Cintron and the civilian personnel report to Mr. Qualli.

The police personnel assigned to PAL consist of officers and supervisors who are assigned to PAL headquarters in an administrative capacity and officers and supervisors who are assigned to the PAL Centers throughout the city. The officers and supervisor assigned the PAL Centers have limited contact with the personnel assigned to PAL headquarters, as those officers are required to man their respective PAL Centers from the time it opens to the time it closes.

Due the nature of the allegations set forth by the anonymous letter writer(s) and employees (police and civilian) interviewed during the course of this investigation, only those officers assigned to PAL headquarters or who were specifically named in the complaint were interviewed during the course of this investigation.

It should be noted that as of the conclusion of this investigation, Lieutenant Cintron had not submitted the EEO complaint form she was issued during her Internal Affairs interview on 02-09-18.

Brent Conway                                    #8892
Sergeant
Internal Affairs Division


Approved by:

Carol Abrams                                    #54
Captain
Internal Affairs Division

CITY031

**CONCLUSION:**

The investigation into the EEO complaint made by unknown person(s) via an anonymous letter that Lieutenant Evelyn Cintron #168, Payroll # ████ H/F, PAL, created a hostile work environment for Police Officer Janice Little #9812, Payroll # ████ B/F, PAL, is **UNFOUNDED**.

The writer(s) of the anonymous letter alleged that Lieutenant Cintron created a hostile work environment for Officer Little after she (Lieutenant Cintron) ordered Sergeant Pascucci to deliver a message to Officer Little advising Officer Little to, "Stay out of things that don't concern her."

Officer Little stated that on 10-13-17, Sergeant Michael Pascucci #562, informed her that Lieutenant Cintron ordered him to tell her (Officer Little) to stay out of things that did not concern her. Officer Little stated that after Sergeant Pascucci relayed Lieutenant Cintron's order to her, she submitted a memorandum to Lieutenant Cintron requesting to take her PAL children to the movies; however, she did not receive a response.

Sergeant Pascucci stated that Lieutenant Cintron did order him to tell Officer Little to stay out of things that did not concern her. Sergeant Pascucci stated that Officer Little expressed to him that memorandums she submitted to Lieutenant Cintron were not being approved. Sergeant Pascucci stated that he told Officer Little that he did not know what memorandums needed the approval of the non-profit personnel at PAL or which memorandums could be approved by Lieutenant Cintron.

Lieutenant Cintron stated that she did tell Sergeant Pascucci to tell Officer Little there was an ongoing investigation and that she (Officer Little) needed to focus on her PAL Center, instead of focusing on rumors.

Lieutenant Cintron denied telling Sergeant Pascucci to tell Officer Little to, "Stay out of things that don't concern her."

Lieutenant Cintron denied disapproving memorandums that were submitted by Officer Little.

This investigation revealed that Lieutenant Cintron did instruct Sergeant Pascucci to tell Officer Little to stay out of things that don't concern her. However, this investigation revealed no evidence to support that Lieutenant Cintron took any action against Officer Little, after ordering Sergeant Pascucci to relay her message to Officer Little, that could have been deemed as an attempt to create a hostile work environment for Officer Little.

The investigation into the EEO complaint made by unknown person(s) via an anonymous letter that Lieutenant Evelyn Cintron #168, Payroll # ████ H/F, PAL, created a hostile work environment for the civilian personnel employee by PAL, is **UNFOUNDED NON-EEO**.

The writer(s) of the anonymous letter alleged that the civilian employees employed by PAL were working from home due to "an ongoing situation involving Lieutenant Cintron and Officer Klayman."

CITY032



Mr. Qualli stated that he told his employees that they could work from home the day following an argument involving Officer Klayman and Mr. Trimmer. Mr. Qualli stated that he did not believe there was a hostile work environment at PAL. Mr. Qualli states that he and Lieutenant Cintron have taken actions together to address communication challenges at PAL.

This investigation revealed that Mr. Qualli informed his employees that they could work from home the day following an argument Officer Klayman had with Mr. Trimmer. There is no evidence that would suggest that the civilian employees worked from home because of "an ongoing situation involving Lieutenant Cintron and Officer Klayman" as indicated by the writer(s) of the anonymous letter.

The investigation into the EEO complaint made by unknown person(s) via an anonymous letter that Police Officer David Klayman #9321, Payroll ▮▮▮▮▮▮ W/M, PAL, acted unprofessional during an incident he had with Chase Trimmer is **SUSTAINED**.

The writer(s) of the anonymous letter alleged that on 10-12-17, Officer Klayman was involved in an argument with Mr. Trimmer while inside of PAL headquarters.

Mr. Trimmer stated that he was approached by Officer Klayman, in the open office area, where Officer Klayman asked him if he had a minute to talk. Mr. Trimmer stated that he and Officer Klayman engaged in a conversation in reference to Officer Klayman's concerns that Mr. Trimmer allowed other people to use his workspace. Mr. Trimmer stated that during the conversation, Officer Klayman raised his voice and starting yelling at him in an aggressive manner. Mr. Trimmer stated that Officer Klayman also used profanity while he yelled at him (Mr. Trimmer). Mr. Trimmer stated that Officer Klayman stated to him (Mr. Trimmer) that he was, "back talking" and "talking behind the lieutenant's back."

Ms. Burton stated that she witnessed the argument Officer Klayman had with Mr. Trimmer on 10-12-17. Ms. Burton stated that during the argument, Officer Klayman became aggressive and that he entered what she described as Mr. Trimmer's, "Personal Space." Ms. Burton stated that she heard Officer Klayman use profanity during the argument he had with Mr. Trimmer. Ms. Burton stated that Mr. Trimmer's tone during the argument was, "Mild" as he was attempting to deescalate the situation.

Mr. Andrews stated that he witnessed the argument Officer Klayman had with Mr. Trimmer on 10-12-17. Mr. Andrews stated that during the argument between Officer Klayman and Mr. Trimmer, Officer Klayman began making personal attacks toward Mr. Trimmer. Mr. Andrews stated that the argument was loud enough for Lieutenant Cintron and Sergeant Faust to hear through Lieutenant Cintron's office door.

Lieutenant Cintron, Sergeant Faust and Ms. Harris all stated that they were in a meeting inside Lieutenant Cintron's office when they heard loud voice coming from outside Lieutenant Cintron's office door. Lieutenant Cintron and Sergeant Faust both stated that they went to see what was going on outside of Lieutenant Cintron's and found that Officer Klayman and Mr. Trimmer were engaged in an argument.

CITY033

Officer Klayman stated that he did ask to speak to Mr. Trimmer in reference to Mr. Trimmer allowing other people to us his (Officer Klayman's) workspace. Officer Klayman stated that he informed Mr. Trimmer that he needed to have respect for Lieutenant Cintron and her twenty-five years of service. Officer Klayman stated that he did raise his voice while talking to Mr. Trimmer; however, he denied using profanity.

This investigation revealed that Officer Klayman acted unprofessionally when he engaged in a verbal argument with Mr. Trimmer during which Officer Klayman yelled and used profanity.

The investigation revealed **SUSTAINED DEPARTMENTAL VIOLATIONS** on the part of Lieutenant Evelyn Cintron #168, Payroll #⬛⬛⬛ as she abused her authority as a supervisor in the Philadelphia Police Department on multiple occasions.

As detailed in the proceeding section, Sergeant Pascucci stated that Lieutenant Cintron ordered him to tell Officer Little to stay out of things that did not concern her. Although Lieutenant Cintron stated that she did not use those exact words, Lieutenant Cintron did state that she told Sergeant Pascucci to tell Officer Little there was an ongoing investigation and that she (Officer Little) needed to focus on her PAL Center, instead of focusing on rumors.

Lieutenant Cintron stated that she told Sergeant Pascucci to deliver her message to Officer Little after Officer Hanton informed her (Lieutenant Cintron) that a civilian employee told Officer Little to start a rumor that Lieutenant Cintron and Officer Klayman were in relationship in an effort to get rid of Officer Klayman.

Lieutenant Cintron did not conduct a formal investigation into the allegation that Officer Little was a party to the spreading of rumors about her (Lieutenant Cintron) and Officer Klayman. The only information Lieutenant Cintron had available to her prior to ordering Sergeant Pascucci to deliver her message to Officer Little, was second-hand information she received that she failed to verify the validity of by conducting an investigation. Lieutenant Cintron ordering a subordinate supervisor to deliver a message the nature of which she ordered Sergeant Pascucci to deliver to Officer Little was an abuse of Lieutenant Cintron's authority.

Lieutenant Cintron stated that on 11-01-17, she sent Ms. McCauley an e-mail with the subject, "Office Gossip." Lieutenant Cintron stated that she sent the e-mail to Ms. McCauley after her (Ms. McCauley's) name came up as being the person who, along with Officer Little, started the rumor about her (Lieutenant Cintron) and Officer Klayman.

In the e-mail sent by Lieutenant Cintron to Ms. McCauley on 11-01-17, Lieutenant Cintron stated she was not accusing Ms. McCauley of spreading rumors about her and Officer Klayman because she could not prove Ms. McCauley was the source of the rumors. However, Lieutenant Cintron also stated that since Ms. McCauley's name came up as "partaking in this matter" it was her (Lieutenant Cintron) duty to "address it accordingly in order to maintain a cohesive work place." In the e-mail, Lieutenant Cintron also stated, "If this continues, I have no other recourse but to defend my integrity through official means."

CITY034



Although Lieutenant Cintron is the Commanding Officer of PAL, Ms. McCauley, despite being employed by PAL, is not a subordinate of Lieutenant Cintron. Ms. McCauley is a civilian employee who is employed by PAL and reports directly to Mr. Trimmer and Mr. Qualli. Lieutenant Cintron was aware that Ms. McCauley did not fall under her command as she (Lieutenant Cintron) stated that she spoke to Ms. McCauley's supervisors (Mr. Trimmer and Mr. Qualli) about her concerns that Ms. McCauley was spreading rumors about her and Officer Klayman. Lieutenant Cintron stated that Mr. Qualli informed her that if anyone was going to speak to Ms. McCauley about her (Lieutenant Cintron), it would have been him.

Lieutenant Cintron sending Ms. McCauley an e-mail in reference to addressing Ms. McCauley's possible role in rumors that Lieutenant Cintron believed were being circulated about her (Lieutenant Cintron) and Officer Klayman, was also an abuse of Lieutenant Cintron's authority.

The investigation revealed **SUSTAINED DEPARTMENTAL VIOLATIONS** on the part of Lieutenant Evelyn Cintron #168, Payroll # ▮▮▮▮ as she violated Directive #11.1, Daily Attendance Report (DAR), Section K, when she failed to ensure that the DAR entries that were made for Officer Klayman were accurate.

Lieutenant Cintron stated that she allowed Officer Klayman to adjust his tour of duty in order to attend a college class on Tuesdays and Thursdays during the fall (2017) semester.

A review of the DAR entries made for Officer Klayman from 01-01-17 through 11-02-17, revealed that Officer Klayman was entered into the DAR as working 9 AM to 5 PM each day he worked during that time period with two exceptions. On 10-05-17 and 10-06-17, Officer Klayman was entered in the DAR as working 8 AM to 4 PM while attending MPO training. There were no DAR entries made for Officer Klayman during which vacation, holiday or sick time was used to reflect Officer Klayman leaving work early.

As it was Lieutenant Cintron's decision to allow Officer Klayman to adjust his tour of duty to attend a college class, it was also her responsibility to ensure the tour of duty adjustments were accurately reflected in the DAR.

A copy of this report is to be sent to the Commanding Officer, Police Board of Inquiry for action.

Kevin Hall
Inspector
Internal Affairs Division

31

Commissioner R. J. Ross, Jr.
8Th & Race Streets
Phila., PA 19106

Dear Commissioner Ross,

I am respectfully informing you of an incident involving PAL Officers before this matter escalates and gets out of control.

On October 13, 2017, at approximately 4:15pm, the acting Commanding Officer, Evelyn Citron ordered Sgt Passcucci #562 to personally deliver an inappropriate and unprofessional message to another PAL Officer(Janice Little), advising her to... and I quote, "Stay out of things that don't concern her". It was in reference to Commander Citron's boyfriend, PAL Ofcr David Klayman. This has somewhat created a hostile work environment for us all and was considered as a threat.

Sgt Passcucci was concerned that the message was inappropriate and was reluctant to deliver it, but did so because he was threatened to be removed from PAL. He informed Commander Citron that it was out of line. But the Commander stated that she would also have you, Commissioner Ross remove both he and Officer Janice Little from PAL as well, because the Commissioner is a good friend of hers. Commander Citron also stated that she would ruin the officers' career because of alleged rumors about her and her boyfriend. This conduct is unbecoming and should be investigated and resolved before it gets worse.

At this present time PAL civilians are working from home because of this hostile work environment and they feel threatened by the ongoing situation involving Officer Citron and Ofcr Klayman. I am writing this letter anonymously for fear of retaliation as I too feel threatened.

WE HERE AT PAL ARE ASKING FOR IMMEDIATE RELIEF. WE CANNOT WORK UNDER THESE CONDITIONS. WE ARE APPEALING TO YOU BEFORE WE ARE FORCED TO TAKE LEGAL ACTION AND OR INVOLVE THE MEDIA. We believe that the Commander's actions are unprofessional, and a bad influence on our young people who participate in our PAL programs, especially POSITIVE IMAGES, as well as PAL civilians who are committed and work so hard to make PAL what it is today.

Please investigate this matter, and take whatever action you feel necessary to have it resolved so we can continue to service our youth in a fair and professional environment. Thank you in advance for your time and attention to this matter.

Respectfully submitted,
A CONCERNED PAL

CHIEF INSPECTOR
OFFICE OF PROFESSIONAL
RESPONSIBILITY
TO _Insp Fedorocks Dont_

OCT 2 7 2017

☐ SEE ME/CALL ME
☐ ACTION AND REPLY
☒ ACTION AND REPORT
☐ ACTION, NO REPLY
☐ INFORMATION & FILE
SUSPENSE DATE: _____

ASSIGN FOR
EEO INVESTIGATION.

CITY036

STATEMENT OF:        **Nija Burton B/F,**
                    Frank Rizzo PAL Center
                    2524 East Clearfield Street
                    Philadelphia, Pa. 19134

DATE AND TIME:      12-13-17   10:38 AM

PLACE:              Philadelphia Police Department
                    Internal Affairs Division
                    7790 Dungan Rd.

IN THE PRESENCE OF:

CONCERNING:         EEO #17-0039

INTERVIEWED BY:     Sergeant Brent Conway #8892

RECORDED BY:        Sergeant Brent Conway #8892

Ms. Burton, I am Sergeant Brent Conway #8892, Internal Affairs Division, and I will be taking your statement, directly on this computer. You are being interviewed regarding a possible EEO/IAD complaint.

Ms. Burton, you are being interviewed a witness to a possible incident involving Philadelphia Police Department personnel. As a witness, you are here under you own accord and are under no obligation to provide a statement. As a witness you, are free to leave at any time.

Q. Do you understand that you are here as a witness and here under your own accord; and you are free to leave at any time?
A. Yes.

Q. Are you willing to provide a statement today?
A. Yes.

Q. Are you represented by counsel?
A. No.

Q. Do you know Lieutenant Evelyn Cintron #168?
A. Yes.

Q. How would you describe your relationship with Lieutenant Cintron?
A. I would describe it as okay; we haven't had any issues. She is nice, we haven't had any issues and she is fair.

_____                    .2|13|17
Nija Burton                                 12-13-17

CITY037

Q. Do you know Police Officer David Klayman #9321?
A. Yes.

Q. How would you describe your relationship with Officer Klayman?
A. I would say we have friendly relationship.

Q. How would you describe Officer Klayman as an employee?
A. I don't know what he did; we have different schedules so I really didn't interact with him. He interacted more the police side then the civilian.

Q. How would you describe the relationship between Lieutenant Cintron and Officer Klayman?
A. I guess it was friendly; he was he aide so I guess they had a pretty close working relationship him being her subordinate.

Q. On 10-12-17, did you observe an incident involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters?
A. Yes.

Q. What is Chase Trimmer's title?
A. The Director of Programs and Education.

Q. Can you describe, in your own words, what occurred during the incident you observed involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters on 10-12-17?
A. There was a verbal altercation about sitting at Officer CLayman's desk. Officer Clayman got aggressive during the conversion to the point it seemed like they were going to get physical. Chase got a little bit louder because Officer Clayman was getting louder. Chase's tone was mild and he was trying to deescalate the conversation. Officer Clayman was inside of Chase's personal space, about a foot and half about between them.

Officer Clayman was using profanity and at one point Officer Clayman asked Chase to step outside. It got really loud and that was when the lieutenant, Sgt. Fust and Cassandra Harris came out. Lieutenant Cintron and Sgt. Fust separated the two of them. They took Officer Clayman into the office and I went next door to get away from the sitation.

Q. Did you have any concerns with what occurred during the incident you observed involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters on 10-12-17?
A. I mean it was pretty frightening. I have never witnessed anyone having a verbal alteration since I been her at PAL. A couple of things went through my mind just the way the things were going watching those two arguing like that. I thought I could have been a little bit more peaceful. Officer Clayman carries a weapon and you never know what he might do when they are getting aggressive. He never went for it but it is the climate this day and age.

2

_____    12|13|17
Nija Burton                12-13-17

CITY038



I did feel a little uncomfortable sitting there watching it; I felt a little scared.

Q. Following the incident involving Officer Klayman and Chase Trimmer on 10-12-17, did you begin to work from home?
A. I went next door for about a half hour to calm down. We were called officer by our Director Ted. I did work from home they next day.

Q. Why did you begin to work from home?
A. I worked from home because the atmosphere was a little frightening. I wanted to get a clear mind after witnessing that whole situations.

Q. Do you believe there is a hostile work environment at the Police Athletic League?
A. No.

Q. Do you feel "threatened" by an ongoing situation involving Lieutenant Cintron and Officer Klayman?
A. No.

Q. Have any of the employees assigned to the Police Athletic League expressed to you that they feel threatened with the ongoing situation with Officer Klayman and Lieutenant Citron?
A. I have heard conversation from the police side. When I visit the centers I have heard from the officers they felt uncomfortable with Officer Clayman because they have more direct contact with him. One officer, Officer Johnson almost came to blows with Officer Clayman. Another officer said Officer Clayman has been a little bit aggressive toward them.

Q. In your opinion, does Lieutenant Cintron give Officer Klayman preferential treatment?
A. From what I witnessed I am going to slightly because I don't really know what an aide does. I guess he would get preferential treatment because he is like her secretary and she would lean more toward him because he works for her in that capacity.

Q. Where is your office/desk located inside the Police Athletic League Headquarters?
A. My desk is located directly opposite of the lieutenant and Officer Clayman's.

Q. Is Officer Klayman's desk located in an area that is designated for police personnel?
A. It is both civilian and police personnel in the area.

Q. Are you aware that an anonymous letter was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. No, I was not aware of that.

3

Nija Burton                    12|13|17

12-13-17

CITY039

Q. Is there anything else you would like to add that had not been addressed in this interview?

A. No.


STATEMENT CONCLUDED: **11:02 AM**

I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **FOUR (4)**
PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE


SIGNATURE: _____

DATE: 12/13/17 ___ TIME: 11:05 _____


WITNESSES: _____

_____


Nija Burton

12-13-17

CITY040

STATEMENT OF:       **Cassandra Harris B/F,** █████████
                    Frank Rizzo PAL Center
                    2524 East Clearfield Street
                    Philadelphia, Pa. 19134

DATE AND TIME:      12-13-17   10:03 AM

PLACE:              Philadelphia Police Department
                    Internal Affairs Division
                    7790 Dungan Rd.

IN THE PRESENCE OF:

CONCERNING:         EEO #17-0039

INTERVIEWED BY:     Sergeant Brent Conway #8892

RECORDED BY:        Sergeant Brent Conway #8892

Ms. Harris, I am Sergeant Brent Conway #8892, Internal Affairs Division, and I will be taking your statement, directly on this computer.  You are being interviewed regarding a possible EEO/IAD complaint.

Ms. Harris, you are being interviewed a witness to a possible incident involving Philadelphia Police Department personnel. As a witness, you are here under you own accord and are under no obligation to provide a statement. As a witness you, are free to leave at any time.

Q.  Do you understand that you are here as a witness and here under your own accord; and you are free to leave at any time?
A.  Yes.

Q.  Are you willing to provide a statement today?
A.  Yes.

Q.  Are you represented by counsel?
A.  No.

Q.  Do you know Lieutenant Evelyn Cintron #168?
A.  Yes.

Q.  How would you describe your relationship with Lieutenant Cintron?
A.  Business.

Q.  How would you describe Lieutenant Cintron as a supervisor?
A.  I don't report to her so I don't have an opinion.

_Cassandra Harris_                              12-13-17
Cassandra Harris

CITY041

CITY042

Q. Do you know Police Officer David Klayman #9321?
A. Yes.

Q. How would you describe your relationship with Officer Klayman?
A. Whenever I have had interaction with him, he seemed fine.

Q. How would you describe Officer Klayman as an employee?
A. I don't have an opinion on him as an employee.

Q. How would you describe the relationship between Lieutenant Cintron and Officer Klayman?
A. He is her Aide is what I know.

Q. On 10-12-17, did you observe an incident involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters?
A. I heard it first and then I did see.

Q. What is Chase Trimmer's title?
A. He is the director of education and programs.

Q. Can you describe, in your own words, what occurred during the incident you observed involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters on 10-12-17?
A. I heard it first and then I observed it. I was in the lieutenant's office along with Sgt. Fust having a meeting when we heard loud voices. Sgt. Fust and Lt. Cintron immediately got up and opened the door to see what was going on. I could hear Lt. Cintron and Sgt. Fust trying to find out what was going on. Then I heard Officer Clayman's voice, so I got up and stood in the doorway and then I could see it was Officer Clayman and Chase Trimmer having a loud conversation.

Q. Did you have any concerns with what occurred during the incident you observed involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters on 10-12-17?
A. I didn't know if it was going to turn physical.

Q. Following the incident involving Officer Klayman and Chase Trimmer on 10-12-17, did you begin to work from home?
A. No, I did not.

Q. Do you believe there is a hostile work environment at the Police Athletic League?
A. No, I do not.

Q. Do you feel "threatened" by an ongoing situation involving Lieutenant Cintron and Officer Klayman?
A. No, I do not.

2

Cassandra Harris                    12-13-17

CITY043

Q. Have any of the employees assigned to the Police Athletic League expressed to you that they feel threatened with the ongoing situation with Officer Klayman and Lieutenant Citron?

A. No, they have not.

Q. In your opinion, does Lieutenant Cintron give Officer Klayman preferential treatment?

A. I am not aware of that.

Q. Where is your office/desk located inside the Police Athletic League Headquarters?

A. I am on the second floor, rear.

Q. Where is your office/desk in relation to where Lieutenant Cintron's office is located?

A. She is on the first floor.

Q. Where is Officer Klayman's desk located?

A. He has a desk out of the lieutenant's office and then he took over an office that was left empty when a sergeant was transferred.

Q. Is Officer Klayman's desk located in an area that is designated for police personnel?

A. We have never been informed that certain areas are designated for police personnel only.

Q. Are you aware that an anonymous letter was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?

A. No.

Q. Is there anything else you would like to add that had not been addressed in this interview?

A. No.

Cassandra Harris                    12-13-17



Please read your interview to be certain that it is accurate. If there are any errors, correct and initial them. After you reviewed your interview, please sign each page in the lower right hand corner.

STATEMENT CONCLUDED: **10:20 AM**

I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **FOUR (54)** PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE: *Cassandra Harris*

DATE: 12.13.17 TIME: 10:32 am

WITNESSES: _____

_____

4

Cassandra Harris                    12-13-17

CITY045

STATEMENT OF:     **Nadirah McCauley B/F,** ▇
                  Frank Rizzo PAL Center
                  2524 East Clearfield Street
                  Philadelphia, Pa. 19134

DATE AND TIME:    01-18-18  9:54 AM

PLACE:            Philadelphia Police Department
                  Internal Affairs Division
                  7790 Dungan Rd.

IN THE PRESENCE OF:

CONCERNING:       EEO #17-0039

INTERVIEWED BY:   Sergeant Brent Conway #8892

RECORDED BY:      Sergeant Brent Conway #8892

Ms. McCauley, I am Sergeant Brent Conway #8892, Internal Affairs Division, and I will be taking your statement, directly on this computer. You are being interviewed regarding a possible EEO/IAD complaint.

Ms. McCauley, you are being interviewed a witness to a possible incident involving Philadelphia Police Department personnel. As a witness, you are here under you own accord and are under no obligation to provide a statement. As a witness you, are free to leave at any time.

Q. Do you understand that you are here as a witness and here under your own accord; and you are free to leave at any time?
A. Yes, I understand.

Q. Are you willing to provide a statement today?
A. Yes

Q. Are you represented by counsel?
A. No.

Q. Do you know Lieutenant Evelyn Cintron #168?
A. Yes.

Q. How would you describe your relationship with Lieutenant Cintron?
A. Currently, there is no relationship between me and Lieutenant Cintron. We do not speak or acknowledge one another nor has she been response to my work emails. Prior to any issues between she and I we had a great working relationship. She would pull me into several projects, work close together and respected one another.

Nadirah McCauley                    01-18-18

CITY046

Q. How would you describe Lieutenant Cintron as a supervisor?
A. I would say she is a poor supervisor. She leads by power and not by what is best for the youth, the organization or her officers.

Q. Do you know Police Officer David Klayman #9321?
A. Yes.

Q. How would you describe your relationship with Officer Klayman?
A. I was cordial with Officer Klayman. I rarely would see him the office but when I did, he was respectable to me.

Q. How would you describe Officer Klayman as an employee?
A. I rarely saw him work on any PAL projects or task. He would be with LT. Cintron at meetings but can't say one way or another how he was with work related task. In the office, there were times he was aggressive and would use unprofessional language on the phone.

Q. How would you describe the relationship between Lieutenant Cintron and Officer Klayman?
A. They were close. When he was around he was always with her. He would drive her car, have her office keys, use her office when she wasn't around.

Q. On 10-12-17, did you observe an incident involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters?
A. No

Q. What is Chase Trimmer's title?
A. Director of Programs and Education

Q. Can you describe, in your own words, what occurred during the incident you observed involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters on 10-12-17?
A. No

Q. Following the incident involving Officer Klayman and Chase Trimmer on 10-12-17, did you begin to work from home?
A. No, I remained in the office.

Q. Why did you begin to work from home?
A. Was advised by Ted to do work from home the following day so that we could create some space and give people time to think and reflect.

Q. Do you believe there is a hostile work environment at the Police Athletic League?
A. Yes

2

Nadirah McCauley                    01-18-18

CITY047



Q. Why do you believe there is a hostile work environment at the Police Athletic League?

A. Tension are very high and the civilians and officers do not collaborate well anymore. It makes for conversations to be awkward and tempers to boil over quickly. I personally walk on egg shells coming and going and with every interaction I have to have with an officer.

Q. Do you feel "threatened" be an ongoing situation involving Lieutenant Cintron and Officer Klayman?

A. No by the situation but certainly by LT. Cintron. I feel she uses her position/rank against me and that she is out to get me.

Q. What ongoing situation involving Lieutenant Cintron and Officer Klayman makes you feel "threatened?"

A. Nothing

Q. Did you work from on 10-13-17?

A. Yes, as advised by Ted Qualli

Q. Have any of the employees assigned to the Police Athletic League expressed to you that they feel threatened with the ongoing situation with Officer Klayman and Lieutenant Citron?

A. Yes

Q. Who expressed to you that they feel threatened with the ongoing situation with Officer Klayman and Lieutenant Citron?

A. Cassandra Harris and Nija Burton

Q. Why did Cassandra Harris inform you they felt threatened with the ongoing situation with Officer Klayman and Lieutenant Citron?

A. Cassandra Harris stated to me that in the 30 plus years working for PAL she's never experience this or felt afraid to come to work or worried about would could possibly take place at work.

Q. In your opinion, does Lieutenant Cintron give Officer Klayman preferential treatment?

A. Yes

Q. What type of treatment did Lieutenant Cintron give Officer Klayman that you believe was preferential?

A. He would come when he seemingly want or was told and leave early. With a 40 our work week I estimate he was in the office no more than 8 hours a week between 5 business days.

Nadirah McCauley                    01-18-18

CITY048

Q. Where is your office/desk located inside the Police Athletic League Headquarters?
A. First floor, first quadrant, back cubicle.

Q. Where is your office/desk in relation to where Lieutenant Cintron's office is located?
A. Almost parallel

Q. Where is Officer Klayman's desk located?
A. Almost parallel

Q. Is Officer Klayman's desk located in an area that is designated for police personnel?
A. No

Q. Did you receive an email from Lieutenant Cintron on 11-01-17 with the subject, "Office Gossip?"
A. Yes

Q. What did Lieutenant Cintron state in the email she sent you on 11-01-17?
A. The email stated that my name came up in conversations regarding gossiping and that I should stop discussing her and Officer Klayman and just do my job; that she wasn't accusing me of anything but asking me to stop gossiping.

Q. To your knowledge, why did Lieutenant Cintron send you the email on 11-01-17 with the subject, "Office Gossip?"
A. I believe she felt she had to address and because my supervisors asked against her meeting with me face to face, an email was the next best thing.

Q. Are you aware that an anonymous letter was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. Yes

Q. Did you write the anonymous letter that was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. No

Q. Do you know who wrote the anonymous letter that was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. No

Q. Is there anything else you would like to add that had not been addressed in this interview?
A. Yes. On Thursday 1/11/18, my coworker Taaj Andrews sent me a text message saying Lt. Cintron came by our work space and began taking pictures of my name tag and desk. He shared she didn't see him and he watch her take the pictures and walk off. He called

4

Nadirah McCauley                    01-18-18

CITY049

her back to address a work related matter and by his words she exclaimed that she did not see him sitting over there and she also turned beak read. He shared this with me because he though it was suspect and wanted me to be aware. I shared the text with my boss immediately and then HR the next business day. HR, Taaj and I met, HR asked Lt. Cintron about taking pictures and she denied doing so and HR documented all conversation via email to the Board President and Vice President. I have no doubt that Taaj was telling the truth and since this matter I am constantly looking over my shoulders wondering when the shoe is going to drop. My initial reaction when I arrived to work on Friday was to check all my draws out of fear that she may have placed something there. I simply have no trust in her and do not enjoy being around her and feel uncomfortable with her in the office.

### STATEMENT CONCLUDED: 10:26 PM

I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **FIVE (5)** PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE: _Nadirah D McCauley_

DATE: 1/18/18    TIME: 10:24 Am

WITNESSES: _____

_____

5

Nadirah McCauley                          01-18-18

CITY050

STATEMENT OF:      **Taaj Andrews B/M,** ▇▇▇▇▇
Frank Rizzo PAL Center
2524 East Clearfield Street
Philadelphia, Pa. 19134

DATE AND TIME:     01-18-18   10:45 AM

PLACE:      Philadelphia Police Department
Internal Affairs Division
7790 Dungan Rd.

IN THE PRESENCE OF:

CONCERNING:      EEO #17-0039

INTERVIEWED BY:      Sergeant Brent Conway #8892

RECORDED BY:      Sergeant Brent Conway #8892

Mr. Andrews, I am Sergeant Brent Conway #8892, Internal Affairs Division, and I will be taking your statement, directly on this computer. You are being interviewed regarding a possible EEO/IAD complaint.

Mr. Andrews, you are being interviewed a witness to a possible incident involving Philadelphia Police Department personnel. As a witness, you are here under you own accord and are under no obligation to provide a statement. As a witness you, are free to leave at any time.

Q. Do you understand that you are here as a witness and here under your own accord; and you are free to leave at any time?
A. Yes I understand.

Q. Are you willing to provide a statement today?
A. Yes

Q. Are you represented by counsel?
A. No.

Q. Do you know Lieutenant Evelyn Cintron #168?
A. Yes.

Q. How would you describe your relationship with Lieutenant Cintron?
A. Friendly and cordial.

Q. How would you describe Lieutenant Cintron as a supervisor?
A. N/A

_____
Taaj Andrews                    01-18-18

CITY051



Q. Do you know Police Officer David Klayman #9321?
A. Yes.

Q. How would you describe your relationship with Officer Klayman?
A. I didn't have many interactions with him. He was friendly and respectful towards me.
I didn't see him too often.

Q. How would you describe Officer Klayman as an employee?
A. I can't speak to this. I don't fully know his responsibilities

Q. How would you describe the relationship between Lieutenant Cintron and Officer
Klayman?
A. They seemed close. They seemed to have a good rapport. I didn't see them together
too often to assess.

Q. On 10-12-17, did you observe an incident involving Officer Klayman and Chase
Trimmer while inside the Police Athletic League headquarters?
A. Yes

Q. What is Chase Trimmer's title?
A. Director of Programs and Education

Q. Can you describe, in your own words, what occurred during the incident you observed
involving Officer Klayman and Chase Trimmer while inside the Police Athletic League
headquarters on 10-12-17?
A. I was at my desk on the computer. Chase walked by my cubicle area towards the
kitchen and printer area. I did not have a visual of where he was actually standing. Officer
Klayman seemed to approach Chase and he asked him if he could talk to him about
something. Chase agreed. He said he understood that some of the Americorps coaches
were sitting at his desk the day before. Chase said he had them sitting there to complete
an assignment and he didn't have anywhere else for them to sit. He didn't think it was a
problem because his desk was clear and they wouldn't be on the computer for long. P/O
Klayman said that it was a problem as he began to get louder. He said that he did things
for Lt. Cintron that involved sensitive information that no civilian could have access to.
They went back and forth for a while and P/O Klayman started bringing up personal
attacks on Chase's character such as "You're passive aggressive. You don't respect Lt.
Cintron and her authority. I'm tired of hearing about this." Chase didn't say much during
that time but he kept saying that he didn't know that he was still sitting at that desk and
that he thought he officially moved into Sgt. Ervin's old office. P/O Klayman began
asking Chase if he wanted to take the conversation outside insinuating a physical
altercation. By this time, the conversation was loud enough for Sgt. Faust and Lt. Cintron
to hear through the closed door of her office. They came out and broke up the two.

2

Taaj Andrews                                01-18-18

CITY052

Q. Did you have any concerns with what occurred during the incident you observed involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters on 10-12-17?
A. Yes

Q. What concerns did you have?
A. I was concerned because I knew that P/O Klayman was carrying a weapon and it didn't seem as though he had enough control over himself. I didn't know what to expect or what might happen if the two of them went outside.

Q. Following the incident involving Officer Klayman and Chase Trimmer on 10-12-17, did you begin to work from home?
A. Yes. I worked from home the next day, Friday 10-13-17

Q. Why did you begin to work from home?
A. My supervisor suggested that everyone work from home. Not everyone felt safe after the incident and it was an uncomfortable environment to continue working

Q. Do you believe there is a hostile work environment at the Police Athletic League?
A. There is at time.

Q. Why do you believe there is a hostile work environment at the Police Athletic League?
A. I think that we let disagreements and personal agendas get in between our purpose for being here. Some people don't feel comfortable speaking up about their opinions, being themselves, for fear of their job security. Others feel like they're not appreciated.

Q. Do you feel "threatened" be an ongoing situation involving Lieutenant Cintron and Officer Klayman?
A. I don't feel threatened now. I learned more about the process and culture here at PAL and learned that this was not necessarily PAL's culture but more of an isolated incident

Q. In your opinion, does Lieutenant Cintron give Officer Klayman preferential treatment?
A. It seems like it because the P/O that is currently her aide is here more than P/O Klayman ever was. Her current aide is in the office probably 80% of the time. P/O Klayman was only in the office like 20% of the time. If they're doing the same role it seems like there's some preferential treatment. I don't know everything that his role entails but from my perspective it doesn't seem like there's equal treatment.

Q. Where is your office/desk located inside the Police Athletic League Headquarters?
A. My desk is to the left of Chase Trimmer's office and directly in front of P/O Keith Balco's desk.

Q. Where is your office/desk in relation to where Lieutenant Cintron's office is located?
A. Across from her office

3

Taaj Andrews                                01-18-18

CITY053

Q. Where is Officer Klayman's desk located?
A. His desk is right outside of Lt. Cintron's desk and he used Sgt. Ervin's office

Q. Is Officer Klayman's desk located in an area that is designated for police personnel?
A. Not to my knowledge

Q. Are you aware that an anonymous letter was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. Yes

Q. Did you write the anonymous letter that was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. No

Q. Do you know who wrote the anonymous letter that was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. No

Q. Is there anything else you would like to add that had not been addressed in this interview?
A. During PAL's Ford Holiday Party on 12/13/17 I had a brief conversation with Lt. Cintron regarding the upcoming reading program. She answered my questions about the program then shifted and started talking about our staff holiday party and why she didn't want to go. She said "I'll work with her but I'm not having a personal relationship with her or being social with anyone that's spreading rumors about me." I acknowledged what she said and we ended the conversation. Last week I was in the office later than most people. It was about 5:10p and I was sitting at my desk on the computer. The lights in the office usually goes off when there isn't anyone in that part of the office. The rest of the office was dark except the area where I was sitting. I heard what sounded like a camera's flash and found it strange because I thought everyone had left. I looked up and saw Lt. Cintron taking a photo of Nadirah's cubicle. It looked like she took a photo of Nadirah's nametag from my angle. Then she stepped closer and took a photo of Nadirah's desk. She looked at the phone then she turned and walked away. She never seen me looking at her. I had questions to follow up with her about the reading program so I called her back and she stopped and turned around. She looked shocked to see me standing there. She kept saying she didn't know I was there and that she didn't see me back there. I did not mention the photos or what I saw. I asked her about the reading program because it was my highest priority for the week. She gave me the answers I needed and kept saying she didn't see me. She left. I left at 5:27 and she and Sgt. Pascucci and P/O Brian Younger were standing outside when I left.

Taaj Andrews                          01-18-18

CITY054

STATEMENT CONCLUDED: **12:15 PM**
I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **FIVE (5)** PAGES
AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE: _____

DATE: 1/18/18 TIME: 12:23p

WITNESSES: _____

_____

Taaj Andrews                01-18-18

CITY055

STATEMENT OF:        **Chase Trimmer W/M,** ▮▮▮▮
                     Frank Rizzo PAL Center
                     2524 East Clearfield Street
                     Philadelphia, Pa. 19134

DATE AND TIME:       12-13-17  11:08 AM

PLACE:               Philadelphia Police Department
                     Internal Affairs Division
                     7790 Dungan Rd.

IN THE PRESENCE OF:

CONCERNING:          EEO #17-0039

INTERVIEWED BY:      Sergeant Brent Conway #8892

RECORDED BY:         Sergeant Brent Conway #8892

Mr. Trimmer, I am Sergeant Brent Conway #8892, Internal Affairs Division, and I will be taking your statement, directly on this computer. You are being interviewed regarding a possible EEO/IAD complaint.

Mr. Trimmer, you are being interviewed a witness to a possible incident involving Philadelphia Police Department personnel. As a witness, you are here under you own accord and are under no obligation to provide a statement. As a witness you, are free to leave at any time.

Q. Do you understand that you are here as a witness and here under your own accord; and you are free to leave at any time?
A. Yes.

Q. Are you willing to provide a statement today?
A. Yes.

Q. Are you represented by counsel?
A. No.

Q. Do you know Lieutenant Evelyn Cintron #168?
A. Yes.

Q. How would you describe your relationship with Lieutenant Cintron?
A. Lt. Cintron; I work directly with her in my role as the Director of Programs and Education. I work directly with the unit she overseas as the commission officer.

Chase Trimmer                                    12-13-17



Q. How would you describe Lieutenant Cintron as a supervisor?

A. I can only speak from observation because she is not my supervisor. I would describe that there a lot of communication challenges and a significant lack of commination. There is a lot of inconsistency of standards based on my observations. I think one of the more primary things that relates to my role on my nonprofit side in the inconsistency of standard protocols; being told by Lt. Cintron that I am not allowed to talk directly with certain people. I have not received an established protocol for communications of who of I can and cannot communicate with. It is more so responded that I shouldn't be talking rather than providing the expected protocol.

Q. Do you know Police Officer David Klayman #9321?

A. Yes.

Q. How would you describe your relationship with Officer Klayman?

A. I would say I was introduced to him when Lt. Cintron became the commanding officer. I noticed that he was occasionally, at the beginning of her tenor, he was with her at events. He then started being her a headquarters; at first time it was a few times a week. It seemed as though he has a different schedule as compare to the other officer who work the field from 1 to 9 and the officers who work in the office. I was told by other officers that he was considered to be her aide. In my seven years at PAL, I worked with two other commanding officers and they did not have aides. I was unfamiliar with his job and his responsibilities were not communicated to us; at least to the PAL nonprofit staff. Based on my observations, he was transport the lieutenant to different events, sometime joining meetings and taking notes, sometimes providing transportation for the lieutenant's daughter and family. I did on multiple occasions observe Officer Klayman addressing PAL officers in a reprimanding manner.

Q. How would you describe the relationship between Lieutenant Cintron and Officer Klayman?

A. I guess it seemed as though they had a preexisting relationship prior to her coming to the PAL unit. It seemed to be personal; just one of multiple indication of it being personal was him providing transportation to her family using the PAL owned vehicle that PAL provides to the commanding officer. I am not sure if that is normal in the police department, but in my personal observation it seemed to be more personal nature. I got the sense that they certainly communicated very regularly and often time he communicated with others on Lt. Cintron's behalf.

Q. On 10-12-17, were you involved in a verbal argument with Officer Klayman while inside the Police Athletic League headquarters?

A. Argument sounds too much like mutual. I was approached by Officer Klayman in the open officer area. Initially he asked me if I had minute to talk. I said I did and he asked me, "What happened yesterday?" I was unsure of what he was referring to as I did not interact with Officer Klayman on that day (October 11th, 2017) but assumed he meant to discuss the use of work space outside of Lt. Cintron's office.

2

Chase Trimmer                          12-13-17

CITY057

Q. What occurred that led to you having a verbal argument with Officer Klayman while inside the Police Athletic League headquarters on 10-12-17?

A. Lt. Cintron communicated to me on Wednesday, October 11th that Officer Klayman was still utilizing work space outside of the Lieutenant's office in addition to the private office space with his designated name plate. I was unaware that both spaces were intended to be reserved for Officer Klayman's use only and had instructed a PAL staff member to utilize the PAL technology for a work assignment related to PAL programming. After informing me of her expectations regarding the space, I shared with Lt. Cintron that I wasn't aware of the work space assignments because I hadn't received any communication, wasn't aware of Officer Klayman's schedule, and assumed the private office space was his new full-time workspace. After asking Lt. Cintron if I should instruct the staff member to move to a different space, she said it was fine for the staff member to complete his assignment using that workspace.

Q. Can you describe, in your own words, what occurred during the verbal argument you had with Officer Klayman while inside the Police Athletic League headquarters?

A. Officer Klayman confirmed that he did want to discuss the use of the workspace outside of Lt. Cintron's office and he questioned my supposed claim that I do not know his hours or what he does at PAL. When I responded that I did say that I was not aware of his regular schedule but that I did not make any comments regarding his hours nor did I question his role at PAL, he began to raise his voice and started yelling at me in an aggressive manner and volume. Officer Klayman proceeded to talk loudly and aggressively at me, saying that I have been "disrespectful towards the Commanding Officer for the past year", have been "passive aggressive" and that I "question" the Commanding Officer.

I asked Officer Klayman to provide specific examples of my "disrespectful" behavior. He responded by cursing at me and stating that I do not need to be communicated to, do not have the authority to use workspace near Lt. Cintron's office, that there needs to be a "separation in the office between Police space and PAL space", and that I needed to understand and respect police protocol and the chain of command. I responded that as a staff member of the PAL organization, whether I have a badge or not, I deserve to be communicated to with respect.

Officer Klayman continued yelling at me. At this time, Lt. Cintron and Sgt. Faust came out of a closed-door meeting in Lt. Cintron's office and witnessed the continued aggressive behavior and cursing from Officer Klayman while he described issues of "back talking" and "talking behind the Lieutenant's back", adding that "everyone should hear this" in reference to other PAL staff members witnessing this entire interaction. After Lt. Cintron and Sgt. Faust asked Officer Klayman to "calm down", Lt. Cintron said, "David, this cannot happen here" and Officer Klayman said "we can go in the kitchen, or we can go outside". At this time, Lt. Cintron extend her arm towards Officer Klayman and positioned herself between him and me. Officer Klayman then said to Sgt. Faust, "you're the reason all of this bullshit is going on".

3

Chase Trimmer                                    12-13-17

At this point, Officer Klayman walked away from the area. He and the Lieutenant left building but shortly returned. Multiple witnesses of the interaction asked me if I was ok and expressed concern for their own safety and comfort as well.

Q. Was anyone else present during the verbal argument you had with Officer Klayman while inside the Police Athletic League headquarters?
A. Yes; Josh, Taaj Andrews, Nija Burton, Taron Franklin, Cassandra Harris

Q. Did you have any concerns with what occurred during the verbal argument you had with Officer Klayman while inside the Police Athletic League headquarters on 10-12-17?
A. Yes

Q. What concerns did you have?
A. I was concerned for my physical safety and the physical and emotional safety of others in the building. I was concerned for the physical safety of myself and others due to Officer Klayman's aggressive manner, physical approach towards me as he became more aggressive, as well as the fact that he carries a service weapon.

Q. Did Officer Klayman threaten you during the verbal argument you had with him 10-12-17?
A. Officer Klayman did not explicitly make any verbal threats, however I felt threatened by his physical approach toward me as he raised his voice and stepped closer to me while yelling.

Q. Did Officer Klayman make any comments or statements to you during the verbal argument you had with him 10-12-17 that could have been deemed inappropriate?
A. Yes; see above

Q. Following the incident you had with Officer Klayman on 10-12-17, did you begin to work from home?
A. Not immediately. I worked from home on Friday, October 13th.

Q. Why did you begin to work from home?
A. I worked from home that day because I felt concerned about the office environment, primarily due to the fact that Officer Klayman's supervisors did not address or acknowledge the incident. Also, PAL leadership communicated to all staff that they could work from home in light of the obviously stressing incident observed and discussed.

Q. Do you believe there is a hostile work environment at the Police Athletic League?
A. Yes, at times.

Q. Why do you believe there is a hostile work environment at the Police Athletic League?
A. I believe the hostile work environment is a direct result of Lt. Cintron's distrust, animosity, failure to communicate, and lack of respect for PAL nonprofit staff.

4

Chase Trimmer                                          12-13-17

CITY059

Q. Do you feel "threatened" by an ongoing situation involving Lieutenant Cintron and Officer Klayman?
A. Yes. Based on a perceived personal nature of their relationship and the fact that I observed Officer Klayman's personal vehicle at a PAL event on November 10th at Hunting Park Rec Center.

Q. Have any of the employees assigned to the Police Athletic League expressed to you that they feel threatened with the ongoing situation with Officer Klayman and Lieutenant Citron?
A. Yes

Q. Who expressed to you that they feel threatened with the ongoing situation with Officer Klayman and Lieutenant Citron?
A. Nadirah McCauley

Q. Why did Nadirah McCauley inform you they felt threatened with the ongoing situation with Officer Klayman and Lieutenant Citron?
A. Nadirah McCauley informed me that she felt threatened with the ongoing situation with Officer Klayman and Lt. Cintron because she received an email from Lt. Cintron regarding communication of interactions between Officer Klayman and Lt. Cintron that Nadirah witnessed directly at an event she was invited to on her personal time. Nadirah shared the email with me and it includes language that threatens filing a harassment complaint while also acknowledging that Lt. Cintron has no evidence of said communication by Nadirah.

Q. In your opinion, does Lieutenant Cintron give Officer Klayman preferential treatment?
A. Yes

Q. What type of treatment did Lieutenant Cintron give Officer Klayman that you believe was preferential?
A. Perceived flexible and inconsistent hours to accommodate Officer Klayman's school schedule, different standards for uniform compared to other PAL officers as well

Q. Where is your office/desk located inside the Police Athletic League Headquarters?
A. First floor, across from the restrooms

Q. Where is your office/desk in relation to where Lieutenant Cintron's office is located?
A. Same floor, across the open office area

Q. Where is Officer Klayman's desk located?
A. Directly outside of Lt. Cintron's office as well as a second space in the near hallway on the first floor. This office was previously occupied by Sgt. Eric Ervin before he was transferred out of the PAL unit by Lt. Cintron.

Chase Trimmer                          12-13-17

CITY060

Q. Is Officer Klayman's desk located in an area that is designated for police personnel?
A. There is no designated area for police personnel only in the PAL nonprofit-owned space.

Q. Are you aware that an anonymous letter was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. Yes

Q. Did you write the anonymous letter that was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. No

Q. Do you know who wrote the anonymous letter that was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. Yes; Officer Janice Little

Q. Was an investigation conducted by your supervisors or human relations personnel in reference to the incident you had with Officer Klayman?
A. Yes; I think the report on the findings of the investigation was shared with PAL's board of directors.

Q. What were the findings of the investigation?
A. They confirmed that an incident occurred with an officer in the PAL unit.

Q. Is there anything else you would like to add that had not been addressed in this interview?
A. No.

6

Chase Trimmer                    12-13-17

CITY061

Please read your interview to be certain that it is accurate. If there are any errors, correct and initial them. After you reviewed your interview, please sign each page in the lower right hand corner.

_____ I would like a copy of this interview sent to me through police mail to my district/unit of assignment.

_____ I would like a copy of this interview sent to my home address.

____X_____ I do not wish to receive a copy of this interview.

STATEMENT CONCLUDED: **12:31 PM**
I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **SEVEN (7)** PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE: _____

DATE: _12/13/17_ TIME: _12:35pm_

WITNESSES: _____

_____

7

Chase Trimmer                    12-13-17

STATEMENT OF:       **Theodore Qualli W/M, ▮▮▮▮**
        PAL Headquarters
        3068 Belgrade Street
        Philadelphia, PA 19134

DATE AND TIME:     2/16/18  10:13 AM

PLACE:          PAL Headquarters
        3068 Belgrade Street
        Philadelphia, PA 19134

IN THE PRESENCE OF:

CONCERNING:      EEO #17-0039

INTERVIEWED BY:    Sergeant Brent Conway #8892

RECORDED BY:      Sergeant Brent Conway #8892

Mr. Qualli, I am Sergeant Brent Conway #8892, Internal Affairs Division; you are being interviewed regarding a possible EEO/IAD complaint.

Mr. Qualli, you are being interviewed a witness to a possible incident involving Philadelphia Police Department personnel. As a witness, you providing this statement own accord and are under no obligation to provide a statement.

Q. Do you understand that you are a witness and are providing this statement on your own accord; and you are free to decline giving a statement at any time?
A. **Yes.**

Q. Are you willing to provide a statement today?
A. **Yes.**

Q. Are you represented by counsel?
A. **No.**

Q. Do you know Lieutenant Evelyn Cintron #168?
A. **Yes.**

Q. How would you describe your relationship with Lieutenant Cintron?
A. **We are professional colleagues. She oversees the PAL Police unit and I oversee the Police Athletic League of Philadelphia, Inc., a 501C3 non-profit organization.**

Q. How would you describe Lieutenant Cintron as a supervisor?
A. **As I don't report to Lt. Cintron, it is difficult to describe her as a supervisor.**

Theodore Qualli           02-16-2018

CITY063

Q. Do you know Police Officer David Klayman #9321?
A. **Yes.**

Q. How would you describe your relationship with Officer Klayman?
A. **Officer Klayman and I were colleagues for a period. He worked as Lt. Cintron's aide. We did not spend much time together, other than on a few occasions when he was driving her to a meeting and I jumped in for a ride to the same meeting.**

Q. How would you describe Officer Klayman as an employee?
A. **I do not know what Officer Klayman's responsibilities were, so it is difficult for me to answer this question.**

Q. How would you describe the relationship between Lieutenant Cintron and Officer Klayman?
A. **He was her aide.**

Q. Are you currently employed by the Police Athletic League?
A. **Yes.**

Q. What is your title at the Police Athletic League?
A. **Executive Director.**

Q. As the Executive Director at the Police Athletic League, are you responsible for the day-to-day operations at the Police Athletic League?
A. **Yes. I have ultimate responsibility for planning, oversight and direction of PAL's overall fundraising, volunteer management, programs, finance and technology efforts.**

Q. Do your responsibilities as the Executive Director at the Police Athletic League include the supervision of the civilian employees employed by the Police Athletic League?
A. **Yes.**

Q. What is Lieutenant Cintron's title at the Police Athletic League?
A. **Lt. Cintron is the Commanding Officer of the Police Athletic League Police Unit.**

Q. What are Lieutenant Cintron's responsibilities at the Police Athletic League as you know them?
A. **To ensure the PAL Police Unit is providing services to children in PAL Centers in a manner that is consistent with the organization's strategic plan.**

Q. Do you report to at the Lieutenant Cintron?
A. **No.**

Q. Does Lieutenant Cintron report to you?
A. **No.**

2

Theodore Qualli          02-16-2018

CITY064

Q. Do the civilian employees employed by the Police Athletic League report to you?
A. **Yes.**

Q. Do the civilian employees employed by the Police Athletic League report to Lieutenant Cintron?
A. **No.**

Q. In the event there is a work related problem with a civilian employee employed by the Police Athletic League, who is responsible for addressing that problem with that employee?
**A. Their direct supervisor or PAL HR.**

Q. Were Lieutenant Cintron to have any concerns related to a civilian employee employed by the Police Athletic League, who should she direct those concerns to?
A. **Their direct supervisor, PAL's Director of Finance & Administration (HR) and/or me.**

Q. On 10-12-17, did you observe an incident involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters?
A. **No.**

Q. On 10-12-17, did Chase Trimmer inform you about an incident he had with Officer Klayman while inside the Police Athletic League headquarters?
A. **Yes.**

Q. Can you describe, in your own words, what Chase Trimmer informed you occurred during the incident he had with Officer Klayman while inside the Police Athletic League headquarters on 10-12-17?
A. **Yes. Chase told me that Officer Klayman asked to speak with him regarding use of the cubicle he once (Officer Klayman) used. Chase said that Officer Klayman then began yelling and cursing at him.**

Q. What actions did you take as it relates to the incident Chase Trimmer informed he had with Officer Klayman while inside the Police Athletic League headquarters on 10-12-17?
A. **I asked Chase what happened and asked him to document the incident. I also asked PAL's Director of Finance & Administration (HR) to speak with Chase about the incident.**

**I then convened a brief meeting with all civilian employees who were in the office to ask them what they saw. Several were visibly shaken about the incident and expressed concern for Chase's safety and their safety in general. I explained that Lt. Cintron and I would discuss the situation upon my return (I was on my way to a meeting), and advised the employees that if for any reason, they ever felt unsafe at work, that they could notify their supervisor and work from home.**

3

Theodore Qualli                    02-16-2018

CITY065

On my way to my meeting, I called PAL's Board Treasurer, Ron Rabena who also chairs the Personnel Subcommittee, and informed him of the incident.

Q. Was the incident Chase Trimmer informed you he had with Officer Klayman while inside the Police Athletic League headquarters on 10-12-17, investigated by the Human Resources personnel employed by the Police Athletic League?
A. **Yes**

Q. What were the results of that investigation?
A. **A memo was sent to the Board Chair and Treasurer requesting counsel on how to proceed, given the incident involved a Philadelphia Police Officer.**

Q. Did you have any discussions with Lieutenant Cintron concerning the incident Chase Trimmer informed he had with Officer Klayman while inside the Police Athletic League headquarters on 10-12-17?
A. **Yes.**

Q. Can you describe, in your words, what you and Lieutenant Cintron discussed as it relates to the incident Chase Trimmer informed he had with Officer Klayman while inside the Police Athletic League headquarters on 10-12-17?
A. **Lt. Cintron told me it was "a disagreement between two men." She said that David was sick of the sarcasm at PAL and people "talking back to her."**

Q. To your knowledge, what actions did Lieutenant Cintron take as it relates to the incident Chase Trimmer informed he had with Officer Klayman while inside the Police Athletic League headquarters on 10-12-17?
A. **To my knowledge, Lt. Cintron did not take any actions.**

Q. Following the incident involving Officer Klayman and Chase Trimmer on 10-12-17, did you inform your staff that they could work from home the following if they chose to?
A. **Yes.**

Q. Why did you did you inform your staff that they could work from home the following if they chose to?
A. **The staff was visibly shaken and they shared that nothing like this had happened in the past. I explained to them that Lt. Cintron and I had a positive discussion about the incident, and both agreed to continue our discussion after the weekend. I advised staff that if they felt uncomfortable or unsafe, that they could work from home the following day.**

Q. Did any members of your staff express to that they did not want to work from home?
A. **Some staff chose to work in the office.**

Q. Did any members of your staff express to you that they did not have any concerns with the incident Officer Klayman had with Chase Trimmer?
A. **Every staff member expressed concern.**

4

Theodore Qualli                    02-16-2018



Q. In or around 11-01-17, did Lieutenant Cintron inform you that she had concerns related to Nadirah McCauley spreading what Lieutenant Cintron describes as "rumors" about her and Officer Klayman?
A. **Yes.**

Q. What did Lieutenant Cintron inform you occurred that led her to believe Nadirah McCauley was spreading "rumors" about her and Officer Klayman?
A. **Lt. Cintron told me that Nadirah was spreading rumors. I asked how she knew it was Nadirah that was spreading this rumor and Lt. Cintron told me that Nadirah was at "the party." I had no knowledge of any party so inquired about the party. Lt. Cintron told me she had a birthday party for herself this past summer and had invited some officers and civilians, and that this rumor emanated from something that happened at this party.**

**Given the significant emotion Lt. Cintron displayed during this conversation, I told her that I didn't think it was a good idea for her to talk to Nadirah at that moment, especially given the uneasiness that staff still had related to the Officer Klayman incident. I told Lt. Cintron that I would rather she let emotion subside prior to (her) talking to Nadirah and that I would talk to Nadirah related to the alleged rumor and get back to her ASAP.**

Q. Did you inform Lieutenant Cintron that you would address her concerns with Nadirah McCauley?
A. **Yes.**

Q. Did Lieutenant Cintron request to meet with the entire PAL staff to discuss the rumors she alleged were being spread?
A. **No.**

Q. Did you inform Lieutenant Cintron that she could not meet with your staff to discuss the rumors that she alleged were being spread about her and Officer Klayman?
A. **No.**

Q. Why didn't you allow Lieutenant Cintron to meet with staff to discuss the rumors that she alleged were being spread about her and Officer Klayman?
A. **N/A.**

Q. During the time Lieutenant Cintron has been assigned to PAL, have you held any meetings during which the topic of rumors and the effect rumors could have on a person's reputation or career were discussed?
A. **We spoke once about a rumor and its potential impact on the organization. This was related to PAL's finances. The rumor was inaccurate and Lt. Cintron wanted to address the rumor with PAL officers herself and asked that I address it with civilians, which we both did. Only after the Klayman incident did we ever have**

5

Theodore Qualli                    02-16-2018

another conversation on rumors and only then did the words reputation or career come up.

Q. Did you believe it would have been inappropriate for Lieutenant Cintron to meet with your staff to discuss the rumors that she alleged were being spread about her and Officer Klayman?

A. **No. I, did tell her that I thought it would be inappropriate to do so at that time, since she (Lt) was so visibly emotional.**

Q. Why did you believe it would have been inappropriate for Lieutenant Cintron to meet with your staff to discuss the rumors that she alleged were being spread about her and Officer Klayman?

A. **Same as above.**

Q. Did you address Lieutenant Cintron's concerns with Nadirah McCauley?

A. **Yes.**

Q. Did Nadirah McCauley inform you that she was spreading "rumors" about Lieutenant Cintron and Officer Klayman?

A. **No, she stated that she had heard the rumor from officers, that she had not engaged in spreading rumors, and that all she wanted to do was go about doing her job. I memorialized this conversation in an email, and also let the Lt. know she could speak directly to Nadirah.**

Q. Following you discussion with Nadirah McCauley, did you believe any further action was necessary to address Lieutenant Cintron's concerns that Nadirah McCauley was spreading "rumors" about her and Officer Klayman?

A. **No. Lt. Cintron subsequently told me that Diana Harris was engaged in spreading rumors. I told Lt. Cintron that I would talk to Diana, ASAP, which I did on 11/1/2017. Diana denied being involved in the spreading of any rumors and asked me if she could talk to LT about this. I told her that she could, and in fact, Lt. would likely want to talk to her. I memorialized this conversation in a similar email to Lt. Cintron.**

Q. Did Nadirah McCauley inform you that she received an e-mail from Lieutenant Cintron with the subject, "Office Gossip?"

A. **I was copied on the email.**

Q. Did you discuss the e-mail Nadirah McCauley received from Lieutenant Cintron with Lieutenant Cintron?

A. **No. The email was shared by Nadirah with PAL's HR staff and brought to the PAL Board Treasurer/Chair of the PAL Board Personnel Committee due the employee and HR staffer's belief that the email was threatening in nature.**

Q. Did Lieutenant Cintron explain to you why she sent Nadirah McCauley the e-mail?

6

Theodore Qualli    02-16-2018

CITY068

A. **No.**

Q. What reason did Lieutenant Cintron provide you to explain why she sent Nadirah McCauley the e-mail?
A. **N/A.**

Q. Do you feel "threatened" be an ongoing situation involving Lieutenant Cintron and Officer Klayman?
A. **In the immediate days following the incident, I did not feel entirely comfortable at PAL.**

Q. What ongoing situation involving Lieutenant Cintron and Officer Klayman makes you feel "threatened?"
A. **Currently Officer Klayman is not assigned to PAL.**

Q. Have any of the employees assigned to the Police Athletic League expressed to you that they feel threatened with the ongoing situation with Officer Klayman and Lieutenant Citron?
A. **See answer to question below.**

Q. Who expressed to you that they feel threatened with the ongoing situation with Officer Klayman and Lieutenant Citron and what concerns did he/she express to you?
A. **Threatened may not be the correct word, but Chase Trimmer, Nadirah McCauley, Nija Burton, Pat Winner, Sunny Li, and Sgt. Faust have all expressed concerns related to the situation.**

Q. What actions did you take as it relates to your employees informing you that they felt threatened with the ongoing situation with Officer Klayman and Lieutenant Citron?
A. **I shared these concerns with Board leadership.**

Q. Do you believe there is a hostile work environment at the Police Athletic League?
A. **No.**

Q. Why do you believe there is a hostile work environment at the Police Athletic League?
A. **N/A.**

Q. In your opinion, does Lieutenant Cintron give Officer Klayman preferential treatment?
A. **I don't know the role of an aide or what is or isn't allowed in that role.**

Q. What type of treatment did Lieutenant Cintron give Officer Klayman that you believe was preferential?
A. **N/A.**

Q. Where is your office/desk located inside the Police Athletic League Headquarters?

7

Theodore Qualli                     02-16-2018

CITY069

A. **Second floor.**

Q. Where is your office/desk in relation to where Lieutenant Cintron's office is located?
A. **I am on the second floor, Lt. Cintron is on the first.**

Q. Where is Officer Klayman's desk located?
A. **When he worked at a cubicle, it was located immediately outside of Lt. Cintron's office. He then moved into an office, at which point, I assumed he used the desk located inside of that office.**

Q. Is Officer Klayman's desk located in an area that is designated for police personnel?
A. **Other than the name tag on a cubicle or office, there is no designation of space for police or civilians. When Officer Klayman moved into the office, I noticed his name tag was moved from the cubicle to the office.**

Q. Do you believe there is a hostile work environment at the Police Athletic League?
A. **No.**

Q. Why do you believe there is a hostile work environment at the Police Athletic League?
A. **N/A.**

Q. What actions have you taken to address your belief there is a hostile work environment at the Police Athletic League?
A. **N/A., I do not believe there is a hostile work environment. We have taken many actions in concert with Lt. Cintron to address communication challenges, including an all-day off-site retreat for all police and civilian PAL staff, a PAL leadership retreat (my direct reports, Lt. Cintron and her Administrative Sgt.), created an internal staff newsletter to, launched the Sunshine Committee to celebrate birthdays, anniversaries, etc, and more.**

Q. Have any of your employees informed you that they believe there is a hostile work environment at the Police Athletic League?
A. **No.**

Q. Who informed you that they believe there is a hostile work environment at the Police Athletic League and what did he or she inform you occurred that led to their belief?
A. **The only mention of hostile work environment that I recall was in the email Lt. Cintron sent to Nadirah.**

Q. Are you aware that an anonymous letter was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. **I learned about the letter when I learned of the internal affairs investigation.**

8

Theodore Qualli                    02-16-2018

CITY070

Q. Did you write the anonymous letter that was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. **No.**

Q. Do you know who wrote the anonymous letter that was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. **No.**

Q. Have you made any attempts to have Lieutenant Cintron removed as the Commanding Officer of PAL?
A. **No.**

Q. Have you done anything during Lieutenant Cintron's time as Commanding Officer of PAL that could have been deemed an attempt to undermine her as a supervisor?
A. **No.**

Q. To you knowledge, have any members of your staff made any attempts to have Lieutenant Cintron removed as the Commanding Officer of PAL?
A. **No.**

Q. To your knowledge, have any members of your staff done anything during Lieutenant Cintron's time as Commanding Officer of PAL that could have been deemed an attempt to undermine her as a supervisor?
A. **No.**

Q. Is there anything else you would like to add that had not been addressed in this interview?
A. **No**

**Please read your interview to be certain that it is accurate. If there are any errors, correct and initial them. After you reviewed your interview, please sign each page in the lower right hand corner.**

STATEMENT CONCLUDED: **12:30 PM**
I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **NINE (9)** PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE:

DATE: 2/16/18   TIME: 10:24 am

WITNESSES:

9

Theodore Qualli                02-16-2018

CITY071

| STATEMENT OF: | **P/O Janice Little #9812, PR** ███ **B/F**
Appointment Date: 03-20-89
Assignment Date: 08-09-04
Assignment: PAL |
|---|---|
| DATE AND TIME: | 11-29-17  1:05 PM |
| PLACE: | Philadelphia Police Department
Internal Affairs Division
7790 Dungan Rd. |
| IN THE PRESENCE OF: | Nicholas Pinto Esq. |
| CONCERNING: | EEO #17-0039 |
| INTERVIEWED BY: | Sergeant Brent Conway #8892 |
| RECORDED BY: | Sergeant Brent Conway #8892 |

Officer Little, I am Sergeant Brent Conway #8892, Internal Affairs Division, and I will be taking your statement, directly on this computer. You are being interviewed regarding a possible EEO/IAD complaint.

Q. Are you represented by counsel?
A. Yes,

**Officer Little, you are reminded that failure to cooperate in a Departmental Administrative Investigation is punishable by ten (10) days suspension to dismissal under Article 1- §008-10 of the Disciplinary Code.**

**Officer Little, you are reminded that lying or attempting to deceive regarding a material fact during the course of any Departmental investigation is punishable by dismissal under Article 1-§009-10 of the Disciplinary Code.**

Q. Do you understand this?
A. Yes.

Q. Are you willing to cooperate?
A. Yes.

Q. Are you recording this interview?
A. No.

Q. Please state your rank, full name, badge number, payroll number, and district or unit of assignment.
A. Police Officer Janice Little #9812, Payroll ███ PAL.

_____
Police Officer Janice Little          11-06-17

CITY072



Q. Do you know Lieutenant Evelyn Cintron #168?
A. Yes.

Q. How would you describe your relationship with Lieutenant Cintron?
A. Right now not good; it was better before. It changed since the incident when she sent Sgt. Pascucci to my PAL center to tell me to mind my business about her and her relationship with Officer David Klayman. This occurred about a month ago.

Q. How would you describe Lieutenant Cintron as a supervisor?
A. We have had a lot better.

Q. Do you know Police Officer David Klayman #9321?
A. Just by him coming to the unit; I don't know him personally.

Q. How would you describe the relationship between Lieutenant Cintron and Officer Klayman?
A. Closer than most. He never jumped a female officer but he jump at male officer and it was said it was because he felt they were being disrespectful toward her.

Q. What do you mean when you state Officer Klayman jumped at male officers?
A. It has been known at the unit he has had words with several officers; Officer Balko, Officer Ragucci and Officer Johnson. I don't know why he had words with Balko and Ragucci. I know he had words with Johnson about him supposedly disrespecting the lieutenant. Klayman and Johnson had to be separated before they got into a fight. He also had words with a civilian employee.

Q. In your opinion, does Lieutenant Cintron give Officer Klayman preferential treatment?
A. He was her aide. There were times he didn't have on his uniform and everyone else did after we were told not to come into headquarters without having our uniforms on.

Q. What is your current assignment at the Police Athletic League?
A. I am assigned to Wynnefield PAL.

Q. How often do you go to the Police Athletic League headquarters (3068 Belgrade Avenue)?
A. I used to go a lot because I joined many committees; but I since this incident I have gotten off of many of the committees except for one because I don't want to run into her.

Q. During you tour of duty on 10-12-17, did you observe an incident involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters?
A. No I wasn't there.

Q. On 10-13-17, did Sergeant Michael Pascucci #562 inform you that Lieutenant Cintron ordered him to tell you to, "Stay out of things that don't concern you?"
A. That is correct.

2

Police Officer Janice Little          11-06-17

CITY073



Q. Why did Sergeant Michael Pascucci #562 inform you that Lieutenant Cintron ordered him to tell you to, "Stay out of things that don't concern you?"
A. He said he was given an order.

Q. To your knowledge, what was Sergeant Michael Pascucci #562 referring to when he informed you that Lieutenant Cintron ordered him to tell you to, "Stay out of things that don't concern you?"
A. He said that the lieutenant said that I had picture of her and Klayman together but I didn't and I don't know where she got that idea. I also informed him that if she wanted to know people were talking about her, she needed to talk to the civilians.

Q. Did you consider Sergeant Michael Pascucci #562 informing you that Lieutenant Cintron ordered him to tell you to, "Stay out of things that done concern you" a threat?
A. Definitely a threat by the lieutenant.

Q. Why did you consider Sergeant Michael Pascucci #562 informing you that Lieutenant Cintron ordered him to tell you to, "Stay out of things that don't concern you" a threat?
A. Because the lieutenant is my commanding officer and I have to go through her to get things done on my job. One of the programs I have is called positive action. The children come to me for four hours and I didn't think it was right to them not to have anything to drink for the four hours. I understood there was a thousand dollars available for the program.

I did a memo asking to buy lunchables, snacks and fruits to feed the children and she has not approved it. I asked the sergeant and he said he approved it and it was on her desk. That is just one of the memos I have submitted that she is not responded to. The change in how she responds to me has effected by ability to do my job. The program also owes me three hundred dollars; I spent three hundred dollars of my own money for supplies for a father-daughter that they were able to get the credit card to pay for it. She told me to submit memo. She told me what to put in the memo and to provide receipts which I did and I haven't received any of my money back. All of this happened in early October.

I also submitted a memo to take my Positive Images program to the library to meet Nicky Giovani who is an African American Poet and Activist. The trip would have been free and PAL encourages us to take the children to trips that are beneficial to the children but she didn't approve the memo. Before this incident I am sure it would have been granted because it didn't cost anything other than to use the bus.

I have written one more memo since; I asked to take the Positive Images children to the movies to see Thurgood that was not approved. This was not anything unusual. Since I have written these memos, I have to go through Sgt. Pascussi to see what is going on with my memos and he tells me they are on her desk.

When he gave me the order, I came up here. I don't have the lieutenant's name but one did come up and told me that I should write the Deputy a letter.

3

_____
P/O ~~~~~~~~~~~~~~
Police Officer Janice Little          11-06-17

CITY074

Q. Was anyone else present when Sergeant Michael Pascucci #562 informed you that Lieutenant Cintron ordered him to tell you to, "Stay out of things that don't concern you?"
A. No it was just he and I.

Q. Have any of the civilian employees assigned to the Police Athletic League expressed to you that they feel threatened with the ongoing situation with Officer Klayman and Lieutenant Cintron?
A. Yes one person.

Q. Who expressed to you that they feel threatened with the ongoing situation with Officer Klayman and Lieutenant Cintron?
A. Naja Burton; she was very concerned that he had escalated.

Q. Why did Naja Burton inform you they felt threatened with the ongoing situation with Officer Klayman and Lieutenant Cintron?
A. The loud voice and I guess what Klayman was saying.

Q. Are you aware that an anonymous letter was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. No.

Q. Do you know who wrote the anonymous letter that was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. No.

Q. Is there anything else you would like to add that had not been addressed in this interview?
A. I basically came up here for help because I didn't know what do and because this is my commanding officer. That was why I came here and the lieutenant said I was supposed to go to my commanding officer and I told him that the reason I am here is because of my commanding officer.

4

Police Officer Janice Little          11-06-17

CITY075

This is an on-going investigation being conducted by Internal Affairs. By orders of the Commanding Officer of Internal Affairs you are instructed not to disclose any information discussed here to anyone other than your attorney and FOP representative.

Q. Do you understand this?
A. Yes.

Please read your interview to be certain that it is accurate. If there are any errors, correct and initial them. After you reviewed your interview, please sign each page in the lower right hand corner.

_____✓_____I would like a copy of this interview sent to me through police mail to my district/unit of assignment.

_____I would like a copy of this interview sent to my home address.

_____I do not wish to receive a copy of this interview.

STATEMENT CONCLUDED: **1:32 PM**
I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **FIVE (5)** PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE: _P/O Jami Little_

DATE: _11-29-17_   TIME: _1:14 pm_

WITNESSES: _____

_____

s

_P/O Jami Little_
Police Officer Janice Little      11-06-17

| | |
|---|---|
| STATEMENT OF: | **P/O Rasheed McDaniels #6362, PR** ███ **B/M**<br>Appointment Date: 12-27-93<br>Assignment Date: 05-27-10<br>Assignment: PAL |
| DATE AND TIME: | 12-21-17   10:51 AM |
| PLACE: | Philadelphia Police Department<br>Internal Affairs Division<br>7790 Dungan Rd. |
| IN THE PRESENCE OF: | |
| CONCERNING: | EEO #17-0039 |
| INTERVIEWED BY: | Sergeant Brent Conway #8892 |
| RECORDED BY: | Sergeant Brent Conway #8892 |

Officer McDaniels, I am Sergeant Brent Conway #8892, Internal Affairs Division, and I will be taking your statement, directly on this computer. You are being interviewed regarding a possible EEO/IAD complaint.

Q. Are you represented by counsel?
A. No.

**Officer McDaniels, you are reminded that failure to cooperate in a Departmental Administrative Investigation is punishable by ten (10) days suspension to dismissal under Article 1- §008-10 of the Disciplinary Code.**

**Officer McDaniels, you are reminded that lying or attempting to deceive regarding a material fact during the course of any Departmental investigation is punishable by dismissal under Article 1-§009-10 of the Disciplinary Code.**

Q. Do you understand this?
A. Yes.

Q. Are you willing to cooperate?
A. Yes.

Q. Are you recording this interview?
A. No.

Q. Please state your rank, full name, badge number, payroll number, and district or unit of assignment.
A. Police Officer Rasheed McDaniels #6362, Payroll ███ PAL.

Police Officer Rasheed McDaniels 12-21-17



Q. Do you know Lieutenant Evelyn Cintron #168?
A. Yes.

Q. How would you describe your relationship with Lieutenant Cintron?
A. Just a work relationship; nothing special.

Q. How would you describe Lieutenant Cintron as a supervisor?
A. Needs work.

Q. Do you know Police Officer David Klayman #9321?
A. Yes.

Q. How would you describe your relationship with Officer Klayman?
A. Very distant.

Q. How would you describe Officer Klayman as an employee?
A. He just seems like a hostile man; very combative.

Q. How would you describe the relationship between Lieutenant Cintron and Officer Klayman?
A. Out of every relationship she may have with the officers in the office I believe they are the closest.

Q. In your opinion, does Lieutenant Cintron give Officer Klayman preferential treatment?
A. Yes.

Q. What type of treatment did Lieutenant Cintron give Officer Klayman that you believe was preferential?
A. It my understanding he didn't have to report to either sergeant just directly to her. I can't; think of one week were he came in on time or left on time she he got there. She gave him the office of the sergeant that was detailed out.

Q. What is the name of the sergeant who was detailed out?
A. Sgt. Irvin.

Q. To your knowledge, why was Sgt. Irvin detailed out?
A. Because of an incident involving Sgt. Irvin involving kids or the parents of the kids at a basketball game.

Q. To your knowledge, does Lieutenant Cintron allow Officer Klayman to adjust his work schedule in order to accommodate his school schedule?
A. Yes; it kind of felt like he left whenever he felt like it. I don't know what his school schedule was and I was told he was in law school at Rutgers. I definitely think he was going to school

2

Police Officer Rasheed McDaniels 12-21-17

CITY078



Q. Does Lieutenant Cintron have a specific uniform policy for the personnel assigned to PAL?
A. Yes; Tan khaki pants or short depending on the time of year and a blue polo work shirts.

Q. Is Officer Klayman required to conform to the same uniform policy as the other personnel assigned to PAL or is allowed to work in plain-clothes?
A. Yes.

Q. Have you ever observed Officer Klayman providing transportation to members of Lieutenant Cintron's family while he was working?
A. I have seen him driving he daughter.

Q. Have you ever observed Officer Klayman providing transportation to members of Lieutenant Cintron's family using a PAL owned vehicle?
A. Yes, her daughter.

Q. Do you know where Officer Klayman was driving Lieutenant Cintron's daughter?
A. No.

Q. To your knowledge, are Lieutenant Cintron and Officer Klayman involved in a personal relationship?
A. Nothing specific that I know of.

Q. What is your current assignment at the Police Athletic League?
A. I am limited duty; I sit at the desk.

Q. How often do you go to the Police Athletic League headquarters (3068 Belgrade Avenue)?
A. Every day, Monday through Friday 9 to 5.

Q. During you tour of duty on 10-12-17, did you observe an incident involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters?
A. No.

Q. Have any of the civilian employees assigned to the Police Athletic League expressed to you that they feel threatened with the ongoing situation with Officer Klayman and Lieutenant Cintron?
A. I never heard the work threatened but I have heard the word uncomfortable coming to work

Q. Who expressed to you that they feel uncomfortable coming to work
A. I know I have heard a few civilian employees say they are uncomfortable with PAL and they were uncomfortable coming into the building.

3

Police Officer Rasheed McDaniels 12-21-17

CITY079

Q. Are you aware that an anonymous letter was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. No.

Q. Did you write the anonymous letter that was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. No.

Q. Do you know who wrote the anonymous letter that was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. No.

Q. Is there anything else you would like to add that had not been addressed in this interview?
A. No.

4

Police Officer Rasheed McDaniels 12-21-17

CITY080

This is an on-going investigation being conducted by Internal Affairs. By orders of the Commanding Officer of Internal Affairs you are instructed not to disclose any information discussed here to anyone other than your attorney and FOP representative.

Q. Do you understand this?
A. Yes.

Please read your interview to be certain that it is accurate. If there are any errors, correct and initial them. After you reviewed your interview, please sign each page in the lower right hand corner.

_____ I would like a copy of this interview sent to me through police mail to my district/unit of assignment.

___RTM___ I would like a copy of this interview sent to my home address.

_____ I do not wish to receive a copy of this interview.


STATEMENT CONCLUDED: **11:12 AM**
I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **FIVE (5)** PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE: _Rasheed J McDaniels_

DATE: _12-21-17_ TIME: _11:20 am_

WITNESSES: _____

_____

5

PO Rasheed J McDaniels
Police Officer Rasheed McDaniels 12-21-17

CITY081

| STATEMENT OF: | **P/O Michael Ragucci #1857, PR ▮▮▮▮ W/M**<br>Appointment Date: 06-22-98<br>Assignment Date: 06-18-07<br>Assignment: PAL |
|---|---|

| DATE AND TIME: | 12-21-17   11:24 AM |
|---|---|

| PLACE: | Philadelphia Police Department<br>Internal Affairs Division<br>7790 Dungan Rd. |
|---|---|

IN THE PRESENCE OF:

| CONCERNING: | EEO #17-0039 |
|---|---|

| INTERVIEWED BY: | Sergeant Brent Conway #8892 |
|---|---|

| RECORDED BY: | Sergeant Brent Conway #8892 |
|---|---|

Officer Ragucci, I am Sergeant Brent Conway #8892, Internal Affairs Division, and I will be taking your statement, directly on this computer. You are being interviewed regarding a possible EEO/IAD complaint.

Q. Are you represented by counsel?
A. No.

**Officer Ragucci, you are reminded that failure to cooperate in a Departmental Administrative Investigation is punishable by ten (10) days suspension to dismissal under Article 1- §008-10 of the Disciplinary Code.**

**Officer Ragucci, you are reminded that lying or attempting to deceive regarding a material fact during the course of any Departmental investigation is punishable by dismissal under Article 1-§009-10 of the Disciplinary Code.**

Q. Do you understand this?
A. Yes.

Q. Are you willing to cooperate?
A. Yes.

Q. Are you recording this interview?
A. No.

Q. Please state your rank, full name, badge number, payroll number, and district or unit of assignment.
A. Police Officer Michael Ragucci #1857, Payroll # ▮▮▮▮ PAL.

*Police Officer Michael Ragucci* 12-21-17
Police Officer Michael Ragucci   12-21-17

CITY082

Q. Do you know Lieutenant Evelyn Cintron #168?
A. Yes I do.

Q. How would you describe your relationship with Lieutenant Cintron?
A. Professional.

Q. How would you describe Lieutenant Cintron as a supervisor?
A. I don't have any problems with her. We have never had any run-ins. I am he procurement officer and I order a lot of materials for the PAL centers. Most of my interactions with her are speaking to about things I have to order. I don't work with her that often.

Q. Do you know Police Officer David Klayman #9321?
A. Yes.

Q. How would you describe your relationship with Officer Klayman?
A. I don't really have a relationship with him.

Q. How would you describe Officer Klayman as an employee?
A. Again with the little interaction I had with him I wasn't really sure what his role was at PAL.

Q. How would you describe the relationship between Lieutenant Cintron and Officer Klayman?
A. With the little interaction I had with them being the building next store I really didn't know what their relationship was. From what I understand he was he aide.

Q. In your opinion, does Lieutenant Cintron give Officer Klayman preferential treatment?
A. The only reasoning I would have to say yes it because when we would work on holidays, 4th of July, Thanksgiving or New years, he never worked. I don't have access to the DAR so I don't know if he used time. Also the time I was in the building he was never there.

Q. To your knowledge, does Lieutenant Cintron allow Officer Klayman to adjust his work schedule in order to accommodate his school schedule?
A. Like I said, whenever I am in headquarters which is not often, he was very seldom there but I don't know what he was doing. There were rumors that he was in school but I couldn't say for sure.

Q. Does Lieutenant Cintron have a specific uniform policy for the personnel assigned to PAL?
A. Yes; we have to where 5-11 khaki pants and navy blue short sleeve shirt with our name and the PAL emblem.

2

Police Officer Michael Ragucci 12-21-17
Police Officer Michael Ragucci   12-21-17

CITY083



Q. Is Officer Klayman required to conform to the same uniform policy as the other personnel assigned to PAL or is allowed to work in plain-clothes?
A. I would assume that he is because he is a PAL office. Again I didn't deal with him enough or see him enough to know what he was wearing while he was on-duty.

Q. Have you ever observed Officer Klayman providing transportation to members of Lieutenant Cintron's family while he was working?
A. No.

Q. During you tour of duty on 10-12-17, did you observe an incident involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters?
A. No.

Q. Have any of the civilian employees assigned to the Police Athletic League expressed to you that they feel threatened with the ongoing situation with Officer Klayman and Lieutenant Cintron?
A. There were there civilians I spoke to that describe the incident that occurred that day and were shaken up. As far as it being ongoing, no one made any indication of that.

Q. Do you have any concerns with the manner in which Officer Klayman speaks to you?
A. The times that we have spoken he speaks down to you or speaks to as if he is in charge of you. He tries to be intimidating.

Q. Have you ever been involved in an incident with Officer Klayman during which he yelled or cursed at you?
A. No.

Q. Have you ever been involved in an incident with Officer Klayman that require other officers or supervisors to separate you and Officer Klayman?
A. No.

Q. Are you aware that an anonymous letter was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. Not until you told me.

Q. Is there anything else you would like to add that had not been addressed in this interview?
A. No.

3

*Police Officer Michael Ragucci* 12-21-17
Police Officer Michael Ragucci    12-21-17    CITY084

This is an on-going investigation being conducted by Internal Affairs. By orders of the Commanding Officer of Internal Affairs you are instructed not to disclose any information discussed here to anyone other than your attorney and FOP representative.

Q. Do you understand this?
A. Yes.

Please read your interview to be certain that it is accurate. If there are any errors, correct and initial them. After you reviewed your interview, please sign each page in the lower right hand corner.

_____ ✓ _____ I would like a copy of this interview sent to me through police mail to my district/unit of assignment.

_____ I would like a copy of this interview sent to my home address.

_____ I do not wish to receive a copy of this interview.


STATEMENT CONCLUDED: **11:37 AM**
I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **FOUR (4)**
PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE: _Mike Rogucci_

DATE: _12-21-17_ TIME: _11:40 AM_

WITNESSES: _____

_____


_Police Officer Michael Ragucca 12-21-17_
Police Officer Michael Ragucci     12-21-17     CITY085

STATEMENT OF:          **P/O Keith Balco #6726, PR #▋▋▋W/M**
                       Appointment Date: 11-03-03
                       Assignment Date: 05-07-12
                       Assignment: PAL

DATE AND TIME:         12-21-17   9:49 AM

PLACE:                 Philadelphia Police Department
                       Internal Affairs Division
                       7790 Dungan Rd.

IN THE PRESENCE OF:

CONCERNING:            EEO #17-0039

INTERVIEWED BY:        Sergeant Brent Conway #8892

RECORDED BY:           Sergeant Brent Conway #8892

Officer Balco, I am Sergeant Brent Conway #8892, Internal Affairs Division, and I will be taking your statement, directly on this computer. You are being interviewed regarding a possible EEO/IAD complaint.

Q. Are you represented by counsel?
A. No.

**Officer Balco, you are reminded that failure to cooperate in a Departmental Administrative Investigation is punishable by ten (10) days suspension to dismissal under Article 1- §008-10 of the Disciplinary Code.**

**Officer Balco, you are reminded that lying or attempting to deceive regarding a material fact during the course of any Departmental investigation is punishable by dismissal under Article 1-§009-10 of the Disciplinary Code.**

Q. Do you understand this?
A. Yes.

Q. Are you willing to cooperate?
A. Yes.

Q. Are you recording this interview?
A. No.

Q. Please state your rank, full name, badge number, payroll number, and district or unit of assignment.
A. Police Officer Keith Balco #6726, Payroll #▋▋▋ PAL.

*P/O Balco #6726*

_____
Police Officer Keith Balco          12-21-17

Q. Do you know Lieutenant Evelyn Cintron #168?
A. Yes I do.

Q. How would you describe your relationship with Lieutenant Cintron?
A. My relation with the lieutenant is good; fine. I work outside her office. I answer directly to her now since the changes with Klayman. Before I reported to her and Sgt. Faust and now I report directly to her.

Q. How would you describe Lieutenant Cintron as a supervisor?
A. She was fine with me personally.

Q. Do you know Police Officer David Klayman #9321?
A. Yes I do.

Q. How would you describe your relationship with Officer Klayman?
A. It is okay.

Q. How would you describe Officer Klayman as an employee?
A. I didn't see a lot of him at times. He worked directly for the lieutenant so she had him going to meetings or any other project she had.

Q. How would you describe the relationship between Lieutenant Cintron and Officer Klayman?
A. I would say they had a past history from working together in the 35th and they work together.

Q. In your opinion, does Lieutenant Cintron give Officer Klayman preferential treatment?
A. In my opinion she did not because she had him doing project for her. She is the lieutenant and he was the officer that was working directly under her.

Q. To your knowledge, does Lieutenant Cintron allow Officer Klayman to adjust his work schedule in order to accommodate his school schedule?
A. Yes.

Q. How did Lieutenant Cintron allow Officer Klayman to adjust his work schedule in order to accommodate his school schedule?
A. I wouldn't know; that was between them.

Q. Did you observed him leaving work attend school?
A. When he left work if he attended school or doing something for the lieutenant work wise. He was very quiet with where he was going.

2

*P/o Balco #6726*

Police Officer Keith Balco        12-21-17

CITY087

Q. How do you know Lieutenant Cintron allowed Officer Klayman to adjust his work schedule in order to accommodate his school schedule?
A. It was common knowledge from her and Sergeant Faust and Sergeant Pascussi. It was said during conversation that he was going to law school.

Q. Was Officer Klayman attending school during work hours?
A. I don't know where he went during work hours. I am an office and he is an officer so it wasn't my position to ask.

Q. Does Lieutenant Cintron have a specific uniform policy for the personnel assigned to PAL?
A. Yes.

Q. What is Lieutenant Cintron's uniform policy for the personnel assigned to PAL?
A. Five-eleven khaki pants or shorts in the summer time and a standards polo shirt with the PAL logo on one side and the officer's name on the other.

Q. Is Officer Klayman required to conform to the same uniform policy as the other personnel assigned to PAL or is allowed to work in plain-clothes?
A. As far as I know yes.

Q. Have you ever observed Officer Klayman provide transportation to members of Lieutenant Cintron's family while he was working?
A. Yes.

Q. Who did Officer Klayman provide transportation to?
A. Her daughter.

Q. Do you know why Officer Klayman provided transportation to Lieutenant Cintron's daughter?
A. I know sometimes it was with PAL events; other times I wouldn't know.

Q. Have you ever observed Officer Klayman provide transportation to members of Lieutenant Cintron's family using a PAL owned vehicle?
A. Yes, the lieutenant's PAL car.

Q. To your knowledge, are Lieutenant Cintron and Officer Klayman involved in a personal relationship?
A. Nothing I ever saw.

Q. What is your current assignment at the Police Athletic League?
A. Administrative.

Q. How often do you go to the Police Athletic League headquarters (3068 Belgrade Avenue)?
A. Monday through Friday 9 to 5.

3

*P/o Balco #6726*

Police Officer Keith Balco          12-21-17

CITY088

Q. During you tour of duty on 10-12-17, did you observe an incident involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters?
A. No, I did not.

Q. Have any of the civilian employees assigned to the Police Athletic League expressed to you that they feel threatened with the ongoing situation with Officer Klayman and Lieutenant Cintron?
A. I will say uncomfortable.

Q. Who expressed to you that they feel uncomfortable with the ongoing situation with Officer Klayman and Lieutenant Cintron?
A. Chase, Nadir McCauley,

Q. Why did Chase and Nadir McCauley inform you they felt uncomfortable with the ongoing situation with Officer Klayman and Lieutenant Cintron?
A. Officer Klayman can kind of talk down to people. In my opinion they felt uncomfortable with his tone.

Q. Are you aware that an anonymous letter was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. I heard that rumor a few weeks ago.

Q. Did you write the anonymous letter that was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. Absolutely.

Q. Do you know who wrote the anonymous letter that was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. No I do not.

Q. Is there anything else you would like to add that had not been addressed in this interview?
A. No.

4

P/O Balco #6226

Police Officer Keith Balco          12-21-17

This is an on-going investigation being conducted by Internal Affairs. By orders of the Commanding Officer of Internal Affairs you are instructed not to disclose any information discussed here to anyone other than your attorney and FOP representative.

Q. Do you understand this?
A. Yes.

Please read your interview to be certain that it is accurate. If there are any errors, correct and initial them. After you reviewed your interview, please sign each page in the lower right hand corner.

_____I would like a copy of this interview sent to me through police mail to my district/unit of assignment.

_____✓_____ I would like a copy of this interview sent to my home address.

_____ I do not wish to receive a copy of this interview.

STATEMENT CONCLUDED: **10:25 AM**
I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **FIVE (5)** PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE: _Keith Balco_

DATE: _12-21-17_ TIME: _10:34 AM_

WITNESSES: _____

_____

s

_P/O Balco #6726_
Police Officer Keith Balco          12-21-17

CITY090

STATEMENT OF:    **P/O Kareem Johnson #5317, PR ███ B/M**
Appointment Date: 06-16-03
Assignment Date: 05-07-12
Assignment: PAL

DATE AND TIME:    12-21-17   12:08 PM

PLACE:    Philadelphia Police Department
Internal Affairs Division
7790 Dungan Rd.

IN THE PRESENCE OF:

CONCERNING:    EEO #17-0039

INTERVIEWED BY:    Sergeant Brent Conway #8892

RECORDED BY:    Sergeant Brent Conway #8892

Officer Johnson, I am Sergeant Brent Conway #8892, Internal Affairs Division, and I will be taking your statement, directly on this computer. You are being interviewed regarding a possible EEO/IAD complaint.

Q. Are you represented by counsel?
A. No.

**Officer Johnson, you are reminded that failure to cooperate in a Departmental Administrative Investigation is punishable by ten (10) days suspension to dismissal under Article 1- §008-10 of the Disciplinary Code.**

**Officer Johnson, you are reminded that lying or attempting to deceive regarding a material fact during the course of any Departmental investigation is punishable by dismissal under Article 1-§009-10 of the Disciplinary Code.**

Q. Do you understand this?
A. Yes.

Q. Are you willing to cooperate?
A. Yes.

Q. Are you recording this interview?
A. No.

Q. Please state your rank, full name, badge number, payroll number, and district or unit of assignment.
A. Police Officer Kareem Johnson #5317, Payroll ███ PAL.

Police Officer Kareem Johnson    12-21-17

Q. Do you know Lieutenant Evelyn Cintron #168?
A. Other then my commanding officer that is it.

Q. How would you describe Lieutenant Cintron as a supervisor?
A. I really don't have interactions with her. I am still trying for figure her out.

Q. Do you know Police Officer David Klayman #9321?
A. I really don't know him other then he works for PAL.

Q. How would you describe the relationship between Lieutenant Cintron and Officer Klayman?
A. Weird; he seems to be real uptight when she is around.

Q. In your opinion, does Lieutenant Cintron give Officer Klayman preferential treatment?
A. I would say so, yeah.

Q. What type of treatment did Lieutenant Cintron give Officer Klayman that you believe was preferential?
A. I can't really say specifically; I know certain things that apply to us that don't apply to him like coming and going from work. I really don't see him often but there is some things you can't help but notice.

Q. To your knowledge, does Lieutenant Cintron allow Officer Klayman to adjust his work schedule in order to accommodate his school schedule?
A. I have heard about, but I don't know definitely. I just heard about it around the unit and the fact that you don't really see much of him.

Q. Does Lieutenant Cintron have a specific uniform policy for the personnel assigned to PAL?
A. Yes; tan khaki cargo pants and a navy blue shirt.

Q. Is Officer Klayman required to conform to the same uniform policy as the other personnel assigned to PAL or is allowed to work in plain-clothes?
A. He definitely has to; anyone who works in PAL has to conform to the uniform policy, even admin personnel.

Q. Have you ever observed Officer Klayman providing transportation to members of Lieutenant Cintron's family while he was working?
A. I can't say that I have.

Q. To your knowledge, are Lieutenant Cintron and Officer Klayman involved in a personal relationship?
A. To my knowledge, I can't say definitively because I don't see enough of them.

2

P/o ___ # 53.7

Police Officer Kareem Johnson    12-21-17

CITY092



Q. What is your current assignment at the Police Athletic League?
A. Cozen PAL Center.

Q. How often do you go to the Police Athletic League headquarters (3068 Belgrade Avenue)?
A. Once, maybe twice a week to turn in paperwork or to pick up equipment.

Q. During you tour of duty on 10-12-17, did you observe an incident involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters?
A. No I wasn't there.

Q. Have any of the civilian employees assigned to Police Athletic League expressed to you that they feel threatened with the ongoing situation with Officer Klayman and Lieutenant Cintron?
A. They haven't said anything to me personally. I heard about the incident through the unit but no one came to me personally and told me that.

Q. Do you have any concerns with the manner in which Officer Klayman speaks to you?
A. I had an incident with him this past summer. I had an issue with my baseball team displaying poor sportsmanship after a game. I rectified the situation by having them shake hands with the other team and they agreed. Lt. Cintron and Klayman approached our team to address their poor sportsmanship and I advised her that I already took care of the situation. Officer Klayman afterward asked to have a word with me and stated "the next time the lieutenant is talking you shut up." I stated to Officer Klayman was he asking me man to man or was he giving me a direct order because I don't take orders from cops. Officer Klayman stated you can take it whatever way you wanted. I begin got walk away once I realize that wasn't the time or the place for that particular discussion. Klayman proceeded to follow me and yell obscenities toward me so I said to him if the lieutenant has any issues with anything I did let her address me and not you. He became more agitated and continued to follow me as I was walking away. At that time I stood with him face to face and stated you have no authority over so stop talking to me like I am one of these kids. Lt. Cintron then approached us both and stated, "Not here David, Do it for me please." Sgt. Pascussi approached us both and stated to me to just walk away which I respectfully did. He advised me to write a memo about the incident which I did.

Q. Where was Lt. Cintron standing when Officer Klayman approached you?
A. She was talking one of the news media a few feet away from us.

Q. Where was Sgt. Pascussi standing when Officer Klayman approached you?
A. He wasn't too far from us but he heard us shouting back and forth; that is when he approached.

Q. Where the PAL kids standing when Officer Klayman approached you?
A. They were scattered all over.

3

Police Officer Kareem Johnson     #531 7     12-21-17

CITY093

Q. What actions did Lt. Cintron take in relation to the incident you and Officer Klayman?

A. Nothing was ever said to me, so I am sure nothing was ever said to him.

Q. Are you aware that an anonymous letter was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?

A. No.

Q. Is there anything else you would like to add that had not been addressed in this interview?

A. No.

Police Officer Kareem Johnson    12-21-17

CITY094

This is an on-going investigation being conducted by Internal Affairs. By orders of the Commanding Officer of Internal Affairs you are instructed not to disclose any information discussed here to anyone other than your attorney and FOP representative.

Q. Do you understand this?
A. Yes.

Please read your interview to be certain that it is accurate. If there are any errors, correct and initial them. After you reviewed your interview, please sign each page in the lower right hand corner.

_____K.J._____ I would like a copy of this interview sent to me through police mail to my district/unit of assignment.

_____K.J._____ I would like a copy of this interview sent to my home address.

_____K.J._____ I do not wish to receive a copy of this interview.


STATEMENT CONCLUDED: 12:50 PM
I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **FIVE (5)** PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE


SIGNATURE: _____

DATE: _12/21/17_ TIME: _1 07pm_

WITNESSES: _____

_____

5

Police Officer Kareem Johnson    12-21-17

CITY095

STATEMENT OF:          **Sgt. Eric Ervin #8643, PR** ████ **B/M**
                       Appointment Date: 11-14-88
                       Assignment Date: 11-09-07
                       Assignment: PAL

DATE AND TIME:         12-28-17   10:22 AM

PLACE:                 Philadelphia Police Department
                       Internal Affairs Division
                       7790 Dungan Rd.

IN THE PRESENCE OF:

CONCERNING:            EEO #17-0039

INTERVIEWED BY:        Sergeant Brent Conway #8892

RECORDED BY:           Sergeant Brent Conway #8892

Sergeant Ervin, I am Sergeant Brent Conway #8892, Internal Affairs Division, and I will be taking your statement, directly on this computer. You are being interviewed regarding a possible EEO/IAD complaint.

Q. Are you represented by counsel?
A. No.

**Sergeant Ervin, you are reminded that failure to cooperate in a Departmental Administrative Investigation is punishable by ten (10) days suspension to dismissal under Article 1- §008-10 of the Disciplinary Code.**

**Sergeant Ervin, you are reminded that lying or attempting to deceive regarding a material fact during the course of any Departmental investigation is punishable by dismissal under Article 1-§009-10 of the Disciplinary Code.**

Q. Do you understand this?
A. Yes.

Q. Are you willing to cooperate?
A. Yes.

Q. Are you recording this interview?
A. No.

Q. Please state your rank, full name, badge number, payroll number, and district or unit of assignment.
A. Sergeant Eric Ervin #8643, Payroll ████ PAL.

Sergeant Eric Ervin                         12-28-17

CITY096



Q. Do you know Lieutenant Evelyn Cintron #168?
A. Yes; she was my commanding officer while I was in PAL.

Q. How would you describe your relationship with Lieutenant Cintron?
A. I thought it was good but apparently not.

Q. How would you describe Lieutenant Cintron as a supervisor?
A. Not knowledgeable about PAL.

Q. Do you know Police Officer David Klayman #9321?
A. Yes; I know of him.

Q. How would you describe your relationship with Officer Klayman?
A. Hands off; there was no relationship. I was ordered by Lt. Cintron not to ask him anything or to ask him to do anything.

Q. How would you describe Officer Klayman as an employee?
A. I barely saw him.

Q. How would you describe the relationship between Lieutenant Cintron and Officer Klayman?
A. Close.

Q. In your opinion, does Lieutenant Cintron give Officer Klayman preferential treatment?
A. In my opinion, I would say so.

Q. What type of treatment did Lieutenant Cintron give Officer Klayman that you believe was preferential?
A. In the summer time as a sergeant there were a lot of vacation and I needed an officer to transport kids to an event. He was available at the time and I needed him to transport the kids to the event. I was told by Lt. Cintron, no, find another way.

Q. To your knowledge, does Lieutenant Cintron allow Officer Klayman to adjust his work schedule in order to accommodate his school schedule?
A. I know nothing of that. The only thing I know is I rarely saw him and not to tell him to do anything. I was told to he works directly for her. That was told to me and Sgt. Faust in a meeting.

Q. Does Lieutenant Cintron have a specific uniform policy for the personnel assigned to PAL?
A. Yes she did come up with one.

Q. What is Lieutenant Cintron's uniform policy for the personnel assigned to PAL?
A. A certain type of 5-11 pants and a PAL polo shirt.

2

Sergeant Eric Ervin                          12-28-17

CITY097



Q. Is Officer Klayman required to conform to the same uniform policy as the other personnel assigned to PAL or is allowed to work in plain-clothes?
A. I have seen him at times not wearing the uniform but I did not know if he was working or not. The one thing I do know is, Sgt. Faust did the DARs but when he was off I did them and if I didn't see him I would ask her his whereabouts. She would either tell me he was off sick or out running an errand for her.

Q. Have you ever observed Officer Klayman providing transportation to members of Lieutenant Cintron's family while he was working?
A. I have seen her daughter coming out of the car with him coming out of the car.

Q. Have you ever observed Officer Klayman providing transportation to members of Lieutenant Cintron's family using a PAL owned vehicle?
A. The daughter did come out of the PAL owned vehicle?

Q. How many times did you observe Lieutenant Cintron's daughter coming out of a PAL owned vehicle?
A. Several times; I couldn't give an exact number but it was numerous times.

Q. Do you know why Lieutenant Cintron's daughter was coming out of a PAL owned vehicle?
A. No.

Q. Are you currently detailed to the Civil Affairs unit?
A. Yes.

Q. How long have you been detailed to the Civil Affairs Unit?
A. Since 07-10-17.

Q. Why were you detailed to the Civil Affairs Unit?
A. At first I didn't now but apparently over a basketball game. Lt. Cintron did not talk to me; she refused to talk to me. I try to talk to her about a basketball game that I scheduled and the officer didn't show up. I tried to write eh officer up and I haven't heard anything else about it. She refused to talk to me about it, she just shut down. I have never been counseled about it or received disciplinary action.

Q. Have any of the civilian employees assigned to the Police Athletic League expressed to you that they feel threatened with the ongoing situation with Officer Klayman and Lieutenant Cintron?
A. No.

Q. Are you aware that an anonymous letter was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. No.

3

Sergeant Eric Ervin                    12-28-17

CITY098

Q. Is there anything else you would like to add that had not been addressed in this interview?

A. Sgt. Faust at one time called me into the office and stated Lt Cintron got a ticket going across the Ben Franklin Bridge.

**This is an on-going investigation being conducted by Internal Affairs. By orders of the Commanding Officer of Internal Affairs you are instructed not to disclose any information discussed here to anyone other than your attorney and FOP representative.**

**Q. Do you understand this?**
**A. Yes.**

**Please read your interview to be certain that it is accurate. If there are any errors, correct and initial them. After you reviewed your interview, please sign each page in the lower right hand corner.**

_____I would like a copy of this interview sent to me through police mail to my district/unit of assignment.

_____✓_____ I would like a copy of this interview sent to my home address.

_____ I do not wish to receive a copy of this interview.


STATEMENT CONCLUDED: **11:01 PM**
I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **FOUR (4)**
PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE: _____

DATE: _12-28-17_ TIME: _11:16 Am_

WITNESSES: _____

_____

Sergeant Eric Ervin                    12-28-17

CITY099

STATEMENT OF:        **Sgt. Michael Pascucci #562, PR▮▮▮▮W/M**
                     Appointment Date: 06-21-99
                     Assignment Date: 03-07-17
                     Assignment: PAL

DATE AND TIME:       11-29-17   2:05 PM

PLACE:               Philadelphia Police Department
                     Internal Affairs Division
                     7790 Dungan Rd.

IN THE PRESENCE OF:  Nicholas Pinto Esq, *[signature]*

CONCERNING:          EEO #17-0039

INTERVIEWED BY:      Sergeant Brent Conway #8892

RECORDED BY:         Sergeant Brent Conway #8892

Sergeant Pascucci, I am Sergeant Brent Conway #8892, Internal Affairs Division, and I will be taking your statement, directly on this computer.  You are being interviewed regarding a possible EEO/IAD complaint.

Q. Are you represented by counsel?
A. Yes.

**Sergeant Pascucci, you are reminded that failure to cooperate in a Departmental Administrative Investigation is punishable by ten (10) days suspension to dismissal under Article 1- §008-10 of the Disciplinary Code.**

**Sergeant Pascucci, you are reminded that lying or attempting to deceive regarding a material fact during the course of any Departmental investigation is punishable by dismissal under Article 1-§009-10 of the Disciplinary Code.**

Q. Do you understand this?
A. Yes.

Q. Are you willing to cooperate?
A. Yes.

Q. Are you recording this interview?
A. No.

Q. Please state your rank, full name, badge number, payroll number, and district or unit of assignment.
A. Sergeant Michael Pascucci #562, Payroll ▮▮▮▮ PAL.

*[signature]*
Sergeant Michael Pascucci            11-06-17

CITY100

Q. Do you know Lieutenant Evelyn Cintron #168?
A. Yes.

Q. How would you describe your relationship with Lieutenant Cintron?
A. Professional.

Q. How would you describe Lieutenant Cintron as a supervisor?
A. She is fine; she is a good supervisor as far as I am concerned.

Q. Do you know Police Officer David Klayman #9321?
A. Yes.

Q. How would you describe your relationship with Officer Klayman?
A. Business professional.

Q. How would you describe Officer Klayman as an employee?
A. I really don't have many dealings with him.

Q. How would you describe the relationship between Lieutenant Cintron and Officer Klayman?
A. Professional.

Q. In your opinion, does Lieutenant Cintron give Officer Klayman preferential treatment?
A. Not that I am aware of.

Q. What is your current assignment at the Police Athletic League?
A. Field Sergeant.

Q. How often do you go to the Police Athletic League headquarters (3068 Belgrade Avenue)?
A. Once or twice a day for paperwork. I am there about an hour and half to two hours in total.

Q. During you tour of duty on 10-12-17, did you observe an incident involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters?
A. No.

Q. On 10-13-17, did Lieutenant Cintron order you to tell Officer Janice Little to, "Stay out of things that don't concern her?"
A. Yes.

Q. Where were you when Lieutenant Cintron ordered you to tell Officer Janice Little to, "Stay out of things that don't concern her?"
A. Oxford Circle PAL.

2

Sergeant Michael Pascucci          11-06-17

CITY101

Q. Was anyone else present when Lieutenant Cintron ordered you to tell Officer Janice Little to, "Stay out of things that don't concern her?"
A. It was done over the phone.

Q. Why did Lieutenant Cintron order you to tell Officer Janice Little to, "Stay out of things that don't concern her?"
A. The Lieutenant stated to me that she received information that Officer Little and a civilian were trying to get her aide out of PAL and the civilian had a picture of Officer Klayman kissing Lt. Cintron at her 50th birthday party.

Q. Did you have any concerns with Lieutenant Cintron ordering you to tell Officer Janice Little to, "Stay out of things that don't concern her?"
A. I was just a little uneasy because it was more a personal thing; not the type of thing I am usually ordered to do.

Q. Did you inform Lieutenant Cintron that the message she ordered you to deliver to Officer Little was inappropriate and out of line?
A. No.

Q. Did Lieutenant Cintron inform you that she would have you and Officer Little removed from the Police Athletic League?
A. No.

Q. Did Lieutenant Cintron inform you that she was good friends with the Police Commissioner?
A. No.

Q. Did Lieutenant Cintron inform you that she would ruin both yours and Officer Little's careers?
A. No.

Q. Did you consider Lieutenant Cintron ordering you to tell Officer Little to, "Stay out of things that done concern her" a threat?
A. Not really.

Q. Did you inform Officer Little that Lieutenant Cintron stated to, "Stay out of things that done concern her?"
A. Yes.

Q. Did you discuss your concerns with Lieutenant Cintron ordering you to tell Officer Little to, "Stay out of things that done concern her" with anyone else assigned to the Police Athletic League?
A. No.

3

Sgt Michael Pre

Sergeant Michael Pascucci          11-06-17

CITY102

Q. Have any of the civilian employees assigned to the Police Athletic League expressed to you that they feel threatened with the ongoing situation with Officer Klayman and Lieutenant Cintron?
A. No.

Q. Have any of the police employees assigned to the Police Athletic League expressed to you that they feel threatened with the ongoing situation with Officer Klayman and Lieutenant Cintron?
A. No.

Q. Are you aware that an anonymous letter was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. Not until now.

Q. Has Officer Little ever expressed to any concerns that memorandums she was submitting to Lieutenant Cintron were not being approved?
A. She wanted to know what was happening with them; basically any officer in PAL would give me a memo asking for money or to run program. However, we are in a non-profit organization, sometimes the memo would have to go to the non-profit for approval. I don't know what happens to the memo after it is submitted to the lieutenant. I told her I didn't know what memos would have to go to the non-profit for approval or which ones could be approved by just the lieutenant.

Q. What types of memorandums did Officer Little submit to Lieutenant Cintron that were not being approved?
A. I couldn't tell you; I think it was for money for certain events she needed approved but I couldn't remember off hand what those were.

Q. Do you know why Lieutenant Cintron was not approving Officer Little's memorandums?
A. No.

Q. Were the types of memorandums Officer Little submitted to Lieutenant Cintron in relation to requests that would typically be approved?
A. Some are and some aren't depending on the money the center is allotted.

Q. Did you produce a memorandum on 09-28-17 with the subject, "Civilian Staff Issues?"
A. Yes.

Q. Why did you produce a memorandum on 09-28-17 with the subject, "Civilian Staff Issues?"
A. The lieutenant asked me to submit a memo in reference to what I did and what issues I had with the civilian staff. The memo reference to the issues I had with the civilian violating our chain of command trying to give them orders without checking with me or the lieutenant first.

4

Sergeant Michael Pascucci                    11-06-17



Q.  Is there anything else you would like to add that had not been addressed in this interview?
A.  No.

**This is an on-going investigation being conducted by Internal Affairs. By orders of the Commanding Officer of Internal Affairs you are instructed not to disclose any information discussed here to anyone other than your attorney and FOP representative.**

**Q. Do you understand this?**
**A. Yes.**

**Please read your interview to be certain that it is accurate.  If there are any errors, correct and initial them.  After you reviewed your interview, please sign each page in the lower right hand corner.**

_____ **I would like a copy of this interview sent to me through police mail to my district/unit of assignment.**

\_\_\_\_\_*Pl.P.*\_\_\_\_\_ **I would like a copy of this interview sent to my home address.**

_____ **I do not wish to receive a copy of this interview.**

STATEMENT CONCLUDED: **2:21 PM**
I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **FIVE (5)** PAGES
AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE: _____

DATE: _1-26-17_ TIME: _2:28 ᴾᴹ_

WITNESSES: _____

_____

5

_____
Sergeant Michael Pascucci          11-06-17

CITY104

STATEMENT OF:  **Sgt. Michael Pascucci #562, PR███████W/M**
Appointment Date: 06-21-99
Assignment Date: 03-07-17
Assignment: PAL

DATE AND TIME:  11-29-17  2:05 PM

PLACE:  Philadelphia Police Department
Internal Affairs Division
7790 Dungan Rd.

IN THE PRESENCE OF:  Nicholas Pinto Esq.

CONCERNING:  EEO #17-0039

INTERVIEWED BY:  Sergeant Brent Conway #8892

RECORDED BY:  Sergeant Brent Conway #8892

Sergeant Pascucci, I am Sergeant Brent Conway #8892, Internal Affairs Division, and I will be taking your statement, directly on this computer.  You are being interviewed regarding a possible EEO/IAD complaint.

Q. Are you represented by counsel?
A. Yes.

**Sergeant Pascucci, you are reminded that failure to cooperate in a Departmental Administrative Investigation is punishable by ten (10) days suspension to dismissal under Article 1- §008-10 of the Disciplinary Code.**

**Sergeant Pascucci, you are reminded that lying or attempting to deceive regarding a material fact during the course of any Departmental investigation is punishable by dismissal under Article 1-§009-10 of the Disciplinary Code.**

Q. Do you understand this?
A. Yes.

Q. Are you willing to cooperate?
A. Yes.

Q. Are you recording this interview?
A. No.

Q. Please state your rank, full name, badge number, payroll number, and district or unit of assignment.
A. Sergeant Michael Pascucci #562, Payroll ████ PAL.

Sergeant Michael Pascucci    11-06-17

Q. Do you know Lieutenant Evelyn Cintron #168?
A. Yes.

Q. How would you describe your relationship with Lieutenant Cintron?
A. Professional.

Q. How would you describe Lieutenant Cintron as a supervisor?
A. She is fine; she is a good supervisor as far as I am concerned.

Q. Do you know Police Officer David Klayman #9321?
A. Yes.

Q. How would you describe your relationship with Officer Klayman?
A. Business professional.

Q. How would you describe Officer Klayman as an employee?
A. I really don't have many dealings with him.

Q. How would you describe the relationship between Lieutenant Cintron and Officer Klayman?
A. Professional.

Q. In your opinion, does Lieutenant Cintron give Officer Klayman preferential treatment?
A. Not that I am aware of.

Q. What is your current assignment at the Police Athletic League?
A. Field Sergeant.

Q. How often do you go to the Police Athletic League headquarters (3068 Belgrade Avenue)?
A. Once or twice a day for paperwork. I am there about an hour and half to two hours in total.

Q. During you tour of duty on 10-12-17, did you observe an incident involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters?
A. No.

Q. On 10-13-17, did Lieutenant Cintron order you to tell Officer Janice Little to, "Stay out of things that don't concern her?"
A. Yes.

Q. Where were you when Lieutenant Cintron ordered you to tell Officer Janice Little to, "Stay out of things that don't concern her?"
A. Oxford Circle PAL.

2

Sergeant Michael Pascucci          11-06-17

Q. Was anyone else present when Lieutenant Cintron ordered you to tell Officer Janice Little to, "Stay out of things that don't concern her?"
A. It was done over the phone.

Q. Why did Lieutenant Cintron order you to tell Officer Janice Little to, "Stay out of things that don't concern her?"
A. The Lieutenant stated to me that she received information that Officer Little and a civilian were trying to get her aide out of PAL and the civilian had a picture of Officer Klayman kissing Lt. Cintron at her 50th birthday party.

Q. Did you have any concerns with Lieutenant Cintron ordering you to tell Officer Janice Little to, "Stay out of things that don't concern her?"
A. I was just a little uneasy because it was more a personal thing; not the type of thing I am usually ordered to do.

Q. Did you inform Lieutenant Cintron that the message she ordered you to deliver to Officer Little was inappropriate and out of line?
A. No.

Q. Did Lieutenant Cintron inform you that she would have you and Officer Little removed from the Police Athletic League?
A. No.

Q. Did Lieutenant Cintron inform you that she was good friends with the Police Commissioner?
A. No.

Q. Did Lieutenant Cintron inform you that she would ruin both yours and Officer Little's careers?
A. No.

Q. Did you consider Lieutenant Cintron ordering you to tell Officer Little to, "Stay out of things that done concern her" a threat?
A. Not really.

Q. Did you inform Officer Little that Lieutenant Cintron stated to, "Stay out of things that done concern her?"
A. Yes.

Q. Did you discuss your concerns with Lieutenant Cintron ordering you to tell Officer Little to, "Stay out of things that done concern her" with anyone else assigned to the Police Athletic League?
A. No.

3

Sergeant Michael Pascucci          11-06-17

Q. Have any of the civilian employees assigned to the Police Athletic League expressed to you that they feel threatened with the ongoing situation with Officer Klayman and Lieutenant Cintron?
A. No.

Q. Have any of the police employees assigned to the Police Athletic League expressed to you that they feel threatened with the ongoing situation with Officer Klayman and Lieutenant Cintron?
A. No.

Q. Are you aware that an anonymous letter was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. Not until now.

Q. Has Officer Little ever expressed to any concerns that memorandums she was submitting to Lieutenant Cintron were not being approved?
A. She wanted to know what was happening with them; basically any officer in PAL would give me a memo asking for money or to run program. However, we are in a non-profit organization, sometimes the memo would have to go to the non-profit for approval. I don't know what happens to the memo after it is submitted to the lieutenant. I told her I didn't know what memos would have to go to the non-profit for approval or which ones could be approved by just the lieutenant.

Q. What types of memorandums did Officer Little submit to Lieutenant Cintron that were not being approved?
A. I couldn't tell you; I think it was for money for certain events she needed approved but I couldn't remember off hand what those were.

Q. Do you know why Lieutenant Cintron was not approving Officer Little's memorandums?
A. No.

Q. Were the types of memorandums Officer Little submitted to Lieutenant Cintron in relation to requests that would typically be approved?
A. Some are and some aren't depending on the money the center is allotted.

Q. Did you produce a memorandum on 09-28-17 with the subject, "Civilian Staff Issues?"
A. Yes.

Q. Why did you produce a memorandum on 09-28-17 with the subject, "Civilian Staff Issues?"
A. The lieutenant asked me to submit a memo in reference to what I did and what issues I had with the civilian staff. The memo reference to the issues I had with the civilian violating our chain of command trying to give them orders without checking with me or the lieutenant first.

4

Sergeant Michael Pascucci          11-06-17

Q. Is there anything else you would like to add that had not been addressed in this interview?
A. No.

**This is an on-going investigation being conducted by Internal Affairs. By orders of the Commanding Officer of Internal Affairs you are instructed not to disclose any information discussed here to anyone other than your attorney and FOP representative.**

**Q. Do you understand this?**
**A. Yes.**

**Please read your interview to be certain that it is accurate. If there are any errors, correct and initial them. After you reviewed your interview, please sign each page in the lower right hand corner.**

_____ I would like a copy of this interview sent to me through police mail to my district/unit of assignment.

_____*M.P.*_____ I would like a copy of this interview sent to my home address.

_____ I do not wish to receive a copy of this interview.

STATEMENT CONCLUDED: **2:21 PM**
I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **FIVE (5)** PAGES
AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE: _[signature]_

DATE: _1-26-17_ TIME: _2:28 PM_

WITNESSES: _____

_____

5

_[signature]_
Sergeant Michael Pascucci          11-06-17

STATEMENT OF:        **Sgt. Michael Pascucci #562, PR▇▇▇▇W/M**
                     Appointment Date: 06-21-99
                     Assignment Date: 03-07-17
                     Assignment: PAL

DATE AND TIME:       01-11-18   12:48 PM

PLACE:               Philadelphia Police Department
                     Internal Affairs Division
                     7790 Dungan Rd.

IN THE PRESENCE OF:  Nicholas Pinto Esq.

CONCERNING:          EEO #17-0039

INTERVIEWED BY:      Sergeant Brent Conway #8892

RECORDED BY:         Sergeant Brent Conway #8892

Sergeant Pascucci, I am Sergeant Brent Conway #8892, Internal Affairs Division, and I will be taking your statement, directly on this computer. You are being interviewed regarding a possible EEO/IAD complaint.

Q. Are you represented by counsel?
A. Yes.

**Sergeant Pascucci, you are reminded that failure to cooperate in a Departmental Administrative Investigation is punishable by ten (10) days suspension to dismissal under Article 1- §008-10 of the Disciplinary Code.**

**Sergeant Pascucci, you are reminded that lying or attempting to deceive regarding a material fact during the course of any Departmental investigation is punishable by dismissal under Article 1-§009-10 of the Disciplinary Code.**

Q. Do you understand this?
A. Yes.

Q. Are you willing to cooperate?
A. Yes.

Q. Are you recording this interview?
A. No.

Q. Please state your rank, full name, badge number, payroll number, and district or unit of assignment.
A. Sergeant Michael Pascucci #562, Payroll ▇▇▇▇ PAL.

Sergeant Michael Pascucci          01-11-18

CITY110



Q. During the summer (2017), did you observed an argument involving Officer Kareem Johnson and Officer Klayman while at a PAL baseball game?
A. Yes.

Q. Can you describe, in your own words, what occurred during the argument you observed involving Officer Kareem Johnson and Officer Klayman while at a PAL baseball game?
A. I was with Lt. Cintron going over the trophy table to hand out the trophies to the limners of the baseball championship when I heard screaming on the baseball field. I observed two officers in what appeared to be a verbal argument. When I got there I saw it was Klayman and Johnson. I took Officer Johnson off to the side behind the batting cage to get him to cool off. Lt. Cintron got Officer Klayman and separated him and I took Officer Johnson to the side.

Q. When did the argument Officer Klayman and Officer Johnson had take place?
A. It was in the summer; right after the championship game I think between the 14 and under teams.

Q. Did you hear Officer Klayman state Officer Johnson, "The next time the lieutenant is talking you shut up?"
A. No.

Q. To your knowledge, did Lieutenant Cintron instruct Officer Klayman to address Officer Johnson about Officer Johnson interrupting her while she was talking?
A. No.

Q. Did you observe Officer Johnson walk away from Officer Klayman?
A. I led him away but I don't remember he was already walking when I arrive. Everything happened very quickly.

Q. Did Officer Klayman yell at Officer Johnson at any point during the argument he had with him?
A. They were both yelling; I don't know what they were yelling about.

Q. Did Officer Klayman use obscenities toward Officer Johnson at any point during the argument he had with him?
A. I don't remember; they were both yelling real loud.

Q. What actions did Lieutenant Cintron take in relation to Officer Klayman and Officer Johnson arguing?
A. She led Officer Klayman to the other side after I took Officer Johnson to the other side.

2

#562

Sergeant Michael Pascucci          01-11-18

CITY111

Q. Did Lieutenant Cintron state to Officer Klayman, "Not here David; do it for me please?"
A. Not that I am aware of.

Q. Did Lieutenant Cintron order Officer Klayman to stop arguing with Officer Johnson?
A. Not that I am aware of.

Q. Did Lieutenant Cintron order Officer Johnson to stop arguing with Officer Klayman?
A. I was with Johnsons. To my knowledge she didn't say anything to Johnson. After the argument and we were in the parking she told everyone to calm down.

Q. Did either Officer Johnson or Officer Klayman receive any form disciplinary action as a result of the argument?
A. Not to my knowledge.

Q. How would you categorize the incident Officer Klayman and Officer Johnson had while at the PAL baseball game?
A. A verbal argument.

Q. Do you feel that either Officer Klayman or Officer Johnson should have received disciplinary action as a result the incident they had while at the PAL baseball game?
A. No.

Q. Is there anything else you would like to add that had not been addressed in this interview?
A. No.

3

Sergeant Michael Pascucci          01-11-18

CITY112

This is an on-going investigation being conducted by Internal Affairs. By orders of the Commanding Officer of Internal Affairs you are instructed not to disclose any information discussed here to anyone other than your attorney and FOP representative.

Q. Do you understand this?
A. Yes.

Please read your interview to be certain that it is accurate. If there are any errors, correct and initial them. After you reviewed your interview, please sign each page in the lower right hand corner.

_____I would like a copy of this interview sent to me through police mail to my district/unit of assignment.

___M.P._____ I would like a copy of this interview sent to my home address.

_____I do not wish to receive a copy of this interview.

STATEMENT CONCLUDED: **12:56 PM**
I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **FOUR (4)** PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE: _Sgt Michael Pascucci_

DATE: _1-11-18_ TIME: _1:00ᵖ_

WITNESSES: _____

_____

4

Sergeant Michael Pascucci          01-11-18

CITY113

| STATEMENT OF: | **Sgt. Michael Faust #369, PR** ▮▮▮▮ **W/M** |
| | Appointment Date: 01-19-88 |
| | Assignment Date: 12-24-02 |
| | Assignment: PAL |

| DATE AND TIME: | 12-19-17   9:55 AM |

| PLACE: | Philadelphia Police Department |
| | Internal Affairs Division |
| | 7790 Dungan Rd. |

IN THE PRESENCE OF:

| CONCERNING: | EEO #17-0039 |

| INTERVIEWED BY: | Sergeant Brent Conway #8892 |

| RECORDED BY: | Sergeant Brent Conway #8892 |

Sergeant Faust, I am Sergeant Brent Conway #8892, Internal Affairs Division, and I will be taking your statement, directly on this computer. You are being interviewed regarding a possible EEO/IAD complaint.

Q. Are you represented by counsel?
A. No.

**Sergeant Faust, you are reminded that failure to cooperate in a Departmental Administrative Investigation is punishable by ten (10) days suspension to dismissal under Article 1- §008-10 of the Disciplinary Code.**

**Sergeant Faust, you are reminded that lying or attempting to deceive regarding a material fact during the course of any Departmental investigation is punishable by dismissal under Article 1-§009-10 of the Disciplinary Code.**

Q. Do you understand this?
A. Yes.

Q. Are you willing to cooperate?
A. Yes.

Q. Are you recording this interview?
A. No.

Q. Please state your rank, full name, badge number, payroll number, and district or unit of assignment.
A. Sergeant Michael Faust #369, Payroll ▮▮▮▮▮ PAL.

Sergeant Michael Faust          12-19-17   CITY114



Q. Do you know Lieutenant Evelyn Cintron #168?
A. I do.

Q. How would you describe your relationship with Lieutenant Cintron?
A. She is the lieutenant; I guess it is okay.

Q. How would you describe Lieutenant Cintron as a supervisor?
A. She is the lieutenant of the unit.

Q. Do you know Police Officer David Klayman #9321?
A. I do.

Q. How would you describe your relationship with Officer Klayman?
A. We just kind of worked in the same place; he didn't report to me and I didn't tell him what to do.

Q. How would you describe Officer Klayman as an employee?
A. Kind of high strung; very tense. I didn't speak to him very often.

Q. How would you describe the relationship between Lieutenant Cintron and Officer Klayman?
A. She brought him as her aide is what she told us. She told us he specifically worked for her and did whatever she needed done.

Q. In your opinion, does Lieutenant Cintron give Officer Klayman preferential treatment?
A. Yes.

Q. What type of treatment did Lieutenant Cintron give Officer Klayman that you believe was preferential?
A. I think at times there were many times we didn't see him on a regular basis where he didn't seem to work an eight hour day.

Q. To your knowledge, does Lieutenant Cintron allow Officer Klayman to adjust his work schedule in order to accommodate his school schedule?
A. I don't know that directly but it appeared that way.

Q. Does Lieutenant Cintron have a specific uniform policy for the personnel assigned to PAL?
A. Yes.

Q. What is Lieutenant Cintron's uniform policy for the personnel assigned to PAL?
A. When we are working at a PAL center we are to wear khaki pants, based on your rank the officers were to were a blue shirt with the PAL logo and their name. The sergeants wear the same pants with a white shirt.

Sergeant Michael Faust                    12-19-17   CITY115

Q. Is Officer Klayman required to conform to the same uniform policy as the other personnel assigned to PAL or is allowed to work in plain-clothes?
A. Everyone complied; he was supposed to be in the same uniform everyone else was.

Q. Have you ever observed Officer Klayman provide transportation to members of Lieutenant Cintron's family while he was working?
A. I know there has been time where he has picked up her daughter. Where they went I don't know. Her daughter works at the 25th PAL center.

Q. Have you ever observed Officer Klayman provide transportation to members of Lieutenant Cintron's family using a PAL owned vehicle?
A. Yes; just her daughter that I am aware of.

Q. What is your current assignment at the Police Athletic League?
A. I am the Administrative Sergeant.

Q. How often do you go to the Police Athletic League headquarters (3068 Belgrade Avenue)?
A. Currently every day, Monday through Friday, 9 to 5.

Q. During you tour of duty on 10-12-17, did you observe an incident involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters?
A. Yes I did.

Q. Can you describe, in your own words, what occurred during the incident you observed involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters on 10-12-17?
A. I was in a meeting with lieutenant in her office with another civilian employee, Sandy Harris. We heard a disturbance outside of the office and it sounded like yelling so we got up to see what was happening. We walked out of the office and noticed that Officer Klayman and Chase Trimmer were having some type of argument. It stemmed over an incident that happened the day before where Chase Trimmer allowed a few people to use a computer that was designated for Officer Klayman became Officer Klayman was not there at the time. At that point we explained to Chase and Officer Klayman that this wasn't the place to have the conversation where other people were in earshot of the conversation. It was suggested that if they wanted to continue the conversation they needed to move it to another location.

Q. What was Officer Klayman's tone and demeanor during the incident he had with Chase Trimmer on 10-12-17?
A. He seemed extremely upset when he was speaking to Chase Trimmer and seemed to be extremely upset about the whole incident that took place.

Sergeant Michael Faust                    12-19-17    CITY116



Q. Did you hear Officer Klayman raise his voice or yell at Chase Trimmer during the incident he had with him on 10-12-17?
A. I did.

Q. Did you hear Officer Klayman use profanity during the incident he had with Chase Trimmer on 10-12-17?
A. Yes he did.

Q. What profanity did Officer Klayman use?
A. He said something in a loud voice that he was, "tired of the backstabbing bull shit that takes in this unit."

Q. Did you hear Officer Klayman make any inappropriate comments or statements during the incident he had with Chase Trimmer on 10-12-17?
A. Not that I can recall.

Q. Did you hear Officer Klayman stated to Chase Trimmer, "We can go in the kitchen, or we can go outside?"
A. He did.

Q. Did Officer Klayman state to you, "You're the reason all of this bullshit is going on?"
A. Yes; not in those exact word but something along that line. I don't know why he said it. I told him it wasn't the place to do this; he looked at me and said not to tell him what to do and that I was part of the problem and he would deal with me later.

Q. Was Lt. Cintron present when Officer Klayman made this statement to you?
A. Yes.

Q. What actions did Lt. Cintron take after when Officer Klayman made this statement to you?
A. No action toward that statement. At that point she told Officer Klayman to go into her office so that she could speak to him.

Q. Did Officer Klayman meet with at a late time to "deal with you?"
A. No.

Q. Was any action taken against Officer Klayman in reference to the statement he made to you?
A. Not that I am aware of.

Q. Were you told you could not take action against Officer Klayman in reference to the statement he made to you?
A. No.

Sergeant Michael Faust                          12-19-17  CITY117



Q. Were you under the impression you could not take action against Officer Klayman in reference to the statement he made to you?
A. I was pretty much told she would handle any problems with Klayman.

Q. What was Chase Trimmer's tone and demeanor during the incident he had with Officer Klayman on 10-12-17?
A. He seemed to be a lot more calm then Officer Klayman said. He just listened to Officer Klayman and came back with some responses. He didn't really raise his voice to much, if any.

Q. Did you hear Chase Trimmer use profanity during the incident he had with Officer Klayman on 10-12-17?
A. No.

Q. Did you or Lieutenant Cintron have to tell Officer Klayman to "calm down" during the incident he had with Chase Trimmer on 10-12-17?
A. Yes; we both did. That is when he responded to me.

Q. Why did the two of you have to tell Officer Klayman to "calm down" during the incident he had with Chase Trimmer on 10-12-17?
A. Because he was very agitated over the situation that happened and he was yelling. His conduct was inappropriate at that time.

Q. Did Lieutenant Cintron stand between Officer Klayman and Chase Trimmer in an event to separate the two of them?
A. I remember her being in that area but I don't know if it was to keep them separated. It was just so she could speak to both people involved.

Q. In your opinion, was Officer Klayman's conduct during the incident he had with Chase Trimmer on 10-12-17 inappropriate for the work place?
A. Yes.

Q. What actions did you take after the incident you observed involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters on 10-12-17?
A. After the incident, the lieutenant spoke to Officer Klayman about the incident. I was not involved in that.

Q. What actions did Lieutenant Cintron take after the incident you observed involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters on 10-12-17?
A. I am not aware of any actions at all.

Q. Have any of the civilian employees assigned to the Police Athletic League expressed to you that they feel threatened with the ongoing situation with Officer Klayman and Lieutenant Cintron?
A. Not directly but I have heard statements to that effect.

Sergeant Michael Faust        12-19-17

CITY118



Q. What did you hear as it relates to civilian employees feeling threatened with the ongoing situation with Officer Klayman and Lieutenant Cintron?
A. They feel a little scare and uptight about Officer Klayman being at PAL, with his attitude and him having a gun.

Q. Are you aware that an anonymous letter was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. No, I was not.

Q. Did you write the anonymous letter that was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. No.

Q. Do you know who wrote the anonymous letter that was sent to the Office of Professional Responsibility regarding Lieutenant Cintron creating a hostile work environment for the personnel assigned to the Police Athletic League?
A. I do now.

Q. Did you produce a memorandum on 10-17-17 with the subject, "Incident on Thursday, October 12, 2017?"
A. I did.

Q. What was the memorandum you produced 10-17-17 with the subject, "Incident on Thursday, October 12, 2017" in reference to?
A. It was in reference to the incident that occurred on October 12th.

Q. In the memorandum you stated, "Lieutenant Cintron told them that this was not the place to argue and discuss their issues. She suggested that they move this discussion to the kitchen which we were standing next to or continue this conversation outside." Is that correct?
A. That is correct.

Q. In your opinion, was there any reason that Officer Klayman and Chase Trimmer should have continued the argument they were having even if they did so in another room or area of the building?
A. No.

Q. Is there anything else you would like to add that had not been addressed in this interview?
A. No.

Sergeant Michael Faust          12-19-17   CITY119

This is an on-going investigation being conducted by Internal Affairs. By orders of the Commanding Officer of Internal Affairs you are instructed not to disclose any information discussed here to anyone other than your attorney and FOP representative.

Q. Do you understand this?
A. Yes.

Please read your interview to be certain that it is accurate. If there are any errors, correct and initial them. After you reviewed your interview, please sign each page in the lower right hand corner.

_____ I would like a copy of this interview sent to me through police mail to my district/unit of assignment.

_____✓_____ I would like a copy of this interview sent to my home address.

_____ I do not wish to receive a copy of this interview.


STATEMENT CONCLUDED: **11:14 AM**
I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **SEVEN (7)** PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE: _Sgt Michael E. Faust #369_

DATE: _12-19-17_ TIME: _11 54am_

WITNESSES: _____

_____

Sergeant Michael Faust          12-19-17  CITY120

STATEMENT OF:  **Sgt. Michael Faust #369, PR** ▮▮▮▮▮ **W/M**
Appointment Date: 01-19-88
Assignment Date: 12-24-02
Assignment: PAL

DATE AND TIME:  12-27-17  10:49 AM

PLACE:  Philadelphia Police Department
Internal Affairs Division
7790 Dungan Rd.

IN THE PRESENCE OF:

CONCERNING:  EEO #17-0039

INTERVIEWED BY:  Sergeant Brent Conway #8892

RECORDED BY:  Sergeant Brent Conway #8892

Sergeant Faust, I am Sergeant Brent Conway #8892, Internal Affairs Division, and I will be taking your statement, directly on this computer. You are being interviewed regarding a possible EEO/IAD complaint.

Q. Are you represented by counsel?
A. No.

**Sergeant Faust, you are reminded that failure to cooperate in a Departmental Administrative Investigation is punishable by ten (10) days suspension to dismissal under Article 1- §008-10 of the Disciplinary Code.**

**Sergeant Faust, you are reminded that lying or attempting to deceive regarding a material fact during the course of any Departmental investigation is punishable by dismissal under Article 1-§009-10 of the Disciplinary Code.**

Q. Do you understand this?
A. Yes.

Q. Are you willing to cooperate?
A. Yes.

Q. Are you recording this interview?
A. No.

Q. Please state your rank, full name, badge number, payroll number, and district or unit of assignment.
A. Sergeant Michael Faust #369, Payroll #197660, PAL.

_Sgt Michael E Faust #369_
Sergeant Michael Faust                    12-27-17

CITY121



Q. Following your interview on 12-19-17, did you inform the assigned investigator (Sergeant Conway) that as of 01-01-18, your tour of duty was being changed to 1 PM to 9 PM?
A. Correct.

Q. Who made the decision to change you tour of duty to 1 PM to 9 PM?
A. Lt. Cintron.

Q. What is your current tour of duty?
A. I am currently the Administrative Sergeant for PAL, 9 AM to 5 PM

Q. How long have you worked the 9 AM to 5 PM tour of duty at PAL?
A. About eight years.

Q. How long have you been the Administrative Sergeant at PAL?
A. About eight years.

Q. Did something occur that led to Lieutenant Cintron changing your assignment and your tour of duty?
A. Yes; I think that the fact the Officer Klayman was detailed out, I became a target.

Q. Why do you believe you became a target after Officer Klayman was detailed out
A. I believe that somewhere she believes that I spoke to the deputy about an incident that occurred between Klayman and Chase Trimmer. Right after the incident with Klayman and Trimmer I was called to the deputy's office and asked about the incident. Afterward, Klayman was detailed out and it seem like after that I was going to be targeted or retaliated on.

Q. What actions have happened that you believe were an attempted to retaliate against or target you?
A. Since he was transferred out I was pulled into her office on 11-06-17 and I received a memo from her giving me notice of my change of tour from 9 AM to 5 PM to 1 PM to 9 PM, Monday through Friday. The memo said that when a new sergeant was assigned to PAL, "A" sergeant will be assigned to the administrative spot. I took that as to mean that another sergeant would get that spot.

Q. Did Lieutenant Cintron explain to you why she was changing your assignment and your tour of duty?
A. She said in the memo it was to provide equal coverage for the PAL centers north and south.

Q. Why do you believe Lieutenant Cintron is changing your assignment and your tour of duty?
A. I believe she is retaliating against me for some reason but I am not really sure what it is.

2

Sgt Michael E Faust #369
Sergeant Michael Faust                    12-27-17

CITY122



Q. Do you have any concerns with Lieutenant Cintron changing your assignment and your tour of duty?
A. Yes; one of the concerns is when we do get a new sergeant, as long as she is there, I won't be coming back to the administrative part of the job.

Q. To your knowledge, is Lieutenant Cintron assigning another sergeant to be the Administrative Sergeant at PAL?
A. Not at this point because we don't have one. Based on the memo I received about the changing of my tour that may be a possibility.

At 11:42 AM Sergeant Faust asked the assigned what the department policy is regarding take home vehicles.

Q. What information do you have concerning a take home vehicle that you can provide today?
A. Currently I oversee the PAL gas cards that are issued the PAL officers. One of my responsibilities to review the gas card reports to ensure that the officers are not using the cards inappropriately. I will question them if there are any discrepancies with how the officers are using the gas cards.

I noticed for over a year or more that there a lot of gas fill ups on Saturdays and Sundays for the PAL vehicle the Lt. Cintron is using and some of those fill ups are in New Jersey. Also her vehicle mileage is often over a thousand miles a month which is unusual.

There was also a ticket assigned to her vehicle for a violation that occurred on the PA Turnpike on a weekend day. Here was also another ticket for a PAL van on the same invoice.   Then M7

I don't recall the date, but I was leaving SAMS Club on a Saturday afternoon and I saw a PAL vehicle and sure enough it was her and her daughter.

Q. Approximately how long ago did you observe Lt. Cintron at SAMS Club using the PAL owned vehicle?
A. It was during the summer time of this year (2017)

Q. Do you have any documentation related to Lt. Cintron using the PAL owned vehicle in the manner in which you have described?
A. I do.

Q. What type of documentation do you have?
A. I have personal gas records from January of 2017 and November of 2017 on her gas usage. I also have a notice that was sent to us from the Turnpike Commission; one was on her vehicle and the other was on PAL Van

3

Sergeant Michael Faust #369    12-27-17

CITY123

Q. Who was responsible for the PAL van the received the ticket?
A. The Van was number 27 and was assigned to Officer Rivera but I don't know who was driving the vehicle at time it was issued on a Sunday; it was issued on a Sunday to?

Q. Was the ticket issued for Van 27 the same day as the ticket was issued for Lt. Cintron's PAL vehicle?
A. No. The one on Lt. Cintron's vehicle was 09-06-16 and one was November of 2016. The notice I received was a late payment notification.

Q. Can you provide the assigned with the documentation you have concerning Lt. Cintron using the PAL owned vehicle in the manner in which you have described?
A. Yes.

Q. When can you provide the assigned with the documentation you have concerning Lt. Cintron using the PAL owned vehicle in the manner in which you have described?
A. Right now.

Q. Is there anything else you would like to add that had not been addressed in this interview?
A. No.

Sergeant Michael Faust                    12-27-17

CITY124

This is an on-going investigation being conducted by Internal Affairs. By orders of the Commanding Officer of Internal Affairs you are instructed not to disclose any information discussed here to anyone other than your attorney and FOP representative.

Q. Do you understand this?
A. Yes.

Please read your interview to be certain that it is accurate. If there are any errors, correct and initial them. After you reviewed your interview, please sign each page in the lower right hand corner.

_____ I would like a copy of this interview sent to me through police mail to my district/unit of assignment.

_____✓_____ I would like a copy of this interview sent to my home address.

_____ I do not wish to receive a copy of this interview.

STATEMENT CONCLUDED: **12:19 PM**

I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **FIVE (5)** PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE: _Sgt Michael E Faust #369_

DATE: _12-27-17_ TIME: _12 37 p_

WITNESSES: _____

_____

_Sgt Michael E Faust #369_
Sergeant Michael Faust          12-27-17

STATEMENT OF:         **P/O David Klayman #9321, PR██████W/M**
                      Appointment Date: 09-15-06
                      Assignment Date: 08-08-16
                      Assignment: PAL

DATE AND TIME:        12-28-17  11:33 AM

PLACE:                Philadelphia Police Department
                      Internal Affairs Division
                      7790 Dungan Rd.

IN THE PRESENCE OF:   Danielle Nitti Esq.

CONCERNING:           EEO #17-0039

INTERVIEWED BY:       Sergeant Brent Conway #8892

RECORDED BY:          Sergeant Brent Conway #8892


Officer Klayman, I am Sergeant Brent Conway #8892, Internal Affairs Division, and I will be taking your statement, directly on this computer. You are being interviewed regarding a possible EEO/IAD complaint.

Q. Are you represented by counsel?
A. Yes.

**Officer Klayman, you are reminded that failure to cooperate in a Departmental Administrative Investigation is punishable by ten (10) days suspension to dismissal under Article 1- §008-10 of the Disciplinary Code.**

**Officer Klayman, you are reminded that lying or attempting to deceive regarding a material fact during the course of any Departmental investigation is punishable by dismissal under Article 1-§009-10 of the Disciplinary Code.**

Q. Do you understand this?
A. Yes.

Q. Are you willing to cooperate?
A. Yes.

Q. Are you recording this interview?
A. No.

Q. Please state your rank, full name, badge number, payroll number, and district or unit of assignment.
A. Police Officer David Klayman #9321, Payroll ██████ PAL.


Police Officer David Klayman         12-28-17

CITY126

Q. Do you know Lieutenant Evelyn Cintron #168?
A. Yes.

Q. How would you describe your relationship with Lieutenant Cintron?
A. Friends; met in the 5th District 5-Squad. She was my Lieutenant.

Q. How would you describe Lieutenant Cintron as a supervisor?
A. Probably one of the best supervisors I have ever had in 14 years. She is fair, she is honest and she is detailed.

Q. Are you currently detailed to the Neighborhood Services Unit?
A. Yes.

Q. Prior to being detailed to the Neighborhood Services Unit, were you assigned to PAL?
A. Yes.

Q. How long were you assigned to PAL?
A. A little over a year to a year and half.

Q. What was your title/position at PAL?
A. Commander's aide.

Q. How long did you know Lieutenant Cintron prior to becoming her aide at PAL?
A. I met the lieutenant when I was on last out in the 25th when I came back in 2015 or 2016.

Q. Did you have personal relationship with Lieutenant Cintron prior to becoming her aide at PAL?
A. Just friends.

Q. Do you currently have a personal relationship with Lieutenant Cintron?
A. We are friends.

Q. Did Lieutenant Cintron give you preferential treatment while you were assigned to PAL?
A. Negative.

Q. Did Lieutenant Cintron allow you to adjust your work schedule in order to accommodate you going school schedule?
A. Lt. Cintron had the sergeant take time from me. Lt. Cintron allowed me to come in early and come in late. I probably worked, between me and Lt. Cintron more than anyone in that place. My time was not saved at PAL, I was in the negative when I went to NSU.

Q. During the time you were assigned to PAL, did you attend college?
A. Law School.

Police Officer David Klayman    12-28-17

Q. During the time you were assigned to PAL, did you attend Law school classes during work hours?
A. There was one semester, last semester that I had on Tuesdays and Thursdays; that was from 2:30 to 3:45 for a portion of the semester. All my other classes were from 6:00 to 10 at night.

Q. During the time you were assigned to PAL, did you leave work during work hours to address any matters related to you going to college?
A. Just that one class for the couple weeks during the fall semester 2017.

Q. Were you required to utilize vacation while you attended classes or addressed matters related to you going to college?
A. I was required to use all my time or I would change my schedule on the days I had classes; I was in the negative when I left PAL.

Q. Did Lieutenant Cintron allow any of the other officers assigned to PAL to attend college classes during work hours?
A. I don't know.

Q. Are you able to provide proof of your class schedule for the college classes you took during the time you were assigned to PAL?
A. Sure.

Q. When can provide proof of your class schedule for the college classes you took during the time you were assigned to PAL?
A. I don't know, but I will get them.

Q. Does Lieutenant Cintron have a specific uniform policy for the personnel assigned to PAL?
A. Yes.

Q. What is Lieutenant Cintron's uniform policy for the personnel assigned to PAL?
A. A specific type of 5-11 tactical pants. I think they were called striker pants and a PAL polo shirt. If you are in a PAL center you can wear sweats if you leave the PAL center you have to be in uniform.

Q. Were you required to conform to the same uniform policy as the other personnel assigned to PAL or are you allowed to work in plain-clothes?
A. I had the same uniform.

Q. Have you ever provided transportation to members of Lieutenant Cintron's family while you were on duty?
A. Not that I recall; however, her daughter is a PAL employee so it is possible.

Police Officer David Klayman        12-28-17

CITY128

Q. Where does Lieutenant Cintron's daughter work?
A. 25th PAL

Q. Why would have to provide Lieutenant Cintron's daughter transportation to the 25th PAL?
A. I don't remember it being the case but if she needed a ride to the PAL center.

Q. Have you ever you provided transportation to members of Lieutenant Cintron's family using a PAL owned vehicle?
A. I am not sure; I don't remember. I know the lieutenant, I was the driver and I remember her daughter being in the car but I don't know if that was to go to a night a Phillies event. As I have stated her daughter is a PAL employee so it is possible.

Q. Have you ever provided Lieutenant Cintron's daughter transportation using a PAL owned vehicle?
A. I don't recall; however, it is possible because she is a PAL employee

Q. Does Lieutenant Cintron provide transportation to all of the civilian employees who work for PAL?
A. She provides it for a lot of civilian members. She is very generous to the board and the civilian staff.

Q. To your knowledge, does Lieutenant Cintron use the PAL owned vehicle that was assigned to her to attend non-work related functions?
A. Not to my knowledge.

Q. To your knowledge, does Lieutenant Cintron use the PAL owned vehicle that was assigned to her on days she is not working?
A. Not to my knowledge.

Q. Have you ever observed Lieutenant Cintron use the PAL owned vehicle that was assigned to her to transport her family to non-work related functions or destinations?
A. No.

Q. Have you ever observed Lieutenant Cintron use the PAL owned vehicle that was assigned to her to go shopping?
A. We have gone to the tactical store to decide what uniforms would be used for the unit.

Q. During the summer (2017), were you involved in an argument with Officer Kareem Johnson?
A. Yes.

Police Officer David Klayman            12-28-17

Q. Can you describe, in your own words, what occurred during the argument you had with Officer Johnson?

A. There was a championship baseball game being played. Myself and the lieutenant went to the field to watch the game. The media was there; a bunch of different networks. I went to the firs base line and had a conversation with one of the officers from the light house PAL who had explained to me that the team they were playing against was not the same team that was in the tournament originally and is in fact an outside team that is coached by an older tall Hispanic male that was on the field. He said that Cozen PAL, Kareem Johnson, was using this team to represent his PAL.

I told the officer if he felt there was any cheating or impropriety going on to submit a memorandum.

The game ends early because of a run rule. The older Hispanic coach started yelling at the light house PAL coach calling him cheater. The lighthouse PAL kids line up at home base to shake hands. The opposing team is sitting on their benches. The cameras were waiting to see the kids shake hands. The kids were refusing to stand up and shake hands. The lieutenant and I went over to tell the kids to shake hands and show good sportsmanship.

AT this point Kareem is talking to the Hispanic male coach. The lieutenant approaches to tell him to have his team shake hands. Kareem turns around with his hands in the air, saying "chill, chill, chill; I got it." Lt. Cintron tells him again to step aside and the sergeant said something and he moved. Lt. Cintron said to the Hispanic coach that this is a PAL event and you will not involved in any more PAL events if the kids don't show sportsmanship. The kids got up and shook hands.

Lt. Cintron was giving an interview; the parents of the kids, and the parents with kids and Kareem got behind Lt. Cintron while she was giving the interview and did a cheer, "one two three, cheaters." Afterwards when we were cleaning, I go to Kareem and said when you get a second I want to talk to you. He says I got a second right now, what's up.

Politely I said, I know there were something's out of your control with that team and the coach, but once you try to talk to the coach and it doesn't work and the lieutenant walks up to talk to the coach you can't flag her with your hands and say chill, chill, chill; that is disrespectful. He said if she finds it disrespectful that she can tell me but you can't tell me. Then I said, I don't know what whoever is going to tell you what but I am going to tell you to respect your commanding office. He said are you telling me or are you asking me and I said I am telling you. Then he said you are not a supervisor, you can't tell me anything. Then the sergeant and the lieutenant came over. He started yelling at the sergeant, escalating it into a weird situation. He was saying I wasn't a supervisor and couldn't tell him anything. I told him I was just talking to him cop to cop.

Lt. Cintron came over and asked what was going on. He said I was trying to talk to him as a supervisor and I said I wasn't trying to talk to him as a supervisor; we were just having a conversation. Sgt. Pascussi said I will take care of it so she went over to finish her

5

Police Officer David Klayman        12-28-17

CITY130

interview. Sgt. Pascussi took him to talk to him and I could hear him flying off the handle. I heard Kareem say, "Fuck him he can't tell me shit."

Q. When did the argument you had with Officer Johnson take place?
A. I don't remember the date.

Q. Did you state to Officer Johnson, "The next time the lieutenant is talking you shut up?"
A. No.

Q. Did Lieutenant Cintron instruct you to talk to Officer Johnson?
A. No.

Q. Did Officer Johnson walk away from you?
A. When the sergeant took him away.

Q. Did you yell at Officer Johnson at any point during the argument you were having with him?
A. The only time I think I raised my voice and I could hear him say, "Fuck him" while he was yelling at the sergeant. I yelled across don't say fuck me. That I was only time I even got excited during the whole situation.

Q. Did you use obscenities toward Officer Johnson at any point during the argument you were having with him?
A. No.

Q. What actions did Lieutenant Cintron take in relation to the incident you had with Officer Johnson?
A. She yelled at me. She said you represent me and something like don't address cops.

Q. Did Lieutenant Cintron state to you, "Not here David; do it for me please?"
A. Absolutely not.

Q. Did Lieutenant Cintron order you to stop arguing with Officer Johnson?
A. Yes.

Q. Did Lieutenant Cintron order Officer Johnson to stop arguing with you?
A. Yes she ordered us both to stop. That is when Sgt. Pascussi said Lieutenant I got and took him away. I wasn't arguing; I was just trying to have a conversation.

Q. Did you receive any form disciplinary action as a result of the incident you had with Officer Johnson?
A. Verbal counseling.

6

Police Officer David Klayman    12-28-17



Q. During you tour of duty on 10-12-17, did you have an argument with Chase Trimmer while inside the Police Athletic League headquarters?
A. I believe that was the date.

Q. What occurred that led to you having argument with Chase Trimmer while inside the Police Athletic League headquarters?
A. I had asked him if I could talk to him when he had some time and he said sure, what's up. He had a bunch of individual using my desk and my computer. Where my computer and desk is it is right outside of Lt. Cintron's office. There are other computer and workplace across the hall and his office has computers and big work spaces. That was the gist of the conversation. They have to respect the police area because I have sensitive information in my work place or get permission from the lieutenant. He said that could have been communicated to me but he said it snarkily to me. I said chase, everything doesn't have to be communicated to him, and he should just know or ask. I know Lt. Cintron had previously asked him why there were people at the desk because she heard the commotion at the desk while she was trying to work.

I said something to him that he should have respect for the commanding officer and her 25 years of service. I said since I have been here I kept my mouth shut but there is a lot of passive aggression from some of the civilian staff toward the police.

Lt. Cintron and Sgt. Faust come out. Sgt. Faust say Dave, not here, you can't do this here. Him and Lt. Cintron said take you conversation in the kitchen or go outside. Then I said okay we can go into the kitchen or we can go outside. I remember Chase saying I thought we were having a conversation because I did get loud during the conversation. I said something to the effect of forget, I am done; I have said I have to said and left the area.

Q. At the time of this incident, did you have two desks or work areas assigned to you?
A. I was giving access to Sgt. Ervin's old office and I had a desk outside of Lt. Cintron's office.

Q. Do any of the other officers/supervisors assigned to PAL have two desk or work areas assigned to them?
A. Ragucci has the whole supply building. I had a work station and we had an office that wasn't being utilize so I could typed things that were not for everyone's eyes and secure documents and files.

Q. What was your tone and demeanor during the incident you had with Chase Trimmer on 10-12-17?
A. It started off fine then my voice rose.

Q. Did you use profanity during the incident he had with Chase Trimmer on 10-12-17?
A. Never; specifically not.

7

Police Officer David Klayman          12-28-17

CITY132

Q. Did you make any inappropriate comments or statements during the incident you had with Chase Trimmer on 10-12-17?
A. No.

Q. Did you state to Chase Trimmer, "We can go in the kitchen, or we can go outside?"
A. It was suggested by the sergeant and the lieutenant to take the conversation into the kitchen or outside. To continue the conversation with Chase I said we can go to the kitchen or go outside following their suggestion. Then I said, I said all I had say and I am done with this conversation and I walked away.

Q. Did you state to Chase Trimmer that he "Questioned" the Commanding Officer?
A. I don't remember.

Q. Did you state to Chase Trimmer that there needs to be a "separation in the office between Police space and PAL space?"
A. I said something to the effect that there is police space and that there is civilian space and something to the effect that you just can't encroach upon police space and computers without permission because there is a lot of personal information that I deal with that I don't want everyone to grab.

Q. Did you state to Chase Trimmer that he does not have the authority to use the workspace near Lieutenant Cintron's office?
A. No.

Q. Did you state to Chase Trimmer he was, "disrespectful towards the Commanding Officer for the past year?"
A. I probably said something to that effect because it is true, but I don't remember.

Q. What did you mean when you stated to Chase Trimmer something to the effect that he was, "disrespectful towards the Commanding Officer for the past year?"
A. Chase Trimmer constantly questions the commander's authority, makes snarky comments and doesn't follow through on certain things she asks.

Q. Did you tell Sergeant Faust not to tell you what to do?
A. No.

Q. Did you state to Sergeant Faust, "You're the reason all of this bullshit that is going on?"
A. After everything was done there was meeting with Lt. Cintron, Sgt. Faust and I when she asked what was that all about? I told her what the issue was and then I said he civilian staff treat the cops like crap and is a lot of passive aggressive that goes in that place; there is a lot of back biting that goes on in that place. The civilian staff doesn't respect the chain of command and certain policies that are in place. Then Faust said something, I agree Dave you are a hundred percent right. I said, Faust you are part of this; this existed way before I got here.

8

Police Officer David Klayman    12-28-17

Q. Why did you believe it was your place to inform Sgt. Faust that he was part of the reason things were happening?

A. I was having a conversation with another person.

Q. What was Chase Trimmer's tone and demeanor during the incident he had with you on 10-12-17?

A. Snarky.

Q. Did Chase Trimmer raise his voice or yell at you during the incident you had with him on 10-12-17?

A. Once the lieutenant and sergeant came out I remember Chase Trimmer getting louder and saying something about a badge and a gun.

Q. Did Chase Trimmer use profanity during the incident you had with you on 10-12-17?

A. I didn't here profanity.

Q. Did Lieutenant Citron have to tell you to "calm down" during the incident you had with Chase Trimmer on 10-12-17?

A. I think they both told me, not here take it outside or the kitchen.

Q. Did Lieutenant Cintron stand between you and Chase Trimmer in an event to separate the two of you?

A. No; it wasn't that kind of an argument. It wasn't nose to nose.

Q. Was your conduct during the incident you had with Chase Trimmer on 10-12-17 inappropriate for the work place?

A. I don't think so.

Q. What actions did Lieutenant Cintron take after the incident you had with Chase Trimmer while inside the Police Athletic League headquarters on 10-12-17?

A. She had a sit down with me and the sergeant. I know she had a sit down with Ted Quali.

Q. Did you receive any form disciplinary action as a result of the incident you had with Chase Trimmer?

A. I was transferred.

Q. Did Lieutenant Cintron ask you to address Chase Trimmer about using your desk?

A. No.

Q. Did Lieutenant Cintron ask you to address Chase Trimmer about him questioning her?

A. No.

Police Officer David Klayman          12-28-17



Q. Why did you believe it was your place to address Chase Trimmer about these matters?
A. The desk was my workstation. I didn't believe it was my place to address him but it came up during the conversation about my desk about the general disregard the civilians have toward the police at PAL.

Q. Are there other supervisors assigned to PAL that could have addressed these matters instead of you addressing them?
A. There were others but I didn't think it warranted getting a supervisor involved. For the record Lt. Cintron did tell them to move.

Q. Is Chase Trimmer an employee of the Philadelphia Police Department?
A. No.

Q. Does Chase Trimmer have a supervisor that he reports to?
A. Ted Quali.

Q. Did Lieutenant Cintron ask you to address Sergeant Faust about issues that were going on at PAL?
A. No.

Q. Did Lieutenant Cintron address with you the manner in which you spoke to Sergeant Faust on 10-12-17?
A. No.

Q. Did Lieutenant Cintron inform you that you had the authority to address Chase Trimmer or any of the civilian employees who work for PAL about their conduct or them the using equipment or work spaces that were not assigned to them?
A. No; to the contrary.

Q. Is there anything else you would like to add that had not been addressed in this interview?
A. No.

10

Police Officer David Klayman          12-28-17

This is an on-going investigation being conducted by Internal Affairs. By orders of the Commanding Officer of Internal Affairs you are instructed not to disclose any information discussed here to anyone other than your attorney and FOP representative.

Q. Do you understand this?
A. Yes.

Please read your interview to be certain that it is accurate. If there are any errors, correct and initial them. After you reviewed your interview, please sign each page in the lower right hand corner.

_____ I would like a copy of this interview sent to me through police mail to my district/unit of assignment.

_____ I would like a copy of this interview sent to my home address.

_____ I do not wish to receive a copy of this interview.


STATEMENT CONCLUDED: **12:53 PM**
I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **ELEVEN (11)** PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE: _____

DATE: _____ TIME: _____

WITNESSES: _____

_____

Police Officer David Klayman    12-28-17

CITY136

STATEMENT OF:          **Lt. Evelyn Cintron #168, PR #**████**H/F**
                       Appointment Date: 07-20-92
                       Assignment Date: 06-20-16
                       Assignment: PAL

DATE AND TIME:         01-25-18   11:31 AM

PLACE:                 Philadelphia Police Department
                       Internal Affairs Division
                       7790 Dungan Rd.

IN THE PRESENCE OF:    Danielle Nitti Esq.

CONCERNING:            EEO #17-0039

INTERVIEWED BY:        Sergeant Brent Conway #8892

RECORDED BY:           Sergeant Brent Conway #8892

Lieutenant Cintron, I am Sergeant Brent Conway #8892, Internal Affairs Division, and I will be taking your statement, directly on this computer.  You are being interviewed regarding a possible EEO/IAD complaint.

Q. Are you represented by counsel?
A. Yes.

**Lieutenant Cintron, you are reminded that failure to cooperate in a Departmental Administrative Investigation is punishable by ten (10) days suspension to dismissal under Article 1- §008-10 of the Disciplinary Code.**

**Lieutenant Cintron, you are reminded that lying or attempting to deceive regarding a material fact during the course of any Departmental investigation is punishable by dismissal under Article 1-§009-10 of the Disciplinary Code.**

Q. Do you understand this?
A. Yes.

Q. Are you willing to cooperate?
A. Yes.

Q. Are you recording this interview?
A. No.

Q. Please state your rank, full name, badge number, payroll number, and district or unit of assignment.
A. Lieutenant Evelyn Cintron #168, Payroll #████ PAL.

_____
Lieutenant Evelyn Cintron          01-25-18

CITY137

Q. Do you know Police Officer David Klayman #9321?
A. Yes.

Q. How would you describe your relationship with Officer Klayman?
A. Officer Klayman was my aide and I consider him a friend

Q. How would you describe Officer Klayman as an employee?
A. He was efficient and I can count on him to get the work done.

Q. During the summer (2017), did you observed an argument involving Officer Kareem Johnson and Officer Klayman while at a PAL baseball game?
A. Yes.

Q. Can you describe, in your own words, what occurred during the argument you observed involving Officer Kareem Johnson and Officer Klayman while at a PAL baseball game?
A. I was in the field talking to a reporter. We were about done doing the interview; I hear behind me one of the parents say, let's do it while she is doing the interview. While I was doing the interview, I heard "one, two , three cheaters." The reporter said don't worry about it I will edit it.

By the time I got done my interview and I was walking to the other side to give out trophies I observed Sgt. Pascussi walking toward Officer Johnson and Officer Klayman because they were involved in a verbal altercation. I walked over, when I walked over Sgt. Pascussi was pulling Officer Johnson away. So I told the sergeant to tell him to calm down because he was cursing. I walked over to Klayman to find out what was going on and I heard Johnson, something along the lines of who the fuck was he. Officer Klayman responded "don't say fuck you to me." I told Klayman to calm down and wait for me in the car because at that time Chase Trimmer came and got me and told me they were ready to do the trophies and I needed to do another interview. Sgt. Pascussi said I got this and Lieutenant, go take care of whatever you need to take care of.

By the time I got done with the trophies and the interviews, I spoke to Sgt. Pascussi and asked him if we needed to address this formally. He said no, that he addressed Officer Johnson and I told him that I would talk to Officer Klayman.

When I got into the car I back I reamed out Officer Klayman and told him that as my aide he is an extension of me and he should know not to get into an argument.

Since Sgt. Pascussi handled the situation I took his recommendation that it was done and over with and no further action was necessary.

Q. Where did the argument Officer Klayman and Officer Johnson had take place?
A. It took place at the light house field on Erie Avenue.

2

Lieutenant Evelyn Cintron        01-25-18

CITY138




Q. When did the argument Officer Klayman and Officer Johnson had take place?
A. I don't remember the date.

Q. Did you hear Officer Klayman state Officer Johnson, "The next time the lieutenant is talking you shut up?"
A. I don't remember hearing that.

Q. Did you instruct Officer Klayman to address Officer Johnson about Officer Johnson interrupting you while you were talking?
A. Absolutely not.

Q. Did you state to Officer Klayman, "Not here David; do it for me please?"
A. No.

Q. Did either Officer Johnson or Officer Klayman receive any form of disciplinary action as a result of the argument?
A. They were both verbally counseled.

Q. During you tour of duty on 10-12-17, did you observe an incident involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters?
A. I saw part of it.

Q. Can you describe, in your own words, what occurred during the part of the incident you observed involving Officer Klayman and Chase Trimmer while inside the Police Athletic League headquarters on 10-12-17?
A. I was in my office having a meeting with Sgt. Faust and Cassandra Harris when we heard people arguing and loud voice. We came outside of my office to see what was going on. When I came outside I observed Officer Klayman and Chase where involved in a verbal argument, at which time I told them to knock it off which they did.

I said what is going on out here. Klayman said I am tired of people undermining and being disrespectful and they forget I sit at this computer. They always try to undermine the command and the sergeants. Chase also started talking and they were talking over each other. I said this wasn't the place, I said to go into the kitchen, come into my office or go outside to finish the conversation calmly. Chase replied we can either go into the kitchen or go outside. Officer Klayman responded we can do either; go in the kitchen or outside to speak about the use his space. I said something along the lines of let it go and then I asked Klayman and Sgt. Faust to come into my office.

While in my office, Officer Klayman said he approached Chased about the use of his cubicle that led into, something along the lines that either Officer Klayman or Chase questioning a commanding officer's decision.

At that point we got into a conversation about the culture at PAL. Sgt. Faust made a comment, something along the lines, that is just the way it is around here. Officer Klayman stated that if you think that is the way it is, then maybe you are part of the

3

_____
Lieutenant Evelyn Cintron        01-25-18

CITY139



problem. I told Office Klayman I was going to reach out to Ted Qualli and we would talk about how we would handle the satiation between Chase and Klayman being that Chase reports to Ted Qualli.

They left my office, I called Ted several times but he didn't respond. I called his office several times, he didn't respond. I called Pat Winter to see if he was up there and she said he was at a meeting. In the mean time I told everyone who was there on the police side to give me memos. While I was waiting for Ted to return my calls, everyone was talking about how Ted was telling the staff that if they were afraid of Officer Klayman because he is a cop and he carries a gun, to go home.

Ted Qualli eventually came to my office, it was almost four o'clock. But when he walked into my office it wasn't to discuss the matter. He basically walked in my office, shut the door behind him. I said I guess you heard about the incident. He said that is why I am here, what are you going to do about Officer Klayman, he needs to go. I said what are you talking about, that is why I am calling you, we need to do something about both of them because they were both involved in an argument. He said we can't have officer here who is inviting Chase to go outside and fight. I said that wasn't what happened.

Later that day, Laura Kelly told Sgt. Faust that when Ted came back from the meeting he was surprised that none of his staff left as he instructed them to do so earlier in the day and he was telling them not to come into work the next day. I confirmed this because when I was heading the bathroom I heard him having a conversation with McCauley about staying home and she said she wasn't even here. Ted told her to stay home anyway. Ted walked over to Taron Franklin and it appeared they were having a similar conversation.

By the time I went into my office Ted was gone so I called him on his cell phone. I asked him why he felt it was necessary to put the seed in people's minds that they needed to be in fear Klayman and he said that was his staff and he could tell them to stay home if he wanted to.

When I realized that he was not going not work with to address the disciplinary at hand I notified D/C Sullivan who instructed me to send him all the memos I had and that he would take it from there.

The next day when I left my house I went straight to Strawberry Mansion to meet with DHS. While in route there I called our grant writer Diana Harris about a grant I needed for the meeting. She informed that Ted told her that she did not need to be at the meeting and she would not be in attendance but that Ted and Chase would be there.

While we spoke on the phone she mentioned it was a shame what Ted is trying to do, nobody is afraid of Dave but if he wants to give me day off I will take. She stated Lieutenant I wanted to give you a timeline about what was going on. She said that after the incident Ted had an emergency meeting with all of his staff encouraging them to go home and was saying that because Officer Klayman is an office and carries a gun there is

4

Lieutenant Evelyn Cintron          01-25-18

CITY140




a reason they should be afraid of him. She said that everyone at meeting said that they were not afraid of Klayman. She said it was all about me, he was trying to get at me.

During the meeting, a person we were speaking to said they would call him later and Chase said he was not returning to the office. When I returned to the office, none of the civilian staff was there except for Laura Kelly who stated to me, nobody is here, except for me and EVA, this is bull sit, nobody is afraid of Dave.

Q. What was Officer Klayman's tone and demeanor during the incident he had with Chase Trimmer on 10-12-17?
A. They were both yelling at each other.

Q. Did you hear Officer Klayman use profanity during the incident he had with Chase Trimmer on 10-12-17?
A. Not that I heard.

Q. Did you hear Officer Klayman make any inappropriate comments or statements during the incident he had with Chase Trimmer on 10-12-17?
A. No.

Q. Did you hear Officer Klayman state to Sergeant Faust, "you're the reason all of this bullshit that is going on?"
A. No.

Q. Did you hear Chase Trimmer use profanity during the incident he had with Officer Klayman on 10-12-17?
A. No.

Q. Did you tell Officer Klayman to "calm down" during the incident he had with Chase Trimmer on 10-12-17?
A. I told both of them to calm down.

Q. Did you tell Officer Klayman and Chase Trimmer that they should take the matter into the kitchen or outside?
A. Yes.

Q. Why did you tell Officer Klayman and Chase Trimmer that they should take the matter into the kitchen or outside?
A. Because initially they were arguing but then they calmed down. I told them if they wanted to finish the conversation to do it elsewhere in a calm matter.

Q. Did you believe it was appropriate for two employees who were overheard arguing, to take that same argument to another area to continue it?
A. I told them to finish the conversation somewhere else. If they wanted to work through an issue they should do it privately, without arguing, as adults.

5

_____
Lieutenant Evelyn Cintron        01-25-18

CITY141

Q. Did Sergeant Faust also tell Officer Klayman to "calm down" during the incident he had with Chase Trimmer on 10-12-17?
A. No.

Q. Did you stand between Officer Klayman and Chase Trimmer in an event to separate the two of them?
A. No.

Q. In your opinion, was Officer Klayman's conduct during the incident he had with Chase Trimmer on 10-12-17 inappropriate for the work place?
A. Yes; definitely, they were both arguing in the workplace.

Q. Did you request disciplinary action for Officer Klayman in reference to his conduct during the incident he had with Chase Trimmer on 10-12-17?
A. No, because once I spoke to D/C Sullivan he told me to give him the memos and he would take it from there. I was waiting to seek his guidance but he never got back to me with how to proceed.

Q. On 10-13-17, did you order Sergeant Pascucci to tell Officer Janice Little to, "Stay out of things that don't concern her?"
A. Not in those words but yes I told him to talk to Officer Little.

Q. What words did you use?
A. Officer Ricardo Hanton called Officer Klayman to give me a heads up that one of the civilian employees told Officer Little to start a rumor that me and Officer Klayman were in relationship to get rid of Klayman. Officer Hanton told Klayman that when Officer Little was saying this to the officers, the officers were telling her that problem was that in order to hurt Klayman they would have to hurt me. Officer Hanton also said the Officer Little was talking about the incident Klayman and Chase had.

I told Sgt. Pascussi to tell Officer Little that this was an ongoing investigation and that she needed to focus on her PAL center instead of focusing on the rumors.

Q. Did Sergeant Pascucci inform you that the message you ordered him to deliver to Officer Little was inappropriate and out of line?
A. No.

Q. Did you inform Sergeant Pascucci that you would have him and Officer Little removed from the Police Athletic League?
A. No.

Lieutenant Evelyn Cintron          01-25-18

CITY142

Q. Did you inform Sergeant Pascucci that you were good friends with the Police Commissioner?
A. No.

Q. Did you inform Sergeant Pascucci that you would ruin both Sergeant Pascucci's and Officer Little's careers?
A. No, absolutely not.

Q. Did you take any formal action against Officer Little based on what Officer Hanton informed Officer Klayman?
A. No.

Q. Has Officer Little ever expressed to any concerns that memorandums she was submitting to you were not being approved?
A. I never disapproved any of her memorandums. I adjust memorandums depending on what is budgeted and do that for all the PAL Centers. I don't specifically recall doing that for one of hers.

Lieutenant Cintron, I am showing a copy of an e-mail you sent to Nadirah McCauley on 11-01-17, with the subject, "Office Gossip."

Q. Did you send Nadirah McCauley the e-mail I am showing you today with the subject, "Office Gossip?"
A. Yes.

Q. Can you describe, in your own words, what the content of the e-mail you sent Nadirah McCauley on 11-01-17 were?
A. When her named came up as being the person who started the rumor with Officer Little, I went and talked to Chase Trimmer so that we could talk to Nadirah together because she reports to Chase. Chase and I agreed that it was appropriate to bring Ted into the conversation. Ted comes down to join us; I explained to Ted that her name came up in the starting of the rumor about me and Klayman.

I tried to explain that this behavior undermined my command and created a hostile work environment for me. I asked to have a conversation with Nadirah, not to accuse her but to talk her about if she was involved to refrain from participating in this type of stuff because it could be damaging to anyone's reputation that was the subject of this type of rumor.

When I told him what was being said, Ted said he didn't see any problem with it, people can say whatever they want to say. He said if anyone was going to talk to her it would be him. I reminded him that in the past when rumors surfaced about him and misappropriation of funds we brought in the entire staff and told everyone that rumors could be damaging to a career and I was asking for the same courtesy.

7

_Lt. Evelyn Cintron_
Lieutenant Evelyn Cintron        01-25-18

CITY143



We left the meeting, after Ted he didn't find anything wrong with what she saying if she was saying anything at all and gave me the impression that he wasn't going to do anything at all and forbid me from talking to Nadirah.

Since Ted was dismissive and implied that this behavior was okay, I felt it was necessary to address the matter and that is why I sent the email.

Q. Does Nadirah McCauley work for the Philadelphia Police Department?
A. No she works for PAL, the non-profit.

Q. Who is Nadirah McCauley's immediate supervisor?
A. Chase Trimmer.

Q. In the e-mail you sent Nadirah McCauley on 11-01-17, you stated, "It was also brought to my attention that there was a plot to spread a malicious rumor that Officer Klayman and I were in a relationship as a way to get him kicked out of the unit." Is that correct?
A. Yes.

Q. Was Officer Klayman detailed out of PAL because of the rumors you referred in this statement?
A. I was called to D/C Sullivan's office and he said we know you are in a relationship with Officer Klayman and then I was told he needed pick three districts to go to. I told D/C Sullivan we were not in a relationship. The Deputy told me to write a memo with the three districts Klayman wanted to go to. However, when I told that to Klayman he got upset and called the FOP who filed a grievance.

I then sent D/C Sullivan the memo he requested saying that Klayman said he was not going to pick three districts.

Sgt. Shevlin then began contacting Officer Klayman and offered him to go to neighborhood services.

Q. Did you conduct a formal investigation into your concerns that rumors were being spread that you and Officer Klayman were involved in a personal relationship?
A. No, because I receive an email from D/C Sullivan that I should not approach anyone else about the subject.

Q. Do you still have the emails you received from D/C Sullivan regarding not approaching anyone else and Officer Klayman being reassigned?
A. Yes.

Q. Can you provide copies of those emails to the assigned (Sergeant Conway)?
A. Yes.

8

_____
Lieutenant Evelyn Cintron          01-25-18

CITY144

Q. Do you believe it was appropriate to send an e-mail regarding rumors that may have been discussed referencing personal matters without first conducting an investigation or taking formal action?
A. I felt that opportunity was taking away from me by D/C Sullivan to address the problem affected me. He sent me an email that stated not address anyone about it. After I sent the email to Nadirah, I received another email stating not to approach anyone else about the rumors.

Q. Does Nadirah McCauley fail under your command?
A. No she is a civilian and she reports to Chase Trimmer.

Q. Have you ever disapproved a memorandum submitted by Officer Little because you believed she was responsible for rumors that you and Officer Klayman were involved in a personal relationship?
A. No.

Q. Have you ever failed to approve a memorandum submitted by Officer Little because you believed she was responsible for rumors that you and Officer Klayman were involved in a personal relationship?
A. No.

Q. What was your tour of duty on 01-11-18?
A. I was working the 9 AM to 5 PM tour of duty.

Q. Toward the end of your tour of duty on 01-11-18, did you have a conversation with Taaj Andrews?
A. I spoke to him that day but it was not toward the end of the day.

Q. What was your conversation on 01-11-18 with Taaj Andrews about?
A. I walked over to Taaj because he sent me an email and wanted to know if I was going to approve a proposal for a program he submitted. Since I had a few questions I walked over to his cubicle to talk about it and Nadirah's cubicle is next to his; I was standing between both of their cubicles.

Q. Prior to talking to Taaj Andrews on 01-11-18, were you standing by his and Nadirah McCauley's cubicles?
A. I walked toward their cubicles to talk to him.

Q. Were you taking pictures of Nadirah McCauley's cubicle?
A. I was taking pictures but it was not of Nadirah McCauley's cubicle. I was taking pictures of the area for this investigation because I wanted to show you where everyone was standing during the argument between Officer Klayman and Chase as instructed by my private attorney.

9

Lieutenant Evelyn Cintron        01-25-18

CITY145



Q. Did Taaj Andrews ask you why you were at Nadirah McCauley's cubicle?
A. No.

Q. Did Taaj Andrews ask you if you were taking pictures of Nadirah McCauley's cubicle?
A. No.

Q. Is Sergeant Eric Ervin currently detailed to the Civil Affairs Unit?
A. Yes.

Q. Why is Sergeant Ervin detailed to the Civil Affairs Unit?
A. Because there was an incident involving Sgt. Ervin not properly handling city wide basketball, he disregarded an order while handled city wide basketball, I received a detailed email from coaches and a memo from Officer Hanton detailing cheating and violations of PAL rules at the city wide basketball games.

Once I got the information, I contacted D/C Sullivan and he ordered me to conduct an investigation which I did. Sgt. Ervin called the FOP complaining I conducting was the investigation because he believed I was doing it on my own. I got called into the Commissioner's office and the Commissioner, D/C Patterson and D/C Sullivan asked me to detail my findings. I told them ether were multiple violations and showed them my documentation. At that point they said to stop the investigation and they were going to detail him out.

The Commission instructed D/C Patterson and D/C Sullivan to speak to him. I wasn't in the meeting. They spoke to him and then I was notified he was detailed out.

Q. Do you know Police Officer Ricardo Hanton #5448?
A. Yes he works for me.

Q. When was Officer Hanton assigned to PAL?
A. He was one of my selections when he came to work for PAL based on his reputation to do great community outreach.

Q. Do you consider Officer Hanton to be your friend?
A. I never met Hanton before he came to PAL and he is just my subordinate.

Q. Prior to Sergeant Ervin being detailed to the Civil Affairs Unit, did he request to take disciplinary action against Officer Hanton because Officer Hanton failed to show up for a PAL event Sergeant Ervin scheduled?
A. He never asked me to take disciplinary action against Officer Hanton.

10

_____
Lieutenant Evelyn Cintron            01-25-18

CITY146

Q. Did you have Sergeant Ervin detailed to the Civil Affairs Unit because he attempted to request disciplinary action against Officer Hanton?
A. No.

Q. On 11-06-17, did you inform Sergeant Faust that as of 01-01-18 his tour of duty would be changing to 1 PM to 9PM?
A. Yes.

Q. Why did you inform Sergeant Faust that as of 01-01-18 his tour of duty would be changing to 1 PM to 9PM?
A. When first I arrived to PAL I was short a sergeant so I submitted a memo to D/C Patterson and they gave me Sgt. Pascussi. Then when Sgt. Ervin left I found myself short a sergeant again. When Sgt. Ervin left I had several meetings with Sgt. Faust and Sgt. Pascussi that there was chance I would have to move Sgt. Faust to supervisor the PAL officers. In addition to that, he is not an efficient administrative sergeant which I have documented in his performance evaluation, emails and memos.

Q. Prior to your meeting with Sergeant Faust on 11-06-17, did Sergeant Faust meet with Deputy Commissioner Sullivan to discuss the incident Officer Klayman had with Chase Trimmer on 10-12-17?
A. Yes, D/C Sullivan called him up to his office.

Q. Did Sergeant Faust's meeting with Deputy Commissioner Sullivan to discuss the incident Officer Klayman had with Chase Trimmer on 10-12-17 have anything to do with you changing Sergeant Faust's tour of duty?
A. No.

Q. When was Sergeant Ervin detailed to the Civil Affairs Unit?
A. I don't remember the date.

Q. Between the times Sergeant Ervin was detailed to the Civil Affairs Unit and the time you met with Sergeant Faust on 11-06-17, how many supervisors did you have assigned to your unit?
A. Just the two sergeants.

Q. Between the times Sergeant Ervin was detailed to the Civil Affairs Unit and the time you met with Sergeant Faust on 11-06-17, did something occur that led you to believe you needed more supervisory coverage?
A. I have been requesting it since I got there and I fell back into the same situation when Sgt. Ervin left. I have memos to D/C Patterson showing that I requested additional sergeants and my need to have two sergeants to supervise the officers.

_____
Lieutenant Evelyn Cintron          01-25-18

CITY147

Q. Did something about Sergeant Faust's performance change between the times Sergeant Ervin was detailed to the Civil Affairs Unit and the time you met with Sergeant Faust on 11-06-17?

A. Sgt. Faust's performance had been inefficient since I got there.

Q. Was Officer Klayman detailed to the Neighborhood Services Unit?

A. Yes.

Q. Why was Officer Klayman detailed to the Neighborhood Services Unit?

A. I don't know that decision was made above my level.

Q. Did you change Sergeant Faust's tour of duty in retaliation for Officer Klayman being detailed out of PAL?

A. No; absolutely not.

Q. Did you change Sergeant Faust's tour of duty because of something he stated to Deputy Commissioner Sullivan when he met with him to discuss the incident Officer Klayman had with Chase Trimmer on 10-12-17?

A. No.

Q. Is it your statement that the only reason you were changing Sergeant Faust's tour of duty was for supervisory coverage?

A. Yes.

Q. When was Officer Klayman assigned to PAL?

A. He came several months after I was assigned to PAL.

Q. Why was Officer Klayman assigned to PAL?

A. Because I spoke to D/C Patterson and explain my need for an aide and he I could find someone. My first choice was Jimmy Mulholland from the 25th but he couldn't work PAL hours. After that Officer Klayman approached me and asked me if I would consider him. Since he was admin staff at the 25th and always did good work, I chose to give him a chance.

Q. Did you submit your request for an aide in a memorandum?

A. I had a meeting with D/C Patterson about it. I may have given him a memo.

Q. Did the previous Commanding Officers of PAL have aides assigned to them?

A. Yes; Lt. Eddis aide was Officer Andre Epps.

Q. How long had you known Officer Klayman prior to you choosing him to be your aide?

A. Not long. I met him at the 25th.

12

Lieutenant Evelyn Cintron          01-25-18

CITY148

Q. Did you have personal relationship with Officer Klayman prior to you choosing him to be your aide?
A. No.

Q. What were Officer Klayman's responsibilities as you aide?
A. He did administrative work as far as doing reports, he did the crime stats that were for funders, he attended meetings on my behalf if I was unavailable and he did overtime management for me making; sure we kept everyone on the wheel.

Q. Did you allow Officer Klayman to utilize the PAL owned vehicle you were assigned when you were assigned to PAL?
A. He would use it sometimes.

Q. What would Officer Klayman be doing when he utilized the PAL owned vehicle you were assigned when you were assigned to PAL?
A. He would use it for police related function related to PAL.

Q. Has Officer Klayman ever given rides to members of your family using the PAL owned vehicle you were assigned when you were assigned to PAL?
A. No.

Q. Has Officer Klayman ever given rides to your daughter using the PAL owned vehicle you were assigned when you were assigned to PAL?
A. No.

Q. Have you ever given rides to your daughter using the PAL owned vehicle you were assigned when you were assigned to PAL?
A. Yes; my daughter as a PAL employee sometimes had to go to the same place I had to go so just like the other PAL employees I would give rides to, I gave her a ride as well.

Q. Did you have permission from PAL to use the vehicle you were assigned to give you daughter rides to the PAL center she was assigned?
A. I had permission to give PAL employees rides to PAL related events and she was a PAL employee. That may have happened once or twice.

Q. During Officer Klayman's time as your aide, did you give him preferential treatment as it compare to the other officers assigned to PAL?
A. I didn't do anything for Klayman that I didn't do for anyone else. There was no preferential treatment.

Q. Did you allow Officer Klayman to adjust his work schedule in order to accommodate his school schedule?
A. Yes.

13

Lieutenant Evelyn Cintron          01-25-18

CITY149



Q. How did you allow Officer Klayman to adjust his work schedule in order to accommodate his school schedule?
A. Most of his classes were a night after work hours. During the fall semester he had a class from 2:30 to 3:30 for which I would let him come in early so that he could leave early or I would adjust his scheduled where he would come back after class. He always worked forty hours a week.

Q. Did you require Officer Klayman to use vacation time to accommodate him going to school during work hours?
A. It was more adjusted then taking time.

Lieutenant Cintron, I am showing you a copy of the DAR entries that were made for Officer Klayman from 01-01-17 through 11-02-17.

Q. Can you review the DAR entries you have been shown and direct the assigned investigator (Sergeant Conway) to the dates Officer Klayman was shown as working a different tour of duty to attend college classes?
A. We did not have the capability of entering the DAR so Community Relations did our DAR up until a few months ago and they showed everyone 9 to 5. They would only make adjustment if Sgt. Faust told them to make them prior to the DAR closing out. Because this was problem I requested for a computer so that we could enter our own DAR.

Q. When did you receive the computer that gave the capably to enter you unit's DAR?
A. It has been three or four months now.

Q. Do you know why there are no DAR entries from 01-01-17 through 11-02-17 that reflect Officer Klayman working a different tour of duty with the exception of two dates (10-05-17 and 10-06-17) that he attended MPO training?
A. Everyone was usually carried 9 to 5 because of the erratic schedules at PAL.

Q. Who was responsible for DAR entries during the time you were assigned to PAL?
A. Sgt. Faust was responsible for communicating with Community Relations when they entered them. Now Sgt. Faust usually does it.

Q. Did you ever inform Sergeant Faust that Officer Klayman was leaving early to attend college classed so that the DAR entry made for him could be adjusted to reflect him leaving early?
A. After we got the computer, I told Sgt. Faust to start adjusting the DAR to reflect the hours people actually worked, but in retrospect I should have checked behind him to see it was being done.

Q. To your knowledge, did Officer Klayman ever inform Sergeant Faust that he was leaving early to attend college classed so that the DAR entry made for him could be adjusted to reflect him leaving early?
A. I don't know.

14

_Lt Evelyn Cintron_
Lieutenant Evelyn Cintron          01-25-18

CITY150

Q. Who is responsible for reviewing the DAR entries made each day for accuracy?
A. Sgt. Faust checks it and he had been certifying it.

Q. Are you aware that Directive #11.1, Daily Attendance Report (DAR), states that, "The platoon/unit Lieutenant will personally check all entries on the D.A.R. for Accuracy?"
A. Yes.

Q. Are you aware that Directive #11.1, Daily Attendance Report (DAR), states that, "If the platoon/unit Lieutenant is unavailable or if one is not assigned, another supervisor will certify the D.A.R?"
A. Yes.

Q. Are you aware that Directive #11.1, Daily Attendance Report (DAR), states that, "District/unit Commanding Officers will periodically review and sign the certified copy of the D.A.R?"
A. I do review them but I haven't been certifying them daily, but we just continued the practice of the sergeant certifying them.

Q. Did you allow any of the other PAL officers to adjust their schedules or utilize vacation time to attend college classes?
A. No; but I have adjusted schedules for other officers and sergeant for personal reasons.

Q. Did you make the other PAL officers aware that they could adjust their schedules or utilize vacation time to attend college classes?
A. No; but when they come to me I adjust their schedules if needed.

Q. Do you have a specific uniform policy for the personnel assigned to PAL?
A. Yes.

Q. Do you require all of your personnel to adhere to the same uniform policy?
A. Yes.

Q. Was Officer Klayman required to adhere to the same uniform policy as the other officers assigned to PAL?
A. Yes.

Q. Where was Officer Klayman's desk located when he was assigned to PAL?
A. He a cubicle right outside my office.

Q. Was Officer Klayman's desk located in an area that is designated for police personnel?
A. Yes.

15

_____
Lieutenant Evelyn Cintron          01-25-18

Q. Was Office Klayman also given permission to utilize the office that was previously assigned to Sergeant Ervin?
A. Yes; he would use that office to work on confidential memos he was writing for me, crime stats memos or any other confidential matter he was working on for me at the time.

Q. After Officer Klayman was detailed to the Neighborhood Service Unit, did you assign another officer to be your aide?
A. No; I brought in Officer Younger to oversee his responsibilities but he is not my aide.

Q. Are you involved in a personal relationship with Officer Klayman?
A. No.

Q. Have you ever been involved in a personal relationship with Officer Klayman?
A. No.

Q. Do you attempt to use your position to threaten the personnel assigned to PAL?
A. No.

Q. Do you attempt to threaten the personnel assigned to PAL by referencing people you know?
A. No.

Q. Have any of the employees assigned to PAL expressed to you that they feel threatened by the relationship you have with Officer Klayman?
A. No, because there is no relationship.

Q. Is there anything else you would like to add that had not been addressed in this interview?
A. I would like to document that Fed Qualli has continued to attempt to create situations for which he wants to argue with me and intimidate me. He is subjecting me along with a few members of this staff to a hostile work environment. Friday he came to my office to yell at me and berate me about PAL related matters in his attempt to have me removed from the Unit. I feel that the incident involving Chase Trimeier and officer Klayman is been used as a platform to drive personal agendas. Evelyn Cintron

16

Lieutenant Evelyn Cintron          01-25-18

CITY152

This is an on-going investigation being conducted by Internal Affairs. By orders of the Commanding Officer of Internal Affairs you are instructed not to disclose any information discussed here to anyone other than your attorney and FOP representative.

Q. Do you understand this?
A. Yes.

Please read your interview to be certain that it is accurate. If there are any errors, correct and initial them. After you reviewed your interview, please sign each page in the lower right hand corner.

_____I would like a copy of this interview sent to me through police mail to my district/unit of assignment.

_____✕_____ I would like a copy of this interview sent to my home address.

_____ I do not wish to receive a copy of this interview.

STATEMENT CONCLUDED:  **3:12 PM**
I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **SEVENTEEN (17)** PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE: _Evelyn Cintron_

DATE: _1/25/18_ TIME: _3:18 PM_

WITNESSES: _____

_____

17

_____
Lieutenant Evelyn Cintron    01-25-18

CITY153

STATEMENT ▪ :          **Lt. Evelyn Cintron #168, P▪ #**▇**H/F**
                       Appointment Date: 07-20-92
                       Assignment Date: 06-20-16
                       Assignment: PAL

DATE AND TIME:         02-09-18   12:22 PM

PLACE:                 Philadelphia Police Department
                       Internal Affairs Division
                       7790 Dungan Rd.

IN THE PRESENCE OF:

CONCERNING:            EEO #17-0039

INTERVIEWED BY:        Sergeant Brent Conway #8892

RECORDED BY:           Sergeant Brent Conway #8892

Lieutenant Cintron, I am Sergeant Brent Conway #8892, Internal Affairs Division, and I will be taking your statement, directly on this computer.  You are being interviewed regarding a possible EEO/IAD complaint.

Q.  Are you represented by counsel?
A.  No.

**Lieutenant Cintron, you are reminded that failure to cooperate in a Departmental Administrative Investigation is punishable by ten (10) days suspension to dismissal under Article 1- §008-10 of the Disciplinary Code.**

**Lieutenant Cintron, you are reminded that lying or attempting to deceive regarding a material fact during the course of any Departmental investigation is punishable by dismissal under Article 1-§009-10 of the Disciplinary Code.**

Q. Do you understand this?
A. Yes.

Q. Are you willing to cooperate?
A. Yes.

Q. Are you recording this interview?
A. No.

Q. Please state your rank, full name, badge number, payroll number, and district or unit of assignment.
A. Lieutenant Evelyn Cintron #168, Payroll # ▇ PAL.

_Lieutenant Evelyn Cintron_          02-09-18



Q. Following your interview on 01-23-18, did you inform the assigned investigator (Sergeant Conway) that you would provide documentation related to information you provided during your interview and copies of pictures you took inside of PAL Headquarters?
A. Yes.

Q. Do you have the documentation and pictures you stated you would provide with you today?
A. Yes.

Q. Lieutenant Cintron, during your interview on 01-23-18, you stated that you believed employees assigned PAL created a hostile work environment for you. Is that correct?
A. Yes.

Q. Lieutenant Cintron, I am issuing you an EEO complaint form and a copy of Directive #8.7, EEO Complaint Procedures. Do you have any questions related to filing an EEO complaint?
A. Not at this time.

Q. Is there anything else you would like to add that had not been addressed in this interview?
A. No.

2

_____
Lieutenant Evelyn Cintron        02-09-18

This is an on-going investigation being conducted by Internal Affairs. By orders of the Commanding Officer of Internal Affairs you are instructed not to disclose any information discussed here to anyone other than your attorney and FOP representative.

Q. Do you understand this?
A. Yes.

Please read your interview to be certain that it is accurate. If there are any errors, correct and initial them. After you reviewed your interview, please sign each page in the lower right hand corner.

_____ I would like a copy of this interview sent to me through police mail to my district/unit of assignment.

_____✓_____ I would like a copy of this interview sent to my home address.

_____ I do not wish to receive a copy of this interview.

STATEMENT CONCLUDED: 1:04 PM
I HAVE READ THE FOREGOING STATEMENT CONSISTING OF **THREE (3)** PAGES AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE: _Evelyn Cintron_

DATE: _2-9-18_ TIME: _1:08 pm_

WITNESSES: _____

_____

3

_____ _Evelyn Cintron_
Lieutenant Evelyn Cintron      02-09-18

CITY156