Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 1 of 46

Deposition of Maureen Rush                                     Evelyn Cintron v. City of Philadelphia, et al.

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

3     _____
                                      :
4     EVELYN CINTRON,                 :
                    Plaintiff         :Civil Action No. 19-4078
5                                     :
                  vs.                 :
6                                     :
      CITY OF PHILADELPHIA, et al.,   :
7                 Defendants          :
      _____:
8

9

10

              Deposition of:  Maureen Rush
11
              Taken by      :  Thomas O. Fitzpatrick, Esquire
12
              Before        :  Lisa L. Miller, RPR
13
              Date          :  Friday, November 3, 2023
14
              At            :  Zoom Videoconference
15

16

17

18

19

20

21

22

23

24

```
 1   APPEARANCES:

 2   THOMAS O. FITZPATRICK, ESQUIRE
     ISAAC H. GREEN, ESQUIRE
 3   MINCEY FITZPATRICK ROSS LLC
     1818 Market Street
 4   Suite 3402
     Philadelphia, Pennsylvania  19103
 5   215.882.3443
     Mike@barrettdeangelo.com
 6        For - The Plaintiff

 7   KEVIN GOLDEN, ESQUIRE
     O'HAGAN MAYER
 8   1717 Arch Street
     Suite 3910
 9   Philadelphia, Pennsylvania  19103
     215.461.3300
10   kgolden@ohaganmayer.com
          For - Maureen Rush
11
     SHARON ULAK, ESQUIRE
12   Deputy City Solicitor
     CITY OF PHILADELPHIA
13   Law Department
     Labor & Employment Unit
14   1515 Arch Street
     17th Floor
15   Philadelphia, Pennsylvania  19102
     215.683.5083
16   sharon.ulak@phila.gov
          For - The City of Philadelphia
17

18

19

20

21

22

23

24
```

1                           INDEX TO WITNESSES

2       Maureen Rush                                              Page

3            Examination by Attorney Fitzpatrick:           4

4            Examination by Attorney Ulak:                  88

5                               *    *    *    *

6

7

8

9

10                          INDEX TO EXHIBITS

11                             (None.)

12                              *    *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

Page 4

P R O C E E D I N G S
(10:08 a.m.)

STIPULATION

It is hereby stipulated by and between counsel for the respective parties that signing, sealing, certification, and filing are hereby waived; and that all objections except as to the form of the question are reserved to the time of trial.

MAUREEN RUSH,
called as a witness, being duly sworn or affirmed, was examined and testified as follows:

EXAMINATION

BY ATTORNEY FITZPATRICK:

Q. Good morning, Ms. Rush.

A. Good morning.

Q. Ms. Rush, my name is Thomas Fitzpatrick. I represent Ms. Evelyn Cintron, Lieutenant Evelyn Cintron in this case. And also on the phone -- on the call here is Attorney Isaac Green. And as you heard us say earlier, Ms. Cintron is on the video conference call and you're joined by your attorney, Mr. Golden, correct?

A. That's correct.

Q. Okay. And he's right there in the room next to you; is that right?

A. He is right next to me, yes.

Q. Okay. Ms. Rush, we're going to be taking your

Page 5

deposition this morning.

Now, have you ever been deposed before?

A. I have.

Q. Okay. Approximately how many times have you been deposed?

A. Fifteen, give or take.

Q. Okay. So I'm sure that you're quite familiar with kind of the ground rules of a deposition and that kind of thing.

I'm not asking you to guess. If you can remember the things that I'm asking you about, great, please give us that information.

You know you need to answer verbally so that your answers can be recorded, of course. And if at any point you need to take a break, I'm more than happy to allow you to do so. I just ask that if there's a question pending, you answer that question prior to taking that break. Is that okay?

A. That's fine.

Q. Okay. Now, Ms. Rush, are you -- are you currently employed by the University of Pennsylvania?

A. I am not.

Q. Okay. Are you retired?

A. I am.

Page 6

Q. Okay. And as of -- as of when did you retire?

A. I stepped down as Vice President for Public Safety Chief of Police in the end of 2021, and then I -- in 2022, I remained working as a senior advisor to my previous boss, who is the senior executive vice president, through the end of 2022, and then I fully retired from Penn.

Q. Okay. Now, as the VP of public safety, did you contemporaneous to that position hold a seat on the board of directors or board of grievances for the University of Pennsylvania?

A. I'm sorry. On the -- on the board of the University of Pennsylvania?

Q. Yes.

A. No, I was not a member of the board of the University of Pennsylvania.

Q. Okay. Did you hold any other positions simultaneous to your position as VP of Public Safety?

A. Chief of Police.

Q. Chief of Police.

Okay. And who did you report to in that position?

A. I reported to the Senior Executive Vice President Craig Carnaroli, C-a-r-n-a-r-o-l-i.

Page 7

Q. Okay. Now, you kind of started at the end of your career and retirement, Ms. Rush. But, just briefly, why don't you tell us about yourself and how you came to become the Vice President of Public Safety and Chief of Police at the University of Pennsylvania.

A. I will try to truncate 45 years for us all.

So I started out my law enforcement career in 1976 as one of the first 100 women to work street patrol in the City of Philadelphia. I was assigned to the 25th District and then subsequently went up the ranks.

I retired in 1994 as a lieutenant. I went over to the University of Pennsylvania. My first assignment there was Director of Victim Support and Special Services. That was '94 through '96.

And in '96, I was appointed Chief of Police -- Chief of the Penn Police Department, the same Penn Police -- I worked closely with Philadelphia Police. I did that position through 2000.

In 2000, I became the Interim Vice President for Public Safety and then appointed officially by the Board of Trustees in 2001 and then subsequently retired in 2021 from that position.

Q. Okay. And you said that back in 1976, when you started with the Philadelphia Police Department, you

Deposition of Maureen Rush                    Evelyn Cintron v. City of Philadelphia, et al.

Page 8

1  were one of the first 100 women to work as a police
2  officer on foot patrol in Philadelphia in 1976; is that
3  right?
4      A. That's correct.
5      Q. Okay. And so then I take it that in 1994, when
6  you left the police department as a lieutenant, I take
7  it that at that time there were relatively few women in
8  leadership positions?
9      A. Where are you speaking about?
10     Q. Philadelphia Police Department by 1994.
11     A. Actually, there was a deputy commissioner when
12 I was leaving and women had started to be in higher
13 ranks in a decent number, so -- and many more women were
14 hired. I don't know the exact number, but somewhere
15 around 1500 or more, and many of those women were now at
16 the rank of sergeant or above.
17     Q. Okay. You specifically recall at least one
18 deputy commissioner back then?
19     A. Yes, I do.
20     Q. Now, at what point did you become involved with
21 the Police Athletic League?
22     A. I believe I came on the board in 2000.
23     Q. Okay. And how did you -- how did you become a
24 member of the Police Athlete League Board? Does Penn

Page 9

1  have an affiliation with the Police Athlete League?
2      A. No. My -- my previous boss who was the vice
3  president of public safety was -- held a position on the
4  board and when he retired I was asked to assume that
5  position.
6      Q. Okay. And what was his name, your previous
7  boss?
8      A. Tom Seamon, S-e-a-m-o-n.
9      Q. Okay. And this is your previous boss at the
10 University of Pennsylvania?
11     A. That's correct.
12     Q. Okay. And so you were asked to come onto the
13 board at the Police Athletic League and that's around
14 2000, you said?
15     A. Yes.
16     Q. Okay. And are you a member of any committees
17 at that time?
18     A. I became a member of the Executive Board and
19 Finance Board. I don't recall the exact timing of it.
20     Q. Okay. Well, let me ask you this: Are you
21 still active with the Police Athletic League Board?
22     A. I am.
23     Q. Okay. And what are your current committee
24 positions?

Page 10

1      A. I'm on the executive board and I'm on the
2  finance board and --
3      Q. Okay.
4      A. -- I believe I'm still on the nominations board
5  as well.
6      Q. Okay. And so, Ms. Rush, although you can't
7  recall exactly when you took on those committee
8  assignments, is it safe to say that once you took those
9  assignments on you remained a part of those committees
10 until this present moment?
11     A. Yes.
12     Q. Okay. And back in 2016 and 2017 -- we could
13 say '16 through '19 -- were you part of those
14 committees?
15     A. Yes.
16     Q. Okay. Now, what are some of your duties as it
17 relates to the Executive Board Committee?
18     A. You know, it's pretty standard for most boards
19 you're involved in in a way that you're going to do
20 development work, raise money for the board, for the
21 Police Athletic League, ensure that we're just making
22 sure -- make sure, you know, the budget's good. So, you
23 know, it's a standard executive board meeting.
24     I was -- I was a member. I was not -- I was

Page 11

1  never president or chair of the board. So, you know, it
2  was just making sure of the strategic direction and
3  financial solvency of the board and to be a
4  representative in the community to help raise money at
5  various events.
6      Q. So then are you telling me that you -- you
7  didn't have any specific responsibilities related to
8  interactions with the Philadelphia Police Department and
9  PAL; is that right?
10     A. Well, no. I mean, it kind of goes hand in
11 hand. The Police Athletic League has a commanding
12 officer of the police. And at the time we had -- we
13 currently have an executive director. And in the years
14 that you're talking about, we had an executive director.
15 And so there's a lot of interaction with the
16 Philadelphia Police both in PAL but also in my role at
17 Penn.
18     Q. Okay. Well, I want to limit it to PAL at this
19 point. And the executive director during those years,
20 was that Ted Quali?
21     A. Ted Quali, yes.
22     Q. Okay. And so when I'm asking you about your
23 duties as a member of the Executive Committee, just so
24 that we're clear, what I'm asking you is, did you have

Page 12

any specific assignments such as liaison to the police
department or liaison to a particular PAL center or
anything of that nature?

I understand that all Board members have
general responsibilities, but did you have any specific
duties as it related to your interaction with the police
representatives?

A. No.

Q. Okay. Now, that was for the Executive Board
Committee.

Did you have any such duties as it related to
your efforts on the Finance Committee?

A. No.

Q. Okay. And what about the Nomination Committee?

A. No.

Q. Okay. Now, do recall at some point the PAL
Board having an interview or a meeting with Ms. Evelyn
Cintron regarding her becoming the police commander for
the police side of the Police Athletic League?

A. Yes.

Q. Okay. Do you recall when that was?

A. I don't.

Q. Okay. And do you recall most of the PAL board
members being present for that meeting?

Page 13

A. No.

Q. Okay. Who do you recall being present for that
meeting?

A. I recall Ron Rabena, Bernie Prazenica. I don't
remember if there was anyone else there. Those are the
two that I remember.

Q. And -- and yourself?

A. Yes.

Q. And just so that we're clear, I'm asking you
about a meeting regarding the actual hiring, or I should
say, the promotion or assignment of Evelyn Cintron to
take over as commander at PAL. I'm not asking about any
planning meetings or anything like that. I'm asking you
about a meeting that took place prior to her actual
assignment.

A. Correct. Yes.

Q. Okay. And so you only recall three people
being at that meeting with Ms. Cintron?

A. Correct.

Q. Okay. Was there a vote taken regarding
Ms. Cintron becoming the commander at PAL?

A. There was no vote, but there was feedback
provided to the police department.

Q. Okay. And shortly thereafter, Ms. Cintron

Page 14

becomes a commander at PAL; yes?

A. She becomes the commanding officer of the
police PAL officers, yes.

Q. Okay. And just so that we're clear -- I think
we understand the structure from prior deposition
testimony. But I'll certainly give you the opportunity
to explain the structure of PAL relationship to the
police department and that partnership. So why don't
you tell us about that.

A. So the police department and the -- and the
employees of the police department, the police officers,
the commanding officer, who was, again, a sworn officer,
in this case lieutenant, is different than the civilian
employees who are working for the board which is a
501(c)(3), and that -- there is -- the police commander
oversees the police officers who are assigned to the PAL
detail. And that's what these officers do every day.
It's a full -- they are transferred into PAL. That
commanding officer is their commanding officer for all
aspects of their duties.

The executive director reports to the board of
directors and is responsible for the strategic mission,
you know, employment of all the civilian staff.

The police commander does not report to the

Page 15

board but reports inside the Philadelphia Police
Department, so whoever the commissioner designated.

Q. Okay. And let me ask you this: During your
time as a police officer, did you have any involvement
with PAL?

A. I'm sure I did. I was -- I was a lieutenant in
the 25th District and I'm sure, you know, we came across
PAL. But I wasn't a member of the board at that point.

Q. You were not a member of the board, obviously,
but were you -- were you assigned to the PAL detail at
any time during your service as a police officer?

A. No, I was not.

Q. Okay. And the -- so PAL was a stand-alone
501(c)(3) organization, correct?

A. Correct.

Q. And then you have the Philadelphia Police
Department and in tandem they work the Police Athletic
League; is that right?

A. Correct.

Q. And what you've just explained is that Ted
Quali is the executive director and he reports to the
PAL board; is that right?

A. Correct.

Q. And Lieutenant Cintron is the commanding

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

Page 16

officer back -- at this time, in 2016, she's the

commanding officer of the police personnel at PAL?

A. Correct.

Q. Okay. There is some level of collaboration

between the two, isn't there?

A. Yes.

Q. Okay. Can you tell us about that?

A. The mission of PAL is helping kids, as the logo

says, and the police assigned to the various PAL centers

are fulfilling the mission of the Police Athletic

League.

So they would come up with great ideas. The

commanding officer would really work closely with the

police of all districts. The commanding officer was

much like a commanding officer of a district. The

commanding officer was responsible for all assignment

issues, discipline issues, you know, performance issues,

and also creative issues working hand in hand with the

executive director and the civilian staff and the board.

So it was a collaborative environment, and at

the same time there were roles that were performed that

people were aware of what their responsibilities were.

Q. Okay. Well, isn't part of the mission of PAL

to provide a safe place for these students and children

Page 17

in the community to play and grow, correct?

A. Absolutely.

Q. Okay. And so I would assume that the police

side of the PAL Police Department relationship, they

have a lot to do with that safety and security provision

in terms of providing that for the young people,

correct?

A. Correct.

Q. Okay. And so the commanding officer would have

some responsibility as it related to that also, right?

A. Correct.

Q. Okay. So it's not just about assignments and

shift changing, right? They actually have real

responsibilities and duties related to the safety of the

people who are there, correct?

A. Correct.

Q. Now, did there -- did there ever come a time

where you became aware of substandard conditions at a

PAL center, the Wissinoming Center for PAL?

A. I don't recall that, no.

Q. You don't recall that.

You were on the Finance Committee back in 2016

though, correct?

A. I believe so.

Page 18

Q. Okay. Do you recall any type of budgeting and

allotment being made for repairs at the Wissinoming

Center?

A. Not specifically.

Q. Do you recall litigation related to the

condition of the PAL center at Wissinoming?

A. No, I do not.

Q. Do you recall litigation related to the

condition of any of PAL centers?

A. Not really, no.

Q. Okay. Do you recall financing and budgeting

line items for the maintenance and repair of any of the

PAL centers?

A. Well, that was a standard in the budget;

preventative maintenance, capital maintenance. But

specifically, you know, I didn't -- I didn't do the

budget so I don't have any specifics that I can

remember.

Q. Okay. Do you recall any PAL centers being

closed due to their condition?

A. I don't.

Q. So as we sit here today, Ms. Rush, you don't

recall any PAL centers being closed related to their

condition? You don't recall any financial line items

Page 19

being attributed to the repair of PAL centers that were

in poor condition; is that right?

A. You know, that's kind of a multi question

there.

Q. It is, and I should break it up.

You said that you recall the line item related

to preventative maintenance. And what I'm asking you

is -- I'm not asking about preventative maintenance.

I'm asking about PAL centers that were in poor repair

and needed to have maintenance and actually be closed to

be repaired. Do you recall budgeted line items for

those kind of issues at PAL centers?

A. I do not.

Q. Okay. Now I want to ask you about a meeting

with Ms. Cintron. So not about the meeting where

Ms. Cintron is, essentially, I guess, interviewed and

there's feedback, the meeting that we discussed earlier.

I'm not asking about that. I'm asking you now about a

meeting that you, yourself, and Ms. Cintron had as a

one-on-one dinner meeting.

Do you recall that meeting, ma'am?

A. I'm sorry. Are we talking about a dinner or a

meeting?

Q. Well, you had dinner. It was just you and

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 8 of 46

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

Page 20

Ms. Cintron. So we can -- we can talk about what happened there, but it was just the two of you. So no one else. And I don't know how many times you had dinner with Ms. Cintron. You can tell us.

How many times have you had dinner one on one with Ms. Cintron?

A. One time.

Q. Okay. So that's the -- that's the moment that I'm talking about.

A. Okay.

Q. Do you recall where that took place?

A. Yes.

Q. Where was it?

A. It was at a restaurant that's attached to the first level of the Inn at Penn, 3600 block of Samson Street. I believe it's no longer there. I believe it was called Penne, P-e-n-n-e.

Q. Okay. And do you recall how that dinner came to be?

A. I invited the lieutenant.

Q. You invited her to that dinner?

A. Yes.

Q. And when you invited her to that dinner didn't you tell her that she was coming to that dinner to

Page 21

discuss programming?

A. I don't recall what -- first off, my assistant set it up. I don't recall what was said to the lieutenant.

Q. Okay. So you don't know what she was told to get her to that meeting?

A. Correct.

Q. And you, yourself, never spoke with her about that meeting prior to it actually happening; is that right?

A. Correct.

Q. So at no time did you tell her that you didn't want to meet at your office or at PAL offices but rather at The Inn at Penn?

A. I don't recall.

Q. Well, you just told us that you never spoke with her, that your assistant set that meeting up, right?

A. Correct.

Q. Okay. And so what I'm asking you now is when you're telling us that you never spoke with her regarding that meeting, are you telling us that you never had a conversation with her prior to walking into the restaurant at The Inn at Penn and seeing her there?

Page 22

A. I don't recall.

Q. Okay. So do you recall when that meeting took place?

A. I don't.

Q. Okay. Now, although you do not recall what Lieutenant Cintron was told to get her to that meeting with you, can you tell us what she was told once she was at the meeting with you?

A. Sure. It was an opportunity for us to have a meet-and-greet and to kind of do what I would do for any new leadership people, not just at PAL but in general. I'm on numerous boards and would do that, have -- have them out for a bite to eat, see how things are going and see if I can be supportive in any way.

Q. Okay. Well, when we spoke earlier about the duties that you had as a member of the executive board and all those other committees, you didn't mention any kind of meet-and-greet.

In fact, you're also a member of the Nominations Committee and you didn't mention any meet-and-greet as a part of your standard operating procedure or as a part of your duties. So I'm a bit confused as to what you're telling us now about this meet-and-greet.

Page 23

Are you telling us that this was one of your duties or are you telling us that this was kind of an ad hoc thing that you would just up and do?

A. It's not any duty. I'm a volunteer member and I've served because I believe in the organization and it is my practice in life to try to help people as they onboard.

And so do I onboard and have time to go to lunch with every new member of the Nominations Committee? No. Sometimes? Maybe. But a new commanding officer, a new captain of the district that covered Penn, a new commissioner, they're the kinds of things I'm talking about.

There's no duty here. It is -- it is out of courtesy and trying to be helpful to anyone who is new in a position that I am somewhat involved in. And as a board member, that was the case here.

Q. Okay. So despite the fact that you were having this meet-and-greet as a courtesy to Lieutenant Cintron, as you recall, you didn't even make the call to extend the invitation to her yourself? Your secretary did that? And although you apparently knew the purpose of it was simply a meet-and-greet and to introduce and provide support to Lieutenant Cintron, you can't recall

Page 24

what she would have been told to get her to the meeting?

A. Well, you know, not quite the way you're describing this. My executive assistant set up all my meetings and she would peripherally know what the meeting was about. If it was a lunch meeting, it may be onboarding a new Dean at Penn.

It was a meet-and-greet. I don't have -- you know, for those kinds of things you don't have an agenda. You have -- you know, you meet people. You get to know them a little better.

I'm sure that my assistant, who was very familiar with this practice, would probably have given some peripheral information such as that.

Q. Okay. Who was your assistant at that time?

A. Danielle Faust, F-a-u-s-t.

Q. Faust. Okay.

So you think that your assistant would have given some kind of peripheral information regarding just a meet-and-greet?

A. That's my understanding, yes.

Q. Okay. And this was actually not a lunch meeting? This was actually dinner with Lieutenant Cintron? Do you recall?

A. That's correct.

Page 25

Q. Okay. And do you recall Lieutenant Cintron at least being under the impression that you all were there to discuss programming?

A. I don't know what she was under the impression of.

Q. Okay. Do you recall her attempting to discuss programming with you at that meeting?

A. I believe programming came up in the conversation.

Q. Okay. Do you recall telling her, no, you just wanted to enjoy dinner first and then you could get to why you were there to actually speak with one another? Do you recall telling her that?

A. There's no separation of what you're describing. It is a meet-and-greet and, as such, work stuff will come up because we're on the same team. I was on the board and she was the commanding officer in a new position and I'm sure we discussed things like that.

Q. I understand. But my question was, do you recall telling Lieutenant Cintron that you did not want to talk about programming at that time, you just wanted to start to enjoy dinner, and then you would tell her why you were all really there to meet?

A. I don't recall.

Page 26

Q. Okay. Did you -- do you recall telling Lieutenant Cintron that the other individuals associated with PAL wanted you to meet with her woman to woman?

A. No, I don't recall.

Q. Okay. Do you recall Lieutenant Cintron asking you if we were talking about Rob [sic] Rabena, Bernie, and the District Deputy Commissioner Sullivan? Do you recall her asking you if those were the people who put you up to having the meeting with her? Do you recall that?

A. I don't recall.

Q. Okay. Do you recall answering that question in the affirmative and referring to them as the good old boys?

A. I don't recall.

Q. Okay. Do you recall telling Lieutenant Cintron that she should just sit back and allow the men to run PAL?

A. Well, I don't recall that, but I will assure you that is not something that would ever come out of my mouth as a trailblazing woman in the police department and at Penn and on the board.

Q. Okay. Well, then you know what you didn't say. But the issue that I have with you, Ms. Rush, is that

Page 27

you can't remember what you did say. So tell us what you did say at this dinner meeting.

A. Well, you didn't quite ask me what I said. What I can tell you is what I can remember. And I don't remember how many years ago this is, but I will give you my best recollection of that one encounter and one dinner.

I wanted to ensure that -- first off, we had a lot in common. I worked the 25th District as a police officer. She worked as a lieutenant in the 25th and did a very nice job working with the community and she had a lot to be proud of. We talked a lot about that.

And then she had never worked in an assignment where there was -- where it was a not-for-profit board. So I tried to outline for her the duties of the executive director versus the duties of the police commander. And I think there had been some -- I don't know -- misperceptions about who was responsible for what and I wanted to take that opportunity to help her succeed in this role.

She had a lot to offer and we wanted her to succeed and so we wanted to -- I wanted to make sure that she understood the roles of each of those positions. And those roles overlapped in a lot of ways

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

Page 28

around strategy, but there were specific roles that she
was responsible for and there were specific roles that
the executive director was responsible for.

Q. Okay. And the executive director that we're
talking about is Ted Quali; is that correct?

A. Correct.

Q. And did you -- so you met with her in an effort
to define these roles for her?

A. Correct.

Q. Okay. Well, when we began this conversation
regarding this meeting, Ms. Rush, you told me that this
meeting was simply a meet-and-greet. You told us that
this meeting was something that you do with everyone,
that you would have done with anyone else taking over a
police district or the district that Penn sits in or for
any other board that you were on. That's why you told
us that you met with her.

Now you're telling us that you met with her
because you needed to define the role of the executive
director versus her role as the police commander at PAL.
That sounds like an agenda to me.

Are you telling us that you did not have an
agenda when you went to that meeting with her on that
evening and that it was still just a meet-and-greet?

Page 29

ATTORNEY GOLDEN: Objection. Go ahead.

THE WITNESS: I'm telling you that the original
purpose of the meeting was a meet-and-greet and to get
to know her better. And as the dinner evolved and the
evening evolved, we did discuss the way that Penn
operates -- I'm sorry, the way that PAL operates.

And I've been a long-time member of the board
and have helped other commanding officers when they
started because it's unique and it's different than any
other assignment in the Philadelphia police.

In conversation that came up, was that an
agenda item? Not necessarily. My agenda was to welcome
her, to help her be successful, and to try to explain
the difference of roles and to realize that this is a
unique position inside the Philadelphia Police
Department.

BY ATTORNEY FITZPATRICK:

Q. Well, there's only one PAL commander in the
Philadelphia Police Department, correct?

A. That's correct.

Q. All right. You think she was aware of that,
correct?

A. Yes.

Q. Okay. So is it safe to say that she would have

Page 30

been aware that the position was unique; yes?

A. Yes.

Q. Okay. You said that there had been problems
regarding the executive director and the police
commander, correct?

A. I don't recall saying that.

Q. Well, there had been some issues leading to you
feeling as though you needed to outline the differences
is these duties between the executive director and the
police commander; no? Did I misunderstand that?

A. Well, I didn't say it was a problem. I said it
was a -- it was a new commanding officer coming into a
new position and I believed that there was some
misperceptions about what the role was for the
lieutenant commanding officer of the Philadelphia Police
PAL Unit.

Q. Okay. And --

A. Also, to inform her of what the executive
director's role was.

Q. Okay. So your word is misperceptions. All
right.

Regardless of that, what I'm getting at is
this, Ms. Rush: Were you aware of those misperceptions
prior to the meeting or are you telling us that you

Page 31

found out about those misperceptions during your dinner?

A. Both.

Q. Both?

A. Yes.

Q. And so -- well, that's an interesting answer,
because I don't know that the answer can be both. So
I'll rephrase my question.

Were you aware of misperceptions between the
executive director and the police commander prior to
your dinner?

A. Yes.

Q. Okay. Now, during your dinner I take it that
you were given additional information regarding what
you've described as misperceptions from Lieutenant
Cintron. Is that what you're telling us?

A. Yes.

Q. Okay. So my very pointed question to you now
is, at the time that you set up that dinner with
Lieutenant Cintron, are you telling us that you had no
intention of addressing these misperceptions with her?

A. I'm not saying that.

Q. Okay. So you did intend on addressing the
misperceptions with her, correct?

A. I didn't say that either.

Page 32

Q. Okay. Well, did you intend to address the misperceptions with her at the dinner?

A. This was a meet-and-greet and I wanted to understand how she was feeling about her new assignment and if it came up, absolutely. If it didn't come up, it would have been just other conversations.

Q. Okay. So you're telling us you didn't bring it up?

A. I don't recall. I don't recall who brought it up.

Q. Well, now, if you brought it up, then of course it would come up and so of course it would be addressed. So you can't say if it came up, then we would talk about it. If it didn't come up, we wouldn't talk about it if you're the person who brought it up.

So my question is, did you bring it up?

A. Well, here's the thing, it was a conversation. Who brought it up first? I don't recall sitting here today.

Q. Okay. But you do recall that you requested the meeting?

A. Yes.

Q. Okay. And how long did this dinner last?

A. I don't know.

Page 33

Q. Do you recall Lieutenant Cintron pointing out to you that as a woman she had to work twice as hard to get to where she was and she wasn't going to sit back and just let men handle everything?

A. I don't recall.

Q. Do you recall her telling you that?

A. I don't recall that, no.

Q. Okay. Beyond the executive director, Ted Quali -- who is a man, correct?

A. Correct.

Q. -- and you defining his role versus Lieutenant Cintron's role, were there any other roles that you defined for Lieutenant Cintron?

A. I don't recall.

Q. Okay. Did you -- do you recall explaining to her what Rob [sic] Rabena's role was?

A. I don't recall specifically what I explained or not. It probably came up, but I don't know. I can't sit here today and tell you what that conversation was.

Q. Okay. But you do know that you defined Ted Quali's role from Lieutenant Cintron's role? You recall that?

A. I do.

Q. But no others, correct?

Page 34

A. I'm not saying that it didn't come up. I don't have any total recollection of what else we talked about around other people.

Q. Okay. And do you have any recollection of what you said? Now you've told us what you talked about. And this is the only thing you can recall talking about; is that right?

A. You know, at dinner you talk about a lot of things. You talk about your kids. You talk about how you started on the job.

She was interested in how it was in 1976, when myself and 99 other women plowed the way into law enforcement for other women, including her.

And, you know, it was a general conversation. And, you know, again, the purpose of it was a meet-and-greet. The purpose was to help a fellow female officer, a lieutenant, succeed in the position.

Q. To help a fellow female officer succeed and that would have been by giving her advice, correct?

A. Guidance.

Q. Guidance.

Okay. And in this particular case, because her assignment is commanding officer at PAL, you would have been giving her guidance and advice about how to proceed

Page 35

on that assignment, correct?

A. Correct.

Q. Okay. And so all I'm asking quite simply at this point is, what guidance and advice did you give her?

A. As I said earlier, I tried to outline for her the distinction between the role of commanding officer of the Police PAL Unit versus the commanding -- the executive director of PAL who oversaw all the civilian staff and was responsible for running a not-for-profit board reporting to a board of directors.

Q. Well, forgive me, Ms. Rush, but that seems like information that someone could have gotten from a pamphlet. That's hardly the kind of information that I would expect a trailblazer from 1976 to be providing to someone at dinner.

So aside from outlining those roles, what guidance and advice did you give Lieutenant Cintron regarding being a female commander in her position?

ATTORNEY GOLDEN: Objection. Go ahead.

ATTORNEY ULAK: I'll join the objection.

THE WITNESS: Well, you know, what I was trying to help Lieutenant Cintron understand is what her role was. And in saying what her role was, yes, did I go

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 12 of 46

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

Page 36

1 into more detail? I'm sure.

2     You know, you're -- you have a -- we, I believe

3 at the time, had some police officers that were assigned

4 to PAL that needed to be re-invigorated, let's say. She

5 was aware of that and actually came into the role, I

6 think, intending to do that.

7     So we talked about the great needs and

8 responsibilities, which were many, of being the

9 commanding officer over the police and also then what

10 were the specific roles that the executive director

11 would be responsible for, which is not written in any

12 pamphlet.

13     Just like most jobs, there's job descriptions

14 and then there's -- you know, you get behind the scenes

15 of what people do each and every day and who is

16 responsible to whom, who reports to whom and what that

17 daily responsibility is and what that long-term

18 responsibility is. And so we just really -- you know, I

19 wanted to make sure that -- she was still new there and

20 it was a completely different role than any other

21 position in the police department in that you're

22 interacting with basically a not-for-profit board with a

23 full board of directors and an executive director. So

24 everything in between there is what we discussed.

Page 37

1     Q. Okay. So you didn't give her any advice

2 regarding how her interactions should go with people,

3 the executive director or any other board members,

4 correct?

5     A. You know, I didn't get into how you should

6 treat people. We got into the roles of people, which in

7 turn would, you know, work cooperatively with one

8 another; ensure that, you know, you were coming to board

9 meetings.

10     The commanding officer always had a role at the

11 full board meeting -- executive board meetings to report

12 out on the different accomplishments and -- you know, it

13 was more about that. It was more about that and that

14 the rest would fall into place if people knew what their

15 roles were. And to basically really work on the things

16 that were in her control and what was expected of her

17 from the police commissioner, to oversee -- I don't

18 remember how many there were at the time. Maybe 34

19 police officers. But to make sure -- just like a

20 captain would of a district, same responsibilities.

21 And, again, I don't know what the police commissioner's

22 orders are. I'm not privy to that. But in watching

23 other commanding officers, that's what it appeared to me

24 to be, that that's what they did, and they certainly

Page 38

1 interacted with the board and with the executive

2 director.

3     Q. Well, right. And so you said that the rest

4 would fall into place. What are you referring to when

5 you say that?

6     A. Well, it was clear there was some friction

7 between the executive director and the lieutenant and I

8 believe the friction came because of understanding

9 roles.

10     And what I mean by that is if everyone is

11 working as a team cooperatively and understanding the

12 impact that you can make and the impact that other

13 person can make and the impact the board can make, that

14 this was an opportunity -- we are here to serve the

15 children of Philadelphia. And that's what we are trying

16 to do. And that's -- that's what I mean by falling into

17 place, making sure it was a successful operation.

18     Q. Okay. Well, you started by saying that there

19 were just misperceptions. Now we've graduated to

20 friction between the executive director and the

21 commanding officer.

22     And just so that I'm clear, again, you were

23 never assigned to PAL as a police officer, correct?

24     A. Correct.

Page 39

1     Q. So you were never a commanding officer in the

2 PAL assignment, correct?

3     A. Correct.

4     Q. All right. And, in fact, there is a deputy

5 commissioner or a commissioner that Lieutenant Cintron

6 would report to in her chain of command, correct?

7     A. Correct.

8     Q. And at any point during this conversation did

9 you advise Lieutenant Cintron to report anything to her

10 deputy commissioner or to the commissioner?

11     A. I don't specifically recall that, no.

12     Q. Okay. Were you aware at this point that there

13 was a Memorandum of Understanding that was being

14 presented concerning the various roles of the Police

15 Athletic League, civilian employees, and the police

16 personnel?

17     A. I was aware of it, yes.

18     Q. Okay. And were you aware that Lieutenant

19 Cintron was one of the proponents of that memorandum in

20 terms of trying to get those roles defined?

21     A. I don't recall that.

22     Q. Okay. Were you aware of this pending

23 memorandum prior to having this dinner with Lieutenant

24 Cintron?

Page 40

A. I don't recall the timing.

Q. Okay. But at any rate, you did not discuss this memorandum; is that right?

A. Not that I recall.

Q. Okay. You just happened to discuss the things that would have been covered by the memorandum; is that right?

ATTORNEY GOLDEN: Objection. Go ahead.

THE WITNESS: I don't know what was in the memorandum. It was not something that I was totally involved in. I heard about it. I don't have a clue what was in it. And the discussion that we had was specifically what was in front of us right then and there.

BY ATTORNEY FITZPATRICK:

Q. Okay. Well, what I'm asking you is that the memorandum is a direct result of the misperceptions and friction between the commanding officer and the executive director of PAL. And are you telling us that it just co- -- by coincidence you discussed the very same things that were going to be addressed by this Memorandum of Understanding?

Although you were aware of the Memorandum of Understanding and you were aware of the misperception

Page 41

and the friction, you're telling us that it was not your intention to discuss the Memorandum of Understanding with Lieutenant Cintron on that date; is that right?

ATTORNEY ULAK: Objection.

ATTORNEY GOLDEN: Objection.

ATTORNEY ULAK: Sorry. You can answer. I just objected.

THE WITNESS: What I'm saying to you is, I was discussing with Lieutenant Cintron my experience of working alongside members of the Philadelphia Police Department, and especially as a board member working with past police commanders of PAL and the distinction -- which, I believe Ted Quali was the first executive director, so it was different than maybe a past commanding officer. So that was my -- that was where I was coming from.

I wanted to ensure that -- this was kind of a new model for PAL. I don't know how many years he was there, but it was -- it was a little bit different than somebody 20 years ago who was the commanding officer -- police commanding officer. So that was -- that was where I was basing that conversation on.

BY ATTORNEY FITZPATRICK:

Q. Well, when you say working alongside these

Page 42

individuals, are you talking about working alongside men?

A. I'm sorry. I don't understand your question.

Q. You said that you were intending to discuss with Lieutenant Cintron working alongside these people which you have had the experience of doing for years.

A. No. What I was saying was that my role -- I was -- my history of being on the board and my history previously at Philadelphia Police Law Enforcement was that I had worked alongside previous commanding officers of PAL and, obviously, been assigned to it, because, you know, PAL members go -- PAL board members, you know, go to the Christmas parties and raise money for the gala and things like that. So, yes, I was very familiar with the police officers, not all, but some, and -- and, again, worked closely with the executive -- I'm sorry, the commanding officer of PAL.

BY ATTORNEY FITZPATRICK:

Q. Right. But, I'm sorry, my question was a much simpler one. I should have been more clear. All I'm asking you is, you would agree with me that the Philadelphia Police Department for many years, and even the PAL board to a degree, were male dominated -- predominantly male organizations and people that you

Page 43

were working with and around?

ATTORNEY GOLDEN: Objection.

THE WITNESS: You know what, by that year, not so much. There were female officers. There were, I believe, one or two female sergeants in PAL at the police department. The board was very diversified in both gender and race.

So the experience of working at PAL -- in my case the experience of serving on this not-for-profit board, I didn't see it just being all men.

BY ATTORNEY FITZPATRICK:

Q. Well, I didn't say all men. I said predominantly men. And so if there's one out of 27, you'd have to agree with me that that would still be predominantly male, correct?

ATTORNEY GOLDEN: Objection. Go ahead.

THE WITNESS: You're asking me my experience and my experience was I didn't experience PAL or the PAL board as being predominantly male. I'm not sitting here doing statistics, but that was my experience.

BY ATTORNEY FITZPATRICK:

Q. Okay. Well, how many -- you said you're on the Executive Committee, correct?

A. Correct.

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 14 of 46

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

Page 44

Q. Okay. And who's on the Executive Committee?

A. I have no idea to name them right now, but there was a mixture of men and women.

Q. Okay. Well, who was the -- I think we talked about the executive director. That was Ted Quali, correct?

A. Correct.

Q. The president of the board, was that Rob [sic] Rabena?

A. I believe so.

Q. Okay. And the vice president, was that Bernie Prazenica?

A. Prazenica, yes.

Q. Prazenica. I'm sorry.

And that was the leadership team that would meet regarding the direction of PAL, wasn't it?

ATTORNEY GOLDEN: Objection. Go ahead.

THE WITNESS: I mean, if you have a listing in front of you, I'd be happy to have you name them. But I know for a fact -- I believe that the chair before Ron Rabena was Sylvia Nisenbaum and Sylvia still remained on the executive board. There were other women that were on the executive board, I believe, as well.

BY ATTORNEY FITZPATRICK:

Page 45

Q. All right. But that's not my question. My question is that at this time, in 2016, when Ted Quali was the executive director, Rob [sic] Rabena was the president, Bernie was the vice president, that was the leadership team at that point in time, correct?

ATTORNEY GOLDEN: Objection. Go ahead.

THE WITNESS: Actually, Bernie was the treasurer and Ron Rabena was the president. I think they just switched it.

BY ATTORNEY FITZPATRICK:

Q. Okay. So Bernie was the treasurer?

A. Yes.

Q. Okay. And Rob [sic] was the chair?

A. Ron was the chair.

Q. Ron was the chair.

And Ted was the executive director?

A. Yes.

Q. And that was the leadership team, correct?

ATTORNEY GOLDEN: Objection.

THE WITNESS: There are more people on the leadership team than that.

BY ATTORNEY FITZPATRICK:

Q. Okay. Well, who were they?

A. Well, I was the secretary of the board. We had

Page 46

a past president that was Sylvia Nisenbaum. And, again, I can't guess at who else was on the board that year.

Q. Okay. So yourself as the secretary and there was a past president. Did the past president have duties?

A. She was on the executive board and definitely, you know, helping guide issues for the -- for the board.

Q. Okay. So aside from the public board meetings that would occur, there would be sometimes private planning meetings or committee meetings, correct?

A. Correct.

Q. Would you take part in those meetings?

A. On the ones I was involved with.

Q. Okay. So by that, do you mean with finance?

A. Finance and the Executive Committee.

Q. And the Executive Committee?

A. And the Nominations Committee.

Q. Okay. And who was on the Executive Committee?

A. I don't -- again, I -- it changes and I have no idea to go down a list without seeing the history of who was on at the time.

Q. How often did the Executive Committee meet?

A. I don't recall the sequence. Several times a year in addition to the full board meeting.

Page 47

Q. Okay. What about the Finance Committee, how often did the Finance Committee meet?

A. Pretty much the same.

Q. Several times a year?

A. Correct.

Q. Is that on a monthly basis?

A. No.

Q. Okay. Are you aware of any groups of board members or officials with PAL who met on a monthly basis?

A. Not specifically, no.

Q. So then it's safe to say that you did not take part in any meetings that occurred on a monthly basis?

A. Yes, that would be safe to assume.

Q. Okay. Were you aware of any meetings that took place every two months?

A. Not specifically.

Q. Okay. So if I told you that Bernie, Rob [sic], and Ted met on a relatively consistent basis once every month, that would not be -- that would be something that would surprise you?

ATTORNEY GOLDEN: Objection. Go ahead.

THE WITNESS: It would not surprise me.

BY ATTORNEY FITZPATRICK:

Page 48

Q. Okay. And if I told you that Lieutenant
Cintron had been promised that she was going to be a
part of those meetings, would it surprise you?
    ATTORNEY GOLDEN: Objection. Go ahead.
    THE WITNESS: I have no knowledge of that.
BY ATTORNEY FITZPATRICK:
Q. Okay. Well, you had knowledge of what prior
executive directors and -- I'm sorry, not prior
executive directors -- prior commanding officers for PAL
had done and participated in, correct?
    ATTORNEY GOLDEN: Objection. Go ahead.
    THE WITNESS: It was a different model. We
didn't have an executive director. And once the
executive director came on board, the commanding officer
wasn't involved in everything that the executive
director was involved in with the board.
BY ATTORNEY FITZPATRICK:
Q. Okay. So are you telling us that the --
there's someone who preceded Lieutenant Cintron,
correct, in the position?
A. Correct.
Q. Okay. Who was that person?
A. It was Bill and I can't recall his last name.
His last name's escaping me.

Page 49

Q. Okay. And he was a lieutenant as well,
correct?
A. Yes.
Q. Okay. And are you telling us that Ted Quali
was not in his position as executive director when this
lieutenant was running PAL from the police side?
A. I believe the overlap occurred maybe midterm to
the past lieutenant's tenure there.
Q. Okay. And are you aware of that lieutenant
meeting with Ted and Rob [sic] and Bernie regarding the
direction of PAL?
A. I'm not familiar with that.
    By the way, it's Ron, not Rob.
Q. Ron, I'm sorry. My apologies.
    So you were not aware of that?
A. I -- no, I was not aware of it.
Q. Okay. And so you're not aware of these monthly
meetings. You don't take part in these monthly
meetings, and do you receive any information from these
monthly meetings?
    ATTORNEY GOLDEN: Objection. Go ahead.
    THE WITNESS: Well, I don't know what monthly
meetings you're talking about as far as what they're
doing, so no.

Page 50

Q. Okay. If the board wanted to communicate
information to the executive director, how was that
done? How did that chain of communication work?
A. I don't know.
Q. Okay. Well, you -- you're on the Executive
Committee now, correct?
A. Correct.
Q. And you're on the Finance Committee, correct?
A. Correct.
Q. And you're on the Nomination Committee,
correct?
A. Correct.
Q. Okay. So the question that I'm asking you
is -- I'll give you a hypothetical. If PAL Center
Number 26 had gone overbudget and the board wanted the
executive director to address that issue, how would you
get that message to the executive director?
A. Hypotheticals are difficult to really give an
answer because it depends on what is going on. I
wasn't the chair of the Finance Committee, so I have no
knowledge how that would happen.
Q. Okay. So you don't have any knowledge of how
to communicate with people who report directly to you as

Page 51

a board member; is that what you're telling us?
    ATTORNEY GOLDEN: Objection. Go ahead.
    THE WITNESS: So I'm sure you're on boards and
the chair of the board is generally the key person that
does communications and there are times where, you know,
other members of the committee or the board might also
have roles in communication. But as a general stance, I
was not involved in the daily issues that would be
presented and so I have no knowledge of how something
like that hypothetical question would roll.
BY ATTORNEY FITZPATRICK:
Q. Okay. But I think you've answered my question
and then disavowed it in the same answer. So that's --
that's why I'm going to ask it again.
    My understanding from what you just said is
that the chair of the board would be the key person and
communicating to someone like the executive director.
And that's really what my question was. But then you
went on to say you have no idea who would be the person
to communicate, so --
A. No, that's -- actually, that's not what I said.
What I said was I was not the chair of the Finance
Committee, of the Executive Committee, nor the
Nominations Committee. And what I said is that the

Page 52

1  chair of the board and the chair of committees have a
2  deeper role than I did, which is basically what I'm
3  saying. I wouldn't know everything they're doing.
4     Q. Okay. So, again, you're not aware of how
5  communication would flow from the board to the executive
6  director?
7     A. Not specifically, no.
8     Q. No. But even though you're unaware of how
9  communication would flow from the board to the executive
10 director who is in your chain of command as a board
11 member, you felt that you could have dinner with
12 Lieutenant Cintron and explain to her what her role was
13 as it related to the executive director?
14    ATTORNEY GOLDEN: Objection. Go ahead.
15    THE WITNESS: My communication style with the
16 executive director or with Lieutenant Cintron has
17 nothing to do with the question you asked me.
18    I am quite aware of the roles. I explained it
19 earlier what the difference was. I was a member of the
20 PAL board before there was an executive director and I
21 know that with the executive director the roles changed.
22    I was just trying to he helpful to Lieutenant
23 Cintron to ensure she was aware specifically of the
24 history and how the roles changed and, also, I wanted to

Page 53

1  see her be successful.
2  BY ATTORNEY FITZPATRICK:
3     Q. Well, right. But I'm not asking you about your
4  communication style, Ms. Rush. What I'm asking you is a
5  much -- a much more pointed question. And maybe it was
6  too convoluted.
7     What I'm saying is that you met with Lieutenant
8  Cintron to explain to her the division between her role
9  and the executive director. And now I'm asking you,
10 well, how did the board communicate with the executive
11 director? And you're saying, I don't have any idea.
12    And so I'm simply saying, if you don't know how
13 the board communicates to the executive director, how in
14 the world were you able to tell her anything about the
15 role of the executive director or anything else like
16 that if you're telling us you don't even know how you
17 communicate with the executive director?
18    ATTORNEY GOLDEN: Objection.
19 BY ATTORNEY FITZPATRICK:
20    Q. Do you understand my question now?
21    A. I understand your question and I think I have
22 answered it different ways and that, perhaps, I'm not
23 communicating as clearly as I can.
24    The difference between knowing on a daily basis

Page 54

1  who's communicating and how they're communicating with
2  an executive director, I am saying I don't know. I
3  certainly did communicate with the executive director in
4  various ways, especially at board meetings when he was
5  there. I also communicated with Lieutenant Cintron
6  formally at meetings but also informally at events at
7  the PAL center.
8     The difference is I'm not the top dog on the
9  board. I don't --
10    Q. Yeah, I'm sorry. Ms. Rush, that's not my
11 question. I'm not asking who's the top dog. I'm not
12 even asking you about daily communications.
13    I'm asking you how -- and I even gave you a
14 hypothetical that you thought wasn't helpful, I guess.
15 But I'm simply asking you, how did you communicate with
16 the executive director?
17    A. And what I just said is at board meetings,
18 especially executive board meetings, we would all be --
19 there would be a conversation.
20    Q. Thank you. Thank you.
21    A. You're welcome.
22    Q. And so beyond board meetings, did you ever
23 e-mail the executive director?
24    A. I'm sure.

Page 55

1     Q. Directly yourself?
2     A. Probably.
3     Q. Okay. Did you ever have phone calls with the
4  executive director?
5     A. Probably.
6     Q. Okay. And so you had a direct line of
7  communication to the executive director; is that right?
8     A. Yeah, I had a direct line of communication with
9  the executive director, as I do with tons and tons of
10 people every day.
11    Q. Okay. But my point is, you were able to
12 communicate directly with Ted Quali, correct?
13    A. Yes.
14    Q. And, of course, you were able to communicate
15 directly with your fellow board members, correct?
16    A. Correct.
17    Q. Those misperceptions and that friction that you
18 spoke about between the executive director and
19 Lieutenant Cintron, where did you derive that
20 information?
21    A. Specifically, I can't say. But I did have a
22 conversation with Ted Quali about his frustrations and
23 concerns and what -- what he felt was, you know,
24 happening with communication.

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 17 of 46

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

Page 56

1  Q. And you had that conversation with Ted Quali
2  prior to having that dinner with Lieutenant Cintron,
3  correct?
4  A. Possibly, yes.
5  Q. Yeah. And did you -- and was that the extent
6  of your conversation -- was that the extent of the
7  information that you received regarding the issues that
8  Ted Quali complained about? In other words, did -- did
9  anyone corroborate what Ted Quali had told you?
10  A. I'm sure there were conversations in the
11  executive board meetings similar.
12  Q. Okay. So, now, who would have been a part of
13  those conversations?
14  A. The executive board and Ted Quali.
15  Q. Okay. So that would include Ron?
16  A. Yes.
17  Q. That would include Bernie?
18  A. Yes.
19  Q. Okay.
20  A. They were there, yeah.
21  Q. All right. Would that include the deputy
22  commissioner for the police department?
23  A. No, not necessarily.
24  Q. No. Okay.

Page 57

1  And so you had this dinner with Lieutenant
2  Cintron early on in her work at PAL, correct?
3  A. Correct.
4  Q. Okay. How many executive board -- how many
5  executive meetings -- committee meetings had you had
6  prior to having that dinner with Lieutenant Cintron?
7  A. I don't recall.
8  Q. Well, how many do you have in a year?
9  A. I'm really bad at calendars. The calendar
10  tells me where to go and my assistant was great, so I
11  don't know.
12  Q. Okay. But were these quarterly meetings? We
13  know they weren't monthly meetings.
14  A. They weren't monthly. I don't know. Maybe
15  four or five a year. Maybe four. I don't know. As I
16  sit here today without a calendar in front of me, to
17  this day I don't know how many there are.
18  Q. Okay. All right. So, Ms. Rush, my point is
19  simply that you had communications with individuals in
20  the leadership at PAL who advised you that there was
21  some kind of an issue, whether you call it
22  misperceptions, friction, whatever term you want to use,
23  and you received information about that from individuals
24  prior to your meeting with Lieutenant Cintron on that

Page 58

1  evening at The Inn at Penn, correct?
2  A. I will say probably.
3  Q. Okay. And although you cannot recall what you
4  specifically told Lieutenant Cintron, what you're
5  telling us today is that you recall attempting to define
6  the roles of the executive director and the commander of
7  PAL; is that right?
8  A. That was the crux of what we talked about.
9  Because if we had the ability to straighten out the
10  roles and everyone knew what their role was, then there
11  would be more of a partnership and for the good of the
12  children of Philadelphia, we would continue to move
13  forward.
14  Q. Right. But there was already a Memorandum of
15  Understanding pending that was going to address those
16  matters, correct?
17  ATTORNEY GOLDEN: Objection.
18  THE WITNESS: I was not involved in forming the
19  MOU.
20  BY ATTORNEY FITZPATRICK:
21  Q. I didn't ask if you were involved.
22  You've already told us that you were aware that
23  it was forthcoming and -- all right? And it just so
24  happens that you're discussing with Lieutenant Cintron

Page 59

1  some of the very same things that were supposed to be
2  outlined in the Memorandum of Understanding.
3  And so my question is, if those things are
4  going to be outlined in the Memorandum of Understanding,
5  why does she need to have the discussion with you at
6  all?
7  ATTORNEY GOLDEN: Objection. Go ahead.
8  THE WITNESS: Well, first off, what I was
9  discussing was basic. It doesn't need to be in an MOU.
10  It is basic leadership skills and understanding the
11  roles. Whether that was in the MOU or not really wasn't
12  the issue.
13  The issue was my experience as a long-time
14  board member who worked with the commanding officer at
15  PAL before there was an executive director, during an
16  executive director, and then hiring -- not hiring but
17  bringing on someone from the police department who knew
18  they were coming into a position where there wasn't an
19  executive director.
20  I just wanted to make sure that I could be
21  helpful to the lieutenant in understanding what the
22  roles were. Just like there's roles in a district,
23  there's roles in a chain of command, that's what we are
24  in the police world. So the conversation's really just

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 18 of 46

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

Page 60

1  clarifying exactly that. It's no different than if we
2  were talking about a role in a district.
3  BY ATTORNEY FITZPATRICK:
4      Q. Okay. And it would have been your thought that
5  the lieutenant, despite having had -- having had to have
6  received numerous promotions to reach the rank of
7  lieutenant, would have needed for you to explain to her
8  that there was a chain of command?
9      A. I didn't say that she had to understand the
10 chain of command. I said she had to understand a new
11 role that she was coming into that was unlike any other
12 role that she had performed before.
13     Q. Okay. And you said you had given her general
14 leadership advice. Is that -- do I have that right?
15     A. I talked about -- no, I don't believe I said
16 that.
17     Q. Okay. Well, I don't know.
18     ATTORNEY FITZPATRICK: Can we -- I'm sorry,
19 Lisa. Can we go back? I -- honestly, I thought that's
20 what she did say just in her answer to the last
21 question. She said something regarding leadership,
22 didn't she?
23     (Reporter read back the requested testimony.)
24 BY ATTORNEY FITZPATRICK:

Page 61

1      Q. That's what I'm referring to, Ms. Rush. You
2  just said that you were speaking to her regarding basic
3  leadership skills.
4      A. Well, I think that you're taking that out of
5  concept. In my mind, basic leadership skills change as
6  you do new roles. As I got promoted along the way in
7  Philly, as I got promoted along the way at Penn,
8  leadership skills changed depending on the role that you
9  are in.
10     And she did not need any tutoring about being a
11 leader. She was a great leader in the 25th District.
12 She shared all of her leadership skills at the interview
13 and she had proof of her leadership skills. I would in
14 no way insult her about leadership skills.
15     What I meant is that the role of the commanding
16 officer of the police in PAL has a different role than
17 the executive director's role. And when I talk about
18 leadership skills, I'm talking about it in that context.
19     Q. Okay. So you never told her to leave this MOU
20 thing alone, to not concern herself with the MOU? You
21 never told her that in that meeting?
22     A. I don't recall saying anything about that.
23     Q. Can you recall telling her that she could go
24 ahead and, you know, fight, but if she did that then

Page 62

1  things wouldn't go well for her?
2      A. No, I did not say that.
3      Q. And although you had had these discussions with
4  the executive board generally and with Ted Quali
5  directly, it is still your testimony that this meeting
6  that you set up with Ms. Cintron was for the general
7  purpose of a meet-and-greet and not to address all of
8  these issues that you had heard through the executive
9  board and directly from Ted Quali and the MOU that was
10 forthcoming? Is that still your testimony?
11     ATTORNEY GOLDEN: Objection. Go ahead.
12     THE WITNESS: I think my idea of a
13 meet-and-greet and maybe your idea of a meet-and-greet
14 might be a little different. Meet-and-greets are
15 conversations and issues will come up on both sides.
16     What I am saying is it was an opportunity for
17 me to be able to have a meal with a fellow female
18 officer, in her case lieutenant, and we had a lot to
19 talk about about the 25th District. So there was --
20 there were issues like that.
21     And, yes, I was aware of the friction and I was
22 trying to be helpful so she would be successful in the
23 role because I thought she had a lot to offer and would
24 be great in the role and I just wanted to put some

Page 63

1  clarifications person to person, woman to woman, to
2  hopefully be able to clarify any misperceptions or, you
3  know, concerns.
4  BY ATTORNEY FITZPATRICK:
5      Q. Okay. Now, you just said woman to woman. When
6  I asked you earlier if you had told Ms. Cintron that you
7  wanted to speak with her woman to woman, you denied
8  saying that and now you just said it.
9      So were you just saying that for me or are you
10 now remembering that you told Ms. Cintron that you were
11 speaking with her woman to woman?
12     THE WITNESS: Could you read back what I said
13 on the first woman to woman? I don't recall saying
14 that.
15 BY ATTORNEY FITZPATRICK:
16     Q. No.
17     A. Well, then I don't --
18     Q. You just said you --
19     A. I don't recall saying that. I'm a woman.
20 She's a woman. It was a woman-to-woman dinner.
21     Q. That's not my question. My question is, do you
22 recall telling her that you were meeting with her woman
23 to woman?
24     A. I don't recall what I said yesterday. I don't

Page 64

recall.

Q. Okay. And aside from your motivations for why you were discussing the issues brought up by Ted Quali, setting aside those things, can you tell us of any other matter related to PAL that didn't -- that you discussed with Ms. Cintron on that evening that didn't relate to those things -- those complaints from Ted Quali and the misperceptions and so forth?

A. Absolutely. PAL funded a center for PAL where we had a police officer from Philly and a police officer from Penn police who staffed it. It was called the Tucker PAL Center. And I don't recall what location -- when she first came on it might have been that we had just moved it from the Wilson School at 46th and Woodland to 4040 Ludlow Street. It was a small center. The school closed and we -- we had to move the center.

So I was very -- you know, obviously, we were funding that and one of my police officers was assigned there. So I'm sure we talked a lot about -- about the model, because there was no other -- there was no other joint model like that, and I don't believe there still is with PAL and the police department. So I'm sure we talked a lot about that as well.

Q. Okay. So Penn and PAL -- and I may have

Page 65

misunderstood you earlier -- there is some relationship between the University of Pennsylvania and the Police Athletic League, correct?

A. In that we have a relationship informing a board -- not a board -- a center, you know, paying for the center and staffing it with one Penn police officer and they staff it with one Philadelphia officer.

Q. Sure. But -- I'm sorry, Ms. Rush, but you make it seem as though PAL was in the business of doing something else, like they're -- I mean, that's -- that's really the only kind of relationship you could have with PAL, isn't it?

A. I'm sorry. I don't understand your question.

Q. The Tucker PAL Center, that's a PAL center, correct? It's like an actual PAL center; is that right?

A. Correct.

Q. And there are approximately 27 or 30 PAL centers throughout Philadelphia; is that right?

A. Correct.

Q. And that is what PAL is in the business of doing, having PAL centers, correct?

A. Correct.

ATTORNEY GOLDEN: Objection.

BY ATTORNEY FITZPATRICK:

Page 66

Q. So donors who give money to PAL, do they give money for specific centers?

A. Sometimes.

Q. Okay. And would this Tucker Center be an example of that?

A. The Tucker PAL Center was created -- I don't remember what year, but it was endowed by Penn and it was named after Past Police Commissioner Kevin Tucker and PAL -- I'm sorry, Penn endowed that, so it continues to support financially that center.

Q. Right. So this would be an example of a donor earmarking its money for a particular PAL center, correct?

A. I guess that would be correct, yes.

Q. Okay. And so when that would be done, those funds given by that donor, all those funds would go toward the programming at that particular PAL center and the staffing of that particular PAL center; is that correct?

A. The staffing's separate.

Q. Okay.

A. The budget for PAL would have, you know, a line for the Tucker PAL Center because there was an endowment. Police officers are not part of the budget

Page 67

for PAL. Police are put there. They're still paid for out of the city. Same thing. Penn still paid for all the expenses of that officer assigned, so it was really just running the center.

Q. But the -- there's -- is there no civilian personnel at the PAL center?

A. Not all the time, no. Not at times. It's just the officers running it.

Q. Okay. So, in any event, the earmarking of funds by donors, how would that impact your PAL centers generally?

In other words, isn't the result that some PAL centers are, essentially, poor centers; whereas, other centers like the Tucker Center may have, you know, an endowment from someone like the University of Pennsylvania?

ATTORNEY GOLDEN: Objection.

ATTORNEY ULAK: I'll join.

THE WITNESS: The goal is always to have all centers provide the best level of service and care for our children of Philadelphia.

BY ATTORNEY FITZPATRICK:

Q. Well, service and care is one thing. But there is also facilities, there's programming. The way that

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 20 of 46

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

Page 68

1  PAL is funded through these donors it seems that it
2  lends itself to opportunities for built-in disparagement
3  between the centers.  Wouldn't you agree?
4      ATTORNEY GOLDEN:  Objection.
5      THE WITNESS:  No, I would not agree.
6  BY ATTORNEY FITZPATRICK:
7      Q.  Well, the disparities between the centers --
8  again, the Tucker PAL Center, which we'll use as an
9  example, because I take it that you're pretty -- pretty
10  familiar with the Tucker PAL Center.  Is it safe to say
11  that is a well-funded PAL center, wouldn't you agree?
12      ATTORNEY GOLDEN:  Objection.
13      THE WITNESS:  Well, actually, it doesn't exist
14  at the moment because it lost the home there.
15      I would say that the majority of funds are not
16  pointed at any particular center.  They are general fund
17  contributions.  And just like that, we at Penn would
18  contribute.  I would contribute personally to general
19  funds so that all the centers could be cared for in the
20  best possible way.
21  BY ATTORNEY FITZPATRICK:
22      Q.  The funds that would be considered general
23  funds, those are funds that are not earmarked to a
24  particular center, correct?

Page 69

1      A.  Correct.
2      Q.  Thus, general?
3      A.  General.
4      Q.  And then it would be up to the board to
5  determine how to distribute those funds between its
6  nearly 30 PAL centers, correct?
7      A.  Well, the funding doesn't just cover a center.
8  It covers running PAL.  It's personnel, civilian
9  personnel, et cetera, the headquarters.
10      So, yeah, I mean, you're running a large
11  organization and are definitely -- you know, our
12  facilities group is looking to make sure, you know,
13  repairs are made, et cetera, et cetera.  So, you know,
14  it's an -- it's an ongoing issue to ensure that we have
15  the best facilities in the neighborhoods where the
16  children need it the most.
17      Q.  Okay.  And beyond facilities, there's also
18  programming, correct?
19      A.  Yes.
20      Q.  Okay.  And going back to my question before
21  that I was simply pointing out that it's the board's
22  responsibility to figure out how to spend that money in
23  the general fund, correct?
24      A.  Yeah, that's correct.

Page 70

1      Q.  In other words, it's not earmarked.  So it's
2  left to the discretion of the board to determine how to
3  spend that money on the administration of PAL across all
4  of its centers, correct?
5      A.  Yes, it's -- it's going for all sorts of
6  centers, yes.
7      Q.  Right.  And in doing so, there are decisions
8  made concerning which centers receive funding for
9  certain programs and for certain facilities'
10  improvements or repairs and which ones don't, correct?
11      A.  Yes.
12      Q.  Okay.  And were you aware of Lieutenant
13  Cintron's challenging PAL's failure to provide funding
14  to make certain repairs -- necessary repairs at the
15  Wissinoming Center?
16      ATTORNEY GOLDEN:  Objection.
17      THE WITNESS:  I answered this earlier.  I was
18  not aware of that.
19  BY ATTORNEY FITZPATRICK:
20      Q.  Okay.  Well, now.  But before I was asking you
21  about the Wissinoming.  Now I'm asking about Cintron's
22  efforts.
23      Were you aware of any efforts by Lieutenant
24  Cintron to get PAL -- excuse me -- to get PAL to

Page 71

1  disburse the funds that it had in a more even-handed
2  manner so that poor children and minority communities
3  would have PAL centers that were just as nice as the PAL
4  centers in majority communities?  Do you recall any of
5  that discussion?
6      A.  No.
7      ATTORNEY FITZPATRICK:  Okay.  Can we take a
8  two-minute break here?  I think we're just about done,
9  but I'd like to take a quick break.  Is that all right?
10      ATTORNEY GOLDEN:  Can we take five, that way we
11  can use the restroom?
12      ATTORNEY FITZPATRICK:  Yes.
13      (A break was taken 11:38 a.m. to 11:49 a.m.)
14  BY ATTORNEY FITZPATRICK:
15      Q.  So, Ms. Rush, I'd like to just cover a couple
16  of other things with you.
17      One is the Tucker PAL Center.  Now, how is it
18  that the Tucker PAL Center came to be?
19      A.  It was something that the executive vice
20  president at the time, John Fry, worked with my
21  predecessor, Tom Seamon, to -- Tom was a long-time
22  member of PAL, the PAL board -- to honor, you know,
23  Kevin -- Kevin Tucker was -- had left the department as
24  commissioner.  And they just decided they wanted to open

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 21 of 46

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

Page 72

1  a center -- be the first to open a center that would be
2  supported by, not only financially, but supported by
3  having a police officer assigned there.
4      And the first -- the first Tucker PAL was at
5  46th and -- I think it was 46th and Woodland, the Wilson
6  School, until it closed. The school closed. Then we
7  moved it over to the Elwyn Institute at an annex at 4040
8  Ludlow. And then that was sold.
9      And so PAL has been trying to find an
10 appropriate home for the Tucker PAL Center. So it's
11 kind of grouped into another center at the moment.
12     Q. Right. But the Tucker PAL Center -- it sounds
13 like that's the University City type area.
14     A. Yeah, but it wasn't -- we don't have -- we
15 wanted to be able to support the kids that lived west of
16 University City and that's why the original PAL center
17 was at 46th and Woodland.
18         PAL looks at centers -- locations to where they
19 can best serve children where there are holes in that
20 service. So that was totally up to PAL to put the
21 center where they wanted it.
22     Q. Okay. All right. Because -- and that's
23 exactly the -- the thrust of my question is that I'm
24 familiar with that area and there aren't a whole bunch

Page 73

1  of kids over there.
2      A. Exactly. Exactly.
3      Q. Okay. So -- okay. But at any rate, what
4  you're telling us is that this center, the Tucker PAL
5  Center, that was something that was in the works before
6  your participation on the PAL board?
7      A. Correct.
8      Q. All right. But had it been completed prior to
9  your participation on the PAL board?
10     A. No, it had not. I had not been on the board
11 yet, no.
12     Q. Okay. So is it fair to say that this was
13 completed during your participation on the PAL board?
14     A. No. Actually, it was started and in motion at
15 46th and Woodland before I became a member of the PAL
16 board.
17     Q. Okay. So Tucker PAL had already began prior to
18 you being on the PAL board?
19     A. That's correct.
20     Q. It was just at the 46th and Woodland location?
21     A. Correct.
22     Q. And while you were on the PAL board you got it
23 moved to the 4040 Ludlow location?
24     A. I didn't get it moved. I was -- it was still

Page 74

1  there when I joined the board, because I joined the
2  board as -- when I was promoted to vice president, and
3  so Tom Seamon left and I ended up taking his position on
4  the board.
5      The Tucker PAL was at 46th and Woodland and
6  happily there until the School District of Philadelphia
7  shut the building down and we were evicted. So we had
8  to find someplace to put the PAL center in a proximity
9  close enough that we could still have the same children
10 coming to the center.
11     Q. Right. I'm just asking, were you on the PAL
12 board when that all happened?
13     A. When -- when the school shut down?
14     Q. Yeah. When you went from 46th and Woodland to
15 4040 Ludlow, were you on the PAL board when that
16 happened?
17     A. Yes, I was.
18     Q. Okay. All right. Were there any other PAL
19 officials on the PAL board when that happened?
20     A. No.
21     Q. Okay. And how long did that PAL center stay
22 open?
23     A. I'd be guessing. I would say a couple years.
24 And then we were notified that the Elwyn Institute was

Page 75

1  leaving and we were able to stay until a developer said
2  that they needed us to move out.
3      Q. Okay. But were they servicing kids at that
4  location?
5      A. Um-hum. Very much so.
6      Actually, there are town homes at 40th and
7  Market and there were a lot of children there that were
8  served. And then we would transport kids who had been
9  over at 46th and Woodland. PAL donated -- I'm sorry.
10 Penn donated a van for PAL marked as PAL and they would
11 transport the kids who were part of the Tucker PAL at
12 46th and Woodland so they would still be part of the
13 center.
14     Q. Were there other PAL centers that bussed the
15 kids to the PAL center?
16     A. Sometimes, yeah.
17     Q. All right. That strikes me as a bit odd for a
18 PAL center, because my understanding is that typically
19 PAL centers, they're kind of like community centers and
20 they draw from the walking -- the walking children
21 within that community.
22      Are you telling me that's not the case?
23     A. That is -- that is the normal case and that is
24 the utopia of what we look for. We want to have

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 22 of 46

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

Page 76

1  children have a safe place to do homework, walk in off
2  the street.
3       And sometimes centers get shut down and that
4  has to -- you know, we don't own them.  We're leasing as
5  a PAL company and we do the very best we can to get
6  property in the neighborhood where the children need to
7  be served.
8       Q.  Okay.  On the -- speaking of that and the
9  facilities, at the time -- do you recall that at the
10 time that Lieutenant Cintron comes to PAL there was a
11 four-year backlog of emergency repairs required to be
12 made at various centers?  Do you recall that?
13      A.  I do not.
14      Q.  You don't recall any backlog for repairs or am
15 I just wrong about the number, like, you recall a
16 three-year number and I said four or is it that you
17 don't recall this issue at all?
18      A.  I don't recall.
19      Q.  You don't recall the issue at all?
20      A.  I don't recall.
21      Q.  Okay.  And so when PAL would pick up children
22 to participate in the PAL program at the PAL center, how
23 does -- how does that -- how does that work?
24 Logistically, how does that work?

Page 77

1       A.  I don't understand your question.
2       Q.  I'm saying that you just told us that in the
3  case of the Tucker PAL Center, and even in the case of
4  some other PAL centers, PAL picks up the children and
5  they bring the children to the PAL center to participate
6  in the program.
7       In a perfect world the children could walk to
8  the PAL center.  But you said that in some cases PAL
9  picks up the children and brings them to the PAL center
10 to participate in the program.
11      And what I'm asking you is, logistically, how
12 would that work?
13      A.  Well, there's -- there's times that the
14 children are transported to -- for example, they were
15 always welcome to Penn Relays.  We had -- Penn hosted
16 the citywide PAL Day at the Pulaski for basketball.
17      Q.  Okay.
18      A.  And PAL centers would take their -- they all
19 had vans and they would transport their kids.  So they
20 would all participate equally in the fun.
21      We did the ice rink.  There were other events
22 around the city where the kids would be transported.
23 And that wasn't that unusual, actually, and logistically
24 it works.

Page 78

1       Q.  Well, just so that we're clear -- because I
2  don't want to misunderstand you and I don't want you to
3  mislead me -- there's a difference between special
4  programming like going to Penn Relays or going to a
5  tournament or going to an event.  There's a difference
6  between that and the regular Monday through Friday,
7  Monday through Thursday playing basketball at the PAL
8  center.  There's a difference between the two.
9       And what I understood you to tell me earlier is
10 that PAL would bus children to participate at the actual
11 PAL center and the regular PAL activities.  Is that what
12 you were telling me or were you telling me about bussing
13 for special events?
14      A.  Well, first off, we don't bus them.  We have
15 very nice 12-person vans.
16      Secondly, not all kids -- when the Wilson
17 School closed, some of the children were absorbed in a
18 closer center to them.  Other children would have to
19 come to the current location for Tucker PAL.  That was
20 never meant to be a full-time location for the Tucker
21 PAL center.
22      But having no center, having somewhere to take
23 the children and make sure they had a continuity of
24 care and knowledge of the police officers that are

Page 79

1  almost like their parents, that was a temporary solution
2  to any child who -- we weren't going to have children
3  walking anywhere.  Even -- even in the centers that are
4  close, there are issues around children being scared to
5  walk around, especially today.
6       So this was a quick shutdown of a school.  We
7  needed to do something for the children.  We were able
8  to get a quick rental and we continually to this day try
9  to look for a center where the Tucker PAL can get a
10 permanent home or be together with another center that
11 would be -- that would serve a similar demographic.
12      Q.  Okay.  I'm afraid that's not responsive to my
13 question.  My question is -- I understand that children
14 are bussed to special PAL events; Penn Relays,
15 tournaments, things of that nature.  Those are meet at
16 the PAL center -- just so that you know, I was a PAL kid
17 once myself.  Meet at the PAL center early in the
18 morning, we get on those nice PAL vans, and you might go
19 someplace, okay?  That's different from the regular
20 day-to-day PAL programming, after school, homework,
21 playing basketball.  That's different.
22      Are you telling us that children were taken in
23 vans to the PAL center to participate in the regular PAL
24 day-to-day activities?

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 23 of 46

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

Page 80

A. So I'm not arguing with you that they're different, number one. What I'm saying to you was the distance between where the Tucker PAL was at 46th and Woodland and where the temporary location was at 4040 Ludlow necessitated the officers assigned to the Tucker PAL center to identify students that wanted to still come to be part of the Tucker PAL center, to be part of that officer's cadre, and they transported those students after school who wanted to come and made sure they were transported back safely to their homes. And, again, it's not -- not utopia, but better than having them not have a place to go.

Q. And my question to you originally was, logistically, how would that transportation work? And that's when you started talking about Penn Relays. I'm not talking about Penn Relays. I'm talking about these officers of yours who you say would go get students so that they could continue to participate in the regular PAL program. Logistically, how would that work? Are they picking these kids up at their homes? Are they picking them up at the school? Do they have permission slips from their parents? How does it work?

A. Well, I'm not that deep into the logistics of that. That is something that the -- police

Page 81

commanding officer of the police officers assigned to PAL would work out.

Q. In fact, Ms. Rush, you have never seen any student or any child be transported to a PAL center for regular PAL activities, have you?

ATTORNEY GOLDEN: Objection. Go ahead.

THE WITNESS: Have I seen or have I --

BY ATTORNEY FITZPATRICK:

Q. Have you seen it? Have you seen it?

A. I haven't seen it but I have heard of.

Q. So -- but you've heard -- you've heard of it; is that what you're saying?

A. Yes.

Q. But although you've heard of it, you have no idea logistically how it works, correct?

A. I am not the logistical person for transportation of PAL students, correct.

Q. Right. But you would, obviously, understand that safety and security would be a concern, correct?

ATTORNEY GOLDEN: Objection.

THE WITNESS: It's our highest concern.

BY ATTORNEY FITZPATRICK:

Q. Okay. And so although safety and security is your highest concern, and what you've just described to

Page 82

me was police officers being able to go into neighborhoods where the PAL center is not located but pick up children and transport them to the PAL center although temporarily, you don't know how that was done logistically? You don't know what your exposure was in terms of insurance, whether there were permission slips? You don't know anything about that; is that what you're telling me?

ATTORNEY GOLDEN: Objection. Go ahead.

THE WITNESS: I said I am not -- I don't direct the logistics. The commanding officer of PAL would be responsible to work with their officers to make sure the children are safely transported.

BY ATTORNEY FITZPATRICK:

Q. Okay. So then would it surprise you that the commanding officer, Lieutenant Cintron, says that that is not something that PAL ever did?

ATTORNEY GOLDEN: Objection.

THE WITNESS: I have no idea what she knows or doesn't know.

BY ATTORNEY FITZPATRICK:

Q. Well, where did you hear that this was happening? Where do you get your information?

A. At board meetings.

Page 83

Q. At board meetings.

So who at a board meeting told you that children were being bussed to the PAL -- not bussed, because you don't like that term, right -- so vanned to the PAL center in the nice vans for their regular PAL activities? Who told you that? Who reported that at a board meeting?

A. Some centers would be closed for repairs and the children would be grouped with other centers. It wasn't often, but it happened. And who specifically told me that? I have no idea.

Q. You have no idea because you just made that up, didn't you?

ATTORNEY GOLDEN: Objection.

THE WITNESS: I'm insulted by that question. I have a passion for PAL centers.

BY ATTORNEY FITZPATRICK:

Q. You don't know who told you. You don't know how it's done, correct? You've never seen it done.

You said the commanding officer would be responsible for doing it. I just told you the commanding officer says that it's not done and you're insulted by the insinuation that you made that up?

ATTORNEY GOLDEN: Objection.

Page 84

THE WITNESS: I have no answer to that other than what I've told you five times.

BY ATTORNEY FITZPATRICK:

Q. Last question. There was -- you said there was a meet-and-greet -- this meet-and-greet meeting that you had with Lieutenant Cintron, the dinner, but there was actually a meet-and-greet with Lieutenant Cintron prior to that dinner at your office where you introduced her to the staff; isn't that right?

A. In my conference room, yes.

Q. Okay. So you led us to believe that this meeting -- this dinner meeting was a meet-and-greet and now you're telling me that you had actually previously had a meet-and-greet with her.

ATTORNEY GOLDEN: Objection.

THE WITNESS: The first meeting was with her staff and my staff. It was very high level and it was just to introduce her to what our officers do with the PAL and with Tucker PAL.

The second meeting, the dinner, was a one-on-one meet-and-greet, which was very different -- a different level of communication at that meeting.

BY ATTORNEY FITZPATRICK:

Q. You defined it as the first meeting and the

Page 85

second meeting. But you had numerous opportunities and occasions to meet with Ms. Cintron prior to that dinner meeting; isn't that right?

A. I'm sorry. Did I have an opportunity, are you saying?

Q. Did you actually meet with her on numerous occasions prior to that dinner meeting? At board meetings, did you see her at board meetings?

A. I saw her. I didn't have conversations with her. I didn't sit down and have a meal with her.

Q. I know there's only one time that you had a meal. I'm simply saying that that wasn't the first time that you met her at dinner. That wasn't the first time meeting her, correct?

A. Correct.

Q. Right. And it wasn't the second time meeting her because we know that you had the meet-and-greet with your office. So you at least had met her on that occasion; yes?

A. Yes.

Q. And you had at least seen her during the interview process, correct?

A. Yes.

Q. And there had been multiple board meetings

Page 86

where you had been in her presence, correct?

ATTORNEY GOLDEN: Objection.

THE WITNESS: I don't know specifically how many board meetings, so I can't say yes or no.

BY ATTORNEY FITZPATRICK:

Q. Well, you presented this as a meet-and-greet that you would do for anyone who is new to a position and coming in and taking over a position. That -- that's how you described this meeting -- this dinner meeting with Lieutenant Cintron, correct?

A. And I still stand by that.

Q. Okay. And I'm simply pointing out that this wasn't her first week on the job that you had this dinner meeting with her for a meet-and-greet, was it?

A. Correct.

Q. Right. She was -- she was well into her time there; is that correct?

A. She was still --

ATTORNEY GOLDEN: Objection.

THE WITNESS: She was still early in her time there.

BY ATTORNEY FITZPATRICK:

Q. Define early.

A. I don't know. I don't even know when she

Page 87

started and I don't even know when the dinner was, but it felt early with me.

And perhaps the word meet-and-greet is what's confusing to you. Because to me, meet-and-greet is where you can really get down and talk to people as opposed to meeting people at board meetings, meeting people in meetings, corporate meetings. There's that and then there's a one-on-one dinner.

So I apologize if my designation of this was a meet-and-greet as opposed to let's have dinner and get to know each other better.

Q. You -- that dinner was a woman-to-woman meeting, that's what that dinner was, isn't it? That's what that dinner was?

A. That dinner was a person-to-person meeting who happened to be two woman who had some shared experiences in life.

ATTORNEY FITZPATRICK: Okay. Thank you so much, Ms. Rush. I don't have any other questions for you at this time.

Mr. Golden might have some questions.

ATTORNEY GOLDEN: Sharon, do you have any questions?

ATTORNEY ULAK: Yeah, I actually do have a

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 25 of 46

Deposition of Maureen Rush                                   Evelyn Cintron v. City of Philadelphia, et al.

Page 88

1  couple of questions. I actually really only have one
2  though.
3           EXAMINATION
4  BY ATTORNEY ULAK:
5     Q. Ms. Rush --
6        ATTORNEY ULAK: Well, maybe it's a couple of
7  questions. I'm sorry.
8  BY ATTORNEY ULAK:
9     Q. Ms. Rush, I want to go back to this dinner
10 that's been the subject of so much debate today. Do you
11 recall approximately what -- like, do you recall the
12 year in which this dinner occurred?
13    A. I've got to tell you, no. I mean, it was -- it
14 was the year she was first on board, whatever year that
15 was.
16    Q. Okay. Do you happen to recall who the deputy
17 commissioner who would have been overseeing PAL was at
18 the time of the dinner?
19    A. I believe -- I believe it was Joe Sullivan.
20       ATTORNEY ULAK: Okay. Thank you.
21       ATTORNEY GOLDEN: No questions on my part.
22       ATTORNEY FITZPATRICK: Okay. Thank you very
23 much. That's all I have.
24              * * * *

Page 89

1        ATTORNEY GOLDEN: Ms. Miller, can we order a
2  copy? It's kgolden, g-o-l-d-e-n, at ohagenmayer.com.
3        You know what, send me an e-mail and just reach
4  out to me and let me think about that and then I'll
5  confirm my answer once I have some time to think about
6  it.
7        ATTORNEY ULAK: Ms. Miller, I also would like
8  to request a copy of the transcript. I want full only,
9  electronically. My e-mail address is Sharon,
10 s-h-a-r-o-n, dot, ulak@phila.gov.
11       ATTORNEY FITZPATRICK: I will need before
12 Thanksgiving. Full size at -- you have my e-mail
13 already.
14              * * * *
15       (Deposition concluded)
16
17
18
19
20
21
22
23
24

```
 1   COUNTY OF LANCASTER        :
                                      SS
 2   COMMONWEALTH OF PENNSYLVANIA:

 3

 4              I, Lisa L. Miller, RPR, a Notary Public of

 5   the Commonwealth of Pennsylvania, County of Lancaster,

 6   do hereby certify that the foregoing was taken

 7   stenographically by me on November 3, 2023, and that

 8   this transcript is a true and correct transcript of the

 9   same, fully transcribed under my direction, to the best

10   of my ability and skill.

11              I further certify that I am not a relative

12   or employee of any of the parties in this action; that I

13   am not a relative or employee of any attorney in this

14   action; and that I am not financially interested in the

15   event of this action.

16              As witness my hand and Notarial Seal this

17   17th day of November 2023.

18

19                     _____
                        Lisa L. Miller, Notary Public
20
                        Notary Public in and for the
21                      Commonwealth of Pennsylvania

22                      My Commission expires:  6/26/2024

23

24
```

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 27 of 46

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

## WORD INDEX

**< 1 >**
**10:08** 4:*1*
**100** 7:*8* 8:*1*
**11:38** 71:*13*
**11:49** 71:*13*
**12-person** 78:*15*
**1500** 8:*15*
**1515** 2:*14*
**16** 10:*13*
**1717** 2:*8*
**17th** 2:*14* 90:*2*
**1818** 2:*3*
**19** 10:*13*
**19102** 2:*15*
**19103** 2:*4, 9*
**19-4078** 1:*4*
**1976** 7:*8, 23* 8:*2*
34:*11* 35:*15*
**1994** 7:*11* 8:*5, 10*

**< 2 >**
**20** 41:*20*
**2000** 7:*18, 19* 8:*22*
9:*14*
**2001** 7:*21*
**2016** 10:*12* 16:*1*
17:*22* 45:*2*
**2017** 10:*12*
**2021** 6:*3* 7:*22*
**2022** 6:*4, 6*
**2023** 1:*7* 90:*2*
**215.461.3300** 2:*9*
**215.683.5083** 2:*15*
**215.882.3443** 2:*5*
**25th** 7:*9* 15:*7* 27:*9,
10* 61:*11* 62:*19*
**26** 50:*16*
**27** 43:*13* 65:*17*

**< 3 >**
**3** 1:*7* 90:*2*
**30** 65:*17* 69:*6*
**34** 37:*18*
**3402** 2:*4*
**3600** 20:*15*
**3910** 2:*8*

**< 4 >**
**4** 3:*3*
**4040** 64:*15* 72:*7*
73:*23* 74:*15* 80:*4*
**40th** 75:*6*
**45** 7:*6*
**46th** 64:*14* 72:*5, 17*
73:*15, 20* 74:*5, 14*
75:*9, 12* 80:*3*

**< 5 >**
**501(c)(3** 14:*15* 15:*14*

**< 6 >**
**6/26/2024** 90:*22*

**< 8 >**
**88** 3:*4*

**< 9 >**
**94** 7:*14*
**96** 7:*14, 15*
**99** 34:*12*

**< A >**
**a.m** 4:*1* 71:*13*
**ability** 58:*9* 90:*2*
**able** 53:*14* 55:*11, 14*
62:*17* 63:*2* 72:*15*
75:*1* 79:*7* 82:*1*
**Absolutely** 17:*2* 32:*5*
64:*9*
**absorbed** 78:*17*
**accomplishments**
37:*12*
**Action** 1:*4* 90:*2*
**active** 9:*21*
**activities** 78:*11*
79:*24* 81:*5* 83:*6*
**actual** 13:*10, 14*
65:*15* 78:*10*
**ad** 23:*2*
**addition** 46:*24*
**additional** 31:*13*
**address** 32:*1* 50:*17*
58:*15* 62:*7* 89:*9*
**addressed** 32:*12*
40:*21*
**addressing** 31:*20, 22*
**administration** 70:*3*

**advice** 34:*19, 24*
35:*4, 18* 37:*1* 60:*14*
**advise** 39:*9*
**advised** 57:*20*
**advisor** 6:*4*
**affiliation** 9:*1*
**affirmative** 26:*13*
**affirmed** 4:*8*
**afraid** 79:*12*
**agenda** 24:*9* 28:*21,
23* 29:*12*
**ago** 27:*5* 41:*20*
**agree** 42:*21* 43:*14*
68:*3, 5, 11*
**ahead** 29:*1* 35:*20*
40:*8* 43:*16* 44:*17*
45:*6* 47:*22* 48:*4, 11*
49:*21* 51:*2* 52:*14*
59:*7* 61:*24* 62:*11*
81:*6* 82:*9*
**al** 1:*6*
**allotment** 18:*2*
**allow** 5:*16* 26:*17*
**alongside** 41:*10, 24*
42:*1, 5, 10*
**annex** 72:*7*
**answer** 5:*13, 17* 31:*5,
6* 41:*6* 50:*20* 51:*13*
60:*20* 84:*1* 89:*5*
**answered** 51:*12*
53:*22* 70:*17*
**answering** 26:*12*
**answers** 5:*14*
**apologies** 49:*14*
**apologize** 87:*9*
**apparently** 23:*22*
**APPEARANCES** 2:*1*
**appeared** 37:*23*
**appointed** 7:*15, 20*
**appropriate** 72:*10*
**Approximately** 5:*4*
65:*17* 88:*11*
**Arch** 2:*8, 14*
**area** 72:*13, 24*
**arguing** 80:*1*
**aside** 35:*17* 46:*8*
64:*2, 4*
**asked** 9:*4, 12* 52:*17*
63:*6*

**advice** ... (continued column)
**asking** 5:*10, 11*
11:*22, 24* 13:*9, 12, 13*
19:*7, 8, 9, 18* 21:*20*
26:*5, 8* 35:*3* 40:*16*
42:*21* 43:*17* 50:*14*
53:*3, 4, 9* 54:*11, 12,
13, 15* 70:*20, 21*
74:*11* 77:*11*
**aspects** 14:*20*
**assigned** 7:*9* 14:*16*
15:*10* 16:*9* 36:*3*
38:*23* 42:*11* 64:*18*
67:*3* 72:*3* 80:*5* 81:*1*
**assignment** 7:*12*
13:*11, 15* 16:*16*
27:*13* 29:*10* 32:*4*
34:*23* 35:*1* 39:*2*
**assignments** 10:*8, 9*
12:*1* 17:*12*
**assistant** 21:*2, 17*
24:*3, 11, 14, 17* 57:*10*
**associated** 26:*2*
**assume** 9:*4* 17:*3*
47:*14*
**assure** 26:*19*
**Athlete** 8:*24* 9:*1*
**Athletic** 8:*21* 9:*13,
21* 10:*21* 11:*11*
12:*19* 15:*17* 16:*10*
39:*15* 65:*3*
**attached** 20:*14*
**attempting** 25:*6* 58:*5*
**Attorney** 3:*3, 4* 4:*11,
17, 19* 29:*1, 17* 35:*20,
21* 40:*8, 15* 41:*4, 5, 6,
23* 42:*18* 43:*2, 11, 16,
21* 44:*17, 24* 45:*6, 10,
19, 22* 47:*22, 24* 48:*4,
6, 11, 17* 49:*21* 50:*1*
51:*2, 11* 52:*14* 53:*2,
18, 19* 58:*17, 20* 59:*7*
60:*3, 18, 24* 62:*11*
63:*4, 15* 65:*23, 24*
67:*17, 18, 22* 68:*4, 6,
12, 21* 70:*16, 19* 71:*7,
10, 12, 14* 81:*6, 8, 20,
22* 82:*9, 14, 18, 21*
83:*14, 17, 24* 84:*3, 15,
23* 86:*2, 5, 19, 22*
87:*18, 22, 24* 88:*4, 6,*

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 28 of 46

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

*8*, *20*, *21*, *22*  89:*1*, *7*, *11*  90:*2*
attributed  19:*1*
aware  16:*22*  17:*18*  29:*21*  30:*1*, *23*  31:*8*  36:*5*  39:*12*, *17*, *18*, *22*  40:*23*, *24*  47:*8*, *15*  49:*9*, *15*, *16*, *17*  52:*4*, *18*, *23*  58:22  62:*21*  70:*12*, *18*, *23*

< B >
back  7:*23*  8:*18*  10:*12*  16:*1*  17:22  26:*17*  33:*3*  60:*19*, *23*  63:*12*  69:*20*  80:*10*  88:*9*
backlog  76:*11*, *14*
bad  57:*9*
basic  59:*9*, *10*  61:*2*, *5*
basically  36:*22*  37:*15*  52:*2*
basing  41:*22*
basis  47:*6*, *10*, *13*, *19*  53:*24*
basketball  77:*16*  78:*7*  79:*21*
becoming  12:*18*  13:*21*
began  28:*10*  73:*17*
believe  8:22  10:*4*  17:*24*  20:*16*  23:*5*  25:*8*  36:*2*  38:*8*  41:*13*  43:*5*  44:*10*, *20*, *23*  49:*7*  60:*15*  64:*21*  84:*11*  88:*19*
believed  30:*13*
Bernie  13:*4*  26:*6*  44:*11*  45:*4*, *7*, *11*  47:*18*  49:*10*  56:*17*
best  27:*6*  67:*20*  68:*20*  69:*15*  72:*19*  76:*5*  90:*2*
better  24:*10*  29:*4*  80:*11*  87:*11*
Beyond  33:*8*  54:*22*  69:*17*
Bill  48:*23*
bit  22:22  41:*19*

75:*17*
bite  22:*13*
block  20:*15*
board  6:*10*, *12*, *15*  7:*21*  8:*22*, *24*  9:*4*, *13*, *18*, *19*, *21*  10:*1*, *2*, *4*, *17*, *20*, *23*  11:*1*, *3*  12:*4*, *9*, *17*, *23*  14:*14*, *21*  15:*1*, *8*, *9*, *22*  16:*19*  22:*16*  23:*17*  25:*17*  26:*22*  27:*14*  28:*16*  29:*7*  35:*11*  36:*22*, *23*  37:*3*, *8*, *11*  38:*1*, *13*  41:*11*  42:*8*, *12*, *23*  43:*6*, *10*, *19*  44:*8*, *22*, *23*  45:*24*  46:*2*, *6*, *7*, *8*, *24*  47:*8*  48:*14*, *16*  50:*2*, *16*  51:*1*, *4*, *6*, *16*  52:*1*, *5*, *9*, *10*, *20*  53:*10*, *13*  54:*4*, *9*, *17*, *18*, *22*  55:*15*  56:*11*, *14*  57:*4*  59:*14*  62:*4*, *9*  65:*5*  69:*4*  70:*2*  71:*22*  73:*6*, *9*, *10*, *13*, *16*, *18*, *22*  74:*1*, *2*, *4*, *12*, *15*, *19*  82:*24*  83:*1*, *2*, *7*  85:*7*, *8*, *24*  86:*4*  87:*6*  88:*14*
boards  10:*18*  22:*12*  51:*3*
board's  69:*21*
boss  6:*5*  9:*2*, *7*, *9*
boys  26:*14*
break  5:*15*, *18*  19:*5*  71:*8*, *9*, *13*
briefly  7:*3*
bring  32:*7*, *16*  77:*5*
bringing  59:*17*
brings  77:*9*
brought  32:*9*, *11*, *15*, *18*  64:*3*
budget  18:*14*, *17*  66:*22*, *24*
budgeted  19:*11*
budgeting  18:*1*, *11*
budget's  10:*22*
building  74:*7*
built-in  68:*2*

bunch  72:*24*
bus  78:*10*, *14*
business  65:*9*, *20*
bussed  75:*14*  79:*14*  83:*3*
bussing  78:*12*

< C >
cadre  80:*8*
calendar  57:*9*, *16*
calendars  57:*9*
call  4:*16*, *18*  23:*20*  57:*21*
called  4:*8*  20:*17*  64:*11*
calls  55:*3*
capital  18:*15*
captain  23:*11*  37:*20*
care  67:*20*, *23*  78:*24*
cared  68:*19*
career  7:*2*, *7*
Carnaroli  6:*24*
C-a-r-n-a-r-o-l-i  6:*24*
case  4:*16*  14:*13*  23:*17*  34:*22*  43:*9*  62:*18*  75:*22*, *23*  77:*3*
cases  77:*8*
center  12:*2*  17:*19*  18:*3*, *6*  50:*15*  54:*7*  64:*9*, *12*, *15*, *16*  65:*5*, *6*, *14*, *15*  66:*4*, *6*, *10*, *12*, *17*, *18*, *23*  67:*4*, *6*, *14*  68:*8*, *10*, *11*, *16*, *24*  69:*7*  70:*15*  71:*17*, *18*  72:*1*, *10*, *11*, *12*, *16*, *21*  73:*4*, *5*  74:*8*, *10*, *21*  75:*13*, *15*, *18*  76:*22*  77:*3*, *5*, *8*, *9*  78:*8*, *11*, *18*, *21*, *22*  79:*9*, *10*, *16*, *17*, *23*  80:*6*, *7*  81:*4*  82:*2*, *3*  83:*5*
centers  16:*9*  18:*9*, *13*, *19*, *23*  19:*1*, *9*, *12*  65:*18*, *21*  66:*2*  67:*10*, *13*, *14*, *20*  68:*3*, *7*, *19*  69:*6*  70:*4*, *6*, *8*  71:*3*, *4*  72:*18*  75:*14*, *19*  76:*3*, *12*  77:*4*, *18*  79:*3*  83:*8*, *9*, *16*
certain  70:*9*, *14*

certainly  14:*6*  37:*24*  54:*3*
certification  4:*5*
certify  90:*2*
cetera  69:*9*, *13*
chain  39:*6*  50:*4*  52:*10*  59:*23*  60:*8*, *10*
chair  11:*1*  44:*20*  45:*13*, *14*, *15*  50:*21*  51:*4*, *16*, *22*  52:*1*
challenging  70:*13*
change  61:*5*
changed  52:*21*, *24*  61:*8*
changes  46:*19*
changing  17:*13*
Chief  6:*3*, *19*, *20*  7:*5*, *15*, *16*
child  79:*2*  81:*4*
children  16:*24*  38:*15*  58:*12*  67:*21*  69:*16*  71:*2*  72:*19*  74:*9*  75:*7*, *20*  76:*1*, *6*, *21*  77:*4*, *5*, *7*, *9*, *14*  78:*10*, *17*, *18*, *23*  79:*2*, *4*, *7*, *13*, *22*  82:*3*, *13*  83:*3*, *9*
Christmas  42:*13*
CINTRON  1:*4*  4:*15*, *18*  12:*18*  13:*11*, *18*, *21*, *24*  15:*24*  19:*15*, *16*, *19*  20:*1*, *4*, *6*  22:*6*  23:*19*, *24*  24:*23*  25:*1*, *20*  26:*2*, *5*, *16*  31:*15*, *19*  33:*1*, *13*  35:*18*, *23*  39:*5*, *9*, *19*, *24*  41:*3*, *9*  42:*5*  48:*2*, *19*  52:*12*, *16*, *23*  53:*8*  54:*5*  55:*19*  56:*2*  57:*2*, *6*, *24*  58:*4*, *24*  62:*6*  63:*6*, *10*  64:*6*  70:*24*  76:*10*  82:*16*  84:*6*, *7*  85:*2*  86:*10*
Cintron's  33:*12*, *21*  70:*13*, *21*
CITY  1:*6*  2:*12*, *16*  7:*9*  67:*2*  72:*13*, *16*  77:22
citywide  77:*16*
Civil  1:*4*

civilian  14:*13*, *23*
16:*19*  35:*9*  39:*15*
67:*5*  69:*8*
clarifications  63:*1*
clarify  63:*2*
clarifying  60:*1*
clear  11:*24*  13:*9*
14:*4*  38:*6*, *22*  42:*20*
78:*1*
clearly  53:*23*
close  74:*9*  79:*4*
closed  18:*20*, *23*
19:*10*  64:*16*  72:*6*
78:*17*  83:*8*
closely  7:*17*  16:*13*
42:*16*
closer  78:*18*
clue  40:*11*
coincidence  40:*20*
collaboration  16:*4*
collaborative  16:*20*
come  9:*12*  16:*12*
17:*17*  25:*16*  26:*20*
32:*5*, *12*, *14*  34:*1*
62:*15*  78:*19*  80:*7*, *9*
comes  76:*10*
coming  20:*24*  30:*12*
37:*8*  41:*16*  59:*18*
60:*11*  74:*10*  86:*8*
command  39:*6*
52:*10*  59:*23*  60:*8*, *10*
commander  12:*18*
13:*12*, *21*  14:*1*, *15*, *24*
27:*17*  28:*20*  29:*18*
30:*5*, *10*  31:*9*  35:*19*
58:*6*
commanders  41:*12*
commanding  11:*11*
14:*2*, *12*, *19*  15:*24*
16:*2*, *13*, *14*, *15*, *16*
17:*9*  23:*11*  25:*17*
29:*8*  30:*12*, *15*  34:*23*
35:*7*, *8*  36:*9*  37:*10*,
*23*  38:*21*  39:*1*  40:*18*
41:*15*, *20*, *21*  42:*10*,
*17*  48:*9*, *14*  59:*14*
61:*15*  81:*1*  82:*11*, *16*
83:*20*, *22*
Commission  90:*22*

commissioner  8:*11*,
*18*  15:*2*  23:*12*  26:*7*
37:*17*  39:*5*, *10*  56:*22*
66:*8*  71:*24*  88:*17*
commissioner's  37:*21*
committee  9:*23*  10:*7*,
*17*  11:*23*  12:*10*, *12*,
*14*  17:*22*  22:*20*
23:*10*  43:*23*  44:*1*
46:*10*, *15*, *16*, *17*, *18*,
*22*  47:*1*, *2*  50:*7*, *9*, *11*,
*21*  51:*6*, *23*, *24*  57:*5*
committees  9:*16*
10:*9*, *14*  22:*17*  52:*1*
common  27:*9*
COMMONWEALTH
90:*2*, *21*
communicate  50:*2*,
*24*  51:*20*  53:*10*, *17*
54:*3*, *15*  55:*12*, *14*
communicated  54:*5*
communicates  53:*13*
communicating  51:*17*
53:*23*  54:*1*
communication  50:*4*
51:*7*  52:*5*, *9*, *15*  53:*4*
55:*7*, *8*, *24*  84:*22*
communications  51:*5*
54:*12*  57:*19*
communities  71:*2*, *4*
community  11:*4*
17:*1*  27:*11*  75:*19*, *21*
company  76:*5*
complained  56:*8*
complaints  61:*4*
completed  73:*8*, *13*
completely  36:*20*
concept  61:*5*
concern  61:*20*  81:*19*,
*21*, *24*
concerning  39:*14*
70:*8*
concerns  55:*23*  63:*3*
concluded  89:*15*
condition  18:*6*, *9*, *20*,
*24*  19:*2*
conditions  17:*18*
conference  4:*18*
84:*10*

confirm  89:*5*
confused  22:*23*
confusing  87:*4*
considered  68:*22*
consistent  47:*19*
contemporaneous  6:*9*
context  61:*18*
continuality  78:*23*
continually  79:*8*
continue  58:*12*  80:*18*
continues  66:*9*
contribute  68:*18*
contributions  68:*17*
control  37:*16*
conversation  21:*23*
25:*9*  28:*10*  29:*11*
32:*17*  33:*19*  34:*14*
39:*8*  41:*22*  54:*19*
55:*22*  56:*1*, *6*
conversations  32:*6*
56:*10*, *13*  62:*15*  85:*9*
conversation's  59:*24*
convoluted  53:*6*
cooperatively  37:*7*
38:*11*
copy  89:*2*, *8*
corporate  87:*7*
correct  4:*19*, *20*  8:*4*
9:*11*  13:*16*, *19*  15:*14*,
*15*, *19*, *23*  16:*3*  17:*1*,
*7*, *8*, *11*, *15*, *16*, *23*
21:*7*, *11*, *19*  24:*24*
28:*5*, *6*, *9*  29:*19*, *20*,
*22*  30:*5*  31:*23*  33:*9*,
*10*, *24*  34:*19*  35:*1*, *2*
37:*4*  38:*23*, *24*  39:*2*,
*3*, *6*, *7*  43:*15*, *23*, *24*
44:*6*, *7*  45:*5*, *18*
46:*10*, *11*  47:*5*  48:*10*,
*20*, *21*  49:*2*  50:*7*, *8*, *9*,
*10*, *12*, *13*  55:*12*, *15*,
*16*  56:*3*  57:*2*, *3*  58:*1*,
*16*  65:*3*, *15*, *16*, *19*, *21*,
*22*  66:*13*, *14*, *19*
68:*24*  69:*1*, *6*, *18*, *23*,
*24*  70:*4*, *10*  73:*7*, *19*,
*21*  81:*15*, *17*, *19*
83:*19*  85:*14*, *15*, *22*
86:*1*, *10*, *15*, *17*  90:*2*

corroborate  56:*9*
counsel  4:*4*
COUNTY  90:*1*, *2*
couple  71:*15*  74:*23*
88:*1*, *6*
course  5:*14*  32:*11*,
*12*  55:*14*
COURT  1:*1*
courtesy  23:*15*, *19*
cover  69:*7*  71:*15*
covered  23:*12*  40:*6*
covers  69:*8*
Craig  6:*24*
created  66:*6*
creative  16:*18*
crux  58:*8*
current  9:*23*  78:*19*
currently  5:*21*  11:*13*

< D >
daily  36:*17*  51:*8*
53:*24*  54:*12*
Danielle  24:*15*
Date  1:*7*  41:*3*
day  14:*17*  36:*15*
55:*10*  57:*17*  77:*16*
79:*8*  90:*2*
day-to-day  79:*20*, *24*
Dean  24:*6*
debate  88:*10*
decent  8:*13*
decided  71:*24*
decisions  70:*7*
deep  80:*23*
deeper  52:*2*
Defendants  1:*7*
define  28:*8*, *19*  58:*5*
86:*23*
defined  33:*13*, *20*
39:*20*  84:*24*
defining  33:*11*
definitely  46:*6*  69:*11*
degree  42:*23*
demographic  79:*11*
denied  63:*7*
Department  2:*13*
7:*16*, *24*  8:*6*, *10*  11:*8*
12:*2*  13:*23*  14:*8*, *10*,
*11*  15:*2*, *17*  17:*4*
26:*21*  29:*16*, *19*

36:*21* 41:*11* 42:*22*
43:*6* 56:22 59:*17*
64:*22* 71:*23*
**depending** 61:*8*
**depends** 50:*20*
**deposed** 5:2, *5*
**Deposition** 1:*7* 5:*1, 8*
14:*5* 89:*15*
**Deputy** 2:*12* 8:*11*,
*18* 26:7 39:*4, 10*
56:*21* 88:*16*
**derive** 55:*19*
**described** 31:*14*
81:*24* 86:*9*
**describing** 24:*3*
25:*15*
**descriptions** 36:*13*
**designated** 15:2
**designation** 87:*9*
**despite** 23:*18* 60:*5*
**detail** 14:*17* 15:*10*
36:*1*
**determine** 69:*5* 70:2
**developer** 75:*1*
**development** 10:*20*
**difference** 29:*14*
52:*19* 53:24 54:*8*
78:*3, 5, 8*
**differences** 30:*8*
**different** 14:*13* 29:*9*
36:*20* 37:*12* 41:*14*,
*19* 48:*12* 53:22 60:*1*
61:*16* 62:*14* 79:*19*,
*21* 80:2 84:*21*, *22*
**difficult** 50:*19*
**dinner** 19:*20, 22, 24*
20:*4, 5, 18, 21, 23, 24*
24:22 25:*11, 22* 27:*2,
7* 29:*4* 31:*1, 10, 12,
18* 32:*2, 23* 34:*8*
35:*16* 39:*23* 52:*11*
56:2 57:*1, 6* 63:*20*
84:*6, 8, 12, 20* 85:*2, 7,
13* 86:*9, 14* 87:*1, 8,
10, 12, 13, 14, 15* 88:*9,
12, 18*
**direct** 40:*17* 55:*6, 8*
82:*10*
**direction** 11:*2* 44:*16*
49:*11* 90:2

**directly** 50:*24* 55:*1,
12, 15* 62:*5, 9*
**Director** 7:*13* 11:*13,
14, 19* 14:*21* 15:*21*
16:*19* 27:*16* 28:*3, 4,
20* 30:*4, 9* 31:*9* 33:*8*
35:*9* 36:*10, 23* 37:*3*
38:*2, 7, 20* 40:*19*
41:*14* 44:*5* 45:*3, 16*
48:*13, 14, 16* 49:*5*
50:*3, 17, 18* 51:*17*
52:*6, 10, 13, 16, 20, 21*
53:*9, 11, 13, 15, 17*
54:*2, 3, 16, 23* 55:*4, 7,
9, 18* 58:6 59:*15, 16,
19*
**directors** 6:*10* 14:22
35:*11* 36:*23* 48:*8, 9*
**director's** 30:*19*
61:*17*
**disavowed** 51:*13*
**disburse** 71:*1*
**discipline** 16:*17*
**discretion** 70:2
**discuss** 21:*1* 25:*3, 6*
29:*5* 40:*2, 5* 41:*2*
42:*4*
**discussed** 19:*17*
25:*18* 36:*24* 40:*20*
64:*5*
**discussing** 41:*9*
58:*24* 59:*9* 64:*3*
**discussion** 40:*12*
59:*5* 71:*5*
**discussions** 62:*3*
**disparagement** 68:2
**disparities** 68:*7*
**distance** 80:*3*
**distinction** 35:*7*
41:*13*
**distribute** 69:*5*
**DISTRICT** 1:*1* 7:*10*
15:*7* 16:*15* 23:*11*
26:*7* 27:*9* 28:*15*
37:*20* 59:22 60:*2*
61:*11* 62:*19* 74:*6*
**districts** 16:*14*
**diversified** 43:*6*
**division** 53:*8*
**dog** 54:*8, 11*

**doing** 42:*6* 43:*20*
49:*24* 52:*3* 65:*9, 21*
70:*7* 83:*21*
**dominated** 42:*23*
**donated** 75:*9, 10*
**donor** 66:*11, 16*
**donors** 66:*1* 67:*10*
68:*1*
**dot** 89:*10*
**draw** 75:*20*
**due** 18:*20*
**duly** 4:*8*
**duties** 10:*16* 11:23
12:*6, 11* 14:*20* 17:*14*
22:*16, 22* 23:2 27:*15,
16* 30:*9* 46:*5*
**duty** 23:*4, 14*

**< E >**
**earlier** 4:*18* 19:*17*
22:*15* 35:6 52:*19*
63:*6* 65:*1* 70:*17*
78:*9*
**early** 57:2 79:*17*
86:*20, 23* 87:*2*
**earmarked** 68:*23*
70:*1*
**earmarking** 66:*12*
67:*9*
**EASTERN** 1:*1*
**eat** 22:*13*
**effort** 28:*7*
**efforts** 12:*12* 70:22,
*23*
**either** 31:*24*
**electronically** 89:*9*
**Elwyn** 72:*7* 74:*24*
**e-mail** 54:*23* 89:*3, 9,
12*
**emergency** 76:*11*
**employed** 5:*21*
**employee** 90:2
**employees** 14:*11, 14*
39:*15*
**Employment** 2:*13*
14:*23*
**encounter** 27:*6*
**ended** 74:*3*
**endowed** 66:*7, 9*

**endowment** 66:*24*
67:*15*
**enforcement** 7:*7*
34:*13* 42:*9*
**enjoy** 25:*11, 22*
**ensure** 10:*21* 27:*8*
37:*8* 41:*17* 52:*23*
69:*14*
**environment** 16:*20*
**equally** 77:*20*
**escaping** 48:*24*
**especially** 41:*11*
54:*4, 18* 79:*5*
**Esquire** 1:*7* 2:2, *7, 10*
**essentially** 19:*16*
67:*13*
**et** 1:*6* 69:*9, 13*
**EVELYN** 1:*4* 4:*15*
12:*17* 13:*11*
**even-handed** 71:*1*
**evening** 28:*24* 29:*5*
58:*1* 64:*6*
**event** 67:*9* 78:*5* 90:2
**events** 11:*5* 54:*6*
77:*21* 78:*13* 79:*14*
**evicted** 74:*7*
**evolved** 29:*4, 5*
**exact** 8:*14* 9:*19*
**exactly** 10:*7* 60:*1*
72:*23* 73:2
**Examination** 3:*3, 4*
4:*10* 88:*3*
**examined** 4:*9*
**example** 66:*5, 11*
68:*9* 77:*14*
**excuse** 70:*24*
**executive** 6:*5, 23*
9:*18* 10:*1, 17, 23*
11:*13, 14, 19, 23* 12:*9*
14:*21* 15:*21* 16:*19*
22:*16* 24:*3* 27:*16*
28:*3, 4, 19* 30:*4, 9, 18*
31:*9* 33:*8* 35:*9*
36:*10, 23* 37:*3, 11*
38:*1, 7, 20* 40:*19*
41:*14* 42:*16* 43:*23*
44:*1, 5, 22, 23* 45:*3,
16* 46:*6, 15, 16, 18, 22*
48:*8, 9, 13, 14, 15*
49:*5* 50:*3, 6, 17, 18*

Case 2:19-cv-04078-RBS   Document 80-18   Filed 01/24/25   Page 31 of 46

Deposition of Maureen Rush                              Evelyn Cintron v. City of Philadelphia, et al.

51:*17, 23*  52:*5, 9, 13,*
*16, 20, 21*  53:*9, 10, 13,*
*15, 17*  54:*2, 3, 16, 18,*
*23*  55:*4, 7, 9, 18*
56:*11, 14*  57:*4, 5*
58:*6*  59:*15, 16, 19*
61:*17*  62:*4, 8*  71:*19*
**EXHIBITS**  3:*10*
**exist**  68:*13*
**expect**  35:*15*
**expected**  37:*16*
**expenses**  67:*3*
**experience**  41:*9*  42:*6*
43:*8, 9, 17, 18, 20*
59:*13*
**experiences**  87:*16*
**expires**  90:*22*
**explain**  14:*7*  29:*13*
52:*12*  53:*8*  60:*7*
**explained**  15:*20*
33:*17*  52:*18*
**explaining**  33:*15*
**exposure**  82:*5*
**extend**  23:*20*
**extent**  56:*5, 6*

**< F >**
**facilities**  67:*24*  69:*12,*
*15, 17*  70:*9*  76:*9*
**fact**  22:*19*  23:*18*
39:*4*  44:*20*  81:*3*
**failure**  70:*13*
**fair**  73:*12*
**fall**  37:*14*  38:*4*
**falling**  38:*16*
**familiar**  5:*7*  24:*12*
42:*14*  49:*12*  68:*10*
72:*24*
**far**  49:*23*
**Faust**  24:*15, 16*
**F-a-u-s-t**  24:*15*
**feedback**  13:*22*  19:*17*
**feeling**  30:*8*  32:*4*
**fellow**  34:*16, 18*
55:*15*  62:*17*
**felt**  52:*11*  55:*23*
87:*2*
**female**  34:*16, 18*
35:*19*  43:*4, 5*  62:*17*

**Fifteen**  5:*6*
**fight**  61:*24*
**figure**  69:*22*
**filing**  4:*5*
**Finance**  9:*19*  10:*2*
12:*12*  17:*22*  46:*14,*
*15*  47:*1, 2*  50:*9, 21*
51:*22*
**financial**  11:*3*  18:*24*
**financially**  66:*10*
72:*2*  90:*2*
**financing**  18:*11*
**find**  72:*9*  74:*8*
**fine**  5:*19*
**first**  7:*8, 12*  8:*1*
20:*15*  21:*2*  25:*11*
27:*8*  32:*18*  41:*13*
59:*8*  63:*13*  64:*13*
72:*1, 4*  78:*14*  84:*16,*
*24*  85:*12, 13*  86:*13*
88:*14*
**Fitzpatrick**  1:*7*  2:*2,*
*3*  3:*3*  4:*11, 14*  29:*17*
40:*15*  41:*23*  42:*18*
43:*11, 21*  44:*24*
45:*10, 22*  47:*24*  48:*6,*
*17*  50:*1*  51:*11*  53:*2,*
*19*  58:*20*  60:*3, 18, 24*
63:*4, 15*  65:*24*  67:*22*
68:*6, 21*  70:*19*  71:*7,*
*12, 14*  81:*8, 22*  82:*14,*
*21*  83:*17*  84:*3, 23*
86:*5, 22*  87:*18*  88:*22*
89:*11*
**five**  57:*15*  71:*10*
84:*2*
**Floor**  2:*14*
**flow**  52:*5, 9*
**follows**  4:*9*
**foot**  8:*2*
**foregoing**  90:*2*
**forgive**  35:*12*
**form**  4:*6*
**formally**  54:*6*
**forming**  58:*18*
**forth**  64:*8*
**forthcoming**  58:*23*
62:*10*
**forward**  58:*13*

**found**  31:*1*
**four**  57:*15*  76:*16*
**four-year**  76:*11*
**friction**  38:*6, 8, 20*
40:*18*  41:*1*  55:*17*
57:*22*  62:*21*
**Friday**  1:*7*  78:*6*
**front**  40:*13*  44:*19*
57:*16*
**frustrations**  55:*22*
**Fry**  71:*20*
**fulfilling**  16:*10*
**full**  14:*18*  36:*23*
37:*11*  46:*24*  89:*8, 12*
**full-time**  78:*20*
**fully**  6:*6*  90:*2*
**fun**  77:*20*
**fund**  68:*16*  69:*23*
**funded**  64:*9*  68:*1*
**funding**  64:*18*  69:*7*
70:*8, 13*
**funds**  66:*16*  67:*10*
68:*15, 19, 22, 23*  69:*5*
71:*1*
**further**  90:*2*

**< G >**
**gala**  42:*13*
**gender**  43:*7*
**general**  12:*5*  22:*11*
34:*14*  51:*7*  60:*13*
62:*6*  68:*16, 18, 22*
69:*2, 3, 23*
**generally**  51:*4*  62:*4*
67:*11*
**getting**  30:*22*
**give**  5:*6, 12*  14:*6*
27:*5*  35:*4, 18*  37:*1*
50:*15, 19*  66:*1*
**given**  24:*12, 18*
31:*13*  60:*13*  66:*16*
**giving**  34:*19, 24*
**go**  23:*8*  29:*1*  35:*20,*
*24*  37:*2*  40:*8*  42:*12*
43:*16*  44:*17*  45:*6*
46:*20*  47:*22*  48:*4, 11*
49:*21*  51:*2*  52:*14*
57:*10*  59:*7*  60:*19*
61:*23*  62:*1, 11*  66:*16*

79:*18*  80:*12, 17*  81:*6*
82:*1, 9*  88:*9*
**goal**  67:*19*
**goes**  11:*10*
**going**  4:*24*  10:*19*
22:*13*  33:*3*  40:*21*
48:*2*  50:*20*  51:*14*
58:*15*  59:*4*  69:*20*
70:*5*  78:*4, 5*  79:*2*
**GOLDEN**  2:*7*  4:*19*
29:*1*  35:*20*  40:*8*
41:*5*  43:*2, 16*  44:*17*
45:*6, 19*  47:*22*  48:*4,*
*11*  49:*21*  51:*2*  52:*14*
53:*18*  58:*17*  59:*7*
62:*11*  65:*23*  67:*17*
68:*4, 12*  70:*16*  71:*10*
81:*6, 20*  82:*9, 18*
83:*14, 24*  84:*15*  86:*2,*
*19*  87:*21, 22*  88:*21*
89:*1*
**g-o-l-d-e-n**  89:*2*
**Good**  4:*12, 13*  10:*22*
26:*13*  58:*11*
**gotten**  35:*13*
**graduated**  38:*19*
**great**  5:*11*  16:*12*
36:*7*  57:*10*  61:*11*
62:*24*
**GREEN**  2:*2*  4:*17*
**grievances**  6:*10*
**ground**  5:*8*
**group**  69:*12*
**grouped**  72:*11*  83:*9*
**groups**  47:*8*
**grow**  17:*1*
**guess**  5:*10*  19:*16*
46:*2*  54:*14*  66:*14*
**guessing**  74:*23*
**Guidance**  34:*20, 21,*
*24*  35:*4, 18*
**guide**  46:*7*

**< H >**
**hand**  11:*10, 11*
16:*18*  90:*2*
**handle**  33:*4*
**happen**  50:*22*  88:*16*

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 32 of 46

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

**happened** 20:*2* 40:*5*
74:*12*, *16*, *19* 83:*10*
87:*16*
**happening** 21:*9*
55:*24* 82:*23*
**happens** 58:*24*
**happily** 74:*6*
**happy** 5:*15* 44:*19*
**hard** 33:*2*
**headquarters** 69:*9*
**hear** 82:*22*
**heard** 4:*17* 40:*11*
62:*8* 81:*10*, *11*, *14*
**held** 9:*3*
**help** 11:*4* 23:*6*
27:*19* 29:*13* 34:*16*,
*18* 35:*23*
**helped** 29:*8*
**helpful** 23:*15* 52:*22*
54:*14* 59:*21* 62:*22*
**helping** 16:*8* 46:*7*
**high** 84:*17*
**higher** 8:*12*
**highest** 81:*21*, *24*
**hired** 8:*14*
**hiring** 13:*10* 59:*16*
**history** 42:*8* 46:*20*
52:*24*
**hoc** 23:*3*
**hold** 6:*9*, *17*
**holes** 72:*19*
**home** 68:*14* 72:*10*
79:*10*
**homes** 75:*6* 80:*10*, *20*
**homework** 76:*1*
79:*20*
**honestly** 60:*19*
**honor** 71:*22*
**hopefully** 63:*2*
**hosted** 77:*15*
**hypothetical** 50:*15*
51:*10* 54:*14*
**Hypotheticals** 50:*19*

**< I >**
**ice** 77:*21*
**idea** 44:*2* 46:*20*
51:*19* 53:*11* 62:*12*,
*13* 81:*15* 82:*19*

**83**:*11*, *12*
**ideas** 16:*12*
**identify** 80:*6*
**impact** 38:*12*, *13*
67:*10*
**impression** 25:*2*, *4*
**improvements** 70:*10*
**include** 56:*15*, *17*, *21*
**including** 34:*13*
**INDEX** 3:*1*, *10*
**individuals** 26:*2*
42:*1* 57:*19*, *23*
**inform** 30:*18*
**informally** 54:*6*
**information** 5:*12*
24:*13*, *18* 31:*13*
35:*13*, *14* 49:*19* 50:*3*
55:*20* 56:*7* 57:*23*
82:*23*
**informing** 65:*4*
**Inn** 20:*15* 21:*14*, *24*
58:*1*
**inside** 15:*1* 29:*15*
**insinuation** 83:*23*
**Institute** 72:*7* 74:*24*
**insult** 61:*14*
**insulted** 83:*15*, *23*
**insurance** 82:*6*
**intend** 31:*22* 32:*1*
**intending** 36:*6* 42:*4*
**intention** 31:*20* 41:*2*
**interacted** 38:*1*
**interacting** 36:*22*
**interaction** 11:*15*
12:*6*
**interactions** 11:*8*
37:*2*
**interested** 34:*11* 90:*2*
**interesting** 31:*5*
**Interim** 7:*19*
**interview** 12:*17*
61:*12* 85:*22*
**interviewed** 19:*16*
**introduce** 23:*23*
84:*18*
**introduced** 84:*8*
**invitation** 23:*21*
**invited** 20:*20*, *21*, *23*
**involved** 8:*20* 10:*19*
23:*16* 40:*11* 46:*13*

**48**:*15*, *16* 51:*8* 58:*18*,
*21*
**involvement** 15:*4*
**ISAAC** 2:*2* 4:*17*
**issue** 26:*24* 50:*17*
57:*21* 59:*12*, *13*
69:*14* 76:*17*, *19*
**issues** 16:*17*, *18*
19:*12* 30:*7* 46:*7*
51:*8* 56:*7* 62:*8*, *15*,
*20* 64:*3* 79:*4*
**item** 19:*6* 29:*12*
**items** 18:*12*, *24* 19:*11*
**its** 66:*12* 69:*5* 70:*4*

**< J >**
**job** 27:*11* 34:*10*
36:*13* 86:*13*
**jobs** 36:*13*
**Joe** 88:*19*
**John** 71:*20*
**join** 35:*21* 67:*18*
**joined** 4:*19* 74:*1*
**joint** 64:*21*

**< K >**
**KEVIN** 2:*7* 66:*8*
71:*23*
**key** 51:*4*, *16*
**kgolden** 89:*2*
**kgolden@ohaganmaye
r.com** 2:*10*
**kid** 79:*16*
**kids** 16:*8* 34:*9*
72:*15* 73:*1* 75:*3*, *8*,
*11*, *15* 77:*19*, *22*
78:*16* 80:*20*
**kind** 5:*8*, *9* 7:*1*
11:*10* 19:*3*, *12* 22:*10*,
*18* 23:*2* 24:*18* 35:*14*
41:*17* 57:*21* 65:*11*
72:*11* 75:*19*
**kinds** 23:*12* 24:*8*
**knew** 23:*22* 37:*14*
58:*10* 59:*17*
**know** 5:*13* 8:*14*
10:*18*, *22*, *23* 11:*1*
14:*23* 15:*7* 16:*17*
18:*16* 19:*3* 20:*3*
21:*5* 24:*2*, *4*, *8*, *9*, *10*

**25**:*4* 26:*23* 27:*18*
29:*4* 31:*6* 32:*24*
33:*18*, *20* 34:*8*, *14*, *15*
35:*22* 36:*2*, *14*, *18*
37:*5*, *7*, *8*, *12*, *21* 40:*9*
41:*18* 42:*12* 43:*3*
44:*20* 46:*7* 49:*22*
50:*5* 51:*5* 52:*3*, *21*
53:*12*, *16* 54:*2* 55:*23*
57:*11*, *13*, *14*, *15*, *17*
60:*17* 61:*24* 63:*3*
64:*17* 65:*5* 66:*22*
67:*14* 69:*11*, *12*, *13*
71:*22* 76:*4* 79:*16*
82:*4*, *5*, *7*, *20* 83:*18*
85:*11*, *17* 86:*3*, *24*
87:*1*, *11* 89:*3*
**knowing** 53:*24*
**knowledge** 48:*5*, *7*
50:*22*, *23* 51:*9* 78:*24*
**knows** 82:*19*

**< L >**
**Labor** 2:*13*
**LANCASTER** 90:*1*, *2*
**large** 69:*10*
**Law** 2:*13* 7:*7* 34:*12*
42:*9*
**leader** 61:*11*
**leadership** 8:*8* 22:*11*
44:*15* 45:*5*, *18*, *21*
57:*20* 59:*10* 60:*14*,
*21* 61:*3*, *5*, *8*, *12*, *13*,
*14*, *18*
**leading** 30:*7*
**League** 8:*21*, *24* 9:*1*,
*13*, *21* 10:*21* 11:*11*
12:*19* 15:*18* 16:*11*
39:*15* 65:*3*
**leasing** 76:*4*
**leave** 61:*19*
**leaving** 8:*12* 75:*1*
**led** 84:*11*
**left** 8:*6* 70:*2* 71:*23*
74:*3*
**lends** 68:*2*
**level** 16:*4* 20:*15*
67:*20* 84:*17*, *22*
**liaison** 12:*2*
**lialson** 12:*1*

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 33 of 46

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

**Lieutenant** 4:*15*
7:*11* 8:*6* 14:*13* 15:*6*,
*24* 20:*20* 21:*4* 22:*6*
23:*19*, *24* 24:*22* 25:*1*,
*20* 26:*2*, *5*, *16* 27:*10*
30:*15* 31:*14*, *19* 33:*1*,
*11*, *13*, *21* 34:*17*
35:*18*, *23* 38:*7* 39:*5*,
*9*, *18*, *23* 41:*3*, *9* 42:*5*
48:*1*, *19* 49:*1*, *6*, *9*
52:*12*, *16*, *22* 53:*7*
54:*5* 55:*19* 56:*2*
57:*1*, *6*, *24* 58:*4*, *24*
59:*21* 60:*5*, *7* 62:*18*
70:*12*, *23* 76:*10*
82:*16* 84:*6*, *7* 86:*10*
**lieutenant's** 49:*8*
**life** 23:*6* 87:*17*
**limit** 11:*18*
**line** 18:*12*, *24* 19:*6*,
*11* 55:*6*, *8* 66:*22*
**Lisa** 1:*7* 60:*19* 90:*2*,
*19*
**list** 46:*20*
**listing** 44:*18*
**litigation** 18:*5*, *8*
**little** 24:*10* 41:*19*
62:*14*
**lived** 72:*15*
**LLC** 2:*3*
**located** 82:*2*
**location** 64:*12* 73:*20*,
*23* 75:*4* 78:*19*, *20*
80:*4*
**locations** 72:*18*
**logistical** 81:*16*
**Logistically** 76:*24*
77:*11*, *23* 80:*14*, *19*
81:*15* 82:*5*
**logistics** 80:*23* 82:*11*
**logo** 16:*8*
**long** 32:*23* 74:*21*
**longer** 20:*16*
**long-term** 36:*17*
**long-time** 29:*7* 59:*13*
71:*21*
**look** 75:*24* 79:*9*
**looking** 69:*12*
**looks** 72:*18*
**lost** 68:*14*

**lot** 11:*15* 17:*5* 27:*9*,
*12*, *21*, *24* 34:*8* 62:*18*,
*23* 64:*19*, *23* 75:*7*
**Ludlow** 64:*15* 72:*8*
73:*23* 74:*15* 80:*5*
**lunch** 23:*9* 24:*5*, *21*

**< M >**
**ma'am** 19:*21*
**maintenance** 18:*12*,
*15* 19:*7*, *8*, *10*
**majority** 68:*15* 71:*4*
**making** 10:*21* 11:*2*
38:*17*
**male** 42:*23*, *24* 43:*15*,
*19*
**man** 33:*9*
**manner** 71:*2*
**marked** 75:*10*
**Market** 2:*3* 75:*7*
**matter** 64:*5*
**matters** 58:*16*
**Maureen** 1:*7* 2:*10*
3:*2* 4:*8*
**MAYER** 2:*7*
**meal** 62:*17* 85:*10*, *12*
**mean** 11:*10* 38:*10*,
*16* 44:*18* 46:*14*
65:*10* 69:*10* 88:*13*
**meant** 61:*15* 78:*20*
**meet** 21:*13* 24:*9*
25:*23* 26:*3* 44:*16*
46:*22* 47:*2* 79:*15*, *17*
85:*2*, *6*
**meet-and-greet** 22:*10*,
*18*, *21*, *24* 23:*19*, *23*
24:*7*, *19* 25:*15* 28:*12*,
*24* 29:*3* 32:*3* 34:*16*
62:*7*, *13* 84:*5*, *7*, *12*,
*14*, *21* 85:*17* 86:*6*, *14*
87:*3*, *4*, *10*
**Meet-and-greets** 62:*14*
**meeting** 10:*23* 12:*17*,
*24* 13:*3*, *10*, *14*, *18*
19:*14*, *15*, *17*, *19*, *20*,
*21*, *23* 21:*6*, *9*, *17*, *22*
22:*2*, *6*, *8* 24:*1*, *5*, *22*
25:*7* 26:*9* 27:*2*
28:*11*, *12*, *13*, *23* 29:*3*

30:*24* 32:*21* 37:*11*
46:*24* 49:*10* 57:*24*
61:*21* 62:*5* 63:*22*
83:*2*, *7* 84:*5*, *12*, *16*,
*20*, *22*, *24* 85:*1*, *3*, *7*,
*14*, *16* 86:*9*, *10*, *14*
87:*6*, *13*, *15*
**meetings** 13:*13* 24:*4*
37:*9*, *11* 46:*8*, *10*, *12*
47:*13*, *15* 48:*3* 49:*18*,
*19*, *20*, *23* 54:*4*, *6*, *17*,
*18*, *22* 56:*11* 57:*5*, *12*,
*13* 82:*24* 83:*1* 85:*8*,
*24* 86:*4* 87:*6*, *7*
**member** 6:*15* 8:*24*
9:*16*, *18* 10:*24* 11:*23*
15:*8*, *9* 22:*16*, *19*
23:*4*, *9*, *17* 29:*7*
41:*11* 51:*1* 52:*11*, *19*
59:*14* 71:*22* 73:*15*
**members** 12:*4*, *24*
37:*3* 41:*10* 42:*12*
47:*9* 51:*6* 55:*15*
**Memorandum** 39:*13*,
*19*, *23* 40:*3*, *6*, *10*, *17*,
*22*, *23* 41:*2* 58:*14*
59:*2*, *4*
**men** 26:*17* 33:*4*
42:*2* 43:*10*, *12*, *13*
44:*3*
**mention** 22:*17*, *20*
**message** 50:*18*
**met** 28:*7*, *17*, *18* 47:*9*,
*19* 53:*7* 85:*13*, *18*
**midterm** 49:*7*
**Mike@barrettdeangel
o.com** 2:*5*
**Miller** 1:*7* 89:*1*, *7*
90:*2*, *19*
**MINCEY** 2:*3*
**mind** 61:*5*
**minority** 71:*2*
**mislead** 78:*3*
**misperception** 40:*24*
**misperceptions** 27:*18*
30:*14*, *20*, *23* 31:*1*, *8*,
*14*, *20*, *23* 32:*2* 38:*19*
40:*17* 55:*17* 57:*22*
63:*2* 64:*8*

**mission** 14:*22* 16:*8*,
*10*, *23*
**misunderstand** 30:*10*
78:*2*
**misunderstood** 65:*1*
**mixture** 44:*3*
**model** 41:*18* 48:*12*
64:*20*, *21*
**moment** 10:*10* 20:*8*
68:*14* 72:*11*
**Monday** 78:*6*, *7*
**money** 10:*20* 11:*4*
42:*13* 66:*1*, *2*, *12*
69:*22* 70:*3*
**month** 47:*20*
**monthly** 47:*6*, *9*, *13*
49:*17*, *18*, *20*, *22*
57:*13*, *14*
**months** 47:*16*
**morning** 4:*12*, *13*
5:*1* 79:*18*
**motion** 73:*14*
**motivations** 64:*2*
**MOU** 58:*19* 59:*9*, *11*
61:*19*, *20* 62:*9*
**mouth** 26:*21*
**move** 58:*12* 64:*16*
75:*2*
**moved** 64:*14* 72:*7*
73:*23*, *24*
**multi** 19:*3*
**multiple** 85:*24*

**< N >**
**name** 4:*14* 9:*6* 44:*2*,
*19* 48:*23*
**named** 66:*8*
**name's** 48:*24*
**nature** 12:*3* 79:*15*
**nearly** 69:*6*
**necessarily** 29:*12*
56:*23*
**necessary** 70:*14*
**necessitated** 80:*5*
**need** 5:*13*, *15* 59:*5*, *9*
61:*10* 69:*16* 76:*6*
89:*11*
**needed** 19:*10* 28:*19*
30:*8* 36:*4* 60:*7* 75:*2*

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 34 of 46

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

79:7
**needs** 36:7
**neighborhood** 76:6
**neighborhoods** 69:15
82:2
**never** 11:1 21:8, 16,
21, 23 27:13 38:23
39:1 61:19, 21 78:20
81:3 83:19
**new** 22:11 23:9, 10,
11, 12, 15 24:6 25:18
30:12, 13 32:4 36:19
41:18 60:10 61:6
86:7
**nice** 27:11 71:3
78:15 79:18 83:5
**Nisenbaum** 44:21
46:1
**Nomination** 12:14
50:11
**nominations** 10:4
22:20 23:9 46:17
51:24
**normal** 75:23
**Notarial** 90:2
**Notary** 90:2, 19
**not-for-profit** 27:14
35:10 36:22 43:9
**notified** 74:24
**November** 1:7 90:2
**number** 8:13, 14
50:16 76:15, 16 80:2
**numerous** 22:12
60:6 85:1, 6

< O >
**objected** 41:7
**Objection** 29:1
35:20, 21 40:8 41:4,
5 43:2, 16 44:17
45:6, 19 47:22 48:4,
11 49:21 51:2 52:14
53:18 58:17 59:7
62:11 65:23 67:17
68:4, 12 70:16 81:6,
20 82:9, 18 83:14, 24
84:15 86:2, 19
**objections** 4:5
**obviously** 15:9 42:11

64:17 81:18
**occasion** 85:19
**occasions** 85:2, 7
**occur** 46:9
**occurred** 47:13 49:7
88:12
**odd** 75:17
**offer** 27:21 62:23
**office** 21:13 84:8
85:18
**officer** 8:2 11:12
14:2, 12, 19 15:4, 11
16:1, 2, 13, 14, 15, 16
17:9 23:11 25:17
27:10 30:12, 15
34:17, 18, 23 35:7
36:9 37:10 38:21, 23
39:1 40:18 41:15, 20,
21 42:17 48:14
59:14 61:16 62:18
64:10 65:6, 7 67:3
72:3 81:1 82:11, 16
83:20, 22
**officers** 14:3, 11, 16,
17 29:8 36:3 37:19,
23 42:10, 15 43:4
48:9 64:18 66:24
67:8 78:24 80:5, 17
81:1 82:1, 12 84:18
**officer's** 80:8
**offices** 21:13
**officially** 7:20
**officials** 47:9 74:19
**O'HAGAN** 2:7
**ohagenmayer.com**
89:2
**Okay** 4:21, 24 5:4, 7,
18, 20, 23 6:1, 8, 17,
21 7:1, 23 8:5, 17, 23
9:6, 9, 12, 16, 20, 23
10:3, 6, 12, 16 11:18,
22 12:9, 14, 16, 21, 23
13:2, 17, 20, 24 14:4
15:3, 13 16:4, 7, 23
17:3, 9, 12 18:1, 11,
19 19:14 20:8, 10, 18
21:5, 20 22:2, 5, 15
23:18 24:14, 16, 21
25:1, 6, 10 26:1, 5, 12,
16, 23 28:4, 10 29:24

30:3, 17, 20 31:12, 17,
22 32:1, 7, 20, 23
33:8, 15, 20 34:4, 22
35:3 37:1 38:18
39:12, 18, 22 40:2, 5,
16 43:22 44:1, 4, 11
45:11, 13, 23 46:3, 8,
14, 18 47:1, 8, 15, 18
48:1, 7, 18, 22 49:1, 4,
9, 17 50:2, 6, 14, 23
51:12 52:4 55:3, 6,
11 56:12, 15, 19, 24
57:4, 12, 18 58:3
60:4, 13, 17 61:19
63:5 64:2, 24 66:4,
15, 21 67:9 69:17, 20
70:12, 20 71:7 72:22
73:3, 12, 17 74:18, 21
75:3 76:8, 21 77:17
79:12, 19 81:23
82:15 84:11 86:12
87:18 88:16, 20, 22
**old** 26:13
**onboard** 23:7, 8
**onboarding** 24:6
**once** 10:8 22:7
47:19 48:13 79:17
89:5
**one-on-one** 19:20
84:21 87:8
**ones** 46:13 70:10
**ongoing** 69:14
**open** 71:24 72:1
74:22
**operates** 29:6
**operating** 22:21
**operation** 38:17
**opportunities** 68:2
85:1
**opportunity** 14:6
22:9 27:19 38:14
62:16 85:4
**opposed** 87:6, 10
**order** 89:1
**orders** 37:22
**organization** 15:14
23:5 69:11
**organizations** 42:24
**original** 29:2 72:16
**originally** 80:13

**outline** 27:15 30:8
35:6
**outlined** 59:2, 4
**outlining** 35:17
**overbudget** 50:16
**overlap** 49:7
**overlapped** 27:24
**oversaw** 35:9
**oversee** 37:17
**overseeing** 88:17
**oversees** 14:16

< P >
**Page** 3:2
**paid** 67:1, 2
**PAL** 11:9, 16, 18
12:2, 16, 23 13:12, 21
14:1, 3, 7, 16, 18 15:5,
8, 10, 13, 22 16:2, 8, 9,
23 17:4, 19 18:6, 9,
13, 19, 23 19:1, 9, 12
21:13 22:11 26:3, 18
28:20 29:6, 18 30:16
34:23 35:8, 9 36:4
38:23 39:2 40:19
41:12, 18 42:11, 12,
17, 23 43:5, 8, 18
44:16 47:9 48:9
49:6, 11 50:15 52:20
54:7 57:2, 20 58:7
59:15 61:16 64:5, 9,
12, 22, 24 65:9, 12, 14,
15, 17, 20, 21 66:1, 6,
9, 12, 17, 18, 22, 23
67:1, 6, 10, 12 68:1, 8,
10, 11 69:6, 8 70:3,
24 71:3, 17, 18, 22
72:4, 9, 10, 12, 16, 18,
20 73:4, 6, 9, 13, 15,
17, 18, 22 74:5, 8, 11,
15, 18, 19, 21 75:9, 10,
11, 14, 15, 18, 19 76:5,
10, 21, 22 77:3, 4, 5, 8,
9, 16, 18 78:7, 10, 11,
19, 21 79:9, 14, 16, 17,
18, 20, 23 80:3, 6, 7,
19 81:2, 4, 5, 17 82:2,
3, 11, 17 83:3, 5, 16
84:19 88:17
**PAL's** 70:13

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 35 of 46

Deposition of Maureen Rush                                                    Evelyn Cintron v. City of Philadelphia, et al.

**pamphlet** 35:*14*
36:*12*
**parents** 79:*1* 80:22
**part** 10:*9, 13* 16:*23*
22:*21, 22* 46:*12*
47:*13* 48:*3* 49:*18*
56:*12* 66:24 75:*11,*
*12* 80:*7* 88:*21*
**participate** 76:22
77:*5, 10, 20* 78:10
79:*23* 80:*18*
**participated** 48:*10*
**participation** 73:6, 9,
*13*
**particular** 12:2
34:22 66:*12, 17, 18*
68:*16, 24*
**parties** 4:*4* 42:*13*
90:2
**partnership** 14:*8*
58:*11*
**passion** 83:*16*
**patrol** 7:*8* 8:2
**paying** 65:5
**pending** 5:*17* 39:22
58:*15*
**Penn** 6:*7* 7:*16* 8:24
11:*17* 20:*15* 21:*14,*
*24* 23:*12* 24:6 26:22
28:*15* 29:5 58:*1*
61:*7* 64:*11, 24* 65:6
66:*7, 9* 67:2 68:*17*
75:*10* 77:*15* 78:*4*
79:*14* 80:*15, 16*
**Penne** 20:*17*
**P-e-n-n-e** 20:*17*
**PENNSYLVANIA**
1:*1* 2:*4, 9, 15* 5:*21*
6:*11, 13, 16* 7:*5, 12*
9:*10* 65:2 67:*16*
90:2, *21*
**people** 13:*17* 16:22
17:*6, 15* 22:*11* 23:6
24:9 26:*8* 34:*3*
36:*15* 37:2, *6, 14*
42:*5, 24* 45:20 50:24
55:*10* 87:5, *6, 7*
**perfect** 77:*7*
**performance** 16:*17*

**performed** 16:*21*
60:*12*
**peripheral** 24:*13, 18*
**peripherally** 24:*4*
**permanent** 79:*10*
**permission** 80:*21*
82:*6*
**person** 32:*15* 38:*13*
48:22 51:*4, 16, 19*
63:*1* 81:*16*
**personally** 68:*18*
**personnel** 16:2
39:*16* 67:6 69:*8, 9*
**person-to-person**
87:*15*
**PHILADELPHIA**
1:*6* 2:*4, 9, 12, 15, 16*
7:*9, 17, 24* 8:2, *10*
11:*8, 16* 15:*1, 16*
29:*10, 15, 19* 30:*15*
38:*15* 41:*10* 42:9, *22*
58:*12* 65:*7, 18* 67:*21*
74:6
**Philly** 61:*7* 64:*10*
**phone** 4:*16* 55:*3*
**pick** 76:*21* 82:*3*
**picking** 80:*20, 21*
**picks** 77:*4, 9*
**place** 13:*14* 16:24
20:*11* 22:*3* 37:*14*
38:*4, 17* 47:*16* 76:*1*
80:*12*
**Plaintiff** 1:*4* 2:*6*
**planning** 13:*13* 46:*10*
**play** 17:*1*
**playing** 78:*7* 79:*21*
**please** 5:*12*
**plowed** 34:*12*
**point** 5:*15* 8:20
11:*19* 12:*16* 15:8
35:*4* 39:*8, 12* 45:*5*
55:*11* 57:*18*
**pointed** 31:*17* 53:*5*
68:*16*
**pointing** 33:*1* 69:*21*
86:*12*
**Police** 6:*3, 19, 20* 7:*5,*
*15, 16, 17, 24* 8:*1, 6,*
*10, 21, 24* 9:*1, 13, 21*
10:*21* 11:*8, 11, 12, 16*

12:*1, 6, 18, 19* 13:*23*
14:*3, 8, 10, 11, 15, 16,*
*24* 15:*1, 4, 11, 16, 17*
16:2, *9, 10, 14* 17:*3, 4*
26:*21* 27:*9, 16* 28:*15,*
*20* 29:*10, 15, 19* 30:*4,*
*10, 15* 31:*9* 35:*8*
36:*3, 9, 21* 37:*17, 19,*
*21* 38:*23* 39:*14, 15*
41:*10, 12, 21* 42:*9, 15,*
*22* 43:*6* 49:*6* 56:22
59:*17, 24* 61:*16*
64:*10, 11, 18, 22* 65:2,
*6* 66:*8, 24* 67:*1* 72:*3*
78:*24* 80:*24* 81:*1*
82:*1*
**poor** 19:2, *9* 67:*13*
71:*2*
**position** 6:*9, 18, 22*
7:*18, 22* 9:*3, 5* 23:*16*
25:*18* 29:*15* 30:*1, 13*
34:*17* 35:*19* 36:*21*
48:20 49:*5* 59:*18*
74:*3* 86:*7, 8*
**positions** 6:*17* 8:*8*
9:*24* 27:*24*
**possible** 68:*20*
**Possibly** 56:*4*
**practice** 23:*6* 24:*12*
**Prazenica** 13:*4*
44:*12, 13, 14*
**preceded** 48:*19*
**predecessor** 71:*21*
**predominantly** 42:*24*
43:*13, 15, 19*
**presence** 86:*1*
**present** 10:*10* 12:*24*
13:*2*
**presented** 39:*14*
51:*9* 86:*6*
**President** 6:*2, 6, 24*
7:*4, 19* 9:*3* 11:*1*
44:*8, 11* 45:*4, 8* 46:*1,*
*4* 71:*20* 74:*2*
**pretty** 10:*18* 47:*3*
68:*9*
**preventative** 18:*15*
19:*7, 8*
**previous** 6:*5* 9:*2, 6,*
*9* 42:*10*

**previously** 42:*9*
84:*13*
**prior** 5:*17* 13:*14*
14:*5* 21:*9, 23* 30:*24*
31:*9* 39:*23* 48:*7, 8, 9*
56:*2* 57:*6, 24* 73:*8,*
*17* 84:*7* 85:*2, 7*
**private** 46:*9*
**privy** 37:*22*
**probably** 24:*12*
33:*18* 55:*2, 5* 58:*2*
**problem** 30:*11*
**problems** 30:*3*
**procedure** 22:22
**proceed** 34:*24*
**process** 85:22
**program** 76:22 77:6,
*10* 80:*19*
**programming** 21:*1*
25:*3, 7, 8, 21* 66:*17*
67:*24* 69:*18* 78:*4*
79:20
**programs** 70:*9*
**promised** 48:2
**promoted** 61:*6, 7*
74:2
**promotion** 13:*11*
**promotions** 60:*6*
**proof** 61:*13*
**property** 76:*6*
**proponents** 39:*19*
**proud** 27:*12*
**provide** 16:24 23:24
67:20 70:*13*
**provided** 13:*23*
**providing** 17:*6* 35:*15*
**provision** 17:*5*
**proximity** 74:*8*
**Public** 6:*2, 8, 18* 7:*4,*
*20* 9:*3* 46:*8* 90:2, *19*
**Pulaski** 77:*16*
**purpose** 23:22 29:*3*
34:*15, 16* 62:*7*
**put** 26:*8* 62:24 67:*1*
72:20 74:*8*

**< Q >**
**Quali** 11:*20, 21*
15:*21* 28:*5* 33:*9*
41:*13* 44:*5* 45:2

49:*4*  55:*12, 22*  56:*1,*
*8, 9, 14*  62:*4, 9*  64:*3,*
*7*
**Quali's**  33:*21*
**quarterly**  57:*12*
**question**  4:*6*  5:*17*
*19:3*  25:*19*  26:*12*
31:*7, 17*  32:*16*  42:*3,*
*19*  45:*1, 2*  50:*14*
51:*10, 12, 18*  52:*17*
53:*5, 20, 21*  54:*11*
59:*3*  60:*21*  63:*21*
65:*13*  69:*20*  72:*23*
77:*1*  79:*13*  80:*13*
83:*15*  84:*4*
**questions**  87:*19, 21,*
*23*  88:*1, 7, 21*
**quick**  71:*9*  79:*6, 8*
**quite**  5:*7*  24:*2*  27:*3*
35:*3*  52:*18*

**< R >**
**Rabena**  13:*4*  26:*6*
*44:9, 21*  45:*3, 8*
**Rabena's**  33:*16*
**race**  43:*7*
**raise**  10:*20*  11:*4*
*42:13*
**rank**  8:*16*  60:*6*
**ranks**  7:*10*  8:*13*
**rate**  40:*2*  73:*3*
**reach**  60:*6*  89:*3*
**read**  60:*23*  63:*12*
**real**  17:*13*
**realize**  29:*14*
**really**  16:*13*  18:*10*
25:*23*  36:*18*  37:*15*
50:*19*  51:*18*  57:*9*
*59:11, 24*  65:*11*  67:*3*
87:*5*  88:*1*
**recall**  8:*17*  9:*19*
10:*7*  12:*16, 21, 23*
13:*2, 4, 17*  17:*20, 21*
18:*1, 5, 8, 11, 19, 23,*
*24*  19:*6, 11, 21*  20:*11,*
*18*  21:*2, 3, 15*  22:*1, 2,*
*5*  23:*20, 24*  24:*23*
25:*1, 6, 10, 13, 20, 24*
26:*1, 4, 5, 8, 9, 11, 12,*
*15, 16, 19*  30:*6*  32:*9,*

*18, 20*  33:*1, 5, 6, 7, 14,*
*15, 17, 21*  34:*6*  39:*11,*
*21*  40:*1, 4*  46:*23*
48:*23*  57:*7*  58:*3, 5*
61:*22, 23*  63:*13, 19,*
*22, 24*  64:*1, 12*  71:*4*
76:*9, 12, 14, 15, 17, 18,*
*19, 20*  88:*11, 16*
**receive**  49:*19*  70:*8*
**received**  56:*7*  57:*23*
60:*6*
**recollection**  27:*6*
34:*2, 4*
**recorded**  5:*14*
**referring**  26:*13*  38:*4*
61:*1*
**regarding**  12:*18*
13:*10, 20*  21:*22*
24:*18*  28:*11*  30:*4*
31:*13*  35:*19*  37:*2*
44:*16*  49:*10*  56:*7*
60:*21*  61:*2*
**Regardless**  30:*22*
**regular**  78:*6, 11*
79:*19, 23*  80:*18*  81:*5*
83:*5*
**re-invigorated**  36:*4*
**relate**  64:*6*
**related**  11:*7*  12:*6, 11*
17:*10, 14*  18:*5, 8, 23*
19:*6*  52:*13*  64:*5*
**relates**  10:*17*
**relationship**  14:*7*
17:*4*  65:*1, 4, 11*
**relative**  90:*2*
**relatively**  8:*7*  47:*19*
**Relays**  77:*15*  78:*4*
79:*14*  80:*15, 16*
**remained**  6:*4*  10:*9*
44:*21*
**remember**  5:*11*  13:*5,*
*6*  18:*18*  27:*1, 4, 5*
37:*18*  66:*7*
**remembering**  63:*10*
**rental**  79:*8*
**repair**  18:*12*  19:*1, 9*
**repaired**  19:*11*
**repairs**  18:*2*  69:*13*
70:*10, 14*  76:*11, 14*

83:*8*
**rephrase**  31:*7*
**report**  6:*21*  14:*24*
37:*11*  39:*6, 9*  50:*24*
**reported**  6:*23*  83:*6*
**Reporter**  60:*23*
**reporting**  35:*11*
**reports**  14:*21*  15:*1,*
*21*  36:*16*
**represent**  4:*15*
**representative**  11:*4*
**representatives**  12:*7*
**request**  89:*8*
**requested**  32:*20*
60:*23*
**required**  76:*11*
**reserved**  4:*6*
**respective**  4:*4*
**responsibilities**  11:*7*
12:*5*  16:*22*  17:*14*
36:*8*  37:*20*
**responsibility**  17:*10*
36:*17, 18*  69:*22*
**responsible**  14:*22*
16:*16*  27:*18*  28:*2, 3*
35:*10*  36:*11, 16*
82:*12*  83:*21*
**responsive**  79:*12*
**rest**  37:*14*  38:*3*
**restaurant**  20:*14*
21:*24*
**restroom**  71:*11*
**result**  40:*17*  67:*12*
**retire**  6:*1*
**retired**  5:*23*  6:*7*
7:*11, 21*  9:*4*
**retirement**  7:*2*
**right**  4:*21, 22, 23*
*8:3*  11:*9*  15:*18, 22*
17:*10, 13*  19:*2*  21:*10,*
*18*  29:*21*  30:*21*  34:*7*
38:*3*  39:*4*  40:*3, 7, 13*
41:*3*  42:*19*  44:*2*
45:*1*  53:*3*  55:*7*
56:*21*  57:*18*  58:*7, 14,*
*23*  60:*14*  65:*15, 18*
66:*11*  70:*7*  71:*9*
72:*12, 22*  73:*8*  74:*11,*
*18*  75:*17*  81:*18*  83:*4*

84:*9*  85:*3, 16*  86:*16*
**rink**  77:*21*
**Rob**  26:*6*  33:*16*
44:*8*  45:*3, 13*  47:*18*
49:*10, 13*
**role**  11:*16*  27:*20*
28:*19, 20*  30:*14, 19*
33:*11, 12, 16, 21*  35:*7,*
*23, 24*  36:*5, 20*  37:*10*
42:*7*  52:*2, 12*  53:*8,*
*15*  58:*10*  60:*2, 11, 12*
61:*8, 15, 16, 17*  62:*23,*
*24*
**roles**  16:*21*  27:*23, 24*
28:*1, 2, 8*  29:*14*
33:*12*  35:*17*  36:*10*
37:*6, 15*  38:*9*  39:*14,*
*20*  51:*7*  52:*18, 21, 24*
58:*6, 10*  59:*11, 22, 23*
61:*6*
**roll**  51:*10*
**Ron**  13:*4*  44:*20*
45:*8, 14, 15*  49:*13, 14*
56:*15*
**room**  4:*21*  84:*10*
**ROSS**  2:*3*
**RPR**  1:*7*  90:*2*
**rules**  5:*8*
**run**  26:*17*
**running**  35:*10*  49:*6*
67:*4, 8*  69:*8, 10*
**Rush**  1:*7*  2:*10*  3:*2*
4:*8, 12, 14, 24*  5:*20*
7:*2*  10:*6*  18:*22*
26:*24*  28:*11*  30:*23*
35:*12*  53:*4*  54:*10*
57:*18*  61:*1*  65:*8*
71:*15*  81:*3*  87:*19*
88:*5, 9*

**< S >**
**safe**  10:*8*  16:*24*
29:*24*  47:*12, 14*
68:*10*  76:*1*
**safely**  80:*10*  82:*13*
**Safety**  6:*3, 8, 18*  7:*4,*
*20*  9:*3*  17:*5, 14*
81:*19, 23*
**Samson**  20:*15*
**saw**  85:*9*

saying 30:6 31:21
34:1 35:24 38:18
41:8 42:7 52:3 53:7,
11, 12 54:2 61:22
62:16 63:8, 9, 13, 19
77:2 80:2 81:12
85:5, 12
says 16:9 82:16
83:22
scared 79:4
scenes 36:14
School 64:14, 16
72:6 74:6, 13 78:17
79:6, 20 80:9, 21
Seal 90:2
sealing 4:5
Seamon 9:8 71:21
74:3
S-e-a-m-o-n 9:8
seat 6:9
second 84:20 85:1,
16
Secondly 78:16
secretary 23:21
45:24 46:3
security 17:5 81:19,
23
see 22:13, 14 43:10
53:1 85:8
seeing 21:24 46:20
seen 81:3, 7, 9, 10
83:19 85:21
send 89:3
senior 6:4, 5, 23
separate 66:20
separation 25:14
sequence 46:23
sergeant 8:16
sergeants 43:5
serve 38:14 72:19
79:11
served 23:5 75:8
76:7
service 15:11 67:20,
23 72:20
Services 7:14
servicing 75:3
serving 43:9
set 21:3, 17 24:3

31:18 62:6
setting 64:4
shared 61:12 87:16
SHARON 2:10
87:22 89:9
s-h-a-r-o-n 89:10
sharon.ulak@phila.go
v 2:16
shift 17:13
shortly 13:24
shut 74:7, 13 76:3
shutdown 79:6
sic 26:6 33:16 44:8
45:3, 13 47:18 49:10
side 12:19 17:4 49:6
sides 62:15
signing 4:4
similar 56:11 79:11
simpler 42:20
simply 23:23 28:12
35:3 53:12 54:15
57:19 69:21 85:12
86:12
simultaneous 6:18
sit 18:22 26:17 33:3,
19 57:16 85:10
sits 28:15
sitting 32:18 43:19
size 89:12
skill 90:2
skills 59:10 61:3, 5,
8, 12, 13, 14, 18
slips 80:22 82:6
small 64:15
sold 72:8
Solicitor 2:12
solution 79:1
solvency 11:3
somebody 41:20
someplace 74:8
79:19
somewhat 23:16
sorry 6:12 19:22
29:6 41:6 42:3, 16,
19 44:14 48:8 49:14
54:10 60:18 65:8, 13
66:9 75:9 85:4 88:7
sorts 70:5
sounds 28:21 72:12
speak 25:12 63:7

speaking 8:9 61:2
63:11 76:8
Special 7:13 78:3, 13
79:14
specific 11:7 12:1, 5
28:1, 2 36:10 66:2
specifically 8:17
18:4, 16 33:17 39:11
40:13 47:11, 17 52:7,
23 55:21 58:4 83:10
86:3
specifics 18:17
spend 69:22 70:3
spoke 21:8, 16, 21
22:15 55:18
SS 90:1
staff 14:23 16:19
35:10 65:7 84:9, 17
staffed 64:11
staffing 65:6 66:18
staffing's 66:20
stance 51:7
stand 86:11
stand-alone 15:13
standard 10:18, 23
18:14 22:21
start 25:22
started 7:1, 7, 24
8:12 29:9 34:10
38:18 73:14 80:15
87:1
STATES 1:1
statistics 43:20
stay 74:21 75:1
stenographically 90:2
stepped 6:2
stipulated 4:4
STIPULATION 4:3
straighten 58:9
strategic 11:2 14:22
strategy 28:1
Street 2:3, 8, 14 7:8
20:16 64:15 76:2
strikes 75:17
structure 14:5, 7
student 81:4
students 16:24 80:6,
9, 17 81:17
stuff 25:16

style 52:15 53:4
subject 88:10
subsequently 7:10, 21
substandard 17:18
succeed 27:20, 22
34:17, 18
successful 29:13
38:17 53:1 62:22
Suite 2:4, 8
Sullivan 26:7 88:19
Support 7:13 23:24
66:10 72:15
supported 72:2
supportive 22:14
supposed 59:1
sure 5:7 10:22 11:2
15:6, 7 22:9 24:11
25:18 27:22 36:1, 19
37:19 38:17 51:3
54:24 56:10 59:20
64:19, 22 65:8 69:12
78:23 80:9 82:12
surprise 47:21, 23
48:3 82:15
switched 45:9
sworn 4:8 14:12
Sylvia 44:21 46:1

< T >
take 5:6, 15 8:5, 6
13:12 27:19 31:12
46:12 47:12 49:18
68:9 71:7, 9, 10
77:18 78:22
Taken 1:7 13:20
71:13 79:22 90:2
talk 20:1 25:21
32:13, 14 34:8, 9
61:17 62:19 87:5
talked 27:12 34:2, 5
36:7 44:4 58:8
60:15 64:19, 23
talking 11:14 19:22
20:9 23:13 26:6
28:5 34:6 42:1
49:23 60:2 61:18
80:15, 16
tandem 15:17
team 25:16 38:11
44:15 45:5, 18, 21

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 38 of 46

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

**Ted** 11:*20*, *21* 15:*20*
28:*5* 33:*8*, *20* 41:*13*
44:*5* 45:*2*, *16* 47:*19*
49:*4*, *10* 55:*12*, *22*
56:*1*, *8*, *9*, *14* 62:*4*, *9*
64:*3*, *7*
**tell** 7:*3* 14:*9* 16:*7*
20:*4*, *24* 21:*12* 22:*7*
25:*22* 27:*1*, *4* 33:*19*
53:*14* 64:*4* 78:*9*
88:*13*
**telling** 11:*6* 21:*21*,
*22* 22:*23* 23:*1*, *2*
25:*10*, *13*, *20* 26:*1*, *16*
28:*18*, *22* 29:*2* 30:*24*
31:*15*, *19* 32:*7* 33:*6*
40:*19* 41:*1* 48:*18*
49:*4* 51:*1* 53:*16*
58:*5* 61:*23* 63:*22*
73:*4* 75:*22* 78:*12*
79:*22* 82:*8* 84:*13*
**tells** 57:*10*
**temporarily** 82:*4*
**temporary** 79:*1* 80:*4*
**tenure** 49:*8*
**term** 57:*22* 83:*4*
**terms** 17:*6* 39:*20*
82:*6*
**testified** 4:*9*
**testimony** 14:*6*
60:*23* 62:*5*, *10*
**Thank** 54:*20* 87:*18*
88:*20*, *22*
**Thanksgiving** 89:*12*
**thing** 5:*9* 23:*3*
32:*17* 34:*6* 61:*20*
67:*2*, *23*
**things** 5:*11* 22:*13*
23:*13* 24:*8* 25:*18*
34:*9* 37:*15* 40:*5*, *21*
42:*14* 59:*1*, *3* 62:*1*
64:*4*, *7* 71:*16* 79:*15*
**think** 14:*4* 24:*17*
27:*17* 29:*21* 36:*6*
44:*4* 45:*8* 51:*12*
53:*21* 61:*4* 62:*12*
71:*8* 72:*5* 89:*4*, *5*
**Thomas** 1:*7* 2:*2*
4:*14*

**thought** 54:*14* 60:*4*,
*19* 62:*23*
**three** 13:*17*
**three-year** 76:*16*
**thrust** 72:*23*
**Thursday** 78:*7*
**time** 4:*6* 8:*7* 9:*17*
11:*12* 15:*4*, *11* 16:*1*,
*21* 17:*17* 20:*7* 21:*12*
23:*8* 24:*14* 25:*21*
31:*18* 36:*3* 37:*18*
45:*2*, *5* 46:*21* 67:*7*
71:*20* 76:*9*, *10* 85:*11*,
*12*, *13*, *16* 86:*16*, *20*
87:*20* 88:*18* 89:*5*
**times** 5:*4* 20:*3*, *5*
46:*23* 47:*4* 51:*5*
67:*7* 77:*13* 84:*2*
**timing** 9:*19* 40:*1*
**today** 18:*22* 32:*19*
33:*19* 57:*16* 58:*5*
79:*5* 88:*10*
**told** 21:*5*, *16* 22:*6*, *7*
24:*1* 28:*11*, *12*, *16*
34:*5* 47:*18* 48:*1*
56:*9* 58:*4*, *22* 61:*19*,
*21* 63:*6*, *10* 77:*2*
83:*2*, *6*, *11*, *18*, *21*
84:*2*
**Tom** 9:*8* 71:*21* 74:*3*
**tons** 55:*9*
**top** 54:*8*, *11*
**total** 34:*2*
**totally** 40:*10* 72:*20*
**tournament** 78:*5*
**tournaments** 79:*15*
**town** 75:*6*
**trailblazer** 35:*15*
**trailblazing** 26:*21*
**transcribed** 90:*2*
**transcript** 89:*8* 90:*2*
**transferred** 14:*18*
**transport** 75:*8*, *11*
77:*19* 82:*3*
**transportation** 80:*14*
81:*17*
**transported** 77:*14*, *22*
80:*8*, *10* 81:*4* 82:*13*
**treasurer** 45:*8*, *11*

**treat** 37:*6*
**trial** 4:*6*
**tried** 27:*15* 35:*6*
**true** 90:*2*
**truncate** 7:*6*
**Trustees** 7:*21*
**try** 7:*6* 23:*6* 29:*13*
79:*8*
**trying** 23:*15* 35:*22*
38:*15* 39:*20* 52:*22*
62:*22* 72:*9*
**Tucker** 64:*12* 65:*14*
66:*4*, *6*, *8*, *23* 67:*14*
68:*8*, *10* 71:*17*, *18*, *23*
72:*4*, *10*, *12* 73:*4*, *17*
74:*5* 75:*11* 77:*3*
78:*19*, *20* 79:*9* 80:*3*,
*5*, *7* 84:*19*
**turn** 37:*7*
**tutoring** 61:*10*
**twice** 33:*2*
**two** 13:*6* 16:*5* 20:*2*
43:*5* 47:*16* 78:*8*
87:*16*
**two-minute** 71:*8*
**type** 18:*1* 72:*13*
**typically** 75:*18*

**< U >**
**ULAK** 2:*10* 3:*4*
35:*21* 41:*4*, *6* 67:*18*
87:*24* 88:*4*, *6*, *8*, *20*
89:*7*
**ulak@phila.gov** 89:*10*
**Um-hum** 75:*5*
**unaware** 52:*8*
**understand** 12:*4*
14:*5* 25:*19* 32:*4*
35:*23* 42:*3* 53:*20*, *21*
60:*9*, *10* 65:*13* 77:*1*
79:*13* 81:*18*
**understanding** 24:*20*
38:*8*, *11* 39:*13* 40:*22*,
*24* 41:*2* 51:*15* 58:*15*
59:*2*, *4*, *10*, *21* 75:*18*
**understood** 27:*23*
78:*9*
**unique** 29:*9*, *15* 30:*1*
**Unit** 2:*13* 30:*16*

35:*8*
**UNITED** 1:*1*
**University** 5:*21* 6:*11*,
*13*, *16* 7:*5*, *12* 9:*10*
65:*2* 67:*15* 72:*13*, *16*
**unusual** 77:*23*
**use** 57:*22* 68:*8*
71:*11*
**utopia** 75:*24* 80:*11*

**< V >**
**van** 75:*10*
**vanned** 83:*4*
**vans** 77:*19* 78:*15*
79:*18*, *23* 83:*5*
**various** 11:*5* 16:*9*
39:*14* 54:*4* 76:*12*
**verbally** 5:*13*
**versus** 27:*16* 28:*20*
33:*11* 35:*8*
**Vice** 6:*2*, *5*, *23* 7:*4*,
*19* 9:*2* 44:*11* 45:*4*
71:*19* 74:*2*
**Victim** 7:*13*
**video** 4:*18*
**Videoconference** 1:*7*
**volunteer** 23:*4*
**vote** 13:20, 22
**VP** 6:*8*, *18*
**vs** 1:*5*

**< W >**
**waived** 4:*5*
**walk** 76:*1* 77:*7* 79:*5*
**walking** 21:*23* 75:*20*
79:*3*
**want** 11:*18* 19:*14*
21:*13* 25:*20* 57:*22*
75:*24* 78:*2* 88:*9*
89:*8*
**wanted** 25:*11*, *21*
26:*3* 27:*8*, *19*, *21*, *22*
32:*3* 36:*19* 41:*17*
50:*2*, *16* 52:*24* 59:*20*
62:*24* 63:*7* 71:*24*
72:*15*, *21* 80:*6*, *9*
**watching** 37:*22*
**way** 10:*19* 22:*14*
24:*2* 29:*5*, *6* 34:*12*

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 39 of 46

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

49:*13*  61:6, *7, 14*
67:*24*  68:*20*  71:*10*
**ways**  27:*24*  53:22
54:*4*
**week**  86:*13*
**welcome**  29:*12*
54:*21*  77:15
**Well**  9:*20*  10:5
11:*10, 18*  16:23
18:*14*  19:24  21:*16*
22:15  24:2  26:*19, 23*
27:*3*  28:*10*  29:18
30:7, *11*  31:5  32:*1,
11, 17*  35:*12, 22*  38:*3,
6, 18*  40:*16*  41:24
43:*12, 22*  44:*4, 23*
45:23, *24*  48:7  49:*1,
22*  50:6  53:*3, 10*
57:8  59:8  60:*17*
61:*4*  62:*1*  63:*17*
64:23  67:23  68:7, *13*
69:7  70:*20*  77:*13*
78:*1, 14*  80:23  82:22
86:*6, 16*  88:6
**well-funded**  68:*11*
**went**  7:*10, 11*  28:23
51:*19*  74:*14*
**we're**  4:24  10:*21*
11:*24*  13:9  14:*4*
25:16  28:4  71:8
76:*4*  78:*1*
**west**  72:*15*
**we've**  38:*19*
**Wilson**  64:*14*  72:5
78:*16*
**Wissinoming**  17:*19*
18:*2, 6*  70:*15, 21*
**witness**  4:8  29:2
35:22  40:9  41:8
43:*3, 17*  44:*18*  45:*7,
20*  47:23  48:5, *12*
49:22  51:*3*  52:*15*
58:18  59:8  62:12
63:*12*  67:*19*  68:5, *13*
70:*17*  81:7, *21*  82:*10,
19*  83:*15*  84:*1, 16*
86:*3, 20*  90:2
**WITNESSES**  3:*1*

**woman**  26:*3, 21*
33:2  63:*1, 5, 7, 11, 13,
19, 20, 22, 23*  87:*16*
**woman-to-woman**
63:*20*  87:*12*
**women**  7:8  8:*1, 7, 12,
13, 15*  34:*12, 13*  44:*3,
22*
**Woodland**  64:*15*
72:*5, 17*  73:*15, 20*
74:*5, 14*  75:9, *12*
80:*4*
**word**  30:*20*  87:*3*
**words**  56:8  67:*12*
70:*1*
**work**  7:8  8:*1*  10:*20*
15:*17*  16:*13*  25:*15*
33:2  37:*7, 15*  50:*4*
57:2  76:*23, 24*  77:*12*
80:*14, 19, 22*  81:2
82:*12*
**worked**  7:*17*  27:*9,
10, 13*  42:*10, 16*
59:*14*  71:20
**working**  6:*4*  14:*14*
16:*18*  27:*11*  38:*11*
41:*10, 11, 24*  42:*1, 5*
43:*1, 8*
**works**  73:5  77:*24*
81:*15*
**world**  53:*14*  59:24
77:7
**written**  36:*11*
**wrong**  76:*15*

**< Y >**
**Yeah**  54:*10*  55:8
56:*5, 20*  69:*10, 24*
72:*14*  74:*14*  75:*16*
87:*24*
**year**  43:*3*  46:2, *24*
47:*4*  57:*8, 15*  66:7
88:*12, 14*
**years**  7:*6*  11:*13, 19*
27:5  41:*18, 20*  42:*6,
22*  74:*23*
**yesterday**  63:*24*
**young**  17:6

**< Z >**
**Zoom**  1:*7*

## WORD LIST

**< 1 >**
**10:08** *(1)*
**100** *(2)*
**11:38** *(1)*
**11:49** *(1)*
**12-person** *(1)*
**1500** *(1)*
**1515** *(1)*
**16** *(1)*
**1717** *(1)*
**17th** *(2)*
**1818** *(1)*
**19** *(1)*
**19102** *(1)*
**19103** *(2)*
**19-4078** *(1)*
**1976** *(5)*
**1994** *(3)*

**< 2 >**
**20** *(1)*
**2000** *(4)*
**2001** *(1)*
**2016** *(4)*
**2017** *(1)*
**2021** *(2)*
**2022** *(2)*
**2023** *(3)*
**215.461.3300** *(1)*
**215.683.5083** *(1)*
**215.882.3443** *(1)*
**25th** *(6)*
**26** *(1)*
**27** *(2)*

**< 3 >**
**3** *(2)*
**30** *(2)*
**34** *(1)*
**3402** *(1)*
**3600** *(1)*
**3910** *(1)*

**< 4 >**
**4** *(1)*
**4040** *(5)*
**40th** *(1)*

**45** *(1)*
**46th** *(11)*

**< 5 >**
**501(c)(3** *(2)*

**< 6 >**
**6/26/2024** *(1)*

**< 8 >**
**88** *(1)*

**< 9 >**
**94** *(1)*
**96** *(2)*
**99** *(1)*

**< A >**
**a.m** *(3)*
**ability** *(2)*
**able** *(9)*
**Absolutely** *(3)*
**absorbed** *(1)*
**accomplishments** *(1)*
**Action** *(4)*
**active** *(1)*
**activities** *(4)*
**actual** *(4)*
**ad** *(1)*
**addition** *(1)*
**additional** *(1)*
**address** *(5)*
**addressed** *(2)*
**addressing** *(2)*
**administration** *(1)*
**advice** *(6)*
**advise** *(1)*
**advised** *(1)*
**advisor** *(1)*
**affiliation** *(1)*
**affirmative** *(1)*
**affirmed** *(1)*
**afraid** *(1)*
**agenda** *(5)*
**ago** *(2)*
**agree** *(5)*
**ahead** *(17)*
**al** *(1)*
**allotment** *(1)*

**allow** *(2)*
**alongside** *(5)*
**annex** *(1)*
**answer** *(10)*
**answered** *(3)*
**answering** *(1)*
**answers** *(1)*
**apologies** *(1)*
**apologize** *(1)*
**apparently** *(1)*
**APPEARANCES** *(1)*
**appeared** *(1)*
**appointed** *(2)*
**appropriate** *(1)*
**Approximately** *(3)*
**Arch** *(2)*
**area** *(2)*
**arguing** *(1)*
**aside** *(4)*
**asked** *(4)*
**asking** *(31)*
**aspects** *(1)*
**assigned** *(12)*
**assignment** *(10)*
**assignments** *(4)*
**assistant** *(7)*
**associated** *(1)*
**assume** *(3)*
**assure** *(1)*
**Athlete** *(2)*
**Athletic** *(10)*
**attached** *(1)*
**attempting** *(2)*
**Attorney** *(95)*
**attributed** *(1)*
**aware** *(27)*

**< B >**
**back** *(13)*
**backlog** *(2)*
**bad** *(1)*
**basic** *(4)*
**basically** *(3)*
**basing** *(1)*
**basis** *(5)*
**basketball** *(3)*
**becoming** *(2)*
**began** *(2)*
**believe** *(20)*

**believed** *(1)*
**Bernie** *(9)*
**best** *(7)*
**better** *(4)*
**Beyond** *(3)*
**Bill** *(1)*
**bit** *(3)*
**bite** *(1)*
**block** *(1)*
**board** *(120)*
**boards** *(3)*
**board's** *(1)*
**boss** *(4)*
**boys** *(1)*
**break** *(6)*
**briefly** *(1)*
**bring** *(3)*
**bringing** *(1)*
**brings** *(1)*
**brought** *(5)*
**budget** *(4)*
**budgeted** *(1)*
**budgeting** *(2)*
**budget's** *(1)*
**building** *(1)*
**built-in** *(1)*
**bunch** *(1)*
**bus** *(2)*
**business** *(2)*
**bussed** *(4)*
**bussing** *(1)*

**< C >**
**cadre** *(1)*
**calendar** *(2)*
**calendars** *(1)*
**call** *(4)*
**called** *(3)*
**calls** *(1)*
**capital** *(1)*
**captain** *(2)*
**care** *(3)*
**cared** *(1)*
**career** *(2)*
**Carnaroli** *(1)*
**C-a-r-n-a-r-o-l-i** *(1)*
**case** *(10)*
**cases** *(1)*
**center** *(71)*

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 41 of 46

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

centers *(37)*
certain *(3)*
certainly *(3)*
certification *(1)*
certify *(2)*
cetera *(3)*
chain *(6)*
chair *(11)*
challenging *(1)*
change *(1)*
changed *(3)*
changes *(1)*
changing *(1)*
Chief *(6)*
child *(2)*
children *(31)*
Christmas *(1)*
CINTRON *(63)*
Cintron's *(4)*
CITY *(9)*
citywide *(1)*
Civil *(1)*
civilian *(7)*
clarifications *(1)*
clarify *(1)*
clarifying *(1)*
clear *(7)*
clearly *(1)*
close *(2)*
closed *(8)*
closely *(3)*
closer *(1)*
clue *(1)*
coincidence *(1)*
collaboration *(1)*
collaborative *(1)*
come *(13)*
comes *(1)*
coming *(8)*
command *(5)*
commander *(14)*
commanders *(1)*
commanding *(40)*
Commission *(1)*
commissioner *(14)*
commissioner's *(1)*
committee *(29)*
committees *(5)*
common *(1)*

COMMONWEALTH *(3)*
communicate *(9)*
communicated *(1)*
communicates *(1)*
communicating *(4)*
communication *(10)*
communications *(3)*
communities *(2)*
community *(5)*
company *(1)*
complained *(1)*
complaints *(1)*
completed *(2)*
completely *(1)*
concept *(1)*
concern *(4)*
concerning *(2)*
concerns *(2)*
concluded *(1)*
condition *(5)*
conditions *(1)*
conference *(1)*
confirm *(1)*
confused *(1)*
confusing *(1)*
considered *(1)*
consistent *(1)*
contemporaneous *(1)*
context *(1)*
continuality *(1)*
continually *(1)*
continue *(2)*
continues *(1)*
contribute *(2)*
contributions *(1)*
control *(1)*
conversation *(13)*
conversations *(5)*
conversation's *(1)*
convoluted *(1)*
cooperatively *(2)*
copy *(2)*
corporate *(1)*
correct *(103)*
corroborate *(1)*
counsel *(1)*
COUNTY *(2)*
couple *(4)*

course *(4)*
COURT *(1)*
courtesy *(2)*
cover *(2)*
covered *(2)*
covers *(1)*
Craig *(1)*
created *(1)*
creative *(1)*
crux *(1)*
current *(2)*
currently *(2)*

< D >
daily *(4)*
Danielle *(1)*
Date *(2)*
day *(7)*
day-to-day *(2)*
Dean *(1)*
debate *(1)*
decent *(1)*
decided *(1)*
decisions *(1)*
deep *(1)*
deeper *(1)*
Defendants *(1)*
define *(4)*
defined *(4)*
defining *(1)*
definitely *(2)*
degree *(1)*
demographic *(1)*
denied *(1)*
Department *(25)*
depending *(1)*
depends *(1)*
deposed *(2)*
Deposition *(5)*
Deputy *(8)*
derive *(1)*
described *(3)*
describing *(2)*
descriptions *(1)*
designated *(1)*
designation *(1)*
despite *(2)*
detail *(3)*
determine *(2)*

developer *(1)*
development *(1)*
difference *(7)*
differences *(1)*
different *(16)*
difficult *(1)*
dinner *(48)*
direct *(4)*
direction *(2)*
directly *(6)*
Director *(58)*
directors *(6)*
director's *(2)*
disavowed *(1)*
disburse *(1)*
discipline *(1)*
discretion *(1)*
discuss *(8)*
discussed *(5)*
discussing *(4)*
discussion *(3)*
discussions *(1)*
disparagement *(1)*
disparities *(1)*
distance *(1)*
distinction *(2)*
distribute *(1)*
DISTRICT *(16)*
districts *(1)*
diversified *(1)*
division *(1)*
dog *(2)*
doing *(8)*
dominated *(1)*
donated *(2)*
donor *(2)*
donors *(3)*
dot *(1)*
draw *(1)*
due *(1)*
duly *(1)*
duties *(13)*
duty *(2)*

< E >
earlier *(9)*
early *(5)*
earmarked *(2)*
earmarking *(2)*

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 42 of 46

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

EASTERN *(1)*
eat *(1)*
effort *(1)*
efforts *(3)*
either *(1)*
electronically *(1)*
Elwyn *(2)*
e-mail *(4)*
emergency *(1)*
employed *(1)*
employee *(2)*
employees *(3)*
Employment *(2)*
encounter *(1)*
ended *(1)*
endowed *(2)*
endowment *(2)*
enforcement *(3)*
enjoy *(2)*
ensure *(6)*
environment *(1)*
equally *(1)*
escaping *(1)*
especially *(4)*
Esquire *(5)*
essentially *(2)*
et *(4)*
EVELYN *(5)*
even-handed *(1)*
evening *(4)*
event *(3)*
events *(5)*
evicted *(1)*
evolved *(2)*
exact *(2)*
exactly *(5)*
Examination *(4)*
examined *(1)*
example *(4)*
excuse *(1)*
executive *(92)*
EXHIBITS *(1)*
exist *(1)*
expect *(1)*
expected *(1)*
expenses *(1)*
experience *(9)*
experiences *(1)*
expires *(1)*

explain *(5)*
explained *(3)*
explaining *(1)*
exposure *(1)*
extend *(1)*
extent *(2)*

< F >
facilities *(6)*
fact *(5)*
failure *(1)*
fair *(1)*
fall *(2)*
falling *(1)*
familiar *(6)*
far *(1)*
Faust *(2)*
F-a-u-s-t *(1)*
feedback *(2)*
feeling *(2)*
fellow *(4)*
felt *(3)*
female *(6)*
Fifteen *(1)*
fight *(1)*
figure *(1)*
filing *(1)*
Finance *(11)*
financial *(2)*
financially *(3)*
financing *(1)*
find *(2)*
fine *(1)*
first *(22)*
Fitzpatrick *(48)*
five *(3)*
Floor *(1)*
flow *(2)*
follows *(1)*
foot *(1)*
foregoing *(1)*
forgive *(1)*
form *(1)*
formally *(1)*
forming *(1)*
forth *(1)*
forthcoming *(2)*
forward *(1)*
found *(1)*

four *(3)*
four-year *(1)*
friction *(8)*
Friday *(2)*
front *(3)*
frustrations *(1)*
Fry *(1)*
fulfilling *(1)*
full *(6)*
full-time *(1)*
fully *(2)*
fun *(1)*
fund *(2)*
funded *(2)*
funding *(4)*
funds *(10)*
further *(1)*

< G >
gala *(1)*
gender *(1)*
general *(12)*
generally *(3)*
getting *(1)*
give *(11)*
given *(5)*
giving *(2)*
go *(32)*
goal *(1)*
goes *(1)*
going *(16)*
GOLDEN *(40)*
g-o-l-d-e-n *(1)*
Good *(5)*
gotten *(1)*
graduated *(1)*
great *(6)*
GREEN *(2)*
grievances *(1)*
ground *(1)*
group *(1)*
grouped *(2)*
groups *(1)*
grow *(1)*
guess *(5)*
guessing *(1)*
Guidance *(5)*
guide *(1)*

< H >
hand *(5)*
handle *(1)*
happen *(2)*
happened *(7)*
happening *(3)*
happens *(1)*
happily *(1)*
happy *(2)*
hard *(1)*
headquarters *(1)*
hear *(1)*
heard *(7)*
held *(2)*
help *(7)*
helped *(1)*
helpful *(5)*
helping *(2)*
high *(1)*
higher *(1)*
highest *(2)*
hired *(1)*
hiring *(3)*
history *(4)*
hoc *(1)*
hold *(2)*
holes *(1)*
home *(3)*
homes *(3)*
homework *(2)*
honestly *(1)*
honor *(1)*
hopefully *(1)*
hosted *(1)*
hypothetical *(3)*
Hypotheticals *(1)*

< I >
ice *(1)*
idea *(10)*
ideas *(1)*
identify *(1)*
impact *(4)*
impression *(2)*
improvements *(1)*
include *(3)*
including *(1)*
INDEX *(2)*
individuals *(4)*

inform  *(1)*
informally  *(1)*
information  *(12)*
informing  *(1)*
Inn  *(4)*
inside  *(2)*
insinuation  *(1)*
Institute  *(2)*
insult  *(1)*
insulted  *(2)*
insurance  *(1)*
intend  *(2)*
intending  *(2)*
intention  *(2)*
interacted  *(1)*
interacting  *(1)*
interaction  *(2)*
interactions  *(2)*
interested  *(2)*
interesting  *(1)*
Interim  *(1)*
interview  *(3)*
interviewed  *(1)*
introduce  *(2)*
introduced  *(1)*
invitation  *(1)*
invited  *(3)*
involved  *(10)*
involvement  *(1)*
ISAAC  *(2)*
issue  *(8)*
issues  *(14)*
item  *(2)*
items  *(3)*
its  *(3)*

< J >
job  *(4)*
jobs  *(1)*
Joe  *(1)*
John  *(1)*
join  *(2)*
joined  *(3)*
joint  *(1)*

< K >
KEVIN  *(4)*
key  *(2)*
kgolden  *(1)*

kgolden@ohaganmaye
r.com  *(1)*
kid  *(1)*
kids  *(12)*
kind  *(16)*
kinds  *(1)*
knew  *(4)*
know  *(86)*
knowing  *(1)*
knowledge  *(6)*
knows  *(1)*

< L >
Labor  *(1)*
LANCASTER  *(2)*
large  *(1)*
Law  *(4)*
leader  *(2)*
leadership  *(17)*
leading  *(1)*
League  *(12)*
leasing  *(1)*
leave  *(1)*
leaving  *(2)*
led  *(1)*
left  *(4)*
lends  *(1)*
level  *(5)*
liaison  *(1)*
lialson  *(1)*
Lieutenant  *(64)*
lieutenant's  *(1)*
life  *(2)*
limit  *(1)*
line  *(7)*
Lisa  *(4)*
list  *(1)*
listing  *(1)*
litigation  *(2)*
little  *(3)*
lived  *(1)*
LLC  *(1)*
located  *(1)*
location  *(7)*
locations  *(1)*
logistical  *(1)*
Logistically  *(7)*
logistics  *(2)*
logo  *(1)*

long  *(2)*
longer  *(1)*
long-term  *(1)*
long-time  *(3)*
look  *(2)*
looking  *(1)*
looks  *(1)*
lost  *(1)*
lot  *(13)*
Ludlow  *(5)*
lunch  *(3)*

< M >
ma'am  *(1)*
maintenance  *(6)*
majority  *(2)*
making  *(3)*
male  *(4)*
man  *(1)*
manner  *(1)*
marked  *(1)*
Market  *(2)*
matter  *(1)*
matters  *(1)*
Maureen  *(4)*
MAYER  *(1)*
meal  *(3)*
mean  *(8)*
meant  *(2)*
meet  *(11)*
meet-and-greet  *(29)*
Meet-and-greets  *(1)*
meeting  *(63)*
meetings  *(34)*
member  *(21)*
members  *(9)*
Memorandum  *(13)*
men  *(7)*
mention  *(2)*
message  *(1)*
met  *(8)*
midterm  *(1)*
Mike@barrettdeangel
o.com  *(1)*
Miller  *(5)*
MINCEY  *(1)*
mind  *(1)*
minority  *(1)*
mislead  *(1)*

misperception  *(1)*
misperceptions  *(16)*
mission  *(4)*
misunderstand  *(2)*
misunderstood  *(1)*
mixture  *(1)*
model  *(4)*
moment  *(4)*
Monday  *(2)*
money  *(8)*
month  *(1)*
monthly  *(9)*
months  *(1)*
morning  *(4)*
motion  *(1)*
motivations  *(1)*
MOU  *(6)*
mouth  *(1)*
move  *(3)*
moved  *(4)*
multi  *(1)*
multiple  *(1)*

< N >
name  *(5)*
named  *(1)*
name's  *(1)*
nature  *(1)*
nearly  *(1)*
necessarily  *(2)*
necessary  *(1)*
necessitated  *(1)*
need  *(8)*
needed  *(7)*
needs  *(1)*
neighborhood  *(1)*
neighborhoods  *(2)*
never  *(13)*
new  *(16)*
nice  *(5)*
Nisenbaum  *(2)*
Nomination  *(2)*
nominations  *(5)*
normal  *(1)*
Notarial  *(1)*
Notary  *(3)*
not-for-profit  *(4)*
notified  *(1)*
November  *(3)*

number  (6)
numerous  (4)

< O >
objected  (1)
Objection  (35)
objections  (1)
obviously  (4)
occasion  (1)
occasions  (2)
occur  (1)
occurred  (3)
odd  (1)
offer  (2)
office  (3)
officer  (50)
officers  (22)
officer's  (1)
offices  (1)
officially  (1)
officials  (2)
O'HAGAN  (1)
ohagenmayer.com  (1)
Okay  (174)
old  (1)
onboard  (2)
onboarding  (1)
once  (6)
one-on-one  (3)
ones  (2)
ongoing  (1)
open  (3)
operates  (2)
operating  (1)
operation  (1)
opportunities  (2)
opportunity  (6)
opposed  (2)
order  (1)
orders  (1)
organization  (3)
organizations  (1)
original  (2)
originally  (1)
outline  (3)
outlined  (2)
outlining  (1)
overbudget  (1)
overlap  (1)

overlapped  (1)
oversaw  (1)
oversee  (1)
overseeing  (1)
oversees  (1)

< P >
Page  (1)
paid  (2)
PAL  (191)
PAL's  (1)
pamphlet  (2)
parents  (2)
part  (16)
participate  (7)
participated  (1)
participation  (3)
particular  (7)
parties  (3)
partnership  (2)
passion  (1)
patrol  (2)
paying  (1)
pending  (3)
Penn  (29)
Penne  (1)
P-e-n-n-e  (1)
PENNSYLVANIA
  (16)
people  (22)
perfect  (1)
performance  (1)
performed  (2)
peripheral  (2)
peripherally  (1)
permanent  (1)
permission  (2)
person  (9)
personally  (1)
personnel  (5)
person-to-person  (1)
PHILADELPHIA
  (28)
Philly  (2)
phone  (2)
pick  (2)
picking  (2)
picks  (2)
place  (10)

Plaintiff  (2)
planning  (2)
play  (1)
playing  (2)
please  (1)
plowed  (1)
point  (11)
pointed  (3)
pointing  (3)
Police  (96)
poor  (4)
position  (21)
positions  (4)
possible  (1)
Possibly  (1)
practice  (2)
Prazenica  (4)
preceded  (1)
predecessor  (1)
predominantly  (4)
presence  (1)
present  (3)
presented  (3)
President  (17)
pretty  (4)
preventative  (3)
previous  (5)
previously  (2)
prior  (19)
private  (1)
privy  (1)
probably  (5)
problem  (1)
problems  (1)
procedure  (1)
proceed  (1)
process  (1)
program  (4)
programming  (10)
programs  (1)
promised  (1)
promoted  (3)
promotion  (1)
promotions  (1)
proof  (1)
property  (1)
proponents  (1)
proud  (1)
provide  (4)

provided  (1)
providing  (2)
provision  (1)
proximity  (1)
Public  (10)
Pulaski  (1)
purpose  (5)
put  (5)

< Q >
Quali  (19)
Quali's  (1)
quarterly  (1)
question  (35)
questions  (1)
quick  (3)
quite  (5)

< R >
Rabena  (6)
Rabena's  (1)
race  (1)
raise  (2)
rank  (2)
ranks  (2)
rate  (2)
reach  (2)
read  (2)
real  (1)
realize  (1)
really  (14)
recall  (91)
receive  (2)
received  (3)
recollection  (3)
recorded  (1)
referring  (3)
regarding  (15)
Regardless  (1)
regular  (7)
re-invigorated  (1)
relate  (1)
related  (11)
relates  (1)
relationship  (5)
relative  (2)
relatively  (2)
Relays  (5)
remained  (3)

Case 2:19-cv-04078-RBS    Document 80-18    Filed 01/24/25    Page 45 of 46

Deposition of Maureen Rush                                    Evelyn Cintron v. City of Philadelphia, et al.

remember *(9)*
remembering *(1)*
rental *(1)*
repair *(3)*
repaired *(1)*
repairs *(8)*
rephrase *(1)*
report *(6)*
reported *(2)*
Reporter *(1)*
reporting *(1)*
reports *(4)*
represent *(1)*
representative *(1)*
representatives *(1)*
request *(1)*
requested *(2)*
required *(1)*
reserved *(1)*
respective *(1)*
responsibilities *(6)*
responsibility *(4)*
responsible *(10)*
responsive *(1)*
rest *(2)*
restaurant *(2)*
restroom *(1)*
result *(2)*
retire *(1)*
retired *(5)*
retirement *(1)*
right *(49)*
rink *(1)*
Rob *(8)*
role *(32)*
roles *(26)*
roll *(1)*
Ron *(8)*
room *(2)*
ROSS *(1)*
RPR *(2)*
rules *(1)*
run *(1)*
running *(6)*
Rush *(25)*

< S >
safe *(7)*
safely *(2)*

Safety *(10)*
Samson *(1)*
saw *(1)*
saying *(23)*
says *(3)*
scared *(1)*
scenes *(1)*
School *(11)*
Seal *(1)*
sealing *(1)*
Seamon *(3)*
S-e-a-m-o-n *(1)*
seat *(1)*
second *(3)*
Secondly *(1)*
secretary *(3)*
security *(3)*
see *(5)*
seeing *(2)*
seen *(7)*
send *(1)*
senior *(3)*
separate *(1)*
separation *(1)*
sequence *(1)*
sergeant *(1)*
sergeants *(1)*
serve *(3)*
served *(3)*
service *(4)*
Services *(1)*
servicing *(1)*
serving *(1)*
set *(5)*
setting *(1)*
shared *(2)*
SHARON *(3)*
s-h-a-r-o-n *(1)*
sharon.ulak@phila.go
v *(1)*
shift *(1)*
shortly *(1)*
shut *(3)*
shutdown *(1)*
sic *(7)*
side *(3)*
sides *(1)*
signing *(1)*
similar *(2)*

simpler *(1)*
simply *(9)*
simultaneous *(1)*
sit *(6)*
sits *(1)*
sitting *(2)*
size *(1)*
skill *(1)*
skills *(8)*
slips *(1)*
small *(1)*
sold *(1)*
Solicitor *(1)*
solution *(1)*
solvency *(1)*
somebody *(1)*
someplace *(2)*
somewhat *(1)*
sorry *(18)*
sorts *(1)*
sounds *(2)*
speak *(2)*
speaking *(4)*
Special *(4)*
specific *(7)*
specifically *(14)*
specifics *(1)*
spend *(2)*
spoke *(5)*
SS *(1)*
staff *(7)*
staffed *(1)*
staffing *(2)*
staffing's *(1)*
stance *(1)*
stand *(1)*
stand-alone *(1)*
standard *(4)*
start *(1)*
started *(10)*
STATES *(1)*
statistics *(1)*
stay *(2)*
stenographically *(1)*
stepped *(1)*
stipulated *(1)*
STIPULATION *(1)*
straighten *(1)*
strategic *(2)*

strategy *(1)*
Street *(7)*
strikes *(1)*
structure *(2)*
student *(1)*
students *(5)*
stuff *(1)*
style *(2)*
subject *(1)*
subsequently *(2)*
substandard *(1)*
succeed *(4)*
successful *(4)*
Suite *(2)*
Sullivan *(1)*
Support *(4)*
supported *(2)*
supportive *(1)*
supposed *(1)*
sure *(25)*
surprise *(4)*
switched *(1)*
sworn *(2)*
Sylvia *(3)*

< T >
take *(16)*
Taken *(5)*
talk *(10)*
talked *(9)*
talking *(14)*
tandem *(1)*
team *(6)*
Ted *(23)*
tell *(15)*
telling *(35)*
tells *(1)*
temporarily *(1)*
temporary *(2)*
tenure *(1)*
term *(2)*
terms *(3)*
testified *(1)*
testimony *(4)*
Thank *(5)*
Thanksgiving *(1)*
thing *(7)*
things *(17)*
think *(15)*

**Thomas** *(3)*
**thought** *(4)*
**three** *(1)*
**three-year** *(1)*
**thrust** *(1)*
**Thursday** *(1)*
**time** *(33)*
**times** *(9)*
**timing** *(2)*
**today** *(7)*
**told** *(25)*
**Tom** *(4)*
**tons** *(2)*
**top** *(2)*
**total** *(1)*
**totally** *(2)*
**tournament** *(1)*
**tournaments** *(1)*
**town** *(1)*
**trailblazer** *(1)*
**trailblazing** *(1)*
**transcribed** *(1)*
**transcript** *(3)*
**transferred** *(1)*
**transport** *(4)*
**transportation** *(2)*
**transported** *(6)*
**treasurer** *(2)*
**treat** *(1)*
**trial** *(1)*
**tried** *(2)*
**true** *(1)*
**truncate** *(1)*
**Trustees** *(1)*
**try** *(4)*
**trying** *(7)*
**Tucker** *(27)*
**turn** *(1)*
**tutoring** *(1)*
**twice** *(1)*
**two** *(7)*
**two-minute** *(1)*
**type** *(2)*
**typically** *(1)*

**< U >**
**ULAK** *(12)*
**ulak@phila.gov** *(1)*
**Um-hum** *(1)*

**unaware** *(1)*
**understand** *(14)*
**understanding** *(14)*
**understood** *(2)*
**unique** *(3)*
**Unit** *(3)*
**UNITED** *(1)*
**University** *(11)*
**unusual** *(1)*
**use** *(3)*
**utopia** *(2)*

**< V >**
**van** *(1)*
**vanned** *(1)*
**vans** *(5)*
**various** *(5)*
**verbally** *(1)*
**versus** *(4)*
**Vice** *(10)*
**Victim** *(1)*
**video** *(1)*
**Videoconference** *(1)*
**volunteer** *(1)*
**vote** *(2)*
**VP** *(2)*
**vs** *(1)*

**< W >**
**waived** *(1)*
**walk** *(3)*
**walking** *(4)*
**want** *(10)*
**wanted** *(22)*
**watching** *(1)*
**way** *(13)*
**ways** *(3)*
**week** *(1)*
**welcome** *(3)*
**Well** *(60)*
**well-funded** *(1)*
**went** *(5)*
**we're** *(10)*
**west** *(1)*
**we've** *(1)*
**Wilson** *(3)*
**Wissinoming** *(5)*
**witness** *(34)*
**WITNESSES** *(1)*

**woman** *(19)*
**woman-to-woman** *(2)*
**women** *(10)*
**Woodland** *(10)*
**word** *(2)*
**words** *(3)*
**work** *(19)*
**worked** *(8)*
**working** *(12)*
**works** *(3)*
**world** *(3)*
**written** *(1)*
**wrong** *(1)*

**< Y >**
**Yeah** *(10)*
**year** *(10)*
**years** *(9)*
**yesterday** *(1)*
**young** *(1)*

**< Z >**
**Zoom** *(1)*