IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EVELYN CINTRON                         :
                                       :
                                       :
v.                                     :   CIVIL ACTION NO. 19-4078
                                       :
CITY OF PHILADELPHIA,                  :
THE PHILADELPHIA POLICE ATHLETIC       :
LEAGUE, and JOSEPH SULLIVAN            :

**PLAINTIFF'S, EVELYN CINTRON, RESPONSE IN OPPOSITION TO DEFENDANTS',
CITY OF PHILADELPHIA and JOSEPH SULLIVAN,
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff, Evelyn Cintron (hereinafter "Citron"), by and through her undersigned counsel, file the following Response in Opposition to Defendants', City of Philadelphia (hereinafter "the City"), and Joseph Sullivan (hereinafter "Sullivan"), Motion for Summary Judgment as follows:

I. **RESPONSE TO DEFENDANTS', THE CITY OF PHILADELPHIA AND JOSEPH SULLIVAN, STATEMENT OF UNDISPUTED MATERIAL FACTS.**[1]

   A. **Cintron worked for the City for over 25 years without any disciplinary charges and/or IAD investigations until October 2017**

   1. Admitted in part. Denied as stated. Cintron admits only that she began working for the City on July 20, 1992. It is specifically denied that she voluntarily retired on January 31, 2019. In fact, the evidence presented by PAL, the City and Sullivan refute this allegation. *See Exhibit "A" at 148:8-9, 148:13-17, attached to PAL's summary judgment motion; See Exhibit "13" at 148:7-25, 149:21-25, 150:1-10, attached to the City and Sullivan's summary judgment motion.* Thus, there are disputed material facts regarding the situation surrounding Cintron's retirement that could lead a jury to conclude that she was forced to retire due to the hostile work environment and retaliatory conduct directed toward her by both Sullivan, other Police personnel and PAL employees. By way of further answer, Deputy Commissioner Wembley

---

[1] The City and Sullivan attempt to reserve their rights to dispute "…the evidence described in its Statement of Undisputed Material Facts…" if the instant case goes to trial. By this statement, the City and Sullivan concede that the evidence supports a contrary version of the "undisputed facts" that would defeat the instant summary judgment motion.

1

encouraged Citron not to retire and to remain on the police force. *A true and correct copy of excerpts from the Deposition Transcript of Robin Wimberly, dated November 16, 2023, is attached hereto as Exhibit "A" at 16:4-25, 17:1-2, 24: 12-25; 25: 1-9*

2. No response is required. Cintron's position with the City on July 20, 1992, as set forth in her employment history attached as Exhibit 1 to the City and Sullivan's summary judgment statement of undisputed material facts, speaks for itself.

3. No response is required. Cintron's position with the City on June 28, 1999, as set forth in her employment history attached as Exhibit 1 to the City and Sullivan's summary judgment statement of undisputed material facts, speaks for itself.

4. Admitted.

5. Admitted in part. Denied as stated. It is admitted only that Cintron was appointed Commanding Officer of PAL on June 20, 2016. It is denied that this information is only contained in the Internal Affairs Investigation attached to the City and Sullivan's summary judgment statement of undisputed material facts as Exhibit 2. *See Exhibit "A", excerpts from Cintron Deposition at 33:7-24; 34:14-18 attached to PAL's summary judgment motion/memorandum; See Exhibit "I", Employee History Record of Cintron – City 509-510 (unredacted), attached to PAL's summary judgment motion/memorandum*

6. Denied as stated. See response #1

7. Admitted.

   **B. The Philadelphia Police Department and Police Athletic League were a "unique organization" that "...brings together a police and civilian workforce to deliver on its mission".**

8. Admitted only that PAL is a non-profit 501(c)(3) corporation. It is denied that PAL and the PAL unit only worked "in collaboration" with the Philadelphia Police Department (hereinafter "PPD") PAL Unit. The PAL civilian employees' manual identified PAL as "a unique organization that brings together a police and civilian workforce to deliver on its mission." *A true and correct copy of the PAL Employment Policies and Procedures for Civilian Employees is attached hereto as Exhibit "B" – at pg. 2 Introduction* Moreover, the PAL Executive Director, Ted Qualli (hereinafter "Qualli"), was an employee of PAL and was authorized by the PAL Board to

2

communicate with Cintron, the PAL Commanding Officer, related to PAL business. There were no written policies and/or procedures in place that set forth what Qualli was allowed to discuss with Cintron or the manner in which Qualli was to communicate with Cintron. *A true and correct copy of the deposition of Gene Castellano, dated November 15, 2024, is attached hereto as Exhibit "C" at 14:4-22; 15:4-7* Cintron complained that Qualli created a hostile work environment through his demeaning and condescending conversations with her. *See Exhibit "2" at City 152* Cintron also complained that Qualli's behavior and attitude towards her undermined both Cintron's authority over PAL police personnel and her standing with the civilian employees at PAL. *See Exhibit "3" at City 251-252* This was demonstrated through Qualli's actions in directing the PAL civilian employees to work from home following the 10/12/17 argument between P/O Klayman (hereinafter "Klayman") and PAL supervisor Chase Trimmer (hereinafter "Trimmer") – despite the fact that most of those employees had no safety concerns related to the situation. *A true and correct copy of the 10/13/17 memo from Cintron to DC Sullivan is attached hereto as Exhibit "D"* Thus, there are material issues of fact related to Qualli's contacts with Cintron, the nature of those contacts and how the PAL personnel interacted with Cintron based upon Qualli's actions and whether Qualli's authorized "communications" with Cintron created a hostile work environment for Cintron.

9. Denied as stated. It is denied that the PAL corporation and the PPD PAL unit "are two distinct entities" as there is a factual issue as to how the PAL corporation, through its employees, communicated with the PPD PAL officers and its commanding officer, Cintron. Trimmer also stated, during his interview with IAD, that he worked "directly" with Cintron as the Director of Programs and Education and that there were a lot of communication challenges and "inconsistency of standard protocols" related to Cintron instructing Trimmer not to talk directly with certain people and then expecting Cintron to provide the protocol related to whom Trimmer can and cannot communicate with. *See Exhibit 2, attached to the City and Sullivan's summary judgment motion, at City 56-57* Trimmer's account to the IAD investigator regarding communications raises material factual issues regarding the lack of written

policies and procedures related to communications between the PPD PAL unit personnel and the PAL civilian employees that suggests that inappropriate directives and/or orders were being given by PAL civilian employees to PPD PAL police personnel in an attempt to undermine Cintron's authority as commanding officer of the PAL Unit.

10. Admitted in part. Denied in part. It is admitted only that the PPD PAL unit is a unit within the PPD. The evidence of record supports a conclusion that the PAL civilian employees were in direct communication with the PPD PAL unit's officers and were instructed by Cintron not to talk to the unit officers directly. *See Exhibit 2* There is also evidence that the PAL civilian employees disrespected Cintron, "talked behind her back" and were "passive/aggressive" towards her and had been acting in that manner for "over a year" *See Exhibit 2, attached to the City and Sullivan's summary judgment motion, at City 55-57; 132-134* These facts are material to a determination of whether the PAL organization, through its supervisors, acted deliberately to undermine Cintron's authority with the PAL officers under her command, thereby creating a hostile work environment.

11. Denied as stated. While Cintron, as PAL Commanding Officer, reported to both the supervision Deputy Commissioner and/or PPD Commissioner, Cintron was also obligated to give periodic reports concerning her administrative work to the PAL board of directors. *See Exhibit "C" at Exhibit "B" – Minutes of the PAL Board of Directors Meetings, dated 9/27/16; 2/22/17; 5/18/17; 9/27/17*

12. Denied as stated. See Responses #9 and #10

13. No response is required. The ranks and numbers of police personnel assigned to the PAL unit during Cintron's time as PAL commanding officer are facts of record.

14. Denied. It is specifically denied that the PAL civilian employees report solely to the PAL Executive Director. Moreover, the City's citation to Castellanos' deposition testimony in support of this statement is misleading. In fact, the question and resulting answer referred to by the City related to enforcement of a complaint procedure outlined in the PAL Civilian Employee policy and procedure guidelines. *See Exhibit "C" at 34:13-16*

15. Admitted.

16. No response is required.
17. Denied as stated. It is admitted only that the PAL Board handles the allocation of financial funding for PAL operations. It is denied that either the City or the PPD is not consulted on those decisions by the PAL Board as the City, in its undisputed material facts, insists that PAL and the PPD "collaborate" on operating the PAL organization. *See the City's statement of undisputed facts at paragraph 8.*
18. Denied as stated. The City provides indirect funding to the PAL/PPD "unique organization" in supplying police administrative and officer personnel to operate the 18 or more sites throughout the City, paying salaries and benefits for those PAL Unit officers and administrative staff and covering the salaries of those City and PPD administrators that attended PAL Board meetings. *See Exhibit "C" at Exhibit "B" – Minutes of the PAL Board of Directors Meetings, dated 9/27/16; 2/22/17; 5/18/17; 9/27/17; See the City's statement of undisputed facts at paragraph 20.*
19. Denied as stated. See Response 18. By way of further answer, the PAL Unit does make decisions regarding disbursement of PAL "gifts and donations" through the operation of PAL events. In fact, one of the PAL Sergeants, Sgt. Ervin, along with PAL officers made decisions regarding distribution of awards during a PAL basketball game. Those awards were purchased with PAL donations and/or gifts. *A true and correct copy of the 5/19/17 memo from Officer Hanton to Cintron at City 182-185, is attached hereto as Exhibit "E"* Furthermore, there is evidence that the PAL policy related to disbursements was a joint decision between PAL and the PAL Unit Commanding Officer. *A true and correct copy of an August 13, 2016 email from Cintron to Francis Healy is attached hereto as Exhibit "F"*
20. Admitted.
21. See Response #15
22. Admitted in part. Denied in part. It is admitted only that Bernie Prazenica (hereinafter "Prazenica"), Rob Rabena (hereinafter "Rabena" and Maureen Rush (hereinafter "Rush") were PAL Board members at all times material to the instant case. It is unknown, and therefore denied, whether Prazenica, Rabena and/or Rush were also employees of the City during that time period. Rush was an Employee of the PPD from 1976-1994, retiring with the rank of Lieutenant.

*See Exhibit "16", attached to the City and Sullivan's summary judgment motion, at 7:7-12*

23. Admitted as referred to in the PPD IAD report dated 5/29/18 – Exhibit 2 at City 2.
24. Admitted.
25. Admitted.
26. Admitted.

### C. Cintron's tenure as Commanding Officer of the PPD PAL Unit

27. Admitted in part. Denied as stated. It is admitted only that Cintron toured the Wissinoming PAL Center on her second day as Commanding Officer. It is denied that the Wissinoming PAL Center was the only center that Cintron toured during her first week on the job and ultimately complained about to her superiors. Cintron toured 15 PAL centers during her first week on the job. *See Exhibit "13", attached to the City and Sullivan's summary judgment motion, at 80:15-24*

28. Admitted in part. Denied in part. It is admitted only that Cintron discussed closing the Wissinoming PAL Center with D/C Patterson, who agreed with Cintron's decision to close the center. It was Cintron who closed the Wissinoming PAL Center over Qualli's objection, saying that she [Cintron] didn't have the authority to do so. *See Exhibit "13", attached to the City and Sullivan's summary judgment motion, at 84:20-25; 85:1-9*

29. Admitted

30. See Response #28. By way of further answer, there is no evidence that the Wissinoming PAL Center ever reopened after Cintron closed it in June/July 2016. *See Exhibit "C" at Exhibit "B" – Minutes of the PAL Board of Directors Meetings, dated 9/27/16; 2/22/17; 5/18/17; 9/27/17*

31. Admitted.
32. Admitted.
33. a. Admitted.
    b. Admitted.
34. Denied. Cintron identified her being excluded by Prazenica from decision making meetings affected her ability to do her job as Commanding Officer and was

6

directly related to Cintron's complaints about inequality. *Exhibit "13", attached to the City and Sullivan's summary judgment motion, at 113:12-23*

35. Denied as stated. It is specifically denied that no one from PAL disciplined her due to Her voicing concerns about inequality between the centers. Qualli verbally abused Cintron by coming into her office at PAL and yelling at her on several occasions after She made the complaints. *See Exhibit "13", attached to the City and Sullivan's summary judgment motion, at 77:22-24; 80:2*

36. Admitted in part. Denied as stated. It is admitted only that, per the email exhibit, Cintron's PAL vehicle received 1 EZ pass toll violation and 1 red light camera Violation (which Cintron paid once notified of same). It is denied that Cintron was responsible for a EZ pass toll violation for a PAL 15 passenger van from the Harrogate PAL center, as identified in the same email. *See Exhibit "4", attached to The City and Sullivan's summary judgment motion, at Sullivan 397-98, 411*

37. See Response #36
38. See Response #36
39. See Response #36
40. See Response #36
41. See Response #36
42. See Response #36

43. Denied as stated. It is denied that Klayman approached Trimmer as Exhibit "2" sets forth Trimmer's version of events that do not support the version provided by the City as an undisputed material fact. *See Exhibit "2", attached to The City and Sullivan's summary judgment motion, at City 58*

44. Denied as stated. It is denied that there was an "altercation". Nija Burton (hereinafter "Burton") described the incident as a "verbal altercation" with Klayman "about a foot and a half" from Trimmer. Burton did not hear Klayman "inviting Trimmer to go outside and engage in a physical fight." as she left the area. *See Exhibit "2", attached to The City and Sullivan's summary judgment motion, at City 38* Cassandra Harris (hereinafter "Harris") reported that she "heard it first then I observed it" and described The incident as a "loud conversation". *See Exhibit "2" at City 43* Taaj Andrews (hereinafter "Andrews") reported that he heard Klayman "…asking Chase if he wanted

7

to take the conversation outside insinuating a physical altercation." where there was no indications given by Andrews in his statement why he believed that Klayman's alleged statement meant he wanted to fight Trimmer. *See Exhibit "2" at City 52* Trimmer acknowledged that Klayman made the statement about going outside after Cintron and Sgt. Faust were involved in the incident and did not report the matter as an escalation by Klayman. *See Exhibit "2" at City 58, 117*

45. Admitted.
46. See Response #44
47. Admitted
48. Denied as stated. It is denied that Faust told Klayman that this was not the place for the conversation and for Klayman to calm down. Faust told Chase and Klayman that this was not the place for the conversation and "it was suggested that if they wanted to continue the conversation they needed to move it to another location." *See Exhibit "2" at City 116*
49. Admitted
50. Admitted as reported by Trimmer.
51. Denied as stated. Cintron asked Klayman and Faust to "come into my office." *See Exhibit "2" at City 139*
52. Admitted
53. Admitted
54. Denied as stated. Qualli's report at City 66 describes the demeanor of the PAL staff.
55. Denied as a mischaracterization of Cintron's statement. Cintron spoke to DC Sullivan about the Klayman incident and DC Sullivan said "he would take it from there." *See Exhibit "2" at City 142*
56. Denied as stated. There is nothing in the email, attached as Exhibit "5", wherein DC Sullivan believed that Cintron and Klayman were in a personal relationship. *See Exhibit "5" at City 167*
57. No response is required. The unsigned email, Exhibit "5", speaks for itself.
58. Admitted
59. No response is required. The email, identified as Exhibit "7", speaks for itself.
60. See Response #59

8

61. See Response #59
62. Admitted in part. Denied as stated. It is admitted only that McCauley was a PAL employee who reported to Trimmer (direct Supervisor) and Qualli (PAL Executive Director). It denied that Cintron was prohibited from communicating with McCauley regarding the rumor issues, as Qualli reported that he "let the Lt. know she [Cintron] could speak directly to Nadirah." *See Exhibit "2" at City 68*
63. Admitted as set forth by Qualli in Exhibit 2 at City 68
64. Admitted only that Cintron originally informed Faust that his tour of duty would change "to" 1pm to 9pm. *See Exhibit "2" at City 147* There is also evidence that Cintron told Faust not to change his shift to 1pm to 9pm "until further notice." *See Exhibit "9" at Sullivan 395*
65. Admitted.
66. Admitted. The evidence also establishes that Cintron counseled Faust about his poor performance on August 4, 2017 (written) and again issued a verbal warning to Faust concerning meeting deadlines in May 2017 (verbal). *A true and correct copy of the 8/4/17 written warning from Cintron to Faust – City 176 is attached hereto as Exhibit "G"; A true and correct copy of the 11/6/17 written memo from Cintron to Faust – City 180-181 is attached hereto as Exhibit "H"*
67. Denied as stated. See Exhibit "9" at Sullivan 395. Cintron told Faust not to change his Shift until further notice and that Faust changed his shift without Cintron's knowledge.
68. Admitted. See also Response #67
69. Admitted
70. No response is required. The "anonymous" letter, and the allegations contained therein, speaks for itself.
71. See Response #70
72. See Response #70
73. See Response #70
74. No response is required. Whether Cintron knew or didn't know about the author of the anonymous letter is irrelevant to the claims asserted in the instant case. By way of further answer, Trimmer knew that Officer Little was the author of the anonymous letter and reported this fact to the IAD investigator. *See Exhibit "2" at City 61* Little

stated in her interview that she did not know who wrote the anonymous letter. *See Exhibit "2" at City 75* Thus, contrary to the City's undisputed material fact, there is a an issue of material fact concerning whether Little did, in fact, write the anonymous letter as reported by Trimmer.

75. See Response #70
76. Admitted as set forth by the Commanding Officer of the IAD in the 5/29/18 memorandum, identified as Exhibit "2" at City 5
77. See Response #76
78. See Response #76
79. Admitted as set forth by Conway in Little's IAD statement dated 11/29/17, identified As Exhibit "2" at City 73-74
80. Admitted as set forth by Conway in Pascucci's IAD statements dated 11/29/17 and 1/11/18, identified as Exhibit "2" at City 105-113
81. No response is required. Pascucci's statements, as set forth in his IAD statements, speak For themselves.
82. See Response #81
83. Admitted as set forth by Conway in Qualli's IAD statement dated 2/16/18, identified as Exhibit "2" at City 63-71
84. No response is required. Qualli's statements, as set forth in his IAD statement, speak for themselves.
85. No response is required. Faust's statements, as set forth in his 12/19/17 IAD statement, speak for themselves.
86. See Response #85
87. See Response #85. By way of further answer, at the conclusion of his IAD interview on 12/19/17, Faust stated that he had nothing else to add that had not been addressed in This interview. *See Exhibit "2" at City 119* After this interview, once Faust learned that his shift was changing to 1pm to 9pm, Faust contacted Conway regarding the shift change. A second interview was conducted on 12/27/17. *See Exhibit "2" at City 121-125* During that interview, Faust revealed to Conway information about Cintron's alleged use of a PAL take home vehicle and offered evidence of gas records dated January 2017 through November 2017 – information that Faust had at the time of the 12/19/17 IAD

interview. Thus, these facts create issues of material facts whether Faust's actions were directed to undermine Cintron's command while at PAL and whether Faust was acting under the direction of a PPD superior officer.

88. Denied. It is specifically denied that Cintron gave Klayman permission to adjust his own hours. This statement is a misrepresentation of Klayman's response to Conway's question about attending school. *See Exhibit "2" at City 127*

89. Denied. There was no "arrangement" as stated in the City's recitation of facts. Furthermore, Cintron explained the DAR entries for all PAL unit officers as being Entered by Community Relations and that everyone at the PAL unit was listed as 9 to 5 because of the erratic schedules at PAL. Cintron also stated that the DAR entries Were adjusted once the PAL unit got a computer. *See Exhibit "2" at 150*

90. No response is required. The conclusions reached by Inspector Hall, as set forth in Exhibit "2" at City 35 speak for themselves.

91. Denied as stated. There is no Directive 11.1 attached to the City's summary judgment Motion as Exhibit "23". There is a Directive 32 attached as Exhibit "23", thus, there is An issue of material fact concerning Directive 11.1 and whether that directive was in force in 2017-2019 and whether the terms of that directive governed Cintron when she was Commanding Officer of PAL as related to the DARs.

92. Denied. There is no evidence in Exhibit "2" City 150 that supports the factual allegations set forth by the City in this paragraph and, thus, same are denied. Any knowledge Cintron had in 2018 concerning Directive 11.1 is a material issue of fact to be determined At trial.

93. Admitted as set forth by Conway in Cintron's IAD statement dated 1/25/18, identified as Exhibit "2" at City 137-153

94. Denied. Cintron raised concerns about DC Sullivan's approach to removing her ability To address the rumors about Cintron and Klayman, that Sullivan was transferring Klayman based upon those rumors and that Cintron was prevented from conducting an Investigation into the rumors because of Sullivan's actions. *See Exhibit "2" at City 144*

95. Admitted as set forth by Conway in Cintron's IAD statement dated 2/9/18, identified as Exhibit "2" at City 154-156

96. Admitted as set forth by Conway in Cintron's IAD statement dated 2/9/18, identified as

11

Exhibit "2" at City 154-156. Denied that Conway gave Cintron Directive 8.7 along with The EEO complaint form as there is no mention of that directive in the 2/9/18 statement. By way of further answer, the evidence establishes that Conway also violated PPD Directive 97 by failing to independently report Cintron's allegations of EEO violations as to Sullivan and Qualli, as set forth in her IAD statement of 1/25/18. *A true and correct copy Directive 97, dated 10/21/11, is attached hereto as Exhibit "I" – See Section J.*

97. See Response #94
98. Denied. The date that the IAD investigation was completed is not set forth on Exhibit "2" City 1, as there are two different dates on that document – neither date Indicates the date that the investigation was completed.
99. Denied. See Response #98
100. Admitted as set forth by Conway in the IAD report under Conclusions, identified as Exhibit "2" at City 34-35
    a. Denied. See Response #94
    b. Denied. See Response #68. It is also denied that Cintron did not Discuss her concerns about McCauley with Qualli prior to sending The email. Qualli was copied on the email and authorized Cintron To speak directly with McCauley about the rumor issue.
101. Denied. See Response #91. There is no Directive 11.1, Section K attached to the IAD Report or to the City's summary judgment motion.
102. Admitted in part. Denied in part. It is admitted only that the PBI charged Cintron with Violations of the PPD disciplinary code, as set forth in Exhibit "12". It is denied that Cintron was ever notified of these charges or given an opportunity to defend herself Against these charges as Cintron was on leave at the time the charges were issued on 9/18/18 but was still an employee of the PPD. *See Exhibit "22" at PDC 3*
103. Denied. See Responses #1 and #102
104. Admitted only that Cintron sent a memo to DC Sullivan dated 1/19/18. Denied that the Memo was deliberately sent during the pending IAD investigation by Cintron to cause Disruption of the IAD investigation.
105. No response is required. The information and facts contained in the memo speak for themselves.

106. See Response #105
107. Denied. See Response #94
108. Admitted as set forth by Conway in Cintron's IAD statement dated 1/25/18, identified as Exhibit "2" at City 152
109. No response is required. Cintron's statements, as set forth in her 1/25/18 IAD statement, speak for themselves.
110. No response is required. Cintron's statements, as set forth in her 1/25/18 IAD statement, speak for themselves.
111. Denied. See Response #94
112. No response is required. Exhibit "11" is titled as Directive 97 with issued date of 10/21/11.
113. No response is required. Exhibit "11" speaks for itself. By way of further answer, this Document purports to set forth the PPD EEO directives and has not been authenticated or certified as required by the applicable rules of evidence.
114. See Response #113
115. See Response #113. By way of further answer, there is nothing in this Directive gives Guidance on how EEO complaints should be reported when the discriminatory conduct is from a civilian employee of a "unique organization" such as PAL. See also Response #8
116. See Response #113
117. See Response #113
118. See Response #113
119. See Response #113
120. See Response #113
121. Denied as stated. Exhibit "2" at City 30 does not support this factual allegation.
122. Denied as stated. Exhibit "2" at City 30 does not support this factual allegation.
123. Denied. See Response #1
124. Denied. See Responses #1 (forced retirement) and #102 (failure to provide notice)
125. No response is required. Cintron's deposition testimony on this issue, if any, speaks for itself.
126. Denied. See Response #94
127. No response is required. Cintron's deposition testimony on this issue, if any, speaks for itself.

128. No response is required. The EEOC complaint filed by Cintron speaks for itself.
129. Admitted. *A true and correct copy of Cintron's first amended complaint is attached hereto as Exhibit "J" – See paragraph 13*
130. Admitted. *See Exhibit "J" – paragraph 14*
131. Admitted.
132. Admitted.
133. No response is required. Cintron's first amended complaint and the averments contained therein are matters of record.
134. No response is required. Cintron's first amended complaint and the averments contained therein are matters of record.

WHEREFORE, based upon the evidence of record refuting Defendants, City of Philadelphia and Joseph Sullivan, statement of undisputed facts, Plaintiff, Evelyn Cintron, respectfully requests that Defendants' Motion for Summary Judgment be denied.

Respectfully submitted:

/s/ James M. DeLeon, Esquire
James M. DeLeon, Esquire
Marilyn Rigmaiden-DeLeon, Esquire

Attorneys for Plaintiff

Date: February 24, 2025